UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2015-CV-12978

DIRK GREINEDER,
Petitioner

v.

SEAN MEDEIROS,
Superintendent of MCI-Norfolk,
Respondent

**ADDENDUM TO
PETITION FOR WRIT OF *HABEAS CORPUS*
VOLUME 1**

Commonwealth v. Greineder, 2007 WL 7008820 (Mass. Super. 2007) .  .  .  .  .  .  .  .  .  . 1-28

Respectfully submitted,
**DIRK GREINEDER,**
By his attorney,

/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
Rankin & Sultan
151 Merrimac Street
Boston, MA  02114
(617) 720-0011

2007 WL 7008820 (Mass.Super.) (Trial Order)
Superior Court of Massachusetts.
Norfolk County

COMMONWEALTH,

v.

Dirk GREINEDER.

No. 2000-08588.
October 31, 2007.

**Findings of Fact, Rulings of Law, and Order On Defendant's Amended Motion for A New Trial**

Paul A. Chernoff, Justice of the Superior Court.

NORFOLK, ss.

## INTRODUCTION

On June 29, 2001, defendant Dirk Greineder was convicted of the first degree murder of his wife Mabel Greineder ("May"). His direct appeal was stayed by the Supreme Judicial Court pending resolution of his Motion for a New Trial pursuant to Mass. R. Crim. P. 30(b). This Decision addresses the grounds of ineffective assistance of counsel, the admission of DNA evidence, and the fact that government expert testimony concerning footwear impressions recently has been proven erroneous. For the reasons discussed below, the Amended Motion for a New Trial is *DENIED*.

## THE RECORD

The Court makes its findings and rulings based on the transcripts, the evidence adduced at the post-trial hearings, the extensive affidavits submitted by both parties, the memoranda of counsel, and the video of both closing arguments. [1]

## *DISPOSITION TO DATE*

The first ground raised by the defendant's motion for a new trial was the alleged exposure of the jury to extraneous information by virtue of an incident in which a member or members of the deliberating jury used one of the trial exhibits, a dimpled brown work glove, to produce a distinctive bruise on an unpeeled banana. Counsel agreed that this Court should address the extraneous evidence issue first. Following an evidentiary hearing which lasted several days, this Court Denied the Motion for a New Trial Based on the Jury's Exposure to Extraneous Evidence in an Order dated May 8, 2006.

## *TABLE OF CONTENTS*

Findings of Fact ... 4Auto Search and the Towel ... 4The Nails Receipt ... 6Extra-Marital Sexual Activities ... 7Evidence of Defendant's Relationship with Wife ... 10DNA Evidence ... 45DNA Expert Affidavits ... 24Footprint Evidence ... 31Rulings of Law ... 33I. Ineffective Assistance of Counsel Based on Non-expert Issues ... 34A. Failure to File Motion to Suppress Nails Receipt ... 34B. Failure to File Motion to Suppress Fruits of Toyota Avalon Search ... 39C. Failure to Object to Improper Admission & Misuse of Sex Evidence ... 41D. Failure to Call Carole Ottesen ... 45I. DNA Issues ... 48A. Failure to File *Lanigan* Motion ... 491. Investigation of Motion ... 492. Likely Success *of Lanigan* Motion ... 51B. Handling of DNA Evidence at Trial ...

54III. Footprint Evidence ... 59A. Ineffective Assistance of Counsel ... 59B. Rebeiro's Changed Opinion as Newly Discovered Evidence ... 60Order ... 67

### FINDINGS OF FACT

This Court held evidentiary hearings on the defendant's motion on May 30, 2006, July 5, 2006, August 14, 2006, and September 13, 2006. After consideration of all the credible evidence, this Court makes the following findings of fact.

Attorney Martin Murphy ("Murphy"), the defendant's trial counsel, is employed by the firm Foley Hoag and has been a member of the Massachusetts Bar for 23 years. Murphy worked for the U.S. Attorney's Office from 1987 to 1991, and was the First Assistant Middlesex County District Attorney from 1992 to 1997. He was a partner at Bingham Dana when he undertook the defendant's representation and had never before tried a murder case for a defendant in the Superior Court. This judge recalls that, when Murphy was the First Assistant District Attorney in Middlesex, he tried the well-publicized murder case of *Commonwealth v. Rosenthal* in the Fall of 1996, in which the defendant was convicted of murdering his wife. Although here he was the only attorney at counsel table, Murphy had the assistance of Attorney Sabita Singh on legal issues. He also had the assistance of several law students and could have requested additional help from the firm if he deemed it necessary to do so.

### Auto Search and the Towel

On November 1, 1999, police obtained a search warrant for the Greineder home at 56 Cleveland Road in Wellesley and a 1997 Chrysler Town and Country van owned by the defendant in police custody. When police arrived at the Greineder home to execute the warrant, a Toyota Avalon owned by the defendant was parked in the driveway. The driveway, which leads to the garage of the home, ends at Cleveland Road and is readily visible from that road. There were no trees, fences, or gates separating the driveway from the street, nor were there any "No Trespassing" signs posted at the entrance to the driveway. During the search of the Greineder home, the police seized the keys to the Toyota Avalon. The defendant informed Murphy that he believed the police had gone through the Avalon when they executed the search warrant.

On November 5,1999, the defendant turned over to Murphy a bloodstained hand towel from the Avalon with a Ritz-Carlton logo, stating that he and May had both wiped their bloody noses on it. This towel corroborated statements the defendant had made to various family members about simultaneous nosebleeds and supported the defense's DNA transfer theory. On April 10, 2000, in accordance with a court order, Murphy turned this towel over to the Commonwealth.

Murphy did not move prior to trial to suppress any evidence discovered in the Toyota Avalon, although he acknowledges that because the vehicle was not within the curtilage of the home, police would need a separate warrant to search it. Neither the returns from the warrant nor any police report indicated that anything had been seized from the Avalon. Murphy had no corroboration, other than the towel itself, of the defendant's assertion that police had actually entered the vehicle until State Police Trooper Foley ("Foley") testified at a pre-trial suppression hearing that police had observed a bloodstained towel in the Avalon but did not seize it. Murphy felt that this testimony was helpful to the defense because it corroborated the defendant's statement about the bloody towel. The failure of the police to seize the towel also supported the defense argument that police had conducted a sloppy investigation. Murphy did not ask Detective McDermott about the towel during the suppression hearing because he was not aware at that time that McDermott was one of the officers involved in the search of the Avalon. Murphy never asked Foley to identify the officers involved because he liked the state of the record at that time.

McDermott testified at trial that she searched the defendant's Toyota Avalon on November 1, 1999 and observed a white towel inside the vehicle. However, McDermott testified that the towel appeared brown and dirty, not bloodstained, and did not have a Ritz-Carlton logo. Although Murphy was surprised by McDermott's testimony, he did not move to strike it as the fruit of an unlawful search of the Toyota Avalon. Murphy believed that the testimony could be exploited by the defense by emphasizing the failure to seize or photograph the towel, and the inconsistencies in the account of the search given by the Wellesley and State Police officers.

### The Nails Receipt

Prior to trial, Murphy filed a motion to suppress certain evidence seized in a November 12, 1999, search of the Greineder home on grounds that the warrant was an unconstitutional general warrant that failed to describe the items to be seized with sufficient particularity. Murphy believed that items not listed in the warrant should be suppressed unless seized pursuant to the plain view doctrine. In a Memorandum on the Defendant's Motion to Suppress Physical Evidence and Statements dated October 18, 2000, this Court concluded that with respect to computer files, receipts, and evidence of financial transactions, the warrant was indeed a general warrant, but the particularity with which items were described in the accompanying affidavit cured any constitutional defect in the warrant itself. Footnote 24 of the decision stated:

> Although not specifically argued by the defendant, this Court would also conclude that the other items seized, including the loaf pans, the tin foil containers, *the Diehl Hardware and Home Depot receipts,* the Roche Brothers grocery bags, the plastic bag containing latex gloves, the box containing latex gloves, the boxes of Zip-Lock bags, the packaging for the EZ-Foil loaf pan, and the Roche Brothers receipt would fall under the scope of the warrant, (emphasis added).

These items were mentioned in the affidavit accompanying the warrant.

One of the items seized on November 12, 1999, was a receipt from F. Diehl & Son, Inc. ("Diehl's"), a hardware store located in Wellesley, for nails purchased on September 3, 1999 at 8:55 a.m. (the nails receipt"). Murphy believed that under the court's reasoning, the nails receipt should have been suppressed but was not. However, Murphy did not specifically argue for suppression of the nails receipt because it did not seem to be probative to him or the Commonwealth at the time of any issue in the case, except that it showed generally that the defendant shopped at Diehl's. During the trial, the significance of the nails receipt changed dramatically when the Commonwealth notified Murphy that it intended to examine all the cash register tapes at Diehl's for September 3, 1999. The Commonwealth discovered that an Estwing hammer, the same model as the alleged murder weapon, had been purchased at Diehl's on September 3, within minutes of the nails purchase and at the same cash register. On June 5, 2001, Murphy objected to this late-disclosed evidence but did not seek to suppress it specifically as the product of a general warrant under the Court's October 18, 2000 decision. Murphy probably thought that the constitutional issue of the general warrant had already been ruled upon and did not specifically think about the nails receipt in Fourth Amendment terms at that moment and he may have made no conscious evaluation of whether to ask the court to reconsider the motion to suppress. This Court denied Murphy's motion to exclude the nails receipt based on its late production. The Commonwealth introduced the nails receipt along with the testimony of the keeper of records for Diehl's that the store sold only one Estwing hammer in September of 1999, as the next transaction at the same register as the purchase of nails reflected in the receipt seized from the defendant's home.

### Extra-Marital Sexual Activities

Prior to trial, the Commonwealth gave notice of its intent to offer evidence pertaining to the defendant's extramarital sexual activities, including his use of telephone sex lines, an alias, dating and pornographic websites, prostitutes, and sexual paraphernalia found in his garage. Murphy moved to exclude such evidence as prior or subsequent bad acts and filed a 20-page brief opposing its admission. Murphy believed that the sex evidence erased the advantage the defendant had by virtue of being a respected doctor with a supportive family. Following oral argument, this Court Allowed the motion in part and Denied it in part in a Memorandum of Decision and Order dated February 5, 2001. This Court ruled that evidence of the defendant's use of telephone sex lines and Internet pornography was inadmissible as too remote in time and not probative of the defendant's hostility toward his wife. However, this Court deemed admissible "the 'flurry' of sexual behavioral activity within the week of the murder including the tryst with an out-of-state prostitute, Internet and/or e-mail solicitation for a sexual relationship with

another or others, and phone communications with an in-state prostitute." This Court stated that "[t]he above-described rulings may be subject to reconsideration at trial in the face of newly discovered evidence."

At trial, several witnesses testified as to the defendant's encounter with a prostitute in New Jersey, his contacts with several Boston prostitutes, and his use of online dating and pornography sites. Several witnesses read to the jury explicit e-mails they received from the defendant, and the e-mails were introduced as exhibits. Witnesses testified as to the defendant's use of a pseudonym during these activities. The Commonwealth also introduced evidence of a box found in the Greineder garage which contained a bottle of Viagra and a dozen condoms. The Court excluded the remaining items in the box, which included a nylon rope with several knots in it, a toothbrush and toothpaste, a thin wire brush, and a marble. However, during cross-examination of the defendant, the prosecutor showed the other items in the box to the defendant and questioned him about them, and the box was marked as an exhibit. The defendant offered an innocent explanation for each of these other items.

During the trial, Murphy did not ask the Court to reconsider its ruling with respect to the sex evidence. Murphy viewed the Court's February 5, 2001 decision as a firm ruling with respect to such evidence falling within a week of the murder, and the Commonwealth did not seek to introduce any sex evidence at trial which fell outside of that time period. Although Murphy believed that the Commonwealth had failed to establish a connection between the sex evidence and a motive for the murder, this had been his view all along, so there was no change in circumstances which he felt would warrant a motion for reconsideration. Murphy did not believe he would have a reasonable chance of success in asking the court to reconsider.

Murphy did not object to the repetitive reading of the explicit e-mails and other sex evidence because he did not want to convey to the jury the impression that the evidence was upsetting to the defense, and he believed his objections were preserved for appellate purposes. Murphy wanted to downplay the sex evidence and suggest to the jury that the Commonwealth's emphasis on such evidence was a desperate attempt to create a motive where none existed. Murphy introduced additional sex evidence because he wanted to show the jury that the extramarital sex activity had been going on for a while and therefore bore no connection to the murder. Murphy did not want the jury to think that there was an explosion of unprecedented activity in the week leading up to the. murder. Murphy discussed his general approach to the sex evidence with the defendant, who was in agreement with Murphy's strategy. Murphy did not, however, consult the defendant about specifics such as objections or sidebars.

With respect to the contents of the box found in the garage, Murphy did not view the prosecutor's questioning of the defendant on cross-examination as inconsistent with the Court's February 5, 2001 ruling. Moreover, Murphy felt that the defendant had a credible, non-inculpatory explanation for the items in the box. Murphy does not recall why he failed to object to the prosecutor's statement in closing that the defendant had characterized his wife as "old and soft." There was no testimony at the trial about such a statement, although a witness had testified to that effect before the Grand Jury. When queried about this characterization during his trial testimony, the defendant stated, "I did not say that exactly." The defendant testified, "I did not say old. I do not recall saying soft" and stated that he told the prostitute that he and his wife no longer had sex. Murphy's usual practice is to object to statements in closing argument only if there is a reasonable chance that the objection will be sustained. However, in his experience, objections to factual misstatements usually are not sustained, as the judge usually rules that the jury's memory of the facts controls.

### *Evidence of Defendant's Relationship with Wife*

The relationship between the defendant and his wife was important to the defense. Within a week of the killing, Murphy began discussing with the defendant potential witnesses concerning the Greineder marriage. The defendant told Murphy about Carole Ottesen ("Ottesen"), one of May's closest friends. Ottesen gave the eulogy at May's funeral. Foley interviewed Ottesen and learned that she had dinner with May a few weeks before the murder and May at that time described her marriage in positive terms. Murphy received a copy of Foley's report in discovery, but never interviewed Ottesen. He believed that reading the report was sufficient to make a decision about whether to call Ottesen as a defense witness. Ottesen has filed an affidavit in support of the defendant's motion for anew trial stating that if called as a witness, she would have testified that she had known May for 25 years, they shared intimate details of their lives, May never expressed dissatisfaction with her marriage and described it as

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

successful, May described her husband as a supportive, caring, long-term partner, and May never complained about her sex life or about anything her husband was doing in that realm outside of their marriage.

Murphy did not specifically discuss with the defendant whether or not to call Ottesen. When compiling his witness list prior to trial, Murphy did not include Ottesen because he believed her testimony would open the door to damaging hearsay statements made by May to her sister Ilse and niece Belinda. For example, one of them had testified at the Grand Jury that May was aware of the defendant's extramarital sex activities. The calculus changed somewhat during the trial after Luis Versado testified differently than suggested by his police report. Versado testified about an angry exchange between the defendant and May concerning her use of his computer. Murphy believed that the judge most likely would have allowed him to call Ottesen as a witness at that point even though she was not on the witness list. However, he decided that the Greineder children would be stronger witnesses concerning the marriage because they would appear to be unbiased, given that their mother was the victim. Murphy also was concerned that if he called Ottesen to testify, she might be cross-examined about negative aspects of the marriage of which she was unaware.

### DNA Evidence

The DNA evidence in the case was analyzed by Cellmark Diagnostics ("Cellmark"), a private forensic testing laboratory located in Maryland. Beginning in January of 2000, Cellmark conducted PCR-based[2] short tandem repeat ("STR") testing using Profiler Plus and Cofiler test kits designed to identify specific DNA alleles present at a total of 13 designated loci within the DNA molecule. Cellmark utilized the ABIPrism 310 Genetic Autoanalyzer to conduct the testing, and ran the data through Genescan and Genotyper software before it was interpreted by an analyst. Murphy received in discovery from the Commonwealth Cellmark's written reports, validation studies, standard operating procedures, interpretation guidelines, and the electropherograms or DNA profile graphs produced by the testing.

Cellmark's initial report in January of 2000 concluded that the defendant could not be excluded as a DNA contributor on the tested items but reached no further conclusion. Cellmark's amended report in February of 2000 provided an alternative statistical analysis identifying the defendant as a contributor to the DNA on several items. Cellmark attributed 7 alleles on the left-hand brown work glove, 8 alleles on the right-hand brown work glove, and 4 alleles on the knife to the defendant's DNA.

Murphy learned of Cellmark's DNA testing some time in the Spring of 2000. He viewed the DNA evidence as an important part of the Commonwealth's circumstantial case against the defendant. However, Murphy was aware that the Commonwealth had additional physical evidence, including blood spatter and footprint evidence, which it intended to use to prove the defendant's presence at the moment of his wife's death.

The DNA testing performed by Cellmark produced a series of visible peaks on a DNA profile graph called an electropherogram, with the vertical height of the peak indicating the relative amount of DNA at each location, expressed in Relative Fluorescent Units ("RFUs"). Murphy reviewed Cellmark's testing protocol and interpretation guidelines and understood that Cellmark gave the analyst discretion to report peaks below 60 or 100 RFUs, subject to technical review by a supervisor. During the first two rounds of Cellmark testing in 1999 and 2000, the protocol allowed the analyst to consider peaks as low as 40 RFUs, but did not contain criteria for dropping the threshold that low.

Murphy reviewed the Grand Jury testimony with an eye toward filing a motion to dismiss the indictment. He was aware that State Police Crime Lab chemist Gwen Pino ("Pino") testified about Cellmark's amended report, which found a match with the defendant's DNA, without disclosing to the Grand Jury that Cellmark's initial report failed to reach such a conclusion. However, Murphy believed that even if the Court disregarded Pino's testimony, the evidence still would have been sufficient to indict the defendant. Accordingly, he did not file a motion to dismiss the indictment.

Murphy discussed with the defendant the need to retain expert witnesses to counter the Commonwealth's DNA evidence. There were no specific financial constraints on Murphy in hiring experts, although he knew that the defendant did not have unlimited

funds. Murphy identified several candidates, printed their resumes, and discussed them with the defendant. The defendant suggested that Murphy call Barry Scheck, a legal expert in the area of DNA. Murphy was unable to reach Scheck, but spoke to Peter Neufield of the Innocence Project, who recommended William Thompson ("Thompson") as the most knowledgeable attorney in the country on cutting edge DNA issues. Around May 8, 2000, Murphy retained Thompson to assist him with analyzing the DNA evidence. Thompson is not a forensic scientist; rather, he is an attorney with a Ph.D. who serves as the moderator of an e-mail list service concerning DNA issues. Murphy sent Thompson the transcript of the defendant's bail hearing, the Cellmark reports, and Pino's Grand Jury testimony. Thompson referred Murphy to several other individuals for assistance with the DNA evidence, including Dr. Christie Davis.

Dr. Davis is a molecular biologist who at that time was employed as a forensic consultant by Lexigen Science and Law Consultants, Inc. in California. By May 23,2000, Murphy had retained Dr. Davis as a defense expert concerning DNA. Murphy sent Dr. Davis all the DNA discovery he had obtained up to that point, including Cellmark's electronic data, validation studies, standard operating procedures, interpretation guidelines, and reported test results. Murphy sent additional materials to Dr. Davis as he received them. Dr. Davis reviewed and analyzed these materials and concluded that Cellmark's results were unreliable because Cellmark had not validated its system with respect to calls made under 100 RFUs, Cellmark's interpretation guidelines failed to provide meaningful standards for labeling peaks as true alleles or artifacts, and Cellmark's results showed inconsistency and bias in interpreting the raw data. Dr. Davis believed that the low RFU peaks called by Cellmark should have been reported as inconclusive. Murphy was in frequent contact with Dr. Davis throughout the fall and winter of 2000. Murphy intended to have Dr. Davis testify as the defense's lead DNA expert at trial, which was scheduled to begin on May 21, 2001.

Part of Murphy's strategy with respect to the DNA evidence was to provide an innocuous explanation for the presence of the defendant's DNA on key pieces of evidence by explaining to the jury the phenomenon of DNA transfer. The defendant himself raised this issue shortly after learning from Sergeant Foley during execution of the search warrant that police "had his DNA." Several of the defendant's family members with backgrounds in science were prepared to testify about their concern that the defendant's DNA had been transferred to the victim innocently. Murphy discussed this issue with Thompson, who mentioned several articles to him, and Murphy also did his own research in scientific journals. Thompson brought to Murphy's attention a paper about DNA transfer in the journal *Nature* which had created a great deal of controversy.

Murphy also believed that the third party DNA in Cellmark's raw data created a powerful argument for reasonable doubt, although he recognized that there were fewer "stranger" alleles than there were alleles that Cellmark had matched to the defendant. Nonetheless, Murphy's strategy was to use the "stranger" alleles in the raw data to create a reasonable doubt as to whether the defendant was the assailant. Murphy intended to emphasize to the jury that the presence on several key pieces of evidence of a DNA profile not belonging to either the defendant or the victim demonstrated that the real killer remained at large. A number of the "stranger" alleles had been called at lower than 100 RFUs.

Murphy educated himself generally about DNA by reviewing FBI materials, scientific working group materials, and other forensic materials. He had numerous conversations with Dr. Davis and Thompson in 2001 about the Commonwealth's DNA evidence. Following one such conversation on January 4, 2001, Murphy wrote in a file memo that according to Davis, Cellmark had not validated any threshold lower than 100 RFUs. Murphy did not have any evidence to the contrary on this point. By January 8, 2001, Murphy was aware that Cellmark had combined two separate testing runs into a single result and that in Dr. Davis's opinion, this was not good science. Murphy also knew that the technical reviewer had not re-run the data, and that this was a subject of controversy. On January 26, 2001, Murphy filed a motion to compel certain discovery from the Commonwealth, supported by an affidavit from Dr. Davis. After the court ordered production of the documents, Murphy forwarded them to Dr. Davis.

Murphy retained Marc Taylor ("Taylor") on February 13, 2001. Taylor, who has a B.S. in zoology, is a forensic scientist who owns his own laboratory, Technical Associates. Murphy retained Taylor to conduct DNA transfer experiments. Murphy had no way of knowing whether the results of such experiments would be favorable to the defense and, if so, would be admissible in evidence.

On March 17, 2001, Murphy retained Dr. Daniel Krane, an associate professor of biological sciences at Wright State University with a Ph.D. in biochemistry who runs the laboratory there but does not conduct forensic testing. Murphy was concerned that Dr. Davis was subject to impeachment on the ground that she only worked for defendants. Dr. Krane, who was not vulnerable to impeachment on that ground, would testify as an academic scientist about his opinion of the DNA evidence after independent analysis of the raw data. Murphy also expected Dr. Krane to testify in support of the defense's DNA transfer theory. Dr. Krane would testify that both secondary and tertiary transfer of DNA is recognized in the scientific world as a legitimate phenomenon. Murphy spoke to William Shields ("Shields") several times concerning the issue of mitochondrial DNA, but the Commonwealth ultimately informed Murphy that it did not intend to present evidence of dog DNA at trial. Murphy also briefly considered retaining Shields for Kane's role.

Murphy examined Cellmark's validation studies. He was aware that the FBI's policy was that peak results below the validated threshold could not be used to make a match, but could be used to exclude a suspect. Murphy knew that Cellmark was the only lab willing to report results at a threshold of 40 RFUs, and that Cellmark had raised its minimum threshold to 60 RFUs. Dr. Davis opined that it was highly questionable to drop the threshold as low as 40 RFUs. Dr. Davis also told Murphy that Cellmark had failed to run substraits at the 40 RFU level. Murphy knew that the manufacturer of the machine used by Cellmark in this case recommended a 150 RFU threshold. Murphy knew that Cellmark had made its allelic calls only after typing the defendant and May's DNA profiles, and that Dr. Davis believed this to be an improper scientific practice.

Murphy understood that Dr. Davis had serious criticisms of Cellmark's results in the case. Dr. Davis informed Murphy that Cellmark was inconsistent in calling peaks, and Murphy was not aware of any consistent criteria for making calls. Murphy believed that Cellmark's operating procedures left great room for Cellmark to "fiddle" with the raw data in deciding what to call as an allele and what to call as an artifact. Dr. Davis described Cellmark's methodology as the "shot in the dark" method, and opined that Cellmark's stretching of the technology was unreliable. Dr. Davis told Murphy that she believed that Cellmark's procedures and results were bad science. Thompson, who also advised Murphy throughout the case on DNA issues, agreed that Cellmark had "fiddled" with the DNA results.

Murphy read Butler's textbook on Cofiler/Profiler DNA analysis. Murphy understood that there was an issue with respect to the reliability of Cellmark's results because the DNA analyzed had a low copy number, meaning only very tiny quantities of DNA were available for analysis, and the DNA was a mixture from more than one contributor. Murphy was also aware that the low RFU peaks called by Cellmark were problematic because of the difficulty of distinguishing between actual alleles and artifacts. Murphy knew that low RFU analysis is associated with allelic dropout, stochastic effect, and problems with stutter. Murphy does not recall whether he understood at that time that analysis of low RFU results requires strict adherence to interpretation guidelines. However, Murphy knew that the laboratory validation studies were important and that each lab sets minimum RFU thresholds based on its validation studies. Murphy does not recall whether he knew at the time that in house validation studies are mandated by the National Forensic Board. Murphy was not aware of any published case in the United States admitting results called as low as 40 RFUs, nor was he aware of any appellate case admitting results where the RFU threshold changed, although similar issues were discussed in California on the list serve.

Murphy printed from a Department of Justice website a 1998 survey of DNA crime labs. He also got information about DNA crime labs from a number of web sites, focusing in particular on accreditation issues. Murphy was aware that laboratories could undergo a voluntary accreditation process and that Cellmark was accredited. Cellmark's accreditation report made no reference to the validity of the practice of making allelic calls at 60 or 40 RFUs. Murphy collected transcripts from cases involving Cellmark. Murphy found no cases excluding DNA test results prepared by Cellmark because of deficiencies such as the lack of adequate interpretation guidelines, low copy number samples, use of a low RFU, or DNA mixtures involving more than one contributor.

Murphy knew that Dr. Robin Cotton, Cellmark's Laboratory Director, would be the Commonwealth's DNA expert at trial. Murphy conducted a search on Westlaw and Lexis of cases in which Dr. Cotton had testified, and spoke to other attorneys

who had cross-examined her. Murphy collected and read transcripts of numerous other *Daubert* hearings in which Dr. Cotton testified. Murphy found no case in which Dr. Cotton was deemed unqualified to testify about DNA test results. Murphy reviewed a decision in the California case *of People v. Jonathan Hill,* in which Dr. Cotton had testified in favor of the admission of DNA evidence and Dr. Davis had testified in favor of excluding the evidence. The court in *Hill* concluded that Dr. Davis' concerns about testing protocols and errors in the results went to the weight and not the admissibility of the NA evidence In addition, Murphy read Dr. Cotton's testimony in the *Hunt* hearing in California, an admissibility hearing involving Cofiler/Profiler DNA evidence. In her testimony, Dr. Cotton testified that Cellmark made allelic calls at 40 RFUs until it raised the threshold to 60 RFUs. Murphy cannot recall whether he read Dr. Arthur Eisenberg's testimony in the *Hunt* case, but he was aware that the thrust of the hearings involved whether Cellmark had adjusted its results in favor of the prosecution. The *Hunt* hearing focused on the acceptability of the new multiplex kits used by Cellmark. The court ultimately admitted the DNA evidence in that case. Murphy read every Massachusetts appellate DNA decision to date and reviewed the transcripts of prior Massachusetts DNA cases. Murphy was aware that there was a reported decision by Judge Ford in the Hampden Superior Court in the case of *Commonwealth v. Alfred Gaynor,* finding admissible PCR testing performed at STR loci in a mixed DNA sample. Murphy's recollection is that the results in that case were attributed to a primary contributor based on high RFU. Murphy obtained the underlying papers in the *Gaynor* case and also spoke to defense counsel in that case, Harry Miles.

On March 29, 2001, an Australian court issued a decision in a case captioned *Regina v. Karger* involving DNA admissibility ("the *Karger* opinion"). Dr. Davis had testified for 19 days at an evidentiary hearing on behalf of Karger. The *Karger* opinion contained strong criticism of Dr. Davis's testimony, suggesting that she lacked integrity, was incompetent, and lacked sufficient training and experience to interpret electropherograms accurately or to testify as an expert. Dr. Davis informed Murphy about the *Karger* opinion on April 2,2001. Murphy began to reconsider calling Dr. Davis as the key defense expert because he believed she was vulnerable to impeachment based on the *Karger* opinion. In addition, Murphy had read a California court's decision in *People v. Elizarraras,* involving the admissibility of Profiler/Cofiler DNA evidence, in which the court gave little weight to an affidavit filed by Dr. Davis because of her prior testimony and the judicial criticism of her work in other cases.

Murphy carefully considered whether to file a *Lanigan* motion to exclude Cellmark's test results. Murphy was familiar with the *Lanigan* standard and the appellate DNA cases in Massachusetts. In reaching a decision on whether to file *a Lanigan* motion, Murphy consulted with Thompson and Dr. Davis on the likely admissibility of Cofiler/Profiler evidence and Cellmark's test results. Although Murphy listened carefully to Thompson and Dr. Davis's criticisms of Cellmark's work, he did not think such arguments would prevail. Based on his review of the DNA case law, particularly the Massachusetts case law, and the available legal arguments based on scientific criticisms of Cellmark's work, Murphy concluded that a *Lanigan* challenge had little likelihood of success. Murphy believed that Cellmark had an excellent reputation and that the Court would conclude that the criticisms of Cellmark's work went to the weight and not the admissibility of the evidence. In Murphy's view, the trend in Massachusetts and across the United States was toward admitting DNA evidence, even where the testing involved new systems or methods of analysis. Although Murphy was aware that the relatively new Profiler/Cofiler methodology had been successfully excluded in Colorado and Vermont, the basis for exclusion in those cases was the test kit manufacturer's refusal, on trade secret grounds, to disclose the composition of certain compounds used in the analytical process.

In addition to Murphy's belief that a motion to exclude the DNA evidence had little likelihood of success, both Thompson and Dr. Davis suggested to Murphy that the process of a *Lanigan* hearing would educate Dr. Cotton as to the weaknesses in Cellmark's results and the planned line of attack on cross-examination. Specifically, Murphy was aware that Dr. Cotton generally did not review the raw data before testifying. Murphy was concerned that following a *Lanigan* hearing, Dr. Cotton would review the data, enabling her to testify persuasively at trial that the "stranger" alleles were mere artifacts.

Murphy understood that some alleles matched to the defendant at 40 RFUs could not be matched to the defendant at a threshold of 100 RFUs. Specifically, he believed that at 100 RFUs, the defendant could not be matched to the knife or to one of the gloves. However, several of the "stranger" alleles had been called at 40 RFUs. If Murphy succeeded in excluding calls by Cellmark under 100 RFUs, he would no longer be able to present these "stranger" alleles to the jury. That was another consideration that Murphy believed weighed against filing *a Lanigan* motion. On April 17, 2001, Murphy filed a notice with the Court that he

did not intend to seek a *Lanigan* hearing on the admissibility of Cellmark's DNA test results and statistical analysis. Thompson ultimately agreed with Murphy's decision not to file the motion.

Murphy discussed the DNA evidence with the defendant on several occasions, and the defendant was very much involved in reviewing the raw data. Murphy gave the defendant copies of all the DNA data he had except for the raw electronic data, which the defendant would not have been able to read without the appropriate equipment. The defendant wrote a series of letters to Murphy containing notes and suggestions concerning the DNA evidence, including comments on issues such as lab accreditation, RFU levels, allelic dropout, DNA transfer, and off-ladder alleles. The defendant offered his opinion on avenues that Dr. Davis should pursue, chalks or exhibits which might be useful to the jury, and lines of cross-examination for certain experts. The defendant generally concurred with Murphy's approach to the DNA evidence, although he relied on Murphy to make the judgment call with respect to a *Lanigan* motion. The defendant never met directly with the DNA experts.

Murphy discussed the statistics issue with his DNA experts. Murphy was aware that the Supreme Judicial Court required DNA test results to be accompanied by a statistical analysis, and that an accurate statistical analysis was necessary for the Commonwealth's presentation to be valid. Thompson told Murphy that there was a strong argument that Cellmark's statistical analysis was improper. However, Murphy did not retain a separate expert on DNA statistical analysis. Murphy believed that there was no need to call a statistics expert because no alternative statistical analysis of the raw data would significantly reduce the probability of a match to the defendant. In addition, if the jury were persuaded by the defense's DNA transfer theory, the statistical probability of a match would be irrelevant.

On April 25,2001, Murphy sent Dr. Davis and Thompson summaries of the Cellmark data. At this point, Murphy had not yet received any experiment results from Taylor. He was also experiencing difficulty reaching Dr. Krane on the telephone. Around this time, Murphy made the final decision not to have Dr. Davis testify. Murphy cannot recall whether he discussed with the defendant whether to call Dr. Davis, but he generally kept the defendant apprized of important events in the case, and believes that he informed the defendant about Dr. Davis' credibility problem. In addition, there was a continuing question about the substantive admissibility of the electropherograms printed by Dr. Davis. Murphy did not file a motion in limine to admit the raw data into evidence.

Murphy did not seek a continuance of the trial date to give him more time to obtain a new forensic expert in part because the defendant, who was in custody, was anxious for the trial to begin. In addition, and perhaps more importantly, the support of one of the defendant's daughters, Kirsten, was flagging as she approached her wedding in August because her soon-to-be husband did not believe in the innocence of the defendant. On the eve of trial, Murphy believed that the defense was manageable with Dr. Krane and Taylor, particularly if the transfer experiments proved helpful. On May 16, 2001, Murphy received Taylor's report. Dr. Krane faxed Murphy his report on May 23, 2001, and the report did not challenge the reliability of Cellmark's methodology.

Dr. Cotton testified at trial as to the forensic testing of the DNA evidence conducted by Magee and reviewed by either Dr. Reynolds or Dr. Maddox. At some point during Dr. Cotton's testimony, it became apparent to Murphy that the prosecutor was aware of the *Karger* opinion. During a sidebar concerning whether Murphy would be allowed to show Dr. Cotton the electropherograms printed by Dr. Davis, the prosecutor objected that an Australian judge had deemed Dr. Davis to be an unreliable reporter of information.

Dr. Davis did not testify at trial. One reason, aside from diminished credibility, that Murphy did not call Dr. Davis was that following Dr. Cotton's testimony, Dr. Davis was concerned that the "stranger" DNA at one particular allele might in fact be a mere artifact. On June 5,2001, Dr. Davis traveled to Massachusetts to assist Murphy with his cross-examination of Dr. Cotton. Dr. Davis sat at counsel table during Dr. Cotton's testimony on June 6, 7, and 8. Murphy's strategy at trial was to attack the DNA evidence by using the electropherograms printed by Dr. Davis to cross-examine Dr. Cotton. Those electropherograms were not substantively admitted by the court but the Court allowed them to be marked as chalks and Murphy was permitted to use them in posing hypothetical questions. As Murphy expected, Dr. Cotton had not reviewed the raw data prior to testifying. Murphy compared the raw data electropherograms to the printouts in order to show the jury that Dr. Cotton had not accounted

for certain information in the raw data. Murphy chose not to call Wendy Magee because he preferred to leave the jury with the impression of one Cellmark witness who had not reviewed the underlying data.

Dr. Davis again traveled to Massachusetts on June 18, 2001 and spent approximately 24 hours over the next few days meeting with Dr. Krane and Marc Taylor and educating them about the work she had done in the case and her analysis of Cellmark's DNA testing. Dr. Davis walked Dr. Krane through the allele calls on her computer to ensure that he was prepared to testify. Dr. Krane testified as to the allele calls and emphasized the inconsistencies between the reported results and the raw data. Murphy did not question Dr. Krane about the validation studies, the operating guidelines, or the reliability of Cellmark's work.

Taylor testified at trial concerning the defense's DNA transfer theory. The Commonwealth moved to exclude Taylor's experiments, and he was not permitted to present his substantive results to the jury. Instead, he testified that he had conducted experiments on DNA transfer and opined that transfer of the defendant's DNA to the gloves and knife could have occurred without any direct contact between the defendant and those objects.

Murphy highlighted the unreliability of Cellmark's test results by comparing them to the results that would have been produced if the DNA had been analyzed under the standards used by the FBI. Murphy argued to the jury that Cellmark's analysis was unreliable and biased, and emphasized that the amount of DNA attributed to the defendant was quite small and could be explained by the DNA transfer theory. Finally, Murphy emphasized the "stranger" alleles present in the raw data.

### DNA Expert Affidavits

In support of his motion for a new trial, the defendant has submitted three affidavits, totaling some 113 pages, from Arthur Eisenberg. Dr. Eisenberg, who has a B.S. in biology, a M.S. in molecular biology, and a Ph.D. in molecular biology, has been employed as a professor of cell biology and genetics at the University of North Texas Health Science Center for 15 years and is the Director of the DNA Identity Laboratory and the Texas Missing Persons DNA Database. Dr. Eisenberg was appointed to the U.S. DNA Advisory Board in 1995 by the Director of the FBI, and became its Chairman in 1998. Dr. Eisenberg is familiar with the Profiler Plus and Cofiler test kits, the ABIPrism 310 Genetic Autoanalyzer, and the GeneScan and Genotyper software used by Cellmark in this case. He has testified as an expert witness in over 100 cases in the United States, Europe, and South America, primarily in support of the government's case.

Dr. Eisenberg reviewed the transcripts of Dr. Cotton's hearing and trial testimony, the electropherograms and reports produced by Cellmark, the CD-rom containing Cellmark's raw data, Cellmark's validation studies and standard operating procedures, Cellmark's quality assurance manual, the cutting sheets prepared by Gwen Pino, the stutter filters for Kazam Macro, the DNA discovery requested by the defendant and produced by the Commonwealth, and the Commonwealth's DNA trial exhibits.

In his affidavit, Dr. Eisenberg concludes that Cellmark's test results in this case were scientifically unreliable. Dr. Eisenberg discusses at length the difficulties of analyzing low copy number ("LCN") samples, particularly when a mixture is involved. In an experiment he performed in his laboratory in October of 2004, analyzing a known, single source LCN sample of less than 100 picograms of DNA, none of the six replicates produced a correct genotype profile, regardless of whether analyzed at 40, 60, or 100 RFUs. Each replicate showed problems with allelic dropout Dr. Eisenberg opines that mixture analysis of LCN samples is generally not reliable because of the likelihood that trace DNA from casual contact will contaminate samples and be detected, increased balance of heterozygous alleles, increased production of stutter products, and prevalence of allelic dropout. Absent specific validation for LCN analysis by a forensic laboratory, such analysis is scientifically unreliable and the results should be reported as inconclusive. Based on his own survey of nine laboratories which use the same technology as Cellmark did in this case, Dr. Eisenberg concludes that it is not generally accepted in the scientific community to interpret LCN mixtures at thresholds lower than 75 RFUs.

Dr. Eisenberg opines that Cellmark's mixture validation studies were inadequate to ensure that an analyst can reliably determine whether a peak is a true allele or stutter in a mixed sample when the minor contributor is less than 10% of the major contributor,

as in this case. The data Cellmark used in setting its stutter filter levels was flawed and the amplification conditions were inconsistent with the conditions Cellmark used in analyzing the crime scene samples in this case. The DNA in the mixture was intact, high molecular weight, of a quality rarely found in crime scene samples.

In addition, Dr. Eisenberg opines that Cellmark lacked validation studies on LCN samples and provided no scientific justification for the use of interpretation levels as low as 40 RFU. He opines that the lowering of the threshold to 40 RFU in order to report detectable results is the "antithesis of proper scientific practice." Dr. Eisenberg opines that Cellmark's interpretation guidelines are unscientifically vague and lack virtually all of the accepted essential criteria for an analyst to make consistent and reliable interpretation of results. The guidelines and Standard Operating Procedure fail to provide guidance about when it is appropriate to lower the RFU threshold and provide no values for minor versus major contributors, peak height ratios, and stutter analysis.

Dr. Eisenberg further opines that Cellmark's results were unfairly and unscientifically biased against the defendant because both the analyst and the technical reviewer interpreted the data after reviewing the known STR profiles of the defendant and May. Dr. Eisenberg also opines that the analyst violated Cellmark guidelines for interpreting peaks in stutter positions in order to include peaks that matched the defendant's profile. Dr. Eisenberg opines that the analyst consistently but arbitrarily excluded as stutter alleles that met Cellmark's interpretation threshold but did not match the defendant's profile, making the mixture statistic rarer and biasing the results against the defendant.

According to Dr. Eisenberg, if a 100 RFU threshold had been applied to analysis of the knife (Item #2.2, Cellmark Sample #04A P), the only alleles that could be called were those matching May, and the presence of a Y (male) allele. Three loci, D18S51, D13S317 and D7S820, would have no callable alleles. If a 100 RFU threshold had been applied to the right brown work glove (Cellmark Sample # 06A P, 06A C/06ACr), Dr. Eisenberg opines that the results should have been deemed inconclusive, because although the defendant cannot be excluded as a contributor at 4 of the 13 loci, he shares an allele in common with May at each of those loci. At 2 other loci, the defendant cannot be excluded, but the results from the Profiler run and the Cofiler run contradict each other. However, at 5 other loci, there are no callable alleles that match the defendant. Finally, if a 100 RFU threshold had been applied to the left brown work glove (Cellmark Sample #19AM Pr), the only alleles that could be called were at three loci which matched May and indicated only a single female contributor.

Dr. Eisenberg opines that Cellmark's results in this case based on peaks of less than 100 RFUs are not scientifically reliable and therefore would not be admissible at trial under Massachusetts law. He notes that most of the "stranger alleles" emphasized by defense counsel were present on items other than the knife and brown work gloves, with only one stranger allele present on each glove, and only two present on the knife. Dr. Eisenberg opines that the presence of one or two unexplained alleles makes it unlikely that another contributor is present in the sample.

The defendant has also filed an affidavit by Charles Brenner, Ph.D. ("Brenner"), a consultant in forensic mathematics and a member of the American Academy of Forensic Sciences and the International Society of Forensic Genetics. Dr. Brenner reviewed Dr. Cotton's hearing and trial testimony, Cellmark's reports, Cellmark's electropherograms, Lexigen's electropherograms, and a handwritten calculation labeled "Glove" and initialed "JER 2/22/00." Dr. Brenner opines that calculating an inclusion probability for a DNA mixture "presents profound complications" when stutter cannot be differentiated from true alleles and allelic drop-out may be prevalent because of the scant quantity of DNA from the sample. Dr. Brenner opines that Cellmark failed to consider the possibility that peaks appearing in the stutter position masked true alleles and the possibility of allelic dropout, and this biased the statistical calculation against the defendant. Dr. Brenner opines that Cellmark's statistical calculation was scientifically invalid because it failed to take into account the possibility that the stutter at the eight loci labeled inclusions on the right brown work glove masked true alleles. Dr. Brenner opines the statistics were therefore erroneous and greatly exaggerated the likelihood that the defendant was a contributor to the DNA samples at issue.

Dr. Cotton has filed an affidavit in opposition to the defendant's motion for a new trial in which she states that although Cellmark's initial standard operating procedures were less detailed than those enacted after the evidence in this case was processed, Cellmark's personnel was highly trained in DNA analysis and well-equipped to interpret results in light of their

knowledge and experience. Dr. Cotton opines that although interpreting mixtures is more difficult than interpreting a single source sample, interpretation of mixtures is within the mainstream of forensic analysis. Dr. Cotton has testified in a few cases where it was argued unsuccessfully that Cellmark's evidence should be excluded because of deficiencies in its validation studies, including the *Hunt* case in California. In addition, Dr. Cotton testified in the *Whittey* case in New Hampshire, in which defense counsel unsuccessfully argued that Cellmark's analysis of mixtures should be excluded based on deficiencies in the standard operating procedures for establishing RFU thresholds and interpreting alleles. The judge in that case admitted the evidence even though defense counsel argued that Cellmark impermissibly changed the RFU threshold from 40 to 60. In the *Gaynor* case, the court rejected the argument that evidence should be excluded because Cellmark applied an improper threshold.

Dr. Cotton is not aware of any case prior to June 6,2001 in which a party argued successfully that DNA results should be excluded because of LCN samples. The scientific literature available in early 2001 discussed the problems of increased stutter and allele dropout caused by amplification of LCN DNA. Cellmark was well aware of these problems and its analysts recognized the limitations of the data. Rather than accept the manufacturer's stutter cut-off values, Cellmark validated stutter values for each individual locus.

Cellmark made a conscious decision not to use a dual RFU threshold like that employed by the FBI. Dr. Cotton disagrees with Dr. Eisenberg that use of a high RFU number eliminates the problem of allelic dropout. Cellmark has observed allelic dropout at levels as high as 350 RFUs. Cellmark made a great effort to use a lower RFU level to get the greatest sensitivity possible, and did not set its threshold at 100 RFU because this would result in a substantial loss of reliable data . The change from 40 to 60 RFU was a consensus decision. Cellmark felt it did not need additional validation for the 60 RFU level because it believed it could reliably detect peaks at 40 RFU, so the change was a conservative adjustment.

Dr. Cotton opines that the use of a technical reviewer addresses the possibility of unconscious bias by an analyst who is aware of the profiles from known samples. Dr. Cotton opines that Cellmark would not jeopardize its reputation and integrity by skewing test results in any particular case. To refute the claims of bias in calling alleles, Dr. Cotton states that Cellmark noted in parentheses but did not include in the profile a 28 allele at D21 on the left brown work glove and and an 11 allele at D5 on the right brown work glove which were consistent with the defendant. Dr. Cotton agrees with Dr. Eisenberg that analyzing the knife sample at 100 RFUs would produce data only consistent with the victim and would not implicate the defendant. With respect to the right brown work glove, Dr. Cotton opines that the baseline for the sample is very good and the all the types from the minor contributor are clearly resolved above the baseline. She disagrees with Dr. Eisenberg that the data between 40 and 100 RFUs is unreliable. Dr. Cotton opines that defense counsel in this case was thoroughly prepared on the DNA issues and conducted the most pointed cross-examination of any lawyer who has cross-examined her.

The Commonwealth has also filed the affidavit of Joanne Sgueglia ("Sgueglia"), the Technical Manager of Forensic Biology for the Massachusetts State Police Crime Laboratory. In May of 2001, Sgueglia conducted an independent review of the Cellmark electropherograms for the knife sample, left-hand brown glove, and right-hand brown glove with no knowledge of the known profiles. She produced profiles for a major female contributor and a minor male contributor which were consistent with May and the defendant when compared to the known profiles. Sgueglia opines that the Cellmark data submitted at trial was reliable.

Sgueglia states that RFU thresholds are set independently by each laboratory based on internal validation studies. The Connecticut State Police Crime Lab uses a 50 RFU threshold, while the Massachusetts State Police Crime Laboratory uses 75 RFUs. The Massachusetts State Police Crime Laboratory does not use the dual RFU threshold endorsed by Dr. Eisenberg. Sgueglia opines that instruments have varying degrees of sensitivity and can differ by as much as tenfold, so that Cellmark's 40 RFU level could equate to another laboratory's 70 RFU level. There is no gold standard or uniform definition of LCN DNA. Sgueglia disagrees with Dr. Eisenberg that it was improper for Cellmark to combine results from two separate injections.

Sgueglia believes that Cellmark's miscall of a 19 allele at D3 demonstrates that Cellmark was not biased against the defendant because that should have been excluded as an artifact and Cellmark's assignment favored the defendant and supported the

stranger allele theory. Sgueglia notes that analysts are trained to take account of stochastic effects when interpreting LCN DNA and opines that the use of training and experience to make judgment calls does not make the analysis unreliable.

### *Footprint Evidence*

State Police Sergeant Deborah Rebeiro ("Rebeiro") testified at trial that she has specialized training in the collection and comparison of footwear impression evidence. She analyzed the footprints observed in the path at Morses Pond on the day of the murder and compared them to the sneakers worn by the defendant. Prior to trial, Murphy retained forensic expert Peter DeForest ("DeForest"), who has written a textbook on pattern identification including a chapter on footwear impressions. DeForest examined the footprint photographs and other evidence in the case. After consulting with DeForest, Murphy decided not to call a footprint expert at trial.

At trial, Rebeiro testified that one of the six impressions, F1, located at the very beginning of the track, perfectly aligned with the characteristics of the defendant's left sneaker. Rebeiro testified that print F7 was located in the center of the path in front of the final resting place of the victim and overlapping some of the bloodstain in that area of the trail. Rebeiro observed a drag mark starting in the area of F7 and leading back to the victim's final resting place. Rebeiro testified that F7 was actually several overlapping impressions within the bloodstained area of the path, and consisted of a heel area and several areas of horizontal lines. Rebeiro opined that the left sneaker of the defendant could have made some of the impressions in F7. She could not exclude either the left or right heel of the defendant's sneakers from F7. Rebeiro testified that F7 "located somewhere in the middle of the path within the bloodstain, the heel area of [F7] was located with the curved surface of the heel towards the victim .." When asked which way a person would be facing in order to make that impression, Rebeiro responded, "Their back, or the heel area of their footwear, would be in front of, or the heel would be towards the back of the victim as she was in her final resting position." Rebeiro testified that the drag mark appears to start in the general vicinity of the heel going back toward the victim. She did not observe any other footwear impressions between the back of the heel of the victim and heel track F7.

In his closing argument, the prosecutor stated:
Is it probable that this person dragged another body without leaving any footwear impressions? Is that probable? I suggest to you it's not, because we have that footwear. It's the defendant's heel mark, right where he would have picked her up. With bloody arms under the jacket, he dragged her backwards. And finally, ladies and gentlemen, what's so important about Sergeant Rebeiro's work? The defendant's heel mark, an undisturbed furrow, drag mark directly to May Greineder's body - I'm sorry, left heel, undisturbed, the heel in it. Picked up three times, ladies and gentlemen, dropped, had to reposition her body. Is that truthful testimony?

That drag mark, ladies and gentlemen, is the same area where the defendant tried to tell you he went out on his knees when he testified. That, ladies and gentlemen, is evidence, strong, powerful evidence, that the wearer of those shoes dragged May Greineder to right where that heel sits, and that that heel stayed there until the police were there.

In connection with his Motion for a New Trial, the defendant filed the affidavit of William Bodziak ("Bodziak"), a former FBI Special Agent and forensic consultant in the area of footwear impressions, tire impressions, and questioned documents. Bodziak is a fellow of the American Academy of Forensic Sciences and a member and past Chairman of the Footwear and Tire Track Section of the International Association for Identification. He has published two editions of the book *Footwear Impression Evidence* and several articles in peer-reviewed journals, and has been qualified in court as an expert on over 300 occasions. Bodziak reviewed Rebeiro's trial testimony and police reports, copies of photographs of eight footwear impressions ascribed to the defendant, photographs of dental casts made of those impressions, the dental cast of F7, photographs of a drag mark and F7, the defendant's left and right sneakers, and trace impressions of the defendant's left and right sneakers made by Rebeiro. Bodziak created known impressions of the defendant's sneakers, created transparencies of the pattern of the sneakers, and matched the transparencies to the dental cast of F7 and the photographs of F7. Bodziak opines, to a reasonable degree of scientific certainty, that F7 represents the toe, not the heel, of the defendant's right sneaker. Bodziak opines that the defendant's sneaker prints were

oriented with the toe facing North and the heel facing South, contrary to Rebeiro's testimony. Bodziak opines that Rebeiro was incorrect when she testified that the footprint evidence was consistent with the defendant having dragged the victim's body to the location where it was found.[3] Thereafter, on May 9, 2007, Rebeiro filed an affidavit in this case stating that she concurs with Bodziak that F7 represents the toe area, not the heel, of the defendant's right sneaker.

### RULINGS OF LAW

A motion for a new trial pursuant to Mass. R. Crim. P. 30(b) may be granted if it appears that justice may not have been done. *Commonwealth v. Walker*, 443 Mass. 867,871, cert. den., 126 S.Ct. 662 (2005); *Commonwealth v. Stewart*, 383 Mass. 253, 257 (1981). The granting of a motion for a new trial is addressed to the sound discretion of the judge. *Commonwealth v. Moore*, 408 Mass. 117, 125 (1990); *Commonwealth v. Stewart* 383 Mass. at 257.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON NON-EXPERT ISSUES

In analyzing ineffective assistance of counsel under art. 12 of the Massachusetts Declaration of Rights, the court's inquiry is whether there has been serious incompetency, inefficiency- or inattention of counsel, conduct falling measurably below that expected from an ordinary fallible lawyer. *Commonwealth v. Phinney*, 446 Mass. 155,162 (2006); *Breese v. Commonwealth*, 415 Mass. 249, 252 (1993).[4] When claiming ineffective assistance of counsel in a capital case, the defendant bears the burden of demonstrating that counsel's conduct created a substantial likelihood of a miscarriage of justice; i.e., that one or more errors by counsel was likely to have influenced the jury's conclusion. *Commonwealth v. Anderson*, 445 Mass. 195,211 (2005); *Commonwealth v. Freeman*, 442 Mass. 779, 791 (2004).

### A. *Failure to File a Reconsideration Motion to Suppress Nails Receipt*

The defendant first contends that trial counsel was ineffective for failing to file a motion asking the Court to reconsider or supplement its pretrial ruling and suppress the nails receipt as improperly seized under a general warrant. An attorney's failure to litigate a viable claim of an illegal search and seizure may constitute ineffective assistance of counsel. *Commonwealth v. Comita*, 441 Mass. 86, 90 (2004). In order to prevail, the defendant must demonstrate a likelihood that the Motion to Suppress would have been successful, and must further show that there was a reasonable possibility that the verdict would have been different without the excludable evidence. *Id.* at 91; *Commonwealth v. Fletcher*, 52 Mass. App. Ct. 166, 169, rev. den., 435 Mass. 1004 (2001). Article 14 of the Declaration of Rights and G.L. c. 276, § 2 protect individuals against general searches by requiring that a search warrant describe the items to be seized with particularity. *Commonwealth* v. *Sheppard*, 394 Mass. 381, 386-387 (1985). Deficiencies in particularity may be cured by reference to a supporting affidavit, typically attached and incorporated by reference, which particularly describes the items to be seized. *Commonwealth v. Rutkowski*, 406 Mass. 673, 676-677 (1990).

The November 12 search warrant authorized police to search for and seize the following items:

> Computers and terminals, receipts and/or other evidence of financial transactions, zip-lock bags, lighter fluid, cake or loaf pans, latex gloves, the packaging of any of these materials, checks or cancelled checks, as well as tool mark impressions.

In its October 18,2000 Memorandum, this Court found that the November 12 warrant was a general warrant with respect to its mandate to seize "computers and terminals, receipts and/or other evidence of financial transactions" but concluded that most of the evidence seized was not suppressible because of particularity in the affidavit. The affidavit stated that the evidence sought included "a cake pan, containers of lighter fluid, trash and/or plastic bag type containers, receipts for any of the above ..." This particularity narrowed the universe of receipts for which seizure was authorized. However, at this time more than six years

later, because nails were not one of the items listed in the affidavit, seizure of the nails receipt arguably was not within the scope of the warrant.

When it appeared at trial that the nails receipt would be relevant, defense counsel appropriately moved for its exclusion on the ground that such late disclosure unfairly prejudiced the defendant. The Court finds that its ruling that admission of the receipt would be postponed to give defense counsel an opportunity to address it was appropriate.

Had defense counsel moved to exclude the receipt as part of a motion for reconsideration, this judge would have, as he did with all other similar requests, held a hearing at 4:30 p.m. that evening or 7:30 a.m. the following moving. However, this Court simply cannot say with certainty whether it would have allowed such a motion. On the one hand, this Court may well have concluded that the nails receipt was admissible as within the scope of the warrant as narrowed by the affidavit. Footnote 24 of this Court's October 18, 2000 Memorandum stated in relevant part, "Although not specifically argued by the defendant, this Court would also conclude that the other items seized, including the loaf pans, the tin foil containers, *the Diehl Hardware and Home Depot receipts ...* would fall under the scope of the warrant."(emphasis added). In retrospect, this footnote could have been clearer, but at the time it may well have given defense counsel pause in asking the court again to suppress a Diehl's receipt for nails. Although the receipt at issue was not for a specific item listed in the search warrant affidavit, the items in the affidavit were all likely to be purchased at a hardware store, and the nails receipt evidenced when and where the defendant purchased hardware items. Thus, defense counsel's conclusion that the Court had already ruled the nails receipt admissible was not unreasonable, and if asked to reconsider the matter, this Court may well have concluded that the receipt should not be suppressed.

On the other hand, footnote 24 might be interpreted as approving only the seizure of Diehl's receipts insofar as they evidenced the purchase of one of the specific items mentioned in the search warrant or supporting affidavit. Nails were not so mentioned. Thus, there is a serious argument that seizure of the nails receipt was not within the scope of the warrant. Further, police would not have been able to seize the nails receipt under the plain view exception to the warrant requirement because its incriminating character was not immediately apparent to law enforcement at the time. See *Commonwealth v. D'Amour*, 428 Mass. 725,730 (1999). If this judge found that seizure of the nails receipt was not within the scope of the warrant and that there was no plain view rationale for the seizure, then the Court might have allowed a motion by defense counsel to suppress the receipt itself, but not necessarily its contents.

Regardless of which way this Court ultimately would have ruled, counsel's failure to file a motion to suppress the nails receipt cannot be deemed to constitute ineffective assistance of counsel warranting a new trial. If the nails receipt had been deemed admissible, then it would have been placed into evidence, as it was. Even if the receipt itself was suppressed, the jury in all probability would have learned of its existence and contents. As discussed above, the police were entitled during the search to examine the nails receipt, as a hardware receipt, to determine whether it was evidence within the scope of the warrant. This Court would have permitted the officers who examined the nails receipt to testify as to its contents if they so remembered. In addition, the officers would have been permitted to refresh their memories, if need be, with police notes, reports, and the receipt itself. See *Commonwealth v. Billings*, 42 Mass. App. Ct. 261, 264, rev. den., 424 Mass. 1108 (1997) (officer permissibly testified about his observations of pattern on defendant's sneakers made prior to unlawful seizure of sneakers); *Commonwealth v. Wilson*, 38 Mass. App. Ct. 680,682, rev. den., 421 Mass. 1101 (1995) (officer permissibly testified about his observations of cocaine made prior to unlawful seizure of cocaine). Thus, suppression of the nails receipt would probably have had no practical impact on the evidence heard by the jury.

More importantly, in order to receive a new trial, the defendant must show that there was a reasonable possibility that the verdict would have been different without the excludable evidence. *Commonwealth v. Fletcher* 52 Mass. App. Ct. at 169; *Commonwealth v. Pena* 31 Mass. App. Ct. 201, 205 (1991). The admission of the nails receipt, even if deemed erroneous, did not create a substantial likelihood of a miscarriage of justice. An error creates a substantial likelihood of a miscarriage of justice unless the court is persuaded that it did not materially influence the guilty verdict. *Commonwealth v. Azar*, 50 Mass. App. Ct. 767, 771 (2001), aff'd, 435 Mass. 675 (2002). The court considers the strength of the case against the defendant, the nature of

the error, and whether the error is sufficiently significant in the context of the trial to make plausible an inference that the jury's result might have been otherwise but for the evidence. Id.

Here, the prosecutor argued that the nails receipt found in the defendant's home linked him to one of the murder weapons because the nails were purchased on the same date and at the same Diehl's cash register as a cash purchase of a two-pound Estwing hammer, the only one sold at that store that month, with the two purchases made consecutively and within mere minutes of each other. However, the nails receipt as evidence of guilt may have been tenuous at best and was rebutted by medical school student Colin Greineder, the son of the defendant and the victim, whose testimony was that he bought six boxes of nails at a store in Wellesley shortly before the murder and left them on his father's work bench and that the nails receipt evidenced that very transaction. Even if the jury disbelieved Colin's testimony, the nails receipt simply was not a key piece of evidence implicating the defendant in light of the DNA evidence linking him to the knife and work glove, the blood spatter and transfer evidence and absence of blood on the defendant's hands and the cuffs of his jacket, the blood pattern on his glasses, the fiber evidence, the consciousness of guilt evidence, and the myriad other pieces of circumstantial evidence in the case. The defendant has failed to demonstrate a reasonable possibility that the verdict would have been different without admission of the nails receipt. See *Commonwealth v. Fletcher*, 52 Mass. App. Ct. at 169; *Commonwealth v. Pena*, 31 Mass. App. Ct. at 205. Accordingly, defense counsel's failure to renew or file a new motion to suppress the receipt midway through trial does not constitute ineffective assistance of counsel warranting a new trial.

### B. *Failure to File Motion to Suppress Fruits of Toyota Avalon Search*

The defendant next contends that defense counsel was ineffective in failing to file a motion to suppress the testimony concerning the dirty towel as the fruit of an unlawful search of the Toyota Avalon. Article 14 of the Declaration of Rights and G.L. c. 276, § 2 require that search warrants state with particularity the place to be searched. *Commonwealth v. McCarthy*, 428 Mass. 871, 873 (1999). A warrant authorizing the search of a particularly described residence includes any automobiles owned or controlled by the owner of such residence which are located within the curtilage of the premises at the time the warrant is executed. Id.; *Commonwealth v. Signorine*, 404 Mass. 400, 403 (1989). The critical issue in determining whether a particular area is curtilage is whether the area "harbors those intimate activities associated with domestic life and the privacies of the home." *Commonwealth v. McCarthy*, 428 Mass. at 874. The Court considers the proximity of the area to the home, whether the area is included within an enclosure surrounding the home, the nature of the use to which the area is put, and the steps taken by the resident to protect the area from observations by people passing by. Id.

In general, a driveway is only a semi-private area and any expectation of privacy one may have in a driveway depends on the degree of visibility from the street. *Commonwealth v. Simmons*, 392 Mass. 45, 48-49, cert. den., 469 U.S. 861 (1984) (no expectation of privacy in car parked 2 feet from driveway providing access from public street, where there were no fences, shrubs, or gates preventing access or obstructing view of driveway from street); *Commonwealth v. Butterfield*, 44 Mass. App. Ct. 926, 928 (1998) (no reasonable expectation of privacy in driveway visible from roadway without obstructions). Here, the defendant's driveway was open to public access, was completely visible from Cleveland Road, was not in any way enclosed, and there were no steps taken to protect the privacy of activities undertaken there. Under these circumstances, the driveway cannot be deemed to be an area which harbors intimate activities associated with domestic life and the privacies of the home. Accordingly, the driveway was not within the curtilage of 56 Cleveland Road and the November 1, 1999, search warrant did not extend to the Toyota Avalon parked there. Further, a warrantless search of the Avalon was not justified under the automobile exception to the warrant requirement because police did not have probable cause to believe that the vehicle contained evidence of the murder, nor were they faced with exigent circumstances making obtaining a warrant impracticable. See *Commonwealth v. Alvarado*, 420 Mass. 542, 554 (1995). Therefore, the November 1 search of the Avalon was unlawful and a motion to suppress the officers' observations of the dirty towel would have succeeded.

Although defense counsel recognized that the fruits of the Avalon search were suppressible, he deliberately chose not to move to exclude that evidence. An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made. *Commonwealth v. Frank*, 433 Mass. 185, 190 (2001); *Commonwealth v. Hill*, 432 Mass. 704, 718

(2000); *Commonwealth v. Berry,* 68 Mass. App. Ct. 78, 82 (2007). Only strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent are manifestly unreasonable. *Commonwealth v. Zagrodny,* 443 Mass. 93, 98 (2004). Failure to file a meritorious motion is not ineffective assistance of counsel where it is consistent with a reasonable trial strategy. See, e.g., *Commonwealth v. Cutts,* 444 Mass. 821, 831 (2005) (not manifestly unreasonable to fail to move to suppress defendant's statements as involuntary where they supported defense theory of diminished capacity); *Commonwealth v. Bly,* 444 Mass. 640, 654 (2005) (not manifestly unreasonable to fail to move to exclude defendant's prior murder conviction where it bolstered defense theory that other witnesses implicated defendant because he was already in jail for life and was thus "expendable"). Here, defense counsel wanted the jury to hear the testimony about the towel found in the Toyota Avalon because it appeared to corroborate the defendant's story about the simultaneous nosebleeds, which was crucial to the defense's DNA transfer theory. This was a reasonable tactical decision. Once McDermott testified at variance with the pretrial testimony, defense counsel attempted impeachment with the prior testimony and argued that the conduct of police with respect to the towel demonstrated a sloppy investigation. This strategy was not manifestly unreasonable and the failure to move to suppress the fruits of the Avalon search was not ineffective assistance of counsel.

### C. *Failure to Object to Improper Admission and Misuse of Sex Evidence*

The defendant next contends that trial counsel was ineffective in numerous respects in his handling of the evidence of the defendant's extramarital sexual activities. Prior to trial, defense counsel filed and vigorously argued a motion in limine to suppress the so-called "sex evidence." However, this Court attempted to craft a carefully-reasoned 11-page decision dated February 5, 2001, which deemed much of the evidence, including the defendant's solicitation of prostitutes, and Internet and e-mail solicitations of a sexual relationship during the week prior to the murder, to be admissible as probative of motive. See, e.g., *Commonwealth v. Magraw,* 426 Mass. 589, 598 n.9 (1998) (suggesting that if evidence showed defendant had extramarital affair shortly before killing and before he and wife separated, it would be admissible in judge's discretion); *Commonwealth v. Burke,* 339 Mass. 521, 533-534 (1959) (evidence that defendant had attachment to another woman, if not too remote in time from killing, may form basis of inference that he had feelings of hostility toward wife); *Commonwealth v. Bonomi,* 335 Mass. 327, 355 (1957) (evidence of marital troubles that defendant felt hostile toward his wife and had formed attachment to another woman probative of motive). The defendant argues that counsel was ineffective in failing to ask the Court to reconsider its pre-trial ruling. However, given the court's discretion in determining whether the probative value of the evidence outweighed its potential for undue prejudice, it is unlikely that a motion to reconsider would have succeeded. Accordingly, the failure to file such a motion does not constitute ineffective assistance of counsel. See *Commonwealth v. Arroyo,* 442 Mass. 135, 145 (2004) (failure to object to admission of evidence not ineffective assistance where evidence properly admitted); *Commonwealth v. Comita,* 441 Mass. 86, 91 (2004) (not ineffective assistance to fail to file a motion with only a minimal chance of success); *Commonwealth v. Carroll,* 439 Mass. 547, 557 (2003) (not ineffective assistance of counsel to fail to file futile motion asking judge to reconsider motion in limine ruling).

To the extent that the defendant complains that defense counsel expanded the sex evidence beyond the temporal limits of this Court's pre-trial ruling, counsel offered a credible explanation for such conduct. See *Commonwealth v. Hill,* 432 Mass. at 718 (decision not manifestly unreasonable where defense counsel produces a credible tactical explanation for his decision). The introduction of additional sex evidence was part of a strategy to show the jury that the defendant's extramarital activities had been occurring for some time and there was not, as portrayed by the Commonwealth, an unprecedented explosion of extramarital sex occurring in the week prior to the murder. This strategy, although it involved the introduction of potentially prejudicial evidence, was not manifestly unreasonable in light of the Court's ruling that much of the sex evidence was admissible. Cf. *Commonwealth v. Bly,* 444 Mass. at 654 (not manifestly unreasonable for defense counsel to fail to exclude evidence of defendant's prior murder conviction where it supported defense argument that eyewitnesses blamed defendant for murder because he was already in jail for life and was thus expendable). Moreover, defense counsel credibly testified that he discussed this general strategy with the defendant, who agreed. A defendant's informed and voluntary agreement to proceed in accordance with counsel's strategic recommendations undermines a later argument that counsel was ineffective for pursuing that strategy at trial. *Commonwealth v. LaCava,* 438 Mass. 708, 716 (2003); *Commonwealth v. Alvarez,* 62 Mass. App. Ct. 866, 873, rev. den, 443 Mass. 1106 (2005).

The defendant further argues that defense counsel was ineffective in failing to object to the repetition of the sex evidence as prejudicial "piling on" by the Commonwealth. In the context of fresh complaint testimony, the SJC has recognized that excessive and needless repetition of the details of a sexual assault creates a risk of prejudice to the defendant that the jury might use the testimony as substantive evidence that the crime occurred. See, e.g., *Commonwealth v. Trowbridge,* 419 Mass. 750, 761 (1995). That type of risk was not present in this case, where the sex evidence related only to the defendant's motive and not a substantive element of the crime. In addition, the admission of cumulative evidence does not commonly constitute reversible error and it is not ineffective assistance of counsel to fail to make an objection which would not have succeeded. See *Commonwealth v. Bart B.,* 424 Mass. 911, 915 (1997).

Moreover, even assuming that defense counsel might have succeeded in limiting some of the cumulative sex evidence, it is clear that he had a tactical reason for not objecting. Repeated objection in front of the jury would have focused their attention on the sex evidence as something the defendant desired that they not hear. It is clear from the record that defense counsel had adequately preserved for appeal the issue of the admissibility of the sex evidence, and objection was not necessary for that purpose. Failure to object to the admission of unfavorable evidence as part of a reasoned trial strategy does not constitute ineffective assistance of counsel, even where such evidence is inadmissible hearsay. *Commonwealth v. Alphas,* 430 Mass. 8, 13 (1999); *Commonwealth v. Carmona,* 428 Mass. at 276. See, e.g., *Commonwealth v. Fanara,* 47 Mass. App. Ct. 560, 565-566, rev. den., 720 N.E.2d 468 (1999) (not manifestly unreasonable to elicit details of fresh complaint testimony, where defense counsel used testimony to point out inconsistencies in victims' various statements and undermine their credibility). Given this Court's pre-trial ruling that extensive sex evidence was relevant and admissible, it was not manifestly unreasonable for counsel to minimize the importance of such evidence by failing to object and arguing that the Commonwealth's emphasis on the sex evidence was a desperate attempt to sully the defendant in the absence of a convincing motive.

Finally, the defendant contends that counsel was ineffective in failing to object to the prosecutor's misuse of the sex evidence during closing argument. There is no merit to the defendant's suggestion that the prosecutor's use of the sex evidence did not further the motive argument and was merely inflammatory. Nor is there merit to the argument that the prosecutor referred to two sex matters which lacked support in the evidence. First, the prosecutor stated during closings that the defendant described his wife as "old and soft" although there was no direct trial testimony to that effect. During cross-examination, the prosecutor asked the defendant whether he told a prostitute that he was separated from his wife, who was old and soft. The defendant responded, "I did not say that exactly," and later testified that he did not say old and did not recall saying soft, but said they no longer had sex. In addition, the defendant complains that the prosecutor stated during closing arguments that he sought out a woman named Elizabeth with whom he had a long term relationship. The defendant had testified that he had sex with a prostitute named Elizabeth several times and that after that, he called her but she did not return his calls.

Prosecutors must limit the scope of their arguments to facts in evidence and those inferences which may be reasonably drawn, and must take care not to misstate the evidence. *Commonwealth v. Coren,* 437 Mass. 723, 731 (2002). Here, the prosecutor's statements relating to May as "old and soft" and the defendant seeking out Elizabeth had some basis in the evidence and the inferences to be drawn therefrom. Moreover, defense counsel credibly testified that he chose not to object to minor misstatements of the evidence because the Court's response was generally to instruct the jury that closings are not evidence and they must be guided by their own recollection of the evidence. Cf. *Commonwealth v. Carlton,* 43 Mass. App. Ct. 702,706 (1997) (not ineffective assistance of counsel to fail to make an objection with no reasonable likelihood of success). Finally, any slight misstatement in the sex facts did not go to the heart of the case and did not create a substantial likelihood of a miscarriage of justice.

### D. *Failure to Call Carole Ottesen*

The defendant contends that trial counsel was ineffective in failing to call a particular witness, Carol Ottesen, to establish that he and May were happily married. According to an affidavit filed by Ottesen in support of the defendant's motion for a new trial, she would have testified that she had known May for 25 years, they shared intimate details of their lives, May never expressed dissatisfaction with her marriage and described it as successful, May described her husband as a supportive, caring,

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

long-term partner, and May never complained about her sex life or about anything her husband was doing in that realm outside of their marriage. The defendant argues that evidence that May spoke favorably of her relationship with her husband just a few weeks prior to her murder would have been a powerful rebuttal of the prosecution's theory that the Greineder marriage was deteriorating, culminating in the defendant killing his wife. Accordingly, the defendant contends that counsel's failure to call Ottesen as a witness was conduct falling measurably below that expected from an ordinary fallible lawyer which created a substantial likelihood of a miscarriage of justice.

Whether to call a particular witness is a matter of tactical strategy, giving rise to error only if the decision was manifestly unreasonable when made. *Commonwealth v. Zagrodny*, 443 Mass. 93, 102 (2004); *Commonwealth v. Britto*, 433 Mass. 596, 602 (2001). The inquiry is whether counsel's decision with respect to calling a witness was an informed and reasonable one, a consideration assessed in light of his over-all representation of the defendant at trial. *Commonwealth v. Frank*, 433 Mass. at 192. The defendant complains that defense counsel never interviewed Ottesen prior to deciding not to call her as a witness. Counsel has a duty to undertake reasonable investigations, but may make a reasonable decision that makes particular investigations unnecessary. *Commonwealth v. Denis* 442 Mass. 617, 629 (2004). Although a claim of failure to interview a witness may sound impressive in the abstract, it cannot establish ineffective assistance of counsel when the person's account is otherwise fairly known to defense counsel. *Commonwealth v. Conley*, 43 Mass. App. Ct. 385, 393 (1997). Here, counsel spoke to the defendant about Ottesen and read the police report of her interview. He was thus sufficiently informed to be in a position to weigh the potential benefits and harm of calling her to testify. Cf. *Commonwealth v. Farley*, 432 Mass. 153, 156-157 (2000) (where defendant's sole defense was that another individual committed the crime, it was ineffective assistance for counsel not to interview that individual, either before or after he became witness for Commonwealth); *Commonwealth v. Garcia*, 66 Mass. App. Ct. 167, 172 (2006) (in indecent assault and battery case which was battle of credibility, it was manifestly unreasonable for defense counsel to fail to review witness's pretrial statements in order to obtain enough information to decide whether she should testify, where witness reported that child victim repeatedly denied assault unless mother was in room encouraging accusations).

Defense counsel decided not to call Ottesen to testify because he believed the defendant's children would be stronger witnesses concerning the state of the Greineder marriage because they, unlike Ottesen, were percipient witnesses to the marriage. See *Commonwealth v. Britto*, 433 Mass. at 602 (it is not manifestly unreasonable to fail to call a witness whose testimony is cumulative of other testimony). Moreover, counsel had some concern that Ottesen might be cross-examined about negative aspects of the marriage of which she was unaware. Counsel's tactical decision not to call Ottesen as a witness cannot be deemed to be manifestly unreasonable, particularly in light of the fact that her testimony did not bear on a crucial element of the Commonwealth's case and did not establish a substantial ground of defense. There is no ineffective assistance where counsel's failure to call a particular witness was the result of a reasonable assessment that the witness's testimony would not materially assist the defendant's case. See *Commonwealth v. Nerette*, 432 Mass 534, 539 (2000). Cf. *Commonwealth v. Hill*, 432 Mass. 704, 718-719 (2000) (manifestly unreasonable to fail to call witness whose testimony could have called into question the Commonwealth's entire theory of how the crime occurred); *Commonwealth v. Delacruz*, 61 Mass. App. Ct. 445, 450 (2004), aff'd, 443 Mass. 692 (2005) (manifestly unreasonable to fail to call witness whose testimony, if believed, would exonerate defendant); *Commonwealth v. Aviles*, 40 Mass. App. Ct. 440, 445-446, rev. den., 423 Mass. 1105 (1996) (manifestly unreasonable to fail to call chiropractor to testify about defendant's physical condition due to accident a week before attempted rape, where defendant's alibi was that he was home disabled because of the accident). The claim of ineffective assistance based on counsel's failure to call Ottesen may be "the second guessing of a lawyer who has the luxury of pondering the transcript after the battle is over." *Commonwealth v. Hunt*, 38 Mass. App. Ct. 291,296, rev. den., 420 Mass. 1103 (1995). Counsel's decision not to call Otteson was a tactical decision that was reasonable when made. As such, it is entitled to deference by this Court. *Commonwealth v. Berry*, 68 Mass. App. Ct. 78, 82 (2007).

Thus, this Court concludes that the non-expert ineffective assistance of counsel claims asserted by the defendant lack sufficient merit, considered either individually or collectively, to warrant a new trial. Throughout the course of a trial, defense counsel must make numerous tactical decisions, and a list of subjective critiques of those decisions is insufficient to support a claim of ineffective assistance, absent a showing that the errors likely affected the jury's conclusions. *Commonwealth v. Denis*, 442 Mass. at 625. The defendant has failed to make such a showing here.

## II. DNA ISSUES

The defendant further contends that justice was not done in his case because trial counsel was constitutionally ineffective in his handling of the DNA evidence at trial and the DNA evidence was scientifically unreliable and should not have been presented to the jury.

### A. *Failure to file Lanigan Motion*

The defendant first contends that counsel's failure to file a pre-trial *Lanigan* motion to exclude Cellmark's DNA test results as unreliable was conduct involving serious incompetency, inefficiency or inattention of counsel, falling measurably below that expected from an ordinary fallible lawyer. See *Commonwealth v. Phinney,* 446 Mass. 155, 162 (2006).

### 1. Investigation of Motion

Defense counsel has a duty to conduct an independent investigation of the forensic, medical, or scientific evidence on which the Commonwealth intends to rely to prove the defendant's guilt. *Commonwealth v. Baker,* 440 Mass. 519, 529 (2003). It is clear from the evidentiary hearings that counsel's decision not to mount a *Lanigan* challenge was not made hastily but rather, was made after consultation with several DNA experts and after a thorough investigation of the law and facts bearing on the admissibility of Cellmark's work. Defense counsel knew that Cellmark was the only laboratory using a threshold a low as 40 RFUs and that there are difficulties, including allelic dropout and stutter problems, with the analysis of DNA mixtures, particularly those involving LCN. Counsel was also well aware of Dr. Davis's criticisms that Cellmark's work was unscientific and unreliable because it had failed to adequately validate its 40 RFU threshold, lacked sufficiently definite interpretation guidelines, and conducted its interpretations with knowledge of the profiles of the defendant and the victim. [5] Nonetheless, defense counsel recognized that courts in Massachusetts and elsewhere had found issues of RFU, sample size, mixtures, and stutter to bear on the weight rather than the admissibility of DNA test results. In particular, counsel was familiar with Judge Ford's decision in *Commonwealth v. Gaynor,* in which Judge Ford acknowledged that the presence of a mixture makes it more difficult for an analyst to interpret results but rejected arguments that Cellmark's methodology in dealing with mixtures and distinguishing between true alleles and artifacts was not generally acceptable. The court in *Gaynor* further concluded that arguments that Cellmark's results were unreliable because analysts failed to properly consider allele dropout, stochastic effects, spikes, and peak imbalance and because Cellmark analyzed smaller sample sizes than recommended by the manufacturer went to the weight and not the admissibility of the evidence. [6] Although none of the numerous reported and unreported decisions reviewed by defense counsel involved the exact confluence of factors at issue in this case, defense counsel could reasonably conclude that the trend was toward admission of DNA evidence and that a *Lanigan* motion would be denied. See *infra* for this Court's discussion of the likely success of a *Lanigan* motion.

Moreover, defense counsel credibly articulated a tactical reason to refrain from challenging Cellmark's test results below 100 RFUs. A critical component of counsel's strategy for dealing with the DNA evidence was to use the so-called "stranger" alleles to argue that a third party committed the murder. Many of these alleles were called at peaks lower than 100 RFUs. Admittedly, most of the stranger alleles were detected on items other than the critical knife and brown work gloves. However, given the likelihood that at least some of the DNA evidence would be admitted at trial, counsel's decision to emphasize the stranger alleles was not manifestly unreasonable. See *Commonwealth v. Alphas,* 430 Mass. 8, 13 (1999) (failure to object to the admission of unfavorable evidence as part of reasoned trial strategy is not ineffective assistance of counsel). Although counsel could have pursued this strategy by emphasizing only those stranger alleles above 100 RFUS, the ones found on the victim's blue gloves, it was reasonable to believe that the presence of stranger alleles on the knife and the brown work gloves would bear more significance to a jury in assessing reasonable doubt.

In addition, Murphy was concerned that conducting a *Lanigan* hearing would run the risk of educating the prosecutor and Dr. Cotton prior to trial about the weaknesses in the DNA evidence. Murphy was aware from his research that Dr. Cotton typically did not review the electronic data before testifying, and he did not want to provide her with the incentive to do so prior to trial. He believed that it would be strategically wiser to maximize the impact, in front of the jury, of her failure to review the electropherograms. This tactical decision was not manifestly unreasonable. See *Commonwealth v. Choeurn*, 446 Mass. 510, 520-521 (2006).

After considering all these factors, defense counsel made a strategic decision not to file a *Lanigan* motion, a decision concurred in by Thompson, one of the country's most knowledgeable attorneys on DNA issues. Strategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Commonwealth v. Nardone*, 406 Mass. 123, 126-127 (1989). This Court cannot conclude that Murphy's strategic decision not to file a *Lanigan* motion was manifestly unreasonable on April 17, 2001.

## 2. Likely success *of Lanigan* motion

Further, in order to establish ineffective assistance of counsel based on the failure to file a pre-trial *Lanigan* motion, the defendant must establish that his challenge would have been successful at that stage of the proceedings. *Commonwealth v. Beliard*, 443 Mass. 79, 91 (2004). After careful consideration of all the evidence before this Court, including the affidavits of Dr. Eisenberg, Dr. Cotton, Dr. Brenner, and Joanne Sgueglia, this Court is not persuaded that Cellmark's test results were excludable as scientifically unreliable. When faced with a motion to exclude DNA evidence, the Court's role as gatekeeper is to determine whether the methodology underlying the expert testimony is scientifically reliable and whether the actual testing performed in the case was conducted in a valid manner. *Commonwealth v. McNickles*, 434 Mass. 839, 850 (2001); *Commonwealth v. Vao Sok*, 425 Mass. 787, 794 (1997).

Here, Dr. Eisenberg opines that Cellmark could not reliably call any alleles at 40 RFUs given the LCN mixtures in the samples in this case. This Court has not been presented with any scientific literature or case precedent supporting the notion that use of a threshold below 100 RFUs is categorically invalid in cases involving LCN samples, DNA mixtures, or both. See *Commonwealth v. O'Laughlin*, 446 Mass. 188, 207-208 n. 17 (2006) (fact that defendant's expert disagreed with laboratory's RFU threshold for reporting results not a basis for *Lanigan* hearing where expert had no studies or other criteria supporting his opinion). Dr. Eisenberg's informal survey of nine laboratories which will not perform LCN mixture analysis at low RFUs does not persuade this Court that such analysis is scientifically unreliable. Rather, the testimony by Dr. Cotton and Sgueglia suggests that the RFU threshold for interpretation varies widely among laboratories, and the reliability of results at various levels depends on the laboratories' validation studies. Dr. Cotton's affidavit states that Cellmark saw in validation studies that good data was obtained at 40 RFUs. Moreover, the SJC has upheld trial court findings that Cellmark has conducted validation studies indicating that analysts could reliably interpret test results based on readings as low as 40 RFUs, notwithstanding the manufacturer's recommendation of a 150 RFU threshold See *Commonwealth v. Gaynor*, 443 Mass. 245, 267 (2005).

Dr. Eisenberg makes the important point that the analysis of LCN mixtures entails significant difficulties of interpretation compared to single source samples, and argues that Cellmark's guidelines and standard operating procedures are inadequate in guiding analysts in this task. However, this Court finds credible the assertion of Dr. Cotton, supported generally by the affidavit of Sgueglia, that analysts at Cellmark are capable of considering and accounting for issues of stutter and dropout, based on experience and expertise. Finally, Dr. Eisenberg's criticism with respect to possible analyst bias, like the other issues just discussed, goes to the weight and not the admissibility of Cellmark's test results. See, e.g., *Commonwealth v. Gaynor*, 443 Mass. at 263-267 (judge properly rejected argument that Cellmark's methodology in dealing with mixtures and distinguishing between true alleles and artifacts was not generally acceptable, and properly concluded that arguments that results were unreliable because analysts failed to properly consider allele dropout, stochastic effects, spikes, and peak imbalance, and because Cellmark analyzed smaller sample sizes than recommended by the manufacturer went to weight not admissibility). See also *Commonwealth v. O'Laughlin*, 446 Mass. at 207 (argument that laboratory's threshold levels for reportable results was improper was matter for cross-examination); *Commonwealth v. McNickles*, 434 Mass. at 849-850 (argument that results of PCR testing

are unreliable due to small sample size went to weight, not admissibility of evidence); *Commonwealth v. Vao Sok*, 425 Mass. at 806 n. 27 (suggesting that defense assertions of sample contamination and probative force of interpretations are issues of weight). Accord *People v. Henderson* 107 Cal App. 4th 769, 784-788 (App. Ct. 4th Dist. 2003) (upholding admissibility of STR testing performed on multiple source sample as scientifically reliable, despite argument that mixed samples produce stutter complications).

Thus, this Court, in its discretion, would most likely have rejected a *Lanigan* challenge to Cellmark's test results in this case, despite the serious issues raised by Dr. Eisenberg. Defense counsel's failure to file such a motion therefore does not constitute ineffective assistance of counsel warranting a new trial. See *Commonwealth v. Arroyo*, 442 Mass. 135, 145 (2004) (failure to object to admission of evidence not ineffective assistance of counsel where evidence properly admitted); *Commonwealth v. Comita*, 441 Mass. 86, 91 (2004) (not ineffective assistance of counsel to fail to file motion with only minimal chance of success). [7]

## B. *Handling of DNA Evidence at Trial*

The defendant contends that counsel was ineffective in his handling of the DNA evidence at trial. First, the defendant argues that counsel should have filed a motion to dismiss the indictment based on Pino's testimony in front of the Grand Jury. The defendant argues that it was misleading for Pino to testify that Cellmark concluded that the frequency of a match to the glove in the Caucasian population was 1 in 20,000 without disclosing that the initial Cellmark report stated that the defendant could not be excluded but no further conclusions could be made as to the secondary source. He contends that it was also misleading for Pino to fail to tell the Grand Jury that Cellmark's statistical calculation was made only at her request.

Dismissal of an indictment is required when the defendant demonstrates that the integrity of the Grand Jury proceedings was impaired. *Commonwealth v. Drumgold*, 423 Mass. 230, 235 (1996). To establish impairment of the Grand Jury, the defendant must show that false or deceptive evidence was given to the Grand Jury knowingly and for the purpose of obtaining an indictment, and that the presentation of the false or deceptive evidence probably influenced the Grand Jury's decision to indict. *Commonwealth v. Graham*, 431 Mass. 282, 290, cert. den., 531 U.S. 1020 (2000); *Commonwealth v. Drumgold*, 423 Mass. at 235. This requires a showing that the. evidence was material to the question of probable cause and that on the entire Grand Jury record, the false or deceptive testimony probably made a difference. *Commonwealth v. Drumgold*, 423 Mass. at 235. Dismissal of an indictment is also warranted if prosecutors do not disclose exculpatory evidence which would greatly undermine the credibility of evidence likely to affect the decision to indict, or if the Commonwealth uses evidence that gives a distorted picture of its probative force. *Commonwealth v. Levesque*, 436 Mass. 443,446 (2002); *Commonwealth v. Drumgold*, 423 Mass. at 239.

Here, the record is devoid of evidence that Pino intentionally misstated the facts concerning the Cellmark reports and the statistical calculation for the purpose of obtaining an indictment. Rather, it appears that she intended to simplify the evidence by testifying as to Cellmark's ultimate conclusion, and any misstatement that the statistic came from an initial report was inadvertent. Moreover, any omission in withholding the evidence concerning the conclusion in the initial Cellmark report did not greatly undermine the credibility of the evidence likely to affect the decision to indict. Even if the Grand Jury had known all of the facts surrounding the preparation of the statistical calculation that was the subject of Pino's testimony, it is unlikely that their decision to indict would have been affected. See *Commonwealth v. Mayfield*, 398 Mass. 615, 621 (1986). Although such evidence might have raised some doubt as to the reliability of Cellmark's statistical calculation, the other evidence presented to the Grand Jury was more than adequate to establish probable cause to return an indictment. Accordingly, counsel's failure to file a motion to dismiss the indictment did not constitute ineffective assistance of counsel and did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Graham*, 431 Mass. at 290 (no ineffective assistance from failure to move to dismiss where defendant failed to demonstrate Grand Jury impairment).

The defendant further contends that counsel was ineffective in failing to retain a statistics expert to challenge Cellmark's statistical calculations at trial. After discussing the statistics issue with his experts, including Thompson, defense counsel made

a reasoned decision that such an expert was not necessary because no alternative statistical analysis of the raw data would significantly reduce the probability of a match to the defendant. Moreover, the jury's acceptance of the defendant's secondary transfer theory would render Cellmark's statistical calculation irrelevant. The decision not to retain a statistical expert was not manifestly unreasonable, given that the DNA results were only one of numerous pieces of incriminating evidence in the case against the defendant. Cf. *Commonwealth v. Haggerty,* 400 Mass. 437,442 (1987) (ineffective assistance of counsel to fail to seek expert opinion on whether defendant's beating of victim was proximate cause of her death where that was the only realistic defense).

Finally, the defendant argues that counsel was ineffective in failing to seek a continuance to find a forensic expert to replace Dr. Davis to testify at trial concerning the unreliability of Cellmark's results. Counsel did in fact consider whether to seek a continuance but believed that the defense was manageable with the testimony of Dr. Krane and Taylor, and with intense cross-examination of Dr. Cotton. Critical in this calculus was the likelihood that further delay would result in the loss of support and presence at trial of the defendant's eldest daughter, Kirsten. Defense counsel was keenly aware of the importance of having all three children present in the courtroom supporting their father in front of the jury. Counsel's belief that the children's presence was crucial was borne out by the intense media coverage before and during the trial, which often focused on the children and their demeanor.

It was reasonable for Murphy to conclude that to locate and prepare an expert for trial who shared the defense's negative view of Cellmark's work would have required a continuance which would have taken the trial beyond Kirsten's wedding date. It was also reasonable for Murphy to conclude that once married to a man who was convinced of the defendant's guilt, the eldest daughter would unlikely have appeared each and every day at trial in support of the defendant. The decision, a month or two before trial, not to seek a continuance cannot be deemed to be manifestly unreasonable. Although other experienced counsel might reasonably have concluded that a continuance was warranted, the strategic decision to proceed to trial did not constitute serious incompetency, inefficiency, or inattention of counsel falling below that expected from an ordinary fallible defense lawyer. See *Commonwealth v. Avarez,* 433 Mass. 93, 101 (2000). This Court must give deference to strategic decisions which were not manifestly unreasonable when made. *Commonwealth v. Berry,* 68 Mass. App. Ct. 78, 82 (2007). Cf. *Commonwealth v. Nardone,* 406 Mass. 123, 126-127 (1989) (not ineffective assistance for defendant to fail to call ballistics expert after stating in his opening he would do so, where expert became uncomfortable with his planned testimony halfway through trial, and counsel consulted with another expert but made strategic decision that the substitute testimony would not significantly advance his case beyond points made through cross-examination of Commonwealth's experts).

The record reveals that defense counsel conducted a searching cross-examination of Dr. Cotton, focusing on alleles in the raw data not considered by Cellmark and comparing Cellmark's results to the results that would have been reached applying the FBI's standards. In addition, : counsel emphasized the presence of the stranger alleles in the raw data and the possibility that the defendant's DNA was deposited on the evidence through secondary transfer. That in hindsight these trial tactics proved unsuccessful does not establish ineffective assistance of counsel. *Commonwealth v. Smith* 427 Mass. 245258 (998); *Commonwealth v. Sielicki,* 391 Mass. 377, 379 (1984). For all of the reasons discussed above, the defendant has not met his burden of establishing that counsel was constitutionally ineffective with respect to the DNA issues raised before and during trial.

An attorney representing a client in a murder case for 18 months preceding trial and during six weeks of trial makes numerous decisions which, after an unfavorable verdict, may be the subject of "Monday morning quarterbacking." See *Commonwealth v. Almeida,* 34 Mass. App. Ct. 901,903-904 (1993). Strategies and choices which were well thought out may prove unsuccessful and, with the verdict in mind, Mr. Murphy may well believe he should have done certain things differently. Nonetheless, the actions which are the subject of the defendant's ineffective assistance of counsel claims did not fall below the standard of competence expected from an ordinary fallible defense lawyer and do not warrant a new trial.

## III. FOOTPRINT EVIDENCE

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Finally, the defendant contends that he is entitled to a new trial on the ground that counsel was ineffective in his handling of the footprint evidence and more importantly, on the ground that it has now been determined that State Police Sergeant Deborah Rebeiro's trial testimony concerning an inculpatory footprint was erroneous.

## A. *Ineffective Assistance of Counsel*

The defendant's position is that his counsel was ineffective for not hiring a footprint expert to testify at trial and for not discovering the error in Rebeiro's testimony in advance of, or at, trial. As discussed in connection with the DNA evidence, defense counsel has a duty to conduct an independent investigation of the forensic evidence on which the Commonwealth intends to rely to prove the defendant's guilt. *Commonwealth v. Baker,* 440 Mass. 519, 529 (2003). Here, defense counsel retained the services of a competent expert who examined the Commonwealth's footprint evidence and found no issue with it at the time. A further expert consultation did not appear warranted. Counsel's choice not to have a footprint expert testify at trial was a reasonable and informed decision to which this Court will defer. *Commonwealth v. Frank,* 433 Mass. 185, 192 (2001). Further, defense counsel's failure to discover Rebeiro's error was not incompetence. Counsel is not required to second guess the opinion of his own retained expert, especially under circumstances where that opinion was consistent with other significant evidence linking the defendant to the murder scene at the time of the bloodshed event. Accordingly, counsel's representation did not fall below the standard of the average practicing defense attorney and did not constitute ineffective assistance of counsel. See *Commonwealth v. Phinney,* 446 Mass. 155, 162 (2006).

## B. *Rebeiro's Changed Opinion as Newly Discovered Evidence*

The defendant more forcefully argues that Rebeiro's change in opinion warrants a new trial because the jury considered testimony about F7 which has now been revealed to be incorrect. The defendant frames the issue as one of recanted testimony. See, e.g., *Commonwealth v. Raymond,* 424 Mass. 382, 397 (1997) (noting that although new trial is not required based on affidavit that a key prosecution witness may have lied, serious consideration from motion judge is warranted). [8] In determining whether to grant a new trial, the defendant urges this Court to apply the favorable *Larrison* test [9] first articulated by the Seventh Circuit and adopted by several other jurisdictions. Under *Larrison,* the court grants a new trial based on the recantation of a material government witness if satisfied that the witness's trial testimony was false; without the false testimony, the jury *might* have reached a different verdict; and the party seeking a new trial did not know of the testimony's falsity until after trial. See *United States v. Willis,* 257 F.3d 636,642-643 (6th Cir. 2001).

Our courts, however, have never adopted the *Larrison* standard and the case law in Massachusetts treats recantation of a material witness's testimony as a matter of newly discovered evidence. See *Commonwealth v. Waters,* 410 Mass. 224, 228-231 (1991) (applying newly discovered evidence standard to material witness's recantation of testimony, where defendant failed to prove that conviction obtained by knowingly false testimony); *Commonwealth v. Tobin,* 392 Mass. 604,618-619 (1984) (suggesting that recantation of testimony constitutes newly discovered evidence); *Commonwealth v. Robertson,* 357 Mass. 559, 562 (1970) (applying standard of newly discovered evidence where key Commonwealth witness recanted trial testimony, claiming that it had been coerced by police). Moreover, the First Circuit has expressly refused to apply the *Larrison* test, concluding that a motion for a new trial based on false testimony by a material government witness should be analyzed under the usual standard for newly discovered evidence. [10] *United States* v. *Huddleston,* 194 F.3d 214, 221 (1st Cir. 1999). This Court declines the invitation to adopt the more favorable *Larrison* standard, especially under circumstances where the incorrect trial testimony was neither the product of a lie nor bad faith, and will treat the change in Rebeiro's opinion as newly discovered evidence. [11]

A defendant seeking a new trial on the ground of newly discovered evidence must establish that the evidence was unknown to the defendant and was not reasonably discoverable at the time of trial, and that the evidence casts real doubt on the justice of the conviction. *Commonwealth* v. *Shuman,* 445 Mass. 268,271-272 (2005). The evidence must be material and credible and carry a measure of strength in support of the defendant's position. *Id.* at 272. The decision to deny or grant a motion for a new

trial based on newly discovered evidence is committed to the sound discretion of the court. *Id.* The court's determination is not based on its conclusion as to the defendant's guilt or innocence; rather, the question is whether the newly discovered evidence if admitted at trial would have been a real factor in the jury's deliberations, such that there is a substantial risk that the jury would reach a different conclusion if exposed to the evidence. *Commonwealth v. Weichell,* 446 Mass. 785, 798 (2006); *Commonwealth v. Shuman,* 445 Mass. at 272; *Commonwealth v. Cintron,* 435 Mass. 509, 516 (2001); *Commonwealth v. Markham,* 10 Mass. App. Ct. 651,654 (1980). A motion judge who was also the trial judge is in the best position to determine the probable impact on a jury hearing the new evidence with all of the other evidence. *Commonwealth v. Cintron,* 435 Mass. at 517. In evaluating the impact of newly discovered evidence, the judge is entitled to make use of his knowledge and observation of what occurred at trial. *Commonwealth v. Grace* 397 Mass. 303,306 (1986).

This Court credits Rebeiro's affidavit that her trial testimony concerning F7 was erroneous because F7 represents the defendant's toe and not his heel. Indeed, the Commonwealth does not challenge the credibility of Rebeiro's change in opinion but rather, contends that the change is not material and does not cast doubt on the defendant's conviction. The Commonwealth argues that the erroneous heel print evidence was essentially *de minimis* when considered with all of the other evidence in the case and fails to even approach the threshold for the granting of a new trial. In contrast, the defendant argues that Rebeiro's change in opinion warrants a new trial because the jury might well have had a reasonable doubt had the heel print evidence been eliminated and toe print evidence presented in its stead. The elimination of the heel print negates a facet of the Commonwealth's theory that the defendant must have been the murderer because his heel print demonstrated that he dragged the victim's body out of the center of the path, where the fatal assault commenced. Moreover, the defendant argues that the erroneous heel print evidence, when considered with all of the alleged instances of ineffective representation, without question, warrants the granting of a new trial.

This Court is not persuaded by the Commonwealth's argument that the change in Rebeiro's opinion is immaterial because the critical aspect of her testimony was the presence of the defendant's footprint in a large pool of blood in the center of the path where the undisturbed drag marks to the victim's heel began, with the matter of toe versus heel of little significance. It is abundantly clear from the trial record that the Commonwealth's view of the footprint evidence, which was effectively presented and persuasively argued to the jury, was that the positioning of the back of the defendant's heel mark facing away from the center of the path and towards the grassy area evidenced that the defendant had dragged the victim's body from the center of the path to its final resting place off of the path. [12] The uncontroverted evidence was that the victim first received one or more substantial blows when she was in the middle of the dirt path and then was dragged head first and face up to the grassy area off the path where other blows were struck. The blood pool in the middle of the path evidences the site where one or more wounds was first inflicted, the drag marks and blood on the victim's heels demonstrate the movement off the path, and the blood spatter on the victim's face evidences the site of the second phase of the attack.

An important issue at trial was the identity of the person who dragged the victim from the path to the grass. Two pieces of evidence directly supported the Commonwealth's theory that the defendant held the victim from behind and dragged her off the path to the grass. First, transfer blood on his jacket was consistent with holding the victim from behind; and second, a heel print in the drag mark with the back of the print facing the grass was consistent with dragging a substantial weight. The recent change in Rebeiro's opinion concerning F7 negates the second link and offers a measure of support for the defendant's version of events: that his footprints were left in the path as he approached the victim to determine her condition and render assistance.

For purposes of granting or denying a new trial, the question is whether the change in Rebeiro's opinion, if admitted at trial, would have been a real factor in the jury's deliberations, such that there is a substantial risk that the jury would reach a different conclusion if exposed to the evidence. *Commonwealth v. Weichell,* 446 Mass. at 798; *Commonwealth v. Shuman,* 445 Mass. at 272. The trial transcript, the video of the closing argument, and this judge's recollection of the trial all show that the Commonwealth persuasively drove home to the jury its theory that the heel print was strongly probative of the defendant's identity as the dragger of the victim, and thus the murderer. However, the trial testimony revealed that most of the foot traffic on the path did not leave identifiable footprints on the surface. The newly discovered evidence leads to the conclusion that, if the murderer moved backwards while dragging the victim, then he left no footprints whatsoever on the dirt path. Hence, the absence of the defendant's heel print does not rule out his dragging the victim consistent with the Commonwealth's theory.

That, in addition to the blood transfer evidence that the defendant held the victim from behind, supports the Commonwealth's theory at trial. Moreover, the evidence that F7 represents the defendant's toe print pointing towards the grass puts him in the drag pattern where it might be argued, in the alternative, that he dragged the victim while straddling her or dragged her while carrying her against his side. Rebeiro's changed opinion about F7 weakens, but does not negate, the Commonwealth's argument at trial that the defendant dragged the victim's body off the path.

Nonetheless, this Court concludes that Rebeiro's new opinion would not have been a real factor in the jury's deliberations because even without the heel print, there was substantial evidence which placed the defendant at the scene as the bloodshed event was unfolding. The jury was privy to the blood spatter evidence which was probative of the defendant's presence at the scene at the time of the attack and strongly supports the theory that he was the dragger and thus the murderer. There was expert testimony that the blood spatter on the defendant's sneakers and on his jacket sleeve was from medium velocity impacts, suggesting that the defendant was inches away at the time the wounds were inflicted. In addition, there was testimony that the blood stains on the pocket, knee and cuff of the defendant's jeans were medium velocity blood spatter, also consistent with being in close proximity when blood was shed. Moreover, the swipe transfer blood stain on the defendant's glasses, coupled with the pattern of dots on the lens which the jury may well have found were a blood stamp pad type of impression from the murder glove, is consistent with the defendant's presence during the dragging and murder.

Admittedly, the Commonwealth's emphasis on the heel print in its closing argument might have overshadowed other significant linkage evidence. However, without the heel print evidence, the prosecutor would probably have offered alternative theories of the dragging of the victim, either with the defendant moving backwards and making no footprint impression or moving forward with or without making a toe footprint impression. Although these arguments likely would have been less persuasive to the jury, this Court cannot conclude that eliminating both the heel print evidence and the prosecutor's argument on that evidence would have reasonably caused the jury to doubt the theory that the defendant was present at the time the fatal blows were struck and was therefore the dragger.

Moreover, even if elimination of the heel print evidence and the prosecutor's closing argument on the subject would have substantially weakened the Commonwealth's case directly linking the defendant to the dragging, it would not have been a real factor in the jury's deliberations, given all the evidence at trial of the defendant's complicity in his wife's murder. For example, there were numerous pieces of evidence linking the defendant to the brown work gloves, stained with the victim's blood, which were found in the storm drains. The evidence included the absence of blood on the defendant's hands despite the fact that he attempted to take the victim's carotid pulse and her neck was slashed; the absence of blood on the cuffs of his otherwise blood-stained jacket and the abrupt elliptical ending of the bloodstain on the sleeves; the presence of his DNA on one of the gloves; the fibers found under his fingernails; the fact that he was seen leaving the area of the storm drain where one of the gloves and the murder weapons were recovered; the fact that the other glove was recovered from a drain next to where the defendant's car was parked; the dot impression on his glasses matching the glove; the fact that a plastic bag at the murder scene came from the defendant's kitchen but contained no fingerprints; and the fact that similar gloves were secreted inside the roof of his dog house.

Further, the defendant was linked to the knife by the presence of his DNA on that weapon and the fact that he was seen leaving the area of the storm drain where the knife and hammer were recovered. The defendant was also tenuously linked to the hammer through the nails receipt. There was some consciousness of guilt evidence, including the defendant's inconsistent statements to police and inconsistent testimony, and the statements the defendant made to family members about the presence of his DNA at the crime scene. In addition, there was motive evidence that the defendant was pursuing sexual activities outside the marriage and his wife may have discovered those activities. Finally, and perhaps most compelling, there was the evidence of blood spatter on the defendant's shoes, pants, and jacket, as well as the blood smear on his glasses and the numerous transfer stains on his jacket.

The Commonwealth did not need to prove that the defendant dragged the victim's body off the path in order to prove that he was the killer. The jury could have discounted all the footprint evidence and still found beyond a reasonable doubt that the defendant killed his wife. As detailed above, there were numerous pieces of circumstantial evidence tying the defendant to the bloodshed

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

3 incident and to the killing generally. In light of all this evidence, and based on this judge's knowledge and observation of the events at trial, this Court concludes that there is no substantial risk that the jury would have reached a different conclusion if it learned that F7 represents the defendant's toe, not his heel. See *Commonwealth v. Shuman,* 445 Mass. at 271-272. Cf. *Commonwealth v. Buck,* 64 Mass. App. Ct. 760,765 (2005) (concluding that videotape of defendant in bar would have been real factor in jury's deliberations where it bolstered defendant's alibi defense). The change in Rebeiro's testimony, although significant, does not cast real doubt on the justice of the defendant's conviction. Accordingly, this Court in its discretion declines to order a new trial based on newly discovered evidence.

### *ORDER*

For the foregoing reasons, it is hereby *ORDERED* that the defendant's Amended Motion for a New Trial be *DENIED.*

<<signature>>

Paul A. Chernoff

Justice of the Superior Court

DATED: October 31, 2007

## Footnotes

1    At the conclusion of the final post-trial hearing, defense counsel moved to file a Compact Disk ("CD") of the Court TV video to demonstrate the effectiveness of the prosecutor's argument on the "heel print" evidence. The Commonwealth objected. This judge is quite familiar with the video of the closing arguments of both counsel as he has employed it as a teaching aid in his Trial Practice course at Boston College Law School as an example of advocacy and closing style. The Motion for Leave to File an Exhibit is *Allowed* in so far as a CD or DVD of both arguments may be filed. :

2    PCR stands for polymerase chain reaction, a method for amplifying or duplicating minute pieces of genetic material in order to produce a quantity of DNA sufficiently large to be tested.

3    This Court notes that Rebeiro did not directly testify to this; rather, the prosecutor argued that this could be inferred from Rebeiro's footprint testimony.

4    If the test for ineffective assistance of counsel under the Declaration of Rights is met, the requirements of the Federal Constitution are necessarily satisfied as well. See *Commonwealth v. Montanez* 410 Mass. 290, 295 n.7 (1991); *Commonwealth v. Fuller,* 394 Mass. 251, 256 (1985).

5    These are the among the critical concerns raised by Dr. Eisenberg in his three affidavits.

6    This trial court decision was ultimately upheld. See *Commonwealth v. Gaynor,* 443 Mass. 245, 263-267 (2005).

7    The defendant emphasizes that Dr. Cotton should not have been allowed to testify concerning Cellmark's test results. An expert's testimony as to the results of tests obtained by someone else is hearsay where the expert did not review the test data independently to reach an opinion. *Commonwealth v. Evans,* 438 Mass. 142, 152 (2002), cert. den., 538 U.S. 966 (2003). However, it is not an abuse of discretion for a judge to allow a staff scientist to offer an opinion based on DNA testing performed by another analyst at the same laboratory where that scientist independently reviewed the empirical data generated in the case. *Commonwealth v. Hill,* 54 Mass. App. Ct. 690, 695-697 (2002) (permitting one Cellmark staff scientist to testify as to results of test performed by different analyst where although she was not technical reviewer when report was signed, she reviewed entire case file thoroughly to come to court with complete understanding of work that was done). See also *Commonwealth v. McNickles,* 434 Mass. at 855-857 (permitting Dr. Cotton to testify to results of PCR testing performed by other analysts); *Commonwealth v. Sparks,* 433 Mass. 654, 658-659 (2001) (noting that Dr. Cotton was qualified expert in field of DNA testing who independently reviewed data and could testify as to results). Here, Dr. Cotton's testimony was primarily based on her own experience and expertise as applied to the test results obtained in this case, and she conducted an independent review of the empirical data. Accordingly, her testimony was admissible.

8    Here, it is clear that Rebeiro has not "recanted" her testimony in the sense of admitting that it was intentionally false. Rather, upon reflection, Rebeiro now believes that her prior testimony with respect to F7 was erroneous.

9     *Larrison v. United States,* 24 F.2d 82, 87-88 (7th Cir. 1928).

10    Notably, the Seventh Circuit itself has recently rejected the *Larrison* standard and adopted the reasonable probability of acquittal test for evaluating when perjured or false testimony requires a new trial. See *United States v. Mitrione,* 357 F.3d 712, 718 (7th Cir. 2004) (overruling *Larrison*).

11    Because there is neither a hint of wrongdoing nor of bad faith, the Court does not feel compelled to impose a strict due process standard of review, application of which might well result in an order for a new trial.

12    The Commonwealth's citation to *Commonwealth v. Cortez,* 438 Mass. 123, 126-127 (2002) is therefore inapposite. In that case, the court held that counsel's failure to object to an expert's testimony that bloody marks at the scene were made by the victim's heels as her body was dragged through the apartment did not create a substantial likelihood of a miscarriage of justice because the fact that the victim was dragged was not material to the case and did not incriminate the defendant, whose defense was that someone else committed the murder. Here, in contrast, the positioning of the defendant's footprint in relation to the victim's body and the drag marks incriminated the defendant by suggesting that he dragged the victim off the path and thus was her killer.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.