UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---

CIVIL ACTION NO. 2015-CV-12978

---

DIRK GREINEDER,
Petitioner

v.

SEAN MEDEIROS,
Superintendent of MCI-Norfolk,
Respondent

---

**ADDENDUM TO
PETITION FOR WRIT OF *HABEAS CORPUS*
VOLUME 4**

Commonwealth v. Greineder, No. 2000-08588, 2014 WL 3715033 (Mass. Super. 2014) . .73-83

Commonwealth v. Greineder, No. SJ-2014-0352 (2014) . . . . . . . . . . . . . . . 84-89

Respectfully submitted,
**DIRK GREINEDER,**
By his attorney,

/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
Rankin & Sultan
151 Merrimac Street
Boston, MA 02114
(617) 720-0011

2014 WL 3715033
Only the Westlaw citation is currently available.
Superior Court of Massachusetts,
Norfolk County.

COMMONWEALTH
v.
Dirk GREINEDER.

No. 2000–08588.   |   July 24, 2014.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR POST–VERDICT JURY INQUIRY AND NEW TRIAL*

RAYMOND J. BRASSARD, Justice.

***1** On June 29, 2001, defendant Dirk Greineder was found guilty of the deliberately premeditated murder of his wife, Mabel. On July 27, 2005, he filed his first motion for a new trial, which this court (Chernoff, J.) denied in a lengthy decision dated October 31, 2007. Greineder's appeal of that decision was consolidated with the direct appeal of his conviction and argued to the Supreme Judicial Court. On October 23, 2009, the Supreme Judicial Court remanded the case to the trial judge for resolution of the defendant's claim that his right to a public trial was violated by the closure of the courtroom during jury impanelment. In a decision dated February 16, 2010, Judge Chernoff concluded that there was no such violation. On November 4, 2010, the Supreme Judicial Court affirmed the defendant's murder conviction and the denial of his first motion for a new trial. See *Commonwealth v. Greineder,* 458 Mass. 207 (2010).

Greineder petitioned the United States Supreme Court for certiorari review with respect to whether the admission of certain expert DNA testimony at his trial violated the Sixth Amendment confrontation clause. The Supreme Court granted certiorari and remanded the case to the Supreme Judicial Court for further consideration in light of its recent decision in *Williams v. Illinois,* 133 S.Ct. 155 (2012). On March 14, 2013, the Supreme Judicial Court again affirmed the defendant's murder conviction. See *Commonwealth v. Greineder,* 464 Mass. 580, cert. den., 134 S.Ct. 166 (2013).

Greineder now moves for a post-verdict jury inquiry and new trial on the ground that, as revealed by the recently published book *A Murder in Wellesley,* the jury discovered and discussed blood stains on the back of a jacket admitted into evidence as an exhibit, after the judge excluded those stains from evidence. For the reasons discussed below, Defendant's Motion For Post–Verdict Jury Inquiry And New Trial is *DENIED.*

*BACKGROUND*

A critical piece of trial evidence which tied Greineder to his wife's murder was the bloodstained yellow nylon windbreaker jacket he wore that morning. Prior to trial, the defense filed a motion in limine to exclude certain evidence of blood spatter interpretation. On May 17, 2001, prior to the impanelment of the jury, Judge Chernoff held a hearing on that motion. The prosecutor proffered that Ron Englert, a crime scene reconstructionist, would testify that stains on the right back quadrant of the jacket were cast-off stains, consistent with the defendant inflicting a blow on his wife with a weapon, then raising his arm above his head and stopping his arm. When the weapon stopped, small droplets of blood kept going and landed on the back of the jacket. The prosecutor explained that in contrast to the stains on the front of the jacket, the stains on the back initially were not visible to investigators. Those stains were revealed when the back of the jacket was treated with amido black, a stain which is used to detect the presence of protein. Defense counsel informed the court that the use of the amido black precluded testing of the cast-off stains with orthotolidine, the presumptive test for blood used by the Massachusetts Crime Lab. The court did not make a ruling on the motion in limine at that time.

***2** The jury heard the following evidence about the jacket, which was admitted into evidence and marked as Exhibit 241 on June 5, 2001. Responders to the 911 call observed reddish-brown stains on the front shoulders, upper sleeves and elbow, and chest area of the jacket, as well as a stain all along the left arm and cuff that ended abruptly about two inches from the end of the sleeve. A state crime analyst described the jacket as saturated with blood in the inner collar and upper chest areas, with smears along the arms and chest.

On the evening of June 13, 2001, mid-trial, the court conducted a voir dire of Englert outside the presence of the jury. Englert testified that when he examined the jacket under four high intensity lights, he did not observe any stains on the back and concluded that the area was void. Following the amido black treatment, Englert reached the conclusion

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.   1

that the stains on the back of the jacket were cast-off. Based on the location and color of the stains and their similarity to the blood stains on the front of the jacket, Englert inferred that the cast-off stains were blood. However, Englert was not prepared to testify in front of the jury that the stains were blood because they had not been tested for the presence of blood. The prosecutor argued that Englert should be permitted to testify that the stains are consistent with a cast-off of protein such as blood. In response to a question by the judge, the prosecutor stated that notwithstanding treatment with amido black, it was possible to conduct DNA testing of the stains to determine their composition. However, that was never done.

Michael French, an examiner with the Keene County Sheriff's Office in Seattle, testified before the jury about amido black, a chemical which stains proteins a dark blue or black color and is used to enhance stains for better visualization. He explained:

> Amido black comes in a chemical solution. You apply it to the material that you are trying to develop a latent stain on. You let it stand on the material for approximately 30 seconds and you then rinse the stain off. Any contact with protein will stain it a dark blue or black and the background should rinse away with your rinsing process.

French testified that he treated the yellow jacket with amido black at the processing lab in Seattle and then photographed the results.

State Police Trooper Kenneth Martin of the Office of the Chief Medical Examiner testified that he is specially trained in and has testified as an expert in bloodstain pattern analysis. Martin testified that the stains on the right front side and sleeves of the jacket were blood impact spatter, indicating close proximity to a bloodshed incident. Martin further testified that there were transfer stains on the right sleeve shoulder and left sleeve indicating that something bloody came in contact with those surfaces. One of the stains on the sleeve was consistent with a hair swipe, bloody hair coming in contact with the sleeve. Martin also testified about cast-off as follows:

> *3 If we take my hand and I strike that down into that bloody surface, as I impart that energy that blood is going to be projected. Okay. So, that will be my impact spatter as it travels. If there's a wall in front of this particular surface, some will hit this vertical wall, some will head out and actually hit the floor or the surface in front of me.
>
> On the other hand, when you say "fly off" if I take my hand now and it's bloody, if I pull my hand back, using centrifugal force, pulling my hand back, that blood is going to be projected as well. So, that's referred to as cast-off. So, I can actually have the impact spatter resulting from when I draw my hand back, or for example, if I were to draw a weapon back.
>
> ...
>
> Even in a cast-off, for example, in a cast-off pattern, one always is—in fact, the general population assumes that if I strike an individual, and I draw that weapon back, I'm going to be covered with blood. On the contrary, in some of the experiments we've actually conducted with blood, when you draw the weapon back, again centrifugal force projects the blood off, it's not until actually bring that club downwards and actually to this point where I stop where it's actually projected onto my person where one would find is, if I were, again, strike that surface and if we use my notebook here as our surface, as I strike, what will happen, is again, if I strike downward, what's going to happen is that blood will be radiating out 360 degrees so it's possible I may get some of that on myself.

After this trial testimony, Judge Chernoff conducted a voir dire of Martin outside the presence of the jury. Martin testified that the stains on the back of the jacket were cast-off of some protein. Any liquid can create cast-off, including water and protein such as milk. Martin concluded that the stains were cast-off because the pattern was a typical, slow cast-off type of pattern, consistent with cast-off that he has experimented with hundreds of times, creating a pattern "like no other." Martin told the court that he could testify to a reasonable degree of scientific certainty that the stains on the back of the jacket were cast-off, but he could not say to a reasonable degree of scientific certainty that they were blood. Martin stated that there was a very strong inference that they were blood but, "for me, I like to have it tested. I do."

That evening, on June 14, Judge Chernoff issued the following ruling:

> This Court finds that amido black is a *reliable* test for the presence and configuration of a protein substance.

Moreover, the principle of cast-off is sufficiently *reliable* to allow an expert to opine on the vehicle for the configuration here, i.e. cast-off. This Court also concludes that there is a reliable basis for expert evidence that the stains on the back of the jacket, Exhibit No. 241, constitute the cast-off stains of a liquid protein substance. This is *relevant* because, on all of the evidence, the jury might reasonably infer that the source of the stains was blood. Accordingly, the attention of expert witnesses may be drawn to the markings on the back of the jacket and their testimony may include the following (a) that through the use of amido black, the markings show a deposit of a liquid protein substance, (b) that blood is one of many proteins for which amido black yields a positive result, and (c) that the stains on the back of the jacket comprise a pattern consistent with the cast-off of a liquid protein substance.

*4 (emphasis in original). However, several hours later, Judge Chernoff reconsidered his decision and issued a second June 14 ruling entitled, "Order on Reconsideration," stating:

Earlier today, this Court issued a decision on the defendant's Motions in *Limine* to strike certain expert evidence. The Court essentially made three rulings: (1) evidence that protein stains on the back of the defendant's jacket were the product of a cast-off liquid would be admissible ...

On reflection, it appears that the first ruling should be reconsidered. It is clear that the Commonwealth can establish through expert testimony that testing on the back of the jacket was positive for a number of stains of a protein substance and that the configuration of these stains was very consistent with the pattern made by a cast-off liquid, i.e., liquid cast off from an implement being propelled from the front to the back of the wearer of the jacket. The Commonwealth's expert witnesses have testified at extensive *voir dire* hearings that they cannot say within a reasonable degree of scientific certainty that the protein substance on the back of the jacket was blood. This is because all proteins in this world (plant, animal, and human) will yield a positive reaction with the Amido Black reagent. The jury and the experts have been privy to a great deal of blood stain evidence including the rather incriminating stains on the front of the same jacket which are consistent with medium velocity blood spatter. Even though an expert witness may be permitted to assume the truth of all of the evidence submitted in the case, no expert here would testify that the cast-off stains are blood stains. The stains on the back of the jacket are not relevant to the case unless the fact finder can draw the inference that they are cast-off blood stains. The Commonwealth argues that the jury can make that finding inferentially on facts which are not found beyond a reasonable doubt nor even with the standard that governs the experts. In other words that, on the same evidence, the jury can reach conclusions that the experts cannot.

At the *voir dire* hearing on June 12, 2001, this judge heard a Commonwealth expert explain that treatment of a protein with the Amido Black reagent does not render the stain incapable of being further tested, even though it has been indelibly dyed. Subsequent DNA testing of the stain may be possible and hence it might be determined whether it was of human or nonhuman origin, and, if human, the sex of the individual along with other identifying information. More than one dozen proteins stains are evident on the back of the jacket and the Court finds that there is at least the unrealized potential of determining the source of the protein.

As it now stands, the evidence is barely relevant and its prejudicial effect would greatly outweigh its probative value. Hence, evidence of the presence of protein on the back of the jacket and its cast-off configuration will be *excluded.*

*5 (emphasis in original).

The next morning, before the jury arrived, Judge Chernoff discussed with counsel the change in his ruling. The prosecutor suggested cutting out the stained area on the back of the jacket, to which Judge Chernoff responded:

Well, I could just simply tell the jury that what's on the back of the jacket—there's no proof that it's blood and so it's irrelevant to this case. Then they don't think there's something being kept from them. I could simply say it's irrelevant. It's not evidence in this case.

Next © 2015 Thomson Reuters. No claim to original U.S. Government Works.    3

> If you people have an agreement I'll go along with it. If not, I'll make a decision on it.

Counsel apparently never reported any agreement about what was to be done. At a side bar conference later that day, defense counsel stated that he wanted an opportunity to look at the mannequin dressed in the jacket before the jury saw it, and noted that there was a big piece of measuring tape on the back of the jacket. The prosecutor replied, "I can take that off," to which defense counsel responded, "I would prefer to cut that out of it, the whole area out of the jacket. Because if Mr. Englert says anything about cast-off, they're going to draw conclusions." Judge Chernoff then queried whether Englert knew that he could only testify about cast-off on the front of the jacket. Defense counsel responded: "But I think that they'd be able to jump to their own conclusions about the back, if when he starts talking about cast-off, he puts his arm back and when ..." Judge Chernoff then stated, "Well then why don't we move the dummy over here so the jury won't see it and you can take a look at it before you use it." It appears that neither the judge nor counsel ever raised alteration of the jacket or a limiting instruction again.

Englert then testified in front of the jury about the basic properties of blood. He testified about bloodstain analysis as follows:

> Bloodstain analysis is, to simplify, when violence occurs blood is most often shed. And that blood shed can be categorized into three major categories. The first category is low velocity, which simply is drops of blood, transfers of blood, if I have blood on my hand and touch the bar railing, that's considered a swipe. A hand can be determined from a hair swipe from a cloth swipe, from a blood hand and it's all about patterns. Everything in these three different categories is about patterns. So low velocity, again, are drops what's called cast-off type, blood on my hand and I stop my hand the blood continues, whatever it hits and whatever angle you can tell its origin where it come from. You can determine directionality just by the stain itself and I have these cones that I have here. For instance, if a drop of blood falls from the ceiling and strikes a surface like this bar, when you look at it will be round. It falls as a perfect spheroid shape as opposed to a teardrop or an inverted teardrop which you often see in advertisements on paper.

> *6 When a drop hits at an angle, this is the trajectory, the black cone that you're looking at, when it strikes a surface at an angle it starts to become oblong and the more acute that angle, such as this one, you can see the black cone as a demonstration, it's coming at it much more at an angle, it becomes more oblong. So the more acute the angle, whether it's going from the floor up or from your right to your left, that creates an elongated angle with a point on the end. And one can always look and determine the direction that that came from and I have brought a tutorial chart, sir, to be able to demonstrate that.

Englert opined that small stains on the left and right sleeves of the yellow jacket were consistent with medium velocity spatter. He also identified a contact transfer stain on the sleeve, and a hair transfer stain on the left sleeve cuff. He identified reddish brown stains on the sleeves which covered an area of three by three inches and contained voids, and opined that these were consistent with a grabbing type of transfer stain. Englert testified that the stains on the jacket were consistent with touching and moving the victim's body from the back.

Defense witness Stuart James, a forensic scientist who performs crime scene reconstruction and bloodstain pattern analysis, testified that bloodstains act differently on nylon material, which is weather resistant because liquids cannot easily penetrate it. James testified that medium velocity impact spatter is easily confused with satellite spatter, which occurs when small droplets rebound from an initial impact of blood on a surface and fall into each other, forming a small pool. James opined that several areas of splatter on the yellow jacket could be impact spatter or spatter from a passive source.

The jury heard closing arguments and received instructions on the law on June 26, 2001 and found Greineder guilty of first degree murder on June 29, 2001. As noted *supra*, the defendant's exhaustive motion for a new trial was denied and his conviction eventually affirmed on appeal.

On October 9, 2012, Tom Farmer, a *Boston Herald* reporter who covered the trial on a daily basis, and retired State Trooper Martin Foley, the lead police investigator in the case, published a book in print entitled, *A Murder in Wellesley*. The book discusses the jury deliberations in detail and contains what appear to be direct quotes from numerous jurors. Chapter 25 of the book contains the following passage:

> Poring over every inch of the bloodstained evidence, the jurors made another startling discovery on the back of the nylon windbreaker that they had heard no testimony about.

> Discussing what could have caused the small, circular stains highlighted by amido black, they could come to only one conclusion. It had to be blood cast from an upraised weapon. Not knowing [Defense Counsel] Marty Murphy had convinced the judge to keep the incriminating pattern out of evidence because [ADA] Grundy could not prove it was May's blood after deciding not to remove the stain and have it tested, the astute jurors had found it anyway.

*7 Tom Farmer & Marty Foley, *A Murder in Wellesley* 292–293 (Northeastern University Press 2012). This passage forms the basis for Greineder's Motion For Post–Verdict Jury Inquiry And New Trial. In support of the motion, appellate counsel James Sultan has filed an affidavit in which he avers that on January 31, 2014 and February 24, 2014, he spoke by telephone to trial counsel, Martin Murphy, about the trial events with respect to the back of the yellow jacket. Murphy does not recall whether he thought about proposing measures to prevent the jury from seeing the stains during deliberations, such as cutting off the back of the jacket or painting the entire back of the jacket black. Murphy told Sultan that the passage of time has eroded his memory to the point where he simply has no recollection. Reading the relevant portions of the trial transcript did not refresh Murphy's recollection on this subject.

## DISCUSSION

Greineder now moves for a post-verdict inquiry and new trial on the ground that the jury's consideration of the cast-off stains on the back of the jacket violated his Sixth Amendment and art. 12 right to be convicted based solely upon evidence presented in the courtroom. See *Commonwealth v. Beneche*, 458 Mass. 61, 77 (2010) (defendant has right to verdict based solely on evidence presented at trial, governed by rules of evidence, and juror access to prejudicial information not in evidence may invalidate verdict).

### I. WAIVER

The Commonwealth first contends that any argument based on the jury's examination of the back of the jacket has been waived by the defendant's failure to object to the submission of Exhibit 241 to the jury. The jacket was admitted into evidence on June 5, 2001, more than a week prior to the court's voir dire examinations of Englert and Martin and its June 14 ruling excluding evidence of the presence of protein on the back of the jacket and its cast-off configuration. Accordingly, the defendant cannot be faulted for failing to object on June 5. The Commonwealth also argues that Greineder waived the issue by not seeking to remove or conceal the back of the jacket prior to jury deliberations, and by failing to request a limiting instruction or object to the court's general instructions regarding exhibits. Cf. *Commonwealth v. Casey (No. 1)*, 442 Mass. 1, 6 (2004) (defendant's failure to raise issue when he learned that alternate juror had been present in the jury room constituted waiver). The record reveals that there was some discussion between the court and counsel about what, if anything, to do with the jacket in light of the ruling excluding testimony about the cast-off on the back. Judge Chernoff raised the possibility of giving a jury instruction that the back of the jacket was not in evidence and then stated, "If you people have an agreement I'll go along with it. If not, I'll make a decision on it." Ultimately, however, it appears that neither the judge nor the attorneys ever raised the issue again, and the jacket was submitted to the jury during deliberations in its unaltered form, without any limiting instruction. There is a considerable argument that defense counsel's failure to further pursue alteration of the jacket or seek a limiting instruction constitutes a waiver, given that the jury would not have been exposed to the allegedly extraneous evidence had action been taken to prevent it from seeing or considering the back of the jacket. Nonetheless, this court is of the opinion that given the seriousness of the defendant's claim, it is better to address the merits than to rest on waiver. Cf. *United States v. Santana*, 175 F.3d 57, 65 (1st Cir.1999) (noting that jury exposure to extrinsic information is error of constitutional proportions, regardless of whether juror misconduct or judicial error is to blame).

*8 The Commonwealth further contends that Greineder has waived any argument based on the jury's examination of the back of the jacket by failing to raise it in his direct appeal or first motion for a new trial. A motion for a new trial cannot be used as a vehicle to compel review of issues on which a defendant has had his day in court or forgone that opportunity. *Commonwealth v. Balliro*, 437 Mass. 163, 166 (2002); *Commonwealth v. Gagliardi*, 418 Mass. 562, 565 (1994), cert. den., 513 U.S. 1091 (1995). Accordingly, the rule of waiver applies to claims, including those of constitutional dimension, which could have been raised on direct appeal or in a prior motion for a new trial. *Commonwealth v. Gagliardi*, 418 Mass. at 565. See also Mass. R.Crim. P. 30(c)

(2); *Commonwealth v.. Deeran,* 397 Mass. 136, 139 (1986) (defendant must assert all known or reasonably available grounds for post-conviction relief in first new trial motion or those claims are lost). The requirement that a defendant raise a claim of error at the first available opportunity protects the public's interest in the finality of criminal convictions and promotes judicial efficiency. *Commonwealth v. Morganti,* 467 Mass. 96, 102 (2014), petition for cert. filed on May 9, 2014; *Commonwealth v. Randolph,* 438 Mass. 290, 294 (2002).

Here, however, the defendant was unaware of the jury's examination of the back of the jacket and discussion of the cast-off stains at the time he filed and litigated his new trial motion and direct appeal. Although his first new trial motion included a claim that the jury was exposed to extraneous evidence when jurors compared the bloody pattern of dots on the yellow jacket to the pattern left on a banana peel by a juror wearing one of the murder gloves, that claim was based on juror deliberations as recounted in a 2005 book entitled, *Murder at Morses Pond.* There is no indication that the 2005 book contained any suggestion that jurors considered the back of the jacket during their deliberations. Nor could that book create a duty on the part of defense counsel to inquire about other possible jury improprieties, in light of the sanctity of the jury deliberation process. See *Commonwealth v. Pytou Heang,* 458 Mass. 827, 858 (2011) (jury deliberations should be kept secret and inviolable).

The Commonwealth emphasizes that *A Murder in Wellesley* was released on October 9, 2012, while the defendant's remand before the Supreme Judicial Court was pending, before oral argument was heard on November 8, 2012, and before the Supreme Judicial Court affirmed his conviction for the second time on March 14, 2013. However, the remand was limited to the narrow issue of whether the admission of certain DNA evidence violated the Sixth Amendment in light of the Supreme Court's decision in *Williams v. Illinois,* 132 S.Ct. 2221 (2012).[1] The Commonwealth's suggestion that the defendant should have moved for a stay to brief the claim concerning the back of the jacket during the remand process is unrealistic and unpersuasive. Accordingly, the defendant's failure to raise the jury's examination of the back of the jacket in his prior new trial motion or on direct appeal did not constitute a procedural waiver of the right to pursue that claim.

*9 Moreover, the fact that the Supreme Judicial Court conducted a plenary review of Greineder's conviction pursuant to G.L. c. 278, § 33E does not obviate the need for this court to consider the issue, because the jury's alleged exposure to extraneous evidence in the form of the back of the jacket was not apparent from the trial record. See *Commonwealth v. Randolph,* 438 Mass. at 294 (noting that in reviewing first degree murder conviction, Supreme Judicial Court is obligated to consider all issues apparent from the record to determine whether there is substantial likelihood of miscarriage of justice in verdict). For all these reasons, this court rejects the Commonwealth's invocation of the waiver doctrine.

## II. POST-VERDICT INQUIRY

This court declines Greineder's invitation to conduct a post-verdict inquiry of the deliberating jurors. It is essential to the freedom and independence of jury deliberations that jurors' discussions in the jury room should be kept secret and inviolable. *Commonwealth v. Pytou Heang,* 458 Mass. at 858; *Commonwealth v.. Fidler,* 377 Mass. 192, 196 (1979). Post-verdict inquiries are disfavored in the absence of a showing that extraneous matters were brought into the jury's deliberations. *Commonwealth v. Pytou Heang,* 458 Mass. at 858; *Commonwealth v. Lynch,* 439 Mass. 532, 545, cert. den., 540 U.S. 1059 (2003). Extraneous matters include information, knowledge, or specific facts about the matter in litigation that did not come from the evidence at trial. *Commonwealth v. Greineder,* 458 Mass. 207, 246 (2010); *Commonwealth v. Dixon,* 395 Mass. 149, 151 (1985). The defendant must make a colorable showing of exposure to extraneous information, based on something more than speculation, and an evaluation of the adequacy of that showing is left to the sound discretion of the trial judge. *Commonwealth v. Rivera,* 464 Mass. 56, 81 (2103); *Commonwealth v. Lynch,* 439 Mass. at 545; *Commonwealth v. Philyaw,* 55 Mass.App.Ct. 730, 737 (2002). See also *Commonwealth v. Semedo,* 456 Mass. 1, 22 (2010) (judge has broad discretion in determining whether post-verdict inquiry of juror is warranted). Cf. *Commonwealth v. Gagliardi,* 418 Mass. at 572 (whether to hold evidentiary hearing on new trial motion lies in sound discretion of judge). Even where an evidentiary hearing is appropriate, the court must be cautious not to inquire into the subjective mental processes of jurors, such as the reasons for their decision, because such information is inadmissible to impeach a verdict. *Commonwealth v. Pytou Heang,* 458 Mass. at 858.

Here, Greineder has made a colorable showing that the jury examined the cast-off stains on the back of the jacket during their deliberations. See *Commonwealth v. Philyaw,*

55 Mass.App.Ct. at 738–739 (defendant may satisfy initial burden with hearsay). Nonetheless, this court concludes that a post-verdict inquiry of one or more jurors is unnecessary, because even assuming that the jury examined the cast-off stains as recounted on pages 292 and 293 of *A Murder in Wellesley*, a new trial is not warranted for the reasons discussed below. Cf. *Commonwealth v. Morgan*, 453 Mass. 54, 64 (2009) (in determining whether to hold evidentiary hearing on new trial motion, court evaluates whether materials submitted raise substantial issue in light of seriousness of the issue itself).

## III. EXTRANEOUS EVIDENCE

*10 The initial question is whether the cast-off stains on the back of the jacket were extraneous evidence in the context of the trial. The defendant bears the burden of demonstrating, by a preponderance of the evidence, that the jury was in fact exposed to extraneous matter. *Commonwealth v. Kincaid*, 444 Mass. 381, 386–387 (2005); *Commonwealth v. Fidler*, 377 Mass. at 201. As noted *supra*, extraneous matters include information, knowledge, or specific facts about the matter in litigation that did not come from the evidence at trial. *Commonwealth v. Greineder*, 458 Mass. at 246; *Commonwealth v. Dixon*, 395 Mass. at 151. Jurors may leaven their deliberations with their wisdom and experience, but they must not bring extra facts into the jury room. *Commonwealth v. Hunt*, 392 Mass. 32, 40 (1984); *Commonwealth v. Philyaw*, 55 Mass.App.Ct. at 737.

The Commonwealth argues that the cast-off stains were not extraneous evidence because the jacket was admitted into evidence as a trial exhibit, without any restriction, and properly given to the jury to examine and consider during its deliberations. See *Commonwealth v. Freiberg*, 401 Mass. 282, 305, cert. den., 493 U.S. 940 (1989) (where 911 tape was properly in evidence, jury was entitled to listen to it as often as it liked during deliberations). Cf. *Commonwealth v. Pixley*, 42 Mass.App.Ct. 927, 928, rev. den., 425 Mass. 1102 (1997) (it is within judge's discretion to allow exhibit into jury room, regardless of possible experimentation by jury, where any experimentation would be within scope of evidence presented at trial). This therefore is not a case in which the jury acquired information about the case independently or where the only possible source of the information at issue was extraneous to the trial. Cf. *Commonwealth v. Kincaid*, 444 Mass. at 385 (jury was exposed to extraneous evidence where judge found that one juror made explicit reference to co-defendant's flight "rather than the jury having reasoned, opined, or assumed its way to that conclusion"); *Commonwealth v. Hunt*, 392 Mass. at 41 (juror's knowledge of defendant's prior criminal record, not mentioned at trial, was extraneous material); *Commonwealth v. Kamara*, 37 Mass.App.Ct. 769, 771 (1995), aff'd, 422 Mass. 614 (1996) (juror's statement about defendant's gang membership, where attorneys were precluded at trial from making any reference to gangs, was extraneous material).

Greineder emphasizes that "extrinsic evidence does not transform itself into admissible evidence simply because it is hidden within a properly admitted exhibit introduced into evidence without restrictions." *Benjamin v. Fischer*, 248 F.Supp.2d 251, 261 (S.D.N.Y.2002), aff'd, 87 Fed. App'x 761 (2d Cir.2004) (where police report was submitted as exhibit in robbery trial, without any limiting instruction but with defendant's prior robbery convictions redacted by being blacked out with ink, jury's action of holding report up to light to view prior convictions exposed them to extraneous evidence). See also *Eslamina v. White*, 136 F.3d 1234, 1237 (9th Cir.1998) (jury's listening to reverse side of tape admitted into evidence, which contained police interview with defendant's brother who did not testify at trial, exposed it to extraneous evidence); *Lacy v. Gardino*, 791 F.2d 980, 983 (1st Cir.), cert. den., 479 U.S. 888 (1986) (juror's removal of masking tape from two exhibits submitted to jury, revealing defendant's criminal history, exposed jury to extraneous evidence); *Farese v. United States*, 428 F.2d 178, 180 (5th Cir.1970) (jury's discovery of $750 in cash in large denominations hidden in shirt which was part of trial exhibit consisting of attache case containing both clean and dirty shirts was exposed to extraneous evidence). Here, the jacket was submitted to the jury as an exhibit without any attempted concealment of the stains on the back, and the jury did not knowingly consider evidence which obviously had been kept from it. Accordingly, this case does not involve evidence "hidden" within a trial exhibit which is uncovered and considered by the jury during deliberations.

*11 Nonetheless, where the court excludes certain evidence at trial which mistakenly makes its way into the jury room during deliberations, the evidence is extraneous under the Sixth Amendment even though it did not come from a source external to the trial. See *United States v. Lentz*, 383 F.3d 191, 219 (4th Cir.2004) (jury's receipt, along with trial exhibits, of victim's day planners, which judge had excluded from evidence, exposed it to extraneous evidence); *Hinkle v. Clarksburg*, 81 F.3d 416, 427 (4th Cir.1996) (jury's receipt of exhibit which contained information that court suppressed but forgot to redact); *United States v. Barnes*, 747

F.2d 246, 249–250 (4th Cir.1984) (jury's accidental receipt of exhibits received by court during motion to suppress but not admitted at trial); *United States v. Bruscino,* 662 F.2d 450, 457 (7th Cir.1981) (jury's accidental receipt of prison report used to cross-examine witness but not admitted into evidence); *United States v. Shafer,* 455 F.2d 1167, 1169 (5th Cir .1972) (jury's receipt of documents as to which objections to admissibility were sustained); *Borja v. Prunty,* 866 F.Supp. 451, 454 (S.D.Cal.1994) (jury's receipt of defendant's unredacted arrest history on back of properly admitted fingerprint card). Accordingly, Greineder argues that Judge Chernoff's June 14 Order on Reconsideration excluded all evidence of the stains on the back of the jacket, and the jurors' consideration of those stains therefore involves extraneous evidence not admitted through the trial process, despite the absence of any limiting instruction restricting the jury's use of the jacket as an exhibit. See *United States v. Lentz,* 383 F.3d at 219; *United States v. Barnes,* 747 F.2d at 249–250.

In its Order on Reconsideration, the court excluded "evidence of the presence of protein on the back of the jacket and its cast-off configuration" because no expert witness would testify with a reasonable degree of scientific certainty that the stains were blood, as opposed to some other liquid protein. The court stated: "As it now stands, the evidence is barely relevant and its prejudicial effect would greatly outweigh its probative value." The Commonwealth argues that this ruling excluded only expert testimony concerning the stains, not the stains themselves. See *Commonwealth v. Rhoades,* 379 Mass. 810, 819 (1980); *Cormier's Case,* 337 Mass. 714, 716 (1958) (noting that to be admitted, expert opinion must have adequate factual foundation). There is much force to the Commonwealth's argument. Judge Chernoff's principal concern was admitting *expert* testimony about the significance of the stains based on the *assumption* that the protein stains were attributable to human blood and in particular, to the blood of the victim.[2] Judge Chernoff suggested that defense counsel adjust the position of the mannequin so that the back of the jacket would not be visible to the jury during Englert's expert testimony. In addition, the Commonwealth's interpretation arguably is supported by the fact that the court sent the jacket to the jury during deliberations without concealing the stains on the back.

*12 However, Judge Chernoff was also concerned with the stains themselves, and based on the relevant transcripts, it appears that the failure to take action with respect to the back of the jacket was an oversight by the court and the parties.

Following the Order on Reconsideration, counsel discussed with Judge Chernoff whether to black out or cut out the back of the jacket. Judge Chernoff stated that he would defer to any agreement the parties reached, or else he would render a decision. After that, the issue was never raised again by the court or the parties. A comment by Judge Chernoff during the discussion arguably suggests that he intended his final ruling to exclude all evidence of the stains on the back of the jacket. Judge Chernoff proposed to instruct the jury that "what's on the back of the jacket—there's no proof that it's blood and so it's irrelevant to this case. I could simply say it's irrelevant.... It's not evidence in this case."

This court notes that neither the judge nor counsel sought to strike French's expert testimony concerning the fact that amido black enhances protein stains such as blood, or Martin and Englert's expert testimony about distinctive cast-off patterns. This court agrees with the Commonwealth that Judge Chernoff's original ruling, that the jury could draw its own inference that the stains were cast-off blood from the similarity of the stains to the other bloodstains on the jacket, coupled with the expert testimony about amido black and cast-off patterns, was neither an abuse of discretion nor clearly erroneous. See *Commonwealth v. Merry,* 453 Mass. 653, 667 n. 13 (2009) (expert testimony on blood splatter not necessary for prosecutor to argue how defendant's blood got on air bag because jury could draw own conclusions about source of blood); *Commonwealth v. Sturtivant,* 117 Mass. 122, 135 (1875) (it is within range of common knowledge of one familiar with blood to observe stains in blood or other fluid and determine the direction from which they came, if impelled by force); *Commonwealth v. Zitano,* 23 Mass.App.Ct. 403, 407–408 (1987) (prosecutor's statement in closing argument about knife, "Look at the stains on both sides of the blade. My-oh-my could that be blood? ... [The victim's] blood." was proper because although there was no scientific evidence that stains were in fact blood, there was evidence that defendant walked into victim with knife and victim died of fatal penetrating wound); *Commonwealth v. Grogan,* 11 Mass.App.Ct. 684, 686 (1981) (not error to admit evidence that presumptive test showed stains on defendant's shoes to be blood, although there was no proof that it was human blood, where jury could infer that assailant would have victim's blood on his shoes, given brutality of beating).

Under all the circumstances of this case, evidence of the cast-off stains on the back of the jacket cannot be deemed to be extraneous to the trial. As discussed *supra,* Judge Chernoff's primary concern was excluding expert testimony

about the stains. The jury received the evidence of the stains on the back of the jacket as part of a properly admitted trial exhibit, and heard properly admitted expert testimony about how amido black reacts with protein and how bloodstain evidence may show distinctive cast-off patterns. Defense counsel himself drew attention to the back of the jacket in cross-examining Englert on June 15, 2001, asking whether he took notes and made diagrams about the significant stains he observed on the front and the back of the jacket. The stains on the back of the jacket thus were mentioned at trial despite the ruling excluding expert testimony on the subject. Cf. *Commonwealth v. Greineder*, 458 Mass. 207, 246 (2010); *Commonwealth v. Dixon*, 395 Mass. at 151 (extraneous evidence is information, knowledge, or specific facts about matter in litigation that did not come from evidence at trial). Accordingly, even assuming the accuracy of the events described in the book, Greineder has not demonstrated by a preponderance of the evidence that the jury was exposed to extraneous evidence in violation of the Sixth Amendment.

### IV. PREJUDICE

*13 Finally, and most critically, even if the jury improperly was exposed to and drew inferences from the stains on the back of the jacket, Greineder is not entitled to a new trial because there is no reasonable possibility of prejudice. Once the judge determines that extraneous matter was introduced to the jury, the burden shifts to the Commonwealth to prove beyond a reasonable doubt that the defendant was not prejudiced by the extraneous facts. *Commonwealth v. Kincaid*, 444 Mass. at 386; *Commonwealth v. Cuffie*, 414 Mass. 632, 637 (1993); *Commonwealth v. Fidler*, 377 Mass. at 201. See also *Lacy v. Gardino*, 791 F.2d at 983 (government must demonstrate beyond reasonable doubt that exposure to extraneous evidence was harmless error because it did not contribute to verdict). "Modern day trials are factually presented in open court before the iron curtain descends upon the jury room. We cannot tolerate prejudicial factual intrusion into that sanctum ... The dagger of hidden evidence must not be taken from its scabbard for the first time in the jury room to wound the defendant; and unless its piercing effect is only skin deep and without prejudice to the anatomy of the trial, we must apply a constitutional salve." *United States v. Howard*, 506 F.2d 865, 866 (5th Cir.1975).

The prejudice inquiry focuses on the probable effect of the extraneous facts on a hypothetical average jury. *Commonwealth v. Fidler*, 377 Mass. at 201. See *Commonwealth v. Coles*, 44 Mass.App.Ct. 463, 467 n. 3 (1998) (noting that reference to hypothetical jury is another way of expressing policy against inquiring into mental processes of actual jury). In analyzing the probable effect of the improper evidence, the court may consider the strength of the evidence against the defendant, the length of the deliberations, and whether the extraneous matter produced such a high probability of prejudice that error must be inferred. *Commonwealth v. Kincaid*, 444 Mass. at 389; *Commonwealth v. Hunt*, 392 Mass. at 42–43. See also *Lacy v. Gardino*, 791 F.2d at 986 (court must assess record as a whole and weigh prejudicial effect of improper evidence against weight of properly admitted evidence).

This court rejects Greineder's argument that instead of applying the test just described, the court should presume prejudice and grant a new trial because the jury in this case "took an active role in generating new evidence against the defendant." The Supreme Judicial Court has declined to apply the hypothetical average jury standard in two cases where there was active juror participation in an effort to resolve key issues by resort to material not in evidence. See *Fitzpatrick v. Allen*, 410 Mass. 791, 796 (1991) (jurors in medical malpractice case brought home medical reference book into jury room and read and discussed entry on causes of cerebral palsy); *Markee v. Biasetti*, 410 Mass. 785, 789 (1991) (two jurors in motor vehicle negligence case improperly visited accident scene on more than one occasion, paced off distances, and checked visibility). In those cases, the court concluded that prejudice should be presumed and a new trial required because the jury's actions proved it was anything but average. See *id.* But see *Commonwealth v. Coles*, 44 Mass.App.Ct. at 466–468 (in shooting case where four jurors improperly visited scene of crime, court analyzed whether Commonwealth had shown that hypothetical average jury would not have been influenced by extraneous information). Here, in contrast, the jurors did not actively gather outside information for use in reaching a verdict; rather, they examined evidence on the back of a jacket which had been admitted as a trial exhibit and sent to into the jury room for use in their deliberations. Accordingly, a presumption of prejudice necessitating a new trial is not appropriate in this case.

*14 A review of the record as a whole leads to the conclusion that the Commonwealth has demonstrated beyond a reasonable doubt that Greineder was not prejudiced by the jury's consideration of the cast-off stains on the back of the jacket. There was compelling evidence that the defendant killed his wife, including blood spatter on his shoes, shirt, pants, and jacket that showed he was present at the bloodshed

event; scratches on his neck; blood transfer stains on his jacket consistent with grabbing the victim from behind and dragging her body backward; his spotless hands, which he denied washing, despite checking the victim's carotid artery for a pulse where she had a gaping neck wound that exposed tissue, muscle, blood vessels, and vertebra; a witness's observation of the defendant hurrying to and quickly reemerging from the path leading to the storm drains where the murder weapons were found; DNA evidence on the murder weapon and murder gloves linking him to those items; the bloody pattern of smudged dots from the murder gloves on his jacket and eyeglasses; the discovery of a second pair of gloves identical to the murder gloves concealed in a dog house in his yard; his involvement in sexual infidelity which he concealed from his wife, and his contacting a prostitute on the days immediately before and immediately after the murder; and consciousness of guilt evidence including his query to police at the scene whether he was going to be arrested, his refusal to give police his eyeglasses, his expression of fear when asked to turn over his clothing, his statement to police that the victim might have his skin under her fingernails from a back rub the night before, and his statement to his sister-in-law that after having simultaneous nosebleeds, he and the victim wiped their noses on the same towel, from which his DNA might have been transferred to her gloves.

This is not a case where the evidence against the defendant was weak, creating a reasonable possibility that extraneous facts impacted the jury in reaching a verdict. Greineder emphasizes the fact that the jury deliberated for more than four days before finding him guilty. In the view of this court, however, that demonstrates the jury's serious and thoughtful consideration of a large amount of physical evidence and lay and expert testimony, not the infirmity of the evidence. Cf. *Commonwealth v. Coles*, 44 Mass.App.Ct. at 468 & n. 4 (Commonwealth failed to show beyond reasonable doubt that defendant was not prejudiced by jurors' improper visit to crime scene where case rested on eyewitness identification of defendant as shooter, jury reported inability to return unanimous verdict on each of two days of deliberations, and after the improper view, jurors used their own knowledge of scene's layout, perception of size of street, and angles of observation and distances, "totally different information than the lawyers presented," to draw crime scene map on which they relied in deliberating); *United States v. Lentz*, 383 F.3d at 221–222 (defendant prejudiced by jury's receipt of excluded day planners of kidnaping victim who was presumed dead, which contained entries documenting defendant's angry threats to staff at daughter's day care center and disparaging comments about victim to daughter in attempt to alienate her from her mother, and indicating that victim was pursuing a restraining order against him, where case was highly circumstantial with little physical evidence, jury deliberated for ten days and indicated deadlock at one point, and during penalty phase, seven jurors expressed doubt in verdict); *Eslaminia v. White*, 136 F.3d at 1239 (defendant prejudiced by extraneous evidence consisting of recorded police interview with his brother, where case against him was far from overwhelming, and jury took ten days to deliberate, repeatedly asked judge questions about law and requested rereading of testimony, and acquitted defendant of two other charges); *Benjamin v. Fischer*, 248 F.Supp.2d at 262–263 (defendant prejudiced by jury's exposure to his past convictions for robbery and assault, where case against him was thin because victim's descriptions of robber were contradictory and did not match his appearance, other eyewitnesses failed to pick him from lineup, and jury indicated deadlock and asked to review eyewitness testimony and alibi testimony).

*15 Finally, considering the entire record, the cast-off stains on the back of the jacket were not of a nature which produced a high probability of prejudice. In a broad sense, the inference that the those stains were consistent with blood from an upraised weapon was cumulative of other bloodstain evidence on the defendant's clothing that identified him as the assailant. Nor did the improper evidence uniquely undermine the defense. Cf. *Commonwealth v. Kincaid*, 444 Mass. at 389–390 (defendant prejudiced by jury's exposure to information that co-defendant in rape case was fugitive from justice, where only defense was consent, alleged rape was videotaped, videotape was missing, and defendant testified that co-defendant had taken videotape; jury would infer that co-defendant fled because he was guilty and because videotape showed that sex was non-consensual); *Eslaminia v. White*, 136 F.3d at 1239 (defendant prejudiced by extraneous evidence consisting of recorded police interview with his brother, where tape seriously undermined the defense by impeaching testifying defendant and other defense witnesses in case that was far from overwhelming); *United States v.. Barnes*, 747 F.2d at 250 (defendant prejudiced by jury's accidental receipt of transcript of wiretapped phone conversation between defendant and co-conspirator which revealed that they conversed on a particular date, bolstering testimony of key prosecution witness and undermining defense that no such conversation ever occurred); *Farese v. United States*, 428 F.2d at 181–182 (defendant prejudiced by jury's discovery of $750 in large denominations hidden in

shirt which was part of trial exhibit, where he was charged with forging securities, a crime connected to monetary gain).

This court is confident that even if, as urged by Greineder, the cast-off stains on the back of the jacket can be deemed a "dagger of hidden evidence ... taken from its scabbard for the first time in the jury room," its piercing effect was "only skin deep." *United States v. Howard,* 506 F.2d at 866. In light of the compelling evidence identifying Greineder as his wife's killer, there is no reasonable possibility that the cast-off stains, even if extraneous, wounded him so as to warrant a new trial.[3]

*ORDER*

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion For Post–Verdict Inquiry and New Trial be **DENIED.**

All Citations

Not Reported in N.E.3d, 2014 WL 3715033

Footnotes

1   The Supreme Judicial Court's solicitation of amicus briefs described the issue as "(1) what effect, if any, the Supreme Court's holding [in *Williams* ] has on the defendant's conviction and this court's earlier decision, see 458 Mass. 207 (2010), and (2) going forward, in light of the Supreme Court's decision, what changes, if any, must or should be made to Massachusetts practice in cases where an expert witness provides opinion testimony at trial based on lab results or other underlying data prepared by others who do not testify."

2   It appears that the actual motion at issue was entitled, "Renewed Motion to Exclude Evidence of Blood Spatter Interpretation and for Pre-trial Evidentiary Hearing Pursuant to *Commonwealth v. Lanigan* and Canavan's Case."

3   Analyzing the issue as ineffective assistance of counsel based on the failure to request removal of the back of the jacket prior to deliberations and/or a limiting instruction does not change the result, as the defendant cannot show that counsel's inaction in this respect created a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Stewart,* 460 Mass. 817, 832 (2011).

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
No. SJ-2014-0352

COMMONWEALTH

vs.

DIRK K. GREINEDER

## MEMORANDUM OF DECISION

The defendant, Dirk K. Greineder, has filed an application under the gatekeeper provision of G. L. c. 278, § 33E, for leave to appeal the denial of his motion for postverdict inquiry and second motion for a new trial. Because he has received plenary review of his convictions, see *Commonwealth* v. *Greineder*, 464 Mass. 580 (2013), the defendant must show, as a condition to receiving appellate review of the denial of his second motion for a new trial, that his motion "presents a new and substantial question which ought to be determined by the full court." G. L. c. 278, § 33E. See *Commonwealth* v. *Leate*, 361 Mass. 247, 249 (1972).

The defendant contends that the jury's consideration of cast-off stains on the back of the jacket violated his Sixth Amendment and art. 12 rights to be convicted based solely upon evidence presented in the courtroom. See *Commonwealth* v. *Beneche*, 458 Mass. 61, 77 (2010). The defendant says that the issue is "new and substantial" within the meaning of § 33E.

At trial, the Commonwealth offered in evidence the jacket that the defendant was wearing at the time of the murder. Expert testimony demonstrated that blood was present on the front of

the jacket. In preparation for this testimony, the Commonwealth's expert had treated the entire jacket with amido black, a substance that caused stains containing protein. Cast-off stains appeared on the back of the jacket, indicating the presence of a substance containing protein. The expert lacked the time to ascertain if the stains were in fact blood but could confirm that the stains were castoff stains of a substance containing protein. The Commonwealth sought to introduce this testimony and the defense challenged this attempt. After initially allowing the evidence to be admitted, the trial judge reversed his ruling, finding that the presence of stains of an unidentified protein on the back of the jacket were barely relevant and the prejudicial effect of their introduction would greatly outweigh its probative value.

The trial judge offered to instruct the jury to ignore stains on the back of the jacket. Defense counsel instead stated his preference that the back of the jacket be cut out. No action was taken with the jacket and it entered the jury room whole for examination. The jury found the defendant guilty of murder in the first degree.

In 2012, a local reporter, in conjunction with a retired State police trooper who worked on the case, published the book <u>A Murder in Wellesley</u>. The book drew upon interviews with several jurors to describe the events which occurred during deliberation. Specifically, the book stated that the jurors, in the course of reviewing the evidence, examined the back of the jacket and considered the stains present thereon. The defendant moved for a postverdict jury inquiry and new trial, arguing that the jury had reached its verdict relying on extraneous information. A judge of the Superior Court denied the motion, determining that, although he considered the matter waived, the cast-off stains were not extraneous information and that, even if the jury were exposed to extraneous information, the defendant had suffered no prejudice. The defendant filed this gatekeeper application.

I conclude that the defendant's second motion for a new trial does not "present[] a new and substantial question which ought to be determined by the full court." G. L. c. 278, § 33E. A question is not new "where it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review. *Commonwealth* v. *Ambers*, 397 Mass. 705, 708 (1986). An issue is "substantial" where it raises "a meritorious issue in the sense of being worthy of consideration by an appellate court." *Commonwealth* v. *Gunter*, 459 Mass. 480, 487 (2011). The defendant's argument fails on both prongs.

The defendant specifically challenges the introduction into the jury room during deliberations of the back panel of the jacket upon which the jury had received no testimony nor an instruction limiting how they were to consider the back panel. The defendant's claim that that the question is new stems from the recent publication of the manner in which the jury considered the jacket. According to the defendant, only with this information recently coming to light could he now challenge the jury's verdict.

I find the defendant's argument that the issue is "new" unpersuasive. The act that the defendant challenges in this appeal is not the use of the jacket during deliberations, but rather its unadulterated submission to the jury after they had been instructed by the judge. The defendant was aware, or was on notice, at that time, that the jacket was submitted to the jury with the back panel intact. His failure to address this "oversight by the court and the parties" in his direct appeal does not render the issue "new" for purposes of G. L. c. 278, § 33E, gatekeeper review. See *Ambers*, 397 Mass. at 708. The book publication that the defendant uses to strengthen his argument that this issue is new is immaterial to our consideration. Its effect was merely to draw the defendant's attention belatedly to an issue he could have addressed earlier. Understanding the effects of this oversight now does not reinvigorate his claim for § 33E review.

Nor do I think the defendant's question "substantial" as required by § 33E. The motion judge, who was not the trial judge, considered the merits of the defendant's motion despite determining the matter waived for substantially the reasons I do not now find the issue "new" in this gatekeeper application. The judge found that the back panel of the jacket was not extraneous evidence and that, even if it was, the defendant suffered no prejudice from the jury's consideration of it.

The motion judge concluded that the defendant failed to demonstrate by a preponderance of the evidence that the jury's consideration of the back panel of the jacket constituted extraneous information. The jury had heard information regarding the significance of amido black stains as well as cast-off stains. Indeed, the first challenge to the back panel of the jacket focused on the expert testimony that the stains were a substance containing protein and were cast-off. The inference the Commonwealth sought to draw, but could not give by means of expert testimony, was that the stains on the back of the jacket were the victim's blood. The judge excluded this testimony because the expert could not say that the stains were blood for want of time to test them. During cross-examination, defense counsel asked the expert if he had taken note of the stains on both the front and the back of the jacket.

In the totality of the circumstances, the motion judge concluded that the submission of the back panel of the jacket to the jury was not extraneous information because the jury had before it information, knowledge, or specific facts that came from the evidence at trial. See *Commonwealth v. Greineder*, 458 Mass. 207, 246 (2010). The motion judge further considered the ramifications of the back panel of the jacket being extraneous information. He concluded that, even were he to consider the back panel of the jacket extraneous information, the defendant suffered no prejudice.

The defendant argues that the jury actively sought the extraneous information and his motion for new trial should have been allowed as a matter of law. The defendant's position is premised entirely on the success of his argument that the jury actively sought extraneous information. When the jury actively seeks extraneous information, the prejudicial effect of the evidence on the jury must be presumed. *Fitzpatrick* v. *Allen*, 410 Mass. 791, 76 (1991); *Markee* v. *Biasetti*, 410 Mass. 785, 789 (1991). The defendant relies upon *Benjamin* v. *Fischer*, 248 F. Supp. 2d. 251, 257 (S.D.N.Y.), aff'd, 87 Fed. Appx. 761 (2d Cir. 2004), in support of his contention that the jury actively gathered and considered extraneous information. In that case, the jury held an improperly redacted police report to the light to discover that the defendant had been previously arrested. The circumstances in *Benjamin* are not present here. In *Benjamin*, the jury actively sought and considered information which the parties had taken the proper steps to exclude from their deliberations. Here, the issue is not that the jury sought out information properly excluded, but considered information before it due only to "an oversight by the court and the parties." The jury, therefore, did not actively seek out extraneous information.

The proper inquiry when reviewing a claim that a jury reached its verdict to the prejudice of the defendant because of exposure to extraneous information is to determine the probable effect of the extraneous facts on a hypothetical average jury. *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). This the motion judge did. In reviewing the large amount of physical evidence and lay and expert testimony, the judge determined that the prejudicial effect was minimal, if not non-existent. It is not necessary to expound in detail the Commonwealth's case as the motion judge did. See *Commonwealth* v. *Greineder*, 458 Mass. 207, 209-219 (2010). Suffice it to say that the motion judge acted well within his discretion in concluding that the presence of the back panel of the jacket was extremely unlikely to tip the scales of the jury's

verdict because of the amount of evidence against the defendant and the jury's thoughtful deliberation on the extensive material before it.

For the foregoing reasons, I conclude that the defendant's second motion for new trial does not "present[] a new and substantial question which ought to be determined by the full court." G. L. c. 278, § 33E. The oversight of the back panel of the jacket, if not already waived and then also considered extraneous information, would have had little to no significant prejudicial effect on a hypothetical average jury.

The petition for leave to appeal is denied.

By the Court,

_____
Francis X. Spina
Associate Justice

ENTERED:   December  30  , 2014