UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

CIVIL ACTION NO. 2015-CV-12978

_____

DIRK GREINEDER,
Petitioner

v.

SEAN MEDEIROS,
Superintendent of MCI-Norfolk,
Respondent

_____

**MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF *HABEAS CORPUS***

Respectfully submitted,
**DIRK GREINEDER,**
By his attorney,

/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
Rankin & Sultan
151 Merrimac Street
Boston, MA  02114
(617) 720-0011

Dated: July 17, 2015

## TABLE OF CONTENTS

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRIOR PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      SUMMARY OF THE EVIDENCE AND PROCEEDINGS AT TRIAL (2001). . . . . . . 2

        A.      Overview of Evidence Presented at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                1.      The Commonwealth's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                        a.      Civilian observations of Greineder on the morning of the killing. . 3

                        b.      Police investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

                                (1)     Interaction with Greineder. . . . . . . . . . . . . . . . . . . . . . . . 3

                                (2)     Items found at scene.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                                (3)     Evidence found in the Greineder home. . . . . . . . . . . . . . . 4

                                (4)     Other investigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                                (5)     Sex evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                                (6)     DNA evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                                (7)     Testimony of the medical examiner. . . . . . . . . . . . . . . . . 8

                                (8)     Blood spatter evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                                (9)     Footprint evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                                (10)    Other evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                2.      Evidence Presented by the Defense at Trial.. . . . . . . . . . . . . . . . . . . . 9

                        a.      Greineder's testimony about what happened. . . . . . . . . . . . . . . . . 9

                        b.      Evidence about Greineder's marriage and sexual activities. . . . . . 9

                        c.      Response to DNA evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        d.      Response to other scientific evidence. . . . . . . . . . . . . . . . . . . . . 12

        e.      Third-party culprit evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.      PROCEEDINGS ON GREINEDER'S FIRST MOTION FOR NEW TRIAL (2005-2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.      Greineder's Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.      Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          2.      Exposure of deliberating jury to extraneous matter. . . . . . . . . . . . . . . . . 13

          3.      Recantation of expert testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.      Additional Evidence Presented to Motion Judge.. . . . . . . . . . . . . . . . . . . . . . 13

          1.      Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          2.      Exposure of deliberating jury to extraneous matter. . . . . . . . . . . . . . . . . 15

          3.      Recantation of expert testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.      The Motion Judge's Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.     REMAND PROCEEDINGS IN THE TRIAL COURT RESPECTING GREINEDER'S PUBLIC TRIAL CLAIM (2009-2010). . . . . . . . . . . . . . . . . . . . . . 15

IV.     PROCEEDINGS IN THE MASSACHUSETTS SUPREME JUDICIAL COURT (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
.

V.      PROCEEDINGS IN THE UNITED STATES SUPREME COURT (2011-2012). . . . . . 18

VI.     REMAND PROCEEDINGS IN THE MASSACHUSETTS SUPREME JUDICIAL COURT (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VII.    FURTHER PROCEEDINGS IN THE UNITED STATES SUPREME COURT (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VIII.   PROCEEDINGS ON GREINEDER'S SECOND MOTION FOR NEW TRIAL (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.      GREINEDER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A PUBLIC
        TRIAL AND TO A FAIR AND IMPARTIAL TRIBUNAL IN DECIDING HIS
        PUBLIC TRIAL CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.      Statement of Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                1.      Relevant material in the trial record. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                2.      Proceedings on remand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                        a.      Remand order of the Massachusetts SJC. . . . . . . . . . . . . . . . . . . 23

                        b.      Trial judge's initial response and aftermath. . . . . . . . . . . . . . . . 23

                        c.       Greineder's motion for an evidentiary hearing and motion to
                                recuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

                        d.      Evidence presented at the evidentiary hearing. . . . . . . . . . . . . . 25

                                (1)      Greineder's key evidence. . . . . . . . . . . . . . . . . . . . . . . . 25

                                (2)      The Commonwealth's key evidence. . . . . . . . . . . . . . . . 28

                        e.      The trial judge's second response to the court's remand order
                                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                3.      The SJC's decision as to Greineder's public trial rights. . . . . . . . . . . . . 30

        B.      Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

                1.      Constitutional right to a public trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

                2.      *De facto* closures of the courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                3.      Violation of the public trial right is a structural error. . . . . . . . . . . . . . . 35

                4.      Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                5.      Due process right to a fair and impartial tribunal. . . . . . . . . . . . . . . . . . 38

                6.      Standard of review under AEDPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        C.      Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

                1.      Greineder was deprived of a fair and impartial tribunal. . . . . . . . . . . . . 46

2.    A federal evidentiary hearing as to the public trial claim is warranted due to the denial of a fair and impartial tribunal in deciding the public trial claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

3.    In the alternative, *de novo* review of the state court record is required because the state court never addressed the *Waller* factors. . . . . . . . . . 52

4.    Under any standard of review, Greineder is entitled to *habeas* relief due to violation of his constitutional right to a public trial. . . . . . . . . . . 53

    a.    The individual *voir dire* was, in fact, closed to the public. . . . . . 54

        (1)    Jury selection in this case took place in the context of the longstanding practice of the Norfolk Superior Court to close the courtroom during individual juror *voir dire*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        (2)    The courtroom was, in fact, closed to the media. . . . . . . . 56

        (3)    The courtroom was, in fact, closed to the defendant's family members and to the general public. . . . . . . . . . . . . 61

    b.    The closure violated Greineder's constitutional right to a public trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    c.    Greineder is entitled to *habeas* relief. . . . . . . . . . . . . . . . . . . . . . 67

II.    GREINEDER'S CONFRONTATION CLAUSE RIGHTS WERE VIOLATED BY ADMISSION OF TESTIMONY OF A DNA EXPERT REGARDING THE DNA TEST RESULTS OBTAINED BY A NON-TESTIFYING ANALYST. . . . . . . . . . . . . 70

    A.    Statement of Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        1.    DNA evidence presented at trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        a.    Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        b.    Testimony of Dr. Cotton on direct examination. . . . . . . . . . . . . 71

        (1)    Forensic DNA testing in general. . . . . . . . . . . . . . . . . . . . 71

        (2)    Interpretation of DNA results in general. . . . . . . . . . . . . . 71

        (3)    Testing conducted by Cellmark in this case. . . . . . . . . . . . 72

(4)   Test results in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    (a)   Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    (b)   Test results on the knife. . . . . . . . . . . . . . . . . . . . 73

    (c)   Test results on the right-hand work glove. . . . . . . 75

    (d)   Test results on the left-hand work glove. . . . . . . . 76

c.   Testimony of Dr. Cotton on cross-examination. . . . . . . . . . . . . . 77

d.   Dr. Cotton's role. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

e.   Testimony of DNA defense experts. . . . . . . . . . . . . . . . . . . . . . 79

f.   Closing arguments and jury deliberations. . . . . . . . . . . . . . . . . 80

2.   Cellmark's reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

3.   Critique of Cellmark testing by Dr. Eisenberg.. . . . . . . . . . . . . . . . . . 83

4.   Resolution of the issue by the Massachusetts SJC.. . . . . . . . . . . . . . . . 85

a.   Issue raised on appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

b.   The SJC's resolution of the issue prior to remand. . . . . . . . . . . 85

c.   Arguments presented to SJC on remand. . . . . . . . . . . . . . . . . . . 87

d.   The SJC's decision on remand.. . . . . . . . . . . . . . . . . . . . . . . . . . 88

B.   Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

1.   *Melendez-Diaz*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

2.   *Bullcoming*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

3.   *Williams*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

a.   The facts in *Williams*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

b.   The plurality opinion ("targeted accusation" requirement). . . . . 94

c.   Justice Thomas's concurrence ("formality" requirement). . . . . . 95

          d.     The dissenting opinion (basic "evidentiary purpose" test). . . . . 96

C.     Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

1.     The introduction of Dr. Cotton's testimony violated Greineder's Sixth Amendment rights set forth in *Bullcoming*. . . . . . . . . . . . . . . . . . . . . . . . . . . 96

          a.     Greineder's right to confront the witnesses against him was violated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

          b.     The constitutional error was preserved. . . . . . . . . . . . . . . . . . . 100

          c.     The error was prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

          d.     The importance of confrontation as to forensic evidence. . . . . 101

     2.     *Habeas* relief is required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

          a.     The SJC decision was based on an unreasonable determination of the facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

          b.     The SJC decision was contrary to clearly established Federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

          c.     The SJC decision involved an unreasonable application of clearly established Federal law. . . . . . . . . . . . . . . . . . . . . . . . . 109

          d.     Even if its legal analysis were accepted, the SJC's harmlessness analysis was unreasonable. . . . . . . . . . . . . . . . . . 113

III.    GREINEDER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    A.     Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to Exclude or Challenge Scientifically Unreliable DNA Results. . . . . . . . . . . . . 115

        1.     Statement of Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

          a.     Post-trial expert analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

               (1)     The scientific unreliability of interpreting DNA test results based upon low copy number ("LCN") DNA mixtures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

(2)    Cellmark's flawed validation studies and interpretation guidelines for LCN analysis. . . . . . . . . . 116

(3)    Cellmark's reported results were scientifically unreliable and invalid.. . . . . . . . . . . . . . . . . . . . . . . . . . 118

(4)    Scientific errors committed by Cellmark in its statistical analysis of the Greineder evidence. . . . . . . . . 119

b.    The DNA defense investigation prior to April 17, 2001. . . . . . 120

c.    Defense counsel's state of mind respecting DNA evidence on April 17, 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

(1)    What defense counsel knew.. . . . . . . . . . . . . . . . . . . . . . 121

(2)    What defense counsel did not know. . . . . . . . . . . . . . . 123

d.    Defense counsel's "plan".. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

e.    Defense counsel's decision to waive a motion to exclude Cellmark's inculpatory DNA test results as scientifically unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

f.    Defense counsel's response to Cellmark's inculpatory DNA test results at trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

g.    The motion judge's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . 126

h.    The SJC's decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

2.    Summary of Applicable Law.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

a.    Exclusion of unreliable scientific evidence.. . . . . . . . . . . . . . . 128

b.    Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . 128

3.    Application of Law to Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

a.    Defense counsel blundered in failing to move to exclude the Commonwealth's scientifically unreliable DNA results. . . . . . . 131

b.    Defense counsel blundered in failing to challenge the DNA evidence or call a DNA forensic scientist or statistical expert at trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

        c.      Greineder was prejudiced by defense counsel's blunders. . . . . . 138

        d.      This Court should grant *habeas* relief. . . . . . . . . . . . . . . . . . . 139

B.    Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to File a Meritorious Motion to Suppress the Nails Receipt. . . . . . . . . . . . . . . . . . . . . . 139

    1.    Statement of Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

        a.      Pretrial and trial proceedings. . . . . . . . . . . . . . . . . . . . . . . . . 139

        b.      Greineder's motion for new trial. . . . . . . . . . . . . . . . . . . . . . . 141

        c.      Testimony at post-trial hearing. . . . . . . . . . . . . . . . . . . . . . . . 141

        d.      The motion judge's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . 142

        e.      The SJC's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

    2.    Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

        a.      Constitutional prohibition on general warrants. . . . . . . . . . . . . 143

        b.      Standard of review under AEDPA. . . . . . . . . . . . . . . . . . . . . . . 144

    3.    Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

        a.      Trial counsel was deficient for failing to file a meritorious motion to suppress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

        b.      The state court's determination that there was no prejudice was an unreasonable determination of the facts. . . . . . . . . . . . 146

        c.      This Court should order *habeas* relief. . . . . . . . . . . . . . . . . . . 147

C.    Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to File a Meritorious Motion to Suppress the Fruits of a Search of Greineder's Toyota Avalon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

    1.    Statement of Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

        a.      Search of Toyota Avalon in Greineder's driveway. . . . . . . . . . 148

        b.      Pretrial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

c.    Defendant's use of towel at trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 148

d.    Commonwealth trial evidence regarding towel. . . . . . . . . . . . . . 149

e.    Claim of ineffective assistance of counsel respecting towel. . . . 149

f.    The motion judge's decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

g.    The SJC's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

2.    Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

a.    Scope of a residential search warrant.. . . . . . . . . . . . . . . . . . . . 152

b.    Limited  exception  to  warrant  requirement  for  automobile
searches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

c.    Filing of motion to suppress during trial. . . . . . . . . . . . . . . . . . 152

d.    Standard of review under AEDPA.. . . . . . . . . . . . . . . . . . . . . . . 153

3.    Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

a.    Trial counsel was deficient for failing to file a meritorious
motion to suppress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

b.    The motion judge's reasoning and the SJC's affirmance were
unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

c.    Counsel's failure to move to suppress was prejudicial. . . . . . . . 154

d.    This Court should order *habeas* relief. . . . . . . . . . . . . . . . . . . . . 155

D.    The  Cumulative  Effect  of  Counsel's  Failures  Amounted  to  Ineffective
Assistance of Counsel Entitling Greineder to *Habeas* Relief. . . . . . . . . . . . . 155

IV.    GREINEDER'S   CONSTITUTIONAL   RIGHTS   TO   DISCLOSURE   OF
EXCULPATORY INFORMATION AND A FAIR TRIAL BASED ON RELIABLE
EVIDENCE   WERE   DENIED   BASED   ON   THE   RECANTATION   OF   THE
PROSECUTION'S FOOTWEAR EXPERT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  156

A.    Statement of Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

1.    Prosecutor's opening statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

2.      Testimony of Deborah Rebeiro. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

3.      Testimony of  Greineder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

4.      The prosecutor's closing argument. . . . . . . . . . . . . . . . . . . . . . . . . . . 159

5.      Greineder's motion for new trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

6.      Rebeiro's post-trial affidavit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

7.      Defendant's amended motion for new trial. . . . . . . . . . . . . . . . . . . . . . 160

8.      The motion judge's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

9.      The SJC's decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

B.      Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

1.      Constitutional right to disclosure of exculpatory information. . . . . . . . . 161

2.      Constitutional right to fair trial based on reliable evidence. . . . . . . . . . . 162

3.      Standard of review under AEDPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

C.      Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

1.      Greineder's *Brady* and due process claims must be reviewed *de novo*
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

2.      Rebeiro's trial testimony was false, and her recantation was credible.. . 165

3.      Rebeiro's erroneous trial testimony seriously prejudiced the defense. . . 165

4.      Greineder is entitled to relief under federal constitutional law. . . . . . . . 167

        a.      *Brady* violation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

        b.      Due process violation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

5.      Greineder is entitled to *habeas* relief.. . . . . . . . . . . . . . . . . . . . . . . . . . 168

V.      GREINEDER'S  CONSTITUTIONAL  RIGHT  TO  A  FAIR  TRIAL  WAS
        VIOLATED  BASED  ON  THE  ERRONEOUS  ADMISSION  OF  AND
        PROSECUTORIAL MISUSE OF IRRELEVANT AND HIGHLY PREJUDICIAL
        EVIDENCE ABOUT GREINEDER'S EXTRAMARITAL SEXUAL ACTIVITIES
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

        A.  Statement of Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

            1.      Pretrial proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

            2.      The Commonwealth's presentation of extramarital sex evidence at
                    trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

            3.      Limiting instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

            4.      The defendant's response at trial. . . . . . . . . . . . . . . . . . . . . . . . . 171

            5.      The prosecutor's closing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

            6.      The SJC's decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

        B.      Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

            1.      Mistaken evidentiary rulings may violate due process. . . . . . . . . . . . . 173

            2.      Prosecutorial misconduct may violate due process. . . . . . . . . . . . . . 174

            3.      Combined effect of trial errors may violate due process.. . . . . . . . . . . 175

        C.      Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

            1.      The repeated admission of extensive, lurid, prejudicial sex evidence
                    at the trial of this case and the prosecutor's misuse of this evidence
                    during closing argument deprived Greineder of his right to due
                    process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

            2.      This court should grant *habeas* relief.. . . . . . . . . . . . . . . . . . . . . . 178

VI.     GREINEDER'S FUNDAMENTAL RIGHT TO TRIAL BY JURY WAS DENIED
        BASED ON THE DELIBERATING JURY'S EXPOSURE TO EXTRANEOUS
        EVIDENCE  THROUGH  THE  JURY'S  UNAUTHORIZED  BANANA
        EXPERIMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

        A.      Statement of Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

1.    Trial testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

2.    Closing arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

3.    Jury's request for a millimeter ruler.. . . . . . . . . . . . . . . . . . . . . . . . 182

4.    Post-verdict inquiry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

5.    The motion judge's decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

6.    The SJC's decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

B.    Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

1.    Jury experiment as extraneous information. . . . . . . . . . . . . . . . . . . 185

2.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

C.    Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

1.    The banana experiment exposed the jury to extraneous information.  . . 187

2.    The Commonwealth did not prove the absence of prejudice.. . . . . . . . 189

VII.   GREINEDER'S FUNDAMENTAL RIGHT TO TRIAL BY JURY WAS DENIED
       BASED ON THE DELIBERATING JURY'S EXPOSURE TO EXTRANEOUS
       INFORMATION (STAINS ON THE BACK OF GREINEDER'S JACKET) WHICH
       HAD BEEN EXCLUDED FROM THE EVIDENCE AT TRIAL. . . . . . . . . . . . . . .   192

A.    Statement of Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

1.    Pre-Trial Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

2.    Trial proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

3.    Post-conviction developments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

4.    Motion judge's ruling in denying relief. . . . . . . . . . . . . . . . . . . . . . . 196

5.    The SJC's denial of Greineder's gatekeeper application. . . . . . . . . . . 197

B.    Summary of Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

1.    Constitutional right to jury trial based on the evidence. . . . . . . . . . . . 198

   2.   Extraneous information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

   3.   Evaluation of prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

C.   Application of Law to Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

   1.   The jury was exposed to extraneous material. . . . . . . . . . . . . . . . . . . . 202

   2.   The defendant was prejudiced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

   3.   In the alternative, Greineder's right to the effective assistance of counsel was violated. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

   5.   This Court should order *habeas* relief. . . . . . . . . . . . . . . . . . . . . . . . . . 208

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

## INTRODUCTION

Petitioner Dirk Greineder ["Greineder"] is presently incarcerated at MCI-Norfolk, where he is serving a life sentence for first degree murder. His conviction and custody are in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Greineder has exhausted the remedies available in the state courts of Massachusetts as required by 28 U.S.C. §2254(b). He therefore seeks *habeas corpus* relief in this Court. In this memorandum, the petitioner sets forth factual and legal support for the claims raised in his petition.

## PRIOR PROCEEDINGS[1]

Dirk Greineder was indicted by a Norfolk County, Massachusetts, grand jury for the first degree murder of his wife Mabel, who was found dead on October 31, 1999 in a public park in Wellesley, Massachusetts. Greineder went to trial before the Honorable Paul A. Chernoff and a jury on May 23, 2001. On June 29, 2001, the jury returned a verdict of first degree murder by deliberate premeditation, and Greineder was sentenced to life in prison without the possibility of parole.

On July 27, 2005, Greineder filed a *Motion for New Trial*. On October 31, 2007, Judge Chernoff denied his *Motion for New Trial*. In April 2009, Greineder filed a *Consolidated Direct Appeal and Appeal from Denial of Amended Motion for New Trial* in the Massachusetts Supreme Judicial Court ["SJC"]. The SJC remanded the case to the trial court for further proceedings respecting his claim that he was denied a public trial. Following remand proceedings as to the public trial claim, on November 4, 2010, the SJC affirmed Greineder's conviction and the denial of his *Amended Motion for New Trial*. *Commonwealth v. Greineder*, 458 Mass. 207 (2010).

In 2012, the United States Supreme Court granted Greineder's petition for writ of *certiorari*,

---

[1]      References herein will be abbreviated as: pretrial proceedings (*Tr.* date/page), trial transcript (*Tr.* vol./page), post-trial evidentiary hearing proceedings (*Tr.* date/page); Record Appendix filed in the Massachusetts SJC in April 2009 (*2009 R.* page), Supplemental Appendix attached to defendant's brief-in-chief filed in the SJC in March 2010 (*2010 R.* page),  Record Appendix filed in the SJC in September 2012 (*2012 R.* page), Addendum attached to Petition under 28 U.S.C. § 2254 (*Add.*).

vacated the conviction, and remanded to the Massachusetts SJC for reconsideration of the defendant's confrontation claim in light of *Williams v. Illinois*, ___ U.S.___, 132 S.Ct. 2221 (2012). *Greineder v. Massachusetts*, 133 S.Ct. 55 (2012).  On remand, in 2013, the Massachusetts SJC again affirmed Greineder's conviction and denial of his motion for new trial. *Commonwealth v. Greineder*, 464 Mass. 580 (2013). The United States Supreme Court denied Greineder's second petition for writ of *certiorari* on October 7, 2013. *Greineder v. Massachusetts*, 134 S.Ct. 166 (2013).

With the denial of Greineder's second petition for writ of *certiorari* on October 7, 2013, the one year limitations period for filing a petition for writ of *habeas corpus* began to run.  After 162 days, the 365-day clock was tolled on March 18, 2014, when Greineder filed a *Motion for Post-Verdict Jury Inquiry and New Trial.*  On July 24, 2014, without further hearing, the Superior Court (Brassard, J.)[2] denied that motion in a written *Memorandum of Decision and Order.* Greineder sought leave to appeal that ruling to the SJC.  On December 30, 2014, Justice Spina of the SJC denied Greineder's application under M.G.L. c. 278, s. 33E for leave to appeal that ruling. That left 203 days, running from December 30, 2014, with a final deadline of July 21, 2015. Greineder's Petition for Writ of *Habeas Corpus* pursuant to 28 U.S.C. §2254 is timely filed herewith.

## STATEMENT OF RELEVANT FACTS

### I.    SUMMARY OF THE EVIDENCE AND PROCEEDINGS AT TRIAL (2001).

#### A.    Overview of Evidence Presented at Trial.[3]

Greineder was indicted, tried, and convicted for first degree murder by deliberate premeditation of his wife, Mabel.  There were no eyewitnesses to the killing, which occurred in

---

[2]      The trial judge (Chernoff, J.) had retired in the interim.

[3]      This section is intended as a non-exhaustive summary of key evidence introduced at trial.  A detailed recapitulation of evidence respecting the specific issues addressed herein appears in the sections of this memorandum devoted to those issues.

broad daylight at a public recreation area, and no motive was established.   The Commonwealth's

case against Greineder rested principally upon circumstantial and forensic evidence, including DNA

test results, blood spatter evidence, and footprints found near Ms. Greineder's body.   Expert evidence

about this forensic evidence was the linchpin of the prosecution's case.

### 1.      The Commonwealth's Case.

#### a.      Civilian observations of Greineder on the morning of the killing.

William Kear was walking on a paved path to Morse Pond in a public park in Wellesley on

the morning of October 31, 1999, when he observed Greineder walk rapidly behind a concrete

planter, then reappear 45-90 seconds later. Greineder asked to borrow Kear's cellular phone,

explaining that his wife had been attacked. When Kear said he had no phone, Greineder continued

up the path toward the park entrance. Tr. VI/182-190. Further up the path, Greineder met Rick

Magnan, a runner, and asked him if he had a phone. *Tr.* V/210.  When Magnan responded negatively,

Greineder continued up towards the park entrance. *Id.*

#### b.      Police investigation.

##### (1)      Interaction with Greineder.

The Wellesley Police Department Dispatcher received Greineder's call from his car phone

at 8:56 am and dispatched emergency personnel. *Tr.* VI/74-86. Wellesley police and EMTs

responded and found Ms. Greineder's body by a dirt path near the pond.  *Tr.* IV/90-97; V/18-20.

Greineder told police that he and his wife had gone for a walk with their dog when she slipped and

hurt her back. He continued walking with the dog down to the pond. As they headed back to meet

her, the dog ran off. When Greineder caught up, he found the dog licking his wife's face as she lay

near a dirt path.  He checked her injuries and went to get help. *Tr.* V/257-261; VI/114-120, 253-261.

State Trooper Martin Foley arrived and interviewed Greineder, who repeated his account of

what had transpired.  Foley testified that Greineder was wearing a yellow windbreaker stained with

blood.  He described a cuff stain which "end[ed] abruptly."  He noted blood stains on Greineder's

sneakers and on a pair of glasses that hung from Greineder's sweatshirt.  *Tr.* X/33-60.

At the Wellesley police station, Greineder voluntarily gave his clothes and clippings of his

fingernails to the police and consented to a search of his van and home.  *Tr.* X/60-61, 73.  Foley

inspected and photographed Greineder's hands at the police station, noting no evidence of staining.

*Id*. at 76.  No forensic testing of Greineder's hands was conducted.  *Tr.* VII/95; XI/128.

### (2)      Items found at scene.

State police investigators collected a blue glove, a white trash bag, zip-loc bags, a ball, an

E-Z foil loaf pan, and a container of lighter fluid from the area near the body.  *Tr.* VII/151-186.  A

second blue glove was found on Ms. Greineder's hand.  A police dog alerted on a storm drain near

the planter at the end of the paved path to the pond.  *Tr.* VI/227-229.  Items recovered from that storm

drain included a two pound Estwing drilling hammer, a folding knife, and a brown cotton work glove

partially covered with raised dimples.  *Tr.* X/102-104.  The next day, police discovered a matching

brown work glove in a storm drain  across from the park entrance.  *Tr.* IX/112.

### (3)      Evidence found in the Greineder home.

During the execution of a search warrant at  the Greineder home on November 1, 1999,

Wellesley Police Detectives McDermott and Vargas searched a Toyota Avalon parked in the

driveway and observed a hand towel on the floor of the driver's seat.  At trial, McDermott testified

that a bloodstained towel later turned over by the defense to the police was not the one she had

observed during that search.  McDermott testified that she observed no blood stains in the Toyota

on November 1st.  Tr. VII/40,42,136.

During a second search of the Greineder home on November 12th, McDermott seized two

hand-drawn diagrams of Morse Pond from a wastebasket. *Tr.* VII/55-61. Wellesley Police Chief Terrance Cunningham found a pair of brown work gloves with raised dimples in a dog house. *Tr.* IX/165-167. In a work area, Trooper Foley noticed items bearing stickers from a local hardware store, Diehl's. He seized a Diehl's receipt for a purchase made on September 3, 1999. *Tr.* X/180-182; XXV/118-120.

### (4)    Other investigation.

The receipt seized by Foley documented the purchase of nails at the cash register of Lynne Martarelli. *Tr.* X/181; XIV/179-180. The treasurer of Diehl's, Beth Murphy, testified that five two pound Estwing hammers were sold by Diehl's in 1999 through the end of October, and the only sale of such a hammer during the month of September occurred at Martarelli's cash register on September 3rd at 8:55:38 a.m. *Tr.* XIV/197-204. Murphy noted that the sale of nails reflected on the receipt seized from the Greineder home occurred at 8:58:05 a.m., and that no other sales at that register took place between the sale of the hammer and the sale of the nails. *Id.* at 204-205.

Murphy also noted that Diehl's sold a brand of "mini-dot gloves" like those found in the storm drains. *Tr.* XIV/194. Philip Boucher, a sales representative for an importer of the gloves, testified that his company was their sole distributor and that the next closest store which carried them was in Southwick. He opined that the gloves found in the Greineders' doghouse and those recovered from the Morse Pond storm drains were all consistent with the brand distributed by his company. *Tr.* XV/75-78. He did not know whether the Chinese company which manufactures the gloves sold to any other regional distributor. *Id.* at 81. The Commonwealth also presented the testimony of two fiber experts, who described similarities among fibers found under Greineder's fingernails, fibers from the doghouse gloves, fibers from the storm drain gloves, and fibers from a sample pair of mini-dot gloves purchased at Diehl's. *Tr.* XIV/94-102; XV/91-101.

(5)      **Sex Evidence.**

Prior to trial, the Commonwealth gave notice of its intention to offer evidence pertaining to Greineder's extramarital sexual activities, including his use of an alias and telephone "sex lines," access to dating and pornographic websites, contact with prostitutes, and sexual paraphernalia found in his garage. Greineder moved to exclude such evidence. At a pretrial hearing, the Commonwealth argued that the evidence was probative of Greineder's motive to murder his wife. *P. Tr.* 1/25/01/42. Ruling that evidence of Greineder's sexual activities was relevant to the "entire relationship" between him and his wife, the trial judge admitted evidence of Greineder's extramarital sexual activities during the week prior to Ms. Greineder's death, but excluded evidence of earlier activities.

In his opening statement, the prosecutor described Greineder as "a man of secrets." *Tr.* IV/41. This was a clear reference to Greineder's extramarital sexual activities. The Commonwealth introduced evidence about a box of sex-related items, including Viagra and a dozen condoms, which was found in the Greineders' garage during the November 12, 1999 search. *Tr.* X/191-193.[4]

The Commonwealth presented a number of witnesses who testified at length about Greineder's use of an escort service during a trip to New Jersey on October 22-23, 1999, his contacts with several Boston prostitutes, and his use of online dating and pornography sites. *Tr.* XV/135-167; XVI (a.m.)/58-77, 91-92. Witnesses read and re-read to the jury a series of explicit e-mails they received from Greineder. *Tr.* XVI (a.m.)/116-164; XVI (p.m.)/4-43. The e-mails were introduced by the Commonwealth as exhibits. The Commonwealth introduced a (redacted) nude picture of himself Greineder sent to a couple interested in group sex. *Tr.* XVI (p.m.)/44. Several witnesses testified to Greineder's use of a pseudonym during these activities. *Tr.* XV/130-146.

---

[4]      The trial judge allowed the Commonwealth to introduce the Viagra and condoms, but excluded the remaining items in the box. *Tr.* X/94-95. Nevertheless, the prosecutor questioned Greineder about the other items on cross-examination, and subsequently introduced them into evidence, all without objection. *Tr.* XXI/186-188, 196.

The Commonwealth presented some evidence apparently intended to suggest that Ms. Greineder may have discovered her husband's secret, on-line sex life prior to her death. Luis Rosado was doing repair work in the Greineder home on October 29, 1999. He testified that Greineder asked Ms. Greineder if she had been using his computer, and she responded "No." The Commonwealth also presented evidence that two of Ms. Greineder's school papers were saved on Greineder's computer hard drive on the night prior to her death. *Tr.* XVI (a.m.)/101-103,110.

### (6) DNA evidence.

Gwen Pino of the State Police Crime Lab made cuttings of evidence, which she sent to a forensic laboratory, Cellmark Diagnostics, for DNA analysis. *Tr.* IX/68-79. Dr. Robin Cotton, Cellmark's laboratory director, testified about the results of forensic DNA testing conducted by Wendy Magee and reviewed by Dr. Jennifer Reynolds and Dr. Lewis Maddox. *Tr.* XI/207; XIII/20, 26-27. Neither Magee, Reynolds, nor Maddox testified at trial, and Cotton did not review the raw data herself. *Tr.* XII/28. The testing, conducted on an ABI 310 Autoanalyzer using Cofiler and Profiler test kits and Genescan and Genotyper software, involved the amplification and interpretation of extremely small quantities of DNA mixtures extracted from various pieces of evidence. Tr. XI /184, 247; XII/82; XIII/1-60.

The majority of the samples taken from the storm drain gloves and knife produced no readable DNA. *Tr.* XIII/32, 44. Dr. Cotton testified that fragments of DNA found on the knife and both the left and right-hand brown work gloves found in the storm drains partially matched Greineder's DNA profile. *Tr.* XII/27-28, 40-42, 53-57. She presented statistics suggesting that it would be extraordinarily rare for a random individual's DNA profile to match the DNA found on the gloves and knife at as many points as Greineder's. *Id.* No motion challenging the admissibility of Cellmark's DNA test results was filed by Greineder prior to trial.

### (7)      Testimony of the medical examiner.

Dr. Stanton Kessler, who conducted an autopsy on Ms. Greineder's body, testified that the cause of death was one of two stab wounds to her neck.  There were other stab wounds to the head and chest.  Dr. Kessler also noted a single wound to the back of Ms. Greineder's head made with a blunt object.  He testified that she was dragged by her shoulders, based on scrape marks he observed on her lower back and buttocks.  *Tr.* XIX/14-37.

### (8)      Blood spatter evidence.

Based upon the defendant's motion *in limine* to exclude the Commonwealth's proffered blood spatter evidence, the trial court conducted a hearing as to the admissibility of such scientific evidence pursuant to *Commonwealth v. Lanigan*,  419 Mass. 15, 25-26 (1994).  Following the hearing, the court found all of the proffered evidence admissible, with the exception of expert opinion evidence based on the experimental use of stage blood and observations concerning protein stains on the back of  Greineder's jacket.

State Trooper Kenneth Martin testified that stains on Greineder's shoes and windbreaker were "medium velocity impact spatter."  He opined that some of Ms. Greineder's wounds were inflicted before she was dragged from the path, and others were inflicted afterwards. Martin observed that dot patterns on the gloves found in the storm drain matched patterns found on the hammer, knife, and plastic bags recovered from the scene. Tr.XVII/93-135.

 Rod Englert**,** a bloodstain analyst called by the Commonwealth, concurred with Martin's testimony regarding medium velocity blood spatter, dragging, and dot patterns.  He also testified to a grabbing pattern on the sleeves of Greineder's windbreaker and to the presence of a pattern on a streak on Greineder's jacket and on the left lens of his glasses, as depicted in photographs taken at the scene, similar to the dot pattern observed on the work gloves.  *Tr.* XVIII at 90-185.

### (9)     Footprint evidence.

State Police Sgt. Deborah Rebeiro testified that footwear impressions from Greineder's shoes matched an impression on the ground  "in front of the victim or the final resting place of the victim, and ... in close proximity to – in fact, overlapping some of the bloodstain in that area on the trail." *Tr.* VIII/29-36.  She stated that one footwear impression (#7) was oriented so that the wearer's heel would be pointed in the same direction as the head of the victim.  Rebeiro observed a drag mark which "starts in the area of footwear track No. 7 and leads back towards the area of the victim or the final resting place of the victim." *Id.* at 36-37.

### (10)     Other evidence.

The Commonwealth presented the testimony of Ms. Greineder's sister, Ilse Stark, and her niece, Belinda Markel, who stated that the Greineders had grown apart in the months prior to Ms. Greineder's death. Tr. XIV/22-31; 227-234.  These witnesses testified to Greineder's preoccupation with the police investigation in the days immediately following his wife's death. *Tr.* XIV/ 42-43, 45-47, 57-59, 244-46**;**XV/6-40.  Markel testified that Greineder told her that he and his wife had sexual intercourse on the morning of her death.  *Tr.* XIV/241-246.  Stark testified that her sister suffered frequent nosebleeds and wore a back brace.  *Id.* at 27.

### 2.     Evidence Presented by the Defense at Trial.

#### a.     Greineder's testimony about what happened.

Greineder testified that on the evening of October 30, 1999, he helped his wife with a paper by typing the bibliography on his computer.  The next morning, they decided to go to Morse Pond to walk their dog.  Ms. Greineder had a nosebleed as Greineder was struggling to get the dog into their Chrysler mini van, and Greineder reached into his Toyota Avalon for a towel that he kept there. Ms. Greineder used the towel to staunch her nosebleed.  As Greineder collared the dog, its head

banged into his nose, which began to bleed.  Greineder used the same towel to wipe his nose, and then threw it back into the Toyota.[5]  They then drove to the park in the van.  *Tr.* XX/36-59.

Greineder testified that they parked near the Turner Road gate.  As they walked on a path through the woods, Ms. Greineder slipped and hurt her back.  Greineder continued on with the dog, arranging to meet his wife at a designated meeting place. The dog, which was unleashed, found Ms. Greineder prone by an unpaved path.  Greineder noticed a cut on his wife's forehead and tried unsuccessfully to rouse her and to pick her up.  *Tr.* XX/55-82.

Greineder then went looking for help. He encountered Kear, who didn't have a cell phone, so Greineder ran up the access road towards the park entrance and called the police from his car. He denied any role in his wife's death.  *Tr.* XX/37, 82-89.

### b.      Evidence about Greineder's marriage and sexual activities.

Greineder testified that his sexual relationship with his wife ended, by her choice, in the mid-1990s, when she began experiencing pain during sex. *Tr.* XIX/248.  He then began engaging in a series of extramarital sexual activities, beginning with phone sex, which escalated to the use of prostitutes and later to having sex with people he met on the Internet. *Tr.* XIX/248-261; XX/8-18. Greineder emphasized that he was very happily married, and that his sexual activities were collateral. *Tr.* XIX/258, 259, 261;  XX/18,19-20.  He testified that he was not sure if his wife knew about his sexual activities, but she had discovered his supply of Viagra during the summer of 1998, long after they had stopped having sex. *Tr.* XX/17-18.

Colin Greineder testified that his mother didn't know how to use the Internet. *Tr.* XXIV/43. He discovered his father's pornography and Internet sex activities while using his father's computer

---

[5]      Greineder testified that he turned the towel over to his attorney on November 5, 1999.  *Tr.* XX/132. It was introduced into evidence as Exhibit 440. *Id.* at 48.

in 1998. *Id.* at 47-53. He never shared that discovery with his mother. *Id.* at 56. During the summer

of 1999, Colin asked his mother about her marriage. She replied that she was happy, but their sex

life could be better. "I think your dad has his own way of dealing with that now," she added. *Id.* at

55. Colin also testified that his mother had a chronic back problem and frequent nosebleeds. *Id.* at

37-38, 40. Kirsten Greineder testified that her parents had a "wonderful" relationship. *Tr.* XIX/220.

### c.    Response to DNA evidence.

Dr. Christie Davis was retained prior to trial as a defense expert. Davis sat at counsel table

while Dr. Cotton was testifying to assist defense counsel with cross-examination. *Tr.* XI/4. She was

not called as a defense witness at trial.

Dr. Daniel Krane testified as a defense expert. He reviewed Cellmark's DNA test results on

the key pieces of evidence and pointed out some alleles which were inconsistent with both Dirk and

Mabel Greineder. *Tr.* XXII/33-56. On cross-examination, Krane admitted that he was not a forensic

scientist, did not utilize the Genescan and Genotyper software utilized by Cellmark, and had no

formal training on the forensic use of the ABI autoanalyzer. *Id.* at 100-105, 113, 128, 130, 138.

Dr. Krane pointed to specific examples from Cellmark's analysis to show that the putative

presence of Greineder's DNA on the knife and brown work gloves was consistent with transfer of

DNA from Greineder to his wife, and then to the knife and gloves, without there necessarily having

been any direct contact between Greineder and the objects themselves. *Tr.* XXII/82-96. Krane

provided the jury with a review of scientific literature supporting this theory. *Id.* at 58-69. Marc

Taylor, a forensic scientist, testified that he had conducted experiments on DNA transfer and opined

that transfer of Greineder's DNA to the knife and gloves could have occurred without any direct

contact between Greineder and those objects. *Id.* at 224-226, 232-236. Over defense objection, the

trial judge precluded Taylor from providing specific details about his DNA transfer experiments.

-11-

### d.   Response to other scientific evidence.

Stuart James, a defense expert, testified that the spatter stains on Greineder's shoes, jeans, shirt,  and windbreaker, which the prosecution asserted were indicative of his presence at the time of Ms. Greineder's killing, could have been created in other ways. *Tr.* XXIII/44,47,56, 58-67, 70-73. He noted: "[I]f one received a single blow to the head with a blunt object, the possibilities [of] spatter being produced by that event are quite, quite remote." *Id.* at 41-42. James agreed with the prosecution experts that the dot patterns on the knife and hammer matched those found on the work gloves.  The defense presented no response to the prosecution's expert testimony about footprints.

### e.   Third-party culprit evidence.

On cross-examination, Trooper Foley acknowledged that when he responded to Morse Pond on October 31, 1999, he knew that there had been two unsolved homicides in recreation areas in Norfolk County during the preceding 12 months.  *Tr.* XI/42.  The trial judge allowed a single question on this subject and prohibited defense counsel from eliciting any details of those unsolved homicides or the resulting police investigations. *Memorandum and Order* (5/21/01).

## II.   PROCEEDINGS ON GREINEDER'S FIRST MOTION FOR NEW TRIAL (2005-2007).

### A.   Greineder's Claims.

#### 1.   Ineffective assistance of counsel.

Greineder's first motion for new trial raised myriad claims of ineffective assistance of counsel.  Greineder argued that his trial counsel, Martin F. Murphy, failed to present a meritorious pretrial challenge to the admissibility of the Commonwealth's DNA test results, a critical component of the prosecution case.  In a submission supported by expert affidavits, Greineder argued that the test results obtained by Cellmark on tiny, mixed samples of DNA were scientifically unreliable, and

that the statistical results presented by Cellmark were calculated improperly.  Accordingly, Greineder argued, a motion to exclude that flawed scientific evidence would properly have been allowed, so counsel's failure to file such a motion was manifestly unreasonable.  Greineder argued that his counsel was also ineffective in failing to present expert testimony at trial which would have substantially negated the inculpatory impact of Cellmark's DNA test results.

Greineder argued that trial counsel was seriously deficient in other respects.  First, he failed to present expert testimony to contest the Commonwealth's inculpatory expert evidence about footprints.  Second, he failed to object to the admission of unfairly prejudicial, irrelevant evidence respecting Greineder's extramarital sexual behavior, to the prosecutor's improper piling on of that evidence, and to the misuse of that evidence in closing argument.  Third, he failed to file a meritorious motion to suppress the fruits of an automobile search conducted by police on November 1, 1999, which exceeded the scope of the underlying warrant.  Fourth, he failed to specifically challenge the seizure of a hardware store receipt by police on November 12, 1999 pursuant to an improper general warrant once that receipt became critical to the Commonwealth's case.

Greineder argued that these serious omissions by defense counsel fell measurably below the established professional standard of competence and likely affected the jury's verdict.  Indeed, he asserted, the exclusion of the scientifically unreliable DNA evidence alone would have dramatically tilted the balance at trial in his favor.  Greineder asserted that his trial counsel's specific omissions deprived him of effective assistance of counsel  under both the United States Constitution and the Massachusetts Declaration of Rights.

## 2.    Exposure of deliberating jury to extraneous matter.

In his motion for new trial, Greineder also claimed that the jury was exposed to extraneous matter during its deliberations when it conducted an unauthorized experiment using trial exhibits and

a banana.  Greineder requested an evidentiary hearing to determine whether this event had in fact

occurred and whether it tainted the jury's verdict.

### 3.    Recantation of expert testimony.

In support of his motion for new trial, Greineder filed an expert's affidavit challenging the

accuracy of trial testimony presented by Sergeant Deborah Rebeiro, the Commonwealth's footprint

expert.  On May 9, 2007, nearly two years later, Rebeiro filed an affidavit admitting that her trial

testimony linking Footprint #7 to the heel of Greineder's sneaker was erroneous.  That testimony

had been relied upon by the Commonwealth in opening statement and closing argument to support

its theory that Greineder had dragged his wife's body off the trail at Morse Pond after murdering her.

In the wake of Rebeiro's recantation, Greineder filed an amended new trial motion arguing that her

belated admission about the falsity of her trial testimony warranted judicial relief.

### B.    Additional Evidence Presented to Motion Judge.

### 1.    Ineffective assistance of counsel.

Greineder filed a number of affidavits in support of his motion for new trial, including a

lengthy affidavit by a DNA expert, Dr. Arthur J. Eisenberg, and affidavits by his trial counsel's DNA

expert, Dr. Christie T. Davis; an expert in DNA statistical analysis, Dr. Charles H. Brenner; and a

footprint expert, William J. Bodziak.  The trial court heard the testimony of Greineder's trial counsel,

Martin F. Murphy, at an evidentiary hearing.  Greineder subsequently filed two additional affidavits

by Dr. Eisenberg.  Greineder's motion to call Dr. Eisenberg as a witness at the evidentiary hearing

was denied.  The Commonwealth filed two affidavits by its DNA trial expert, Dr. Robin W. Cotton,

and an affidavit of Joanne Sgueglia, Technical Manager of Forensic Biology at the Massachusetts

State Police Crime Laboratory.

### 2.      Exposure of deliberating jury to extraneous matter.

The trial court heard testimony by Linda Rosencrance, an author who had interviewed one of the deliberating jurors and recounted that interview in a published book about the case.  The court also admitted into evidence a tape-recording of that interview.  Testimony from six members of the deliberating jury was taken during the evidentiary hearing.

### 3.      Recantation by the Commonwealth's footprint expert.

On this issue, the Court received the affidavit filed by Sgt. Rebeiro.  The Court also admitted into evidence a video recording of the relevant portion of the prosecutor's closing argument.

### C.      The Motion Judge's Decision.

On October 31, 2007, Judge Chernoff issued a 68-page decision denying Greineder's Amended Motion for New Trial, accompanied by a 51-page appendix, which Judge Chernoff described as an "attempt to abstract the information" he considered in adjudicating the motion.

## III.      REMAND PROCEEDINGS IN THE TRIAL COURT RESPECTING GREINEDER'S PUBLIC TRIAL CLAIM (2009-2010).

On direct appeal to the Massachusetts SJC, in his brief-in-chief filed in April 2009, Greineder argued myriad legal issues, including, *inter alia*, a claim that Greineder was denied his right to a public trial. Following oral argument, on October 23, 2009, the SJC noted that the trial record failed to present "a sufficient factual record for meaningful consideration" of the public trial claim and remanded the case to the trial judge for specific findings. Five days later, the trial judge submitted a detailed written response to the SJC relying on his own unrefreshed memory, with no input from the parties. The very next day, the trial judge informed counsel that he had received further information and notified the SJC not to act on the case until after he met with counsel.  On November 18, 2009, Greineder filed a motion for evidentiary hearing, together with a motion to

recuse or disqualify the trial judge from conducting such hearing or making any findings of fact. The trial judge denied the recusal motion and granted the motion for evidentiary hearing. An evidentiary hearing was held. Following the hearing, the trial judge made adverse factual findings respecting the public trial claim in a second response to the SJC filed on February 16, 2010. The parties filed supplemental briefs in the SJC focusing on the public trial issue.

## IV.     PROCEEDINGS IN THE MASSACHUSETTS SUPREME JUDICIAL COURT (2010).

Upon receipt of the trial judge's second response and the parties' supplemental briefs, the Massachusetts SJC proceeded to decide all of Greineder's appellate claims (including the public trial claim). *Commonwealth v. Greineder*, 458 Mass. 207, 239 (2010). The court rejected all of Greineder's claims and affirmed his conviction, as summarized below.

First, Greineder argued that his constitutional right to a public trial was violated when the entirety of juror *voir dire* took place in private, and that his constitutional right to a fair tribunal was violated when the trial judge refused to recuse himself from ruling on the public trial claim. The SJC held that individual *voir dire* was not closed in violation of the right to a public trial, and that the trial judge did not abuse his discretion in refusing the recuse himself. 458 Mass. at 226-234.

Second, Greineder argued that the admission of inculpatory DNA test results, over objection, through the testimony of a witness who neither conducted the testing nor reviewed the raw data violated his constitutional right to confrontation and the rule against hearsay. The SJC addressed the confrontation issue by separating it into two distinct parts. First, it addressed what it characterized as Greineder's challenge to the admission of Cotton's "opinion" testimony detailing statistical likelihoods based on the DNA testing. It found no error, holding that this was admissible expert opinion testimony. 458 Mass. at 236. The SJC then separately addressed the admission of Cotton's testimony enumerating the specific DNA test results. The SJC found that the admission

of this evidence was  error, but held that this error was not prejudicial.  *Id.* at 226-239.

Third, Greineder argued that the admission of irrelevant and unfairly prejudicial evidence regarding his extramarital sexual activities deprived him of a fair trial.  The SJC held that the probative value of evidence of Greineder's extramarital sexual activity outweighed any possible undue prejudice. 458 Mass. at 239-242.

Fourth, Greineder argued that the post-trial recantation of key opinion testimony presented at trial by the Commonwealth's footwear expert warranted a new trial.  The SJC held that the post-trial recantation of the footwear expert did not create a substantial likelihood of the jury reaching a different result, and the trial judge was within his discretion to deny the claim. 458 Mass. at 244-245.

Fifth, Greineder argued that an experiment conducted by the deliberating jury using materials not in evidence exposed the jury to prejudicial extraneous information, requiring a new trial.  The SJC held that  the experiment was within the scope of the evidence presented at trial and cumulative of expert testimony, thus did not constitute extraneous matter. 458 Mass. at 246-248.

Sixth, Greineder argued that he  was deprived of constitutionally effective assistance of counsel due to his trial counsel's failure to move: (a) to exclude scientifically unreliable DNA test results or challenge those results at trial; (b) to suppress an important receipt seized pursuant to an unconstitutional, general search warrant; and (c)  to suppress the fruits of an unconstitutional car search.  The SJC held that counsel's performance was not deficient.  458 Mass. at 247-255.

Finally, Greineder argued that the myriad errors committed at trial, considerately individually and cumulatively, warrant relief under M.G.L.c. 278, §33E. The SJC held that there was no reason to grant such relief. 458 Mass. at 255-256.[6]

---

[6]        Greineder also argued that the prosecutor's misconduct in unfairly exploiting his pre-arrest right to remain silent under Massachusetts law, to prepare and present a defense, and to attend his trial violated his constitutional right to due process and deprived him of a fair trial. The SJC held that the defendant had not exercised his right to remain

(continued...)

## V.      PROCEEDINGS IN THE UNITED STATES SUPREME COURT (2011-2012).

On January 27, 2011, Greineder petitioned the United States Supreme Court for a writ of

*certiorari* on this issue:

> Does the Confrontation Clause preclude a witness from offering an inculpatory
> expert conclusion based on forensic laboratory tests that she did not herself perform
> or observe, where the reported results of those tests involved highly subjective and
> discretionary analysis by a nontestifying witness and the expert's conclusion was the
> product of the application of straightforward arithmetical computation to those
> reported results?

Following the filing of this petition, the Supreme Court decided two cases involving the

Confrontation Clause and forensic evidence, *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), and

*Williams v. Illinois*, 132 S.Ct. 2221 (2012). On June 29, 2012, the Supreme Court granted

Greineder's petition and issued this order:

> Judgment vacated, and case remanded to the Supreme Judicial Court of
> Massachusetts for further consideration in light of *Williams v. Illinois*, 567 U.S. ___,
> 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012).

__ U.S.__, 133 S.Ct. 55 (2012).[7]

## VI.     REMAND PROCEEDINGS IN THE MASSACHUSETTS SUPREME JUDICIAL COURT (2013).

On remand, the Massachusetts SJC once again affirmed Greineder's conviction, holding that

(1) *Williams v. Illinois* did not require any change to the Massachusetts rule allowing an expert to

testify to his or her independent opinion even if based on data not in evidence, and (2) Greineder's

confrontation rights were not violated by admission of the testimony of Dr. Cotton, despite her

---

[6](...continued)
silent and the prosecutor did not commit misconduct. 458 Mass. at 242-244. Greineder does not raise that claim in this
*habeas* petition.

[7]      The Supreme Court has stated that such an order is appropriate when "intervening
developments...reveal a reasonable probability that the decision below rests upon a premise that the lower court would
reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine
the ultimate outcome." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996)(*per curiam*).

reliance on the DNA test results obtained by a non-testifying analyst. *Commonwealth v. Greineder*, 464 Mass. 580 (2013).

## VII.   FURTHER PROCEEDINGS IN THE UNITED STATES SUPREME COURT (2013).

Greineder again petitioned the United States Supreme Court for a writ of *certiorari*. Greineder's second petition for writ of *certiorari* was denied on October 7, 2013.

## VIII.   PROCEEDINGS ON GREINEDER'S SECOND MOTION FOR NEW TRIAL (2014).

On March 18, 2014, Greineder filed a *Motion for Post-Verdict Jury Inquiry and New Trial*. He asserted a claim that the jury's consideration of cast-off stains on the back of a jacket which had been excluded by the trial judge violated his Sixth Amendment right to be convicted based solely upon the evidence presented in the courtroom. On July 24, 2014, without further hearing, the Superior Court (Brassard, J.) denied that motion in a written *Memorandum of Decision and Order.* Greineder sought leave to appeal that ruling to the SJC. On December 30, 2014, Justice Spina of the SJC denied Greineder's application under M.G.L. c. 278, s. 33E for leave to appeal that ruling.

## ARGUMENT

## I.   GREINEDER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A PUBLIC TRIAL AND TO A FAIR AND IMPARTIAL TRIBUNAL IN DECIDING HIS PUBLIC TRIAL CLAIM.

### A.   Statement of Relevant Facts.

#### 1.   Relevant material in the trial record.

On May 17, 2001, four days before the start of trial, the trial judge ruled on Greineder's motion for individual *voir dire*. In so doing, he noted:

> My strong inclination is to give the jury a questionnaire and ask jurors to respond and then through some mechanism, I'm not quite sure how we will do it with the jurors sitting in a seat in the courtroom or at the sidebar or whatever, make a query of each or at least a number of the jurors - based upon their answers to certain questions perhaps even ask a question that deals with the logistics of the trial in this case as part

of an individual *voir dire*.

*PT Tr.* (5/17/01), pp. 120-121. At the end of the May 17th hearing, the judge indicated that he intended to meet with representatives of the media the following morning:

> [T]here have been a number of inquiries made with the clerk about **the media's presence at trial**. We've scheduled a meeting at a quarter of 9 tomorrow morning between representatives of the media and myself and the attorneys to talk about those issues and so if anybody from the media has an interest in that particular issue, I'd invite you to be here at quarter of 9 tomorrow morning.

*PT Tr.* (5/17/01), pp. 127-128 (*emphasis added*).

Following the non-recorded meeting with the media,[8] and at the outset of recorded proceedings on May 18th, the trial judge briefly discussed what occurred at that meeting:

> Good morning. I would like the record to reflect that earlier this morning at about a quarter of nine I had an opportunity to meet with the people from the different branches of the media who have an interest **in being present** during **the public part of this case**. And we attempted to and I think have worked out almost all, if not all of the logistical issues as far as the case is concerned.

*PT Tr.* (5/18/01), pp. 3-4 (*emphasis added*).

From there, the judge proceeded to discuss the process that would be used during empanelment of the jury. In so doing, the judge indicated that the First Session in the courthouse (the Main Courtroom) would serve as "Staging Area # 2" and would "not be a courtroom for purposes - for jury empanelment, it's just going to be a more comfortable place where the jurors can stretch out." *PT Tr.* (5/18/01), p. 36. In describing the process that would be utilized for the individual *voir dire*, the judge explained:

> [W]e'll either do them up at the sidebar or **off to the side in a sideroom for jurors' private conversations with the Court**. We'll try to work that out.

*Id.* (*emphasis added*).

---

[8]     The judge's meeting with the media was not transcribed, and it is uncontested that the meeting was "off-the-record."

The trial commenced on the following Monday, May 21, 2001. The judge explained to the potential jurors that questionnaires were going to be distributed. He followed up with:

> Then, after you fill out the questionnaire, the way we do our empanelment is that we would like to give you this room as a room to spread out in. You can stretch. You can chat about anything you want except not about this case if you happen to know anything about it, and then **we will invite you one-at-a-time to come into a side room** where I will have an opportunity to talk to you about a couple of issues.

*Tr.* I/5 (*emphasis added*).

Individual *voir dire* commenced shortly thereafter, at the outset of which the judge stated:

> First of all, we are in Room 8. The record should reflect that we are in Room 8 for the purposes of conducting a **non-public** individual *voir dire* of the jurors.

*Id*. at 37 (*emphasis added*). The judge then proceeded to conduct the individual *voir dire* of prospective jurors for the remainder of the day. *Tr.* I/38-320. The individual *voir dire* proceeded in a similar fashion the following day, May 22nd. *Tr.* II/3-236.

During the two days of individual *voir dire*, when speaking to individual jurors, the judge repeatedly referred to the attorneys having previously introduced themselves, and repeatedly referred to the courtroom where the prior introduction had occurred as "**open court**" or "**the open courtroom**," in contrast to Courtroom 8 where the "non-public individual *voir dire* of the jurors" was taking place.[9] The jurors were individually brought in to speak with the judge, and then simply

---

[9]     *Tr.* I/55 ("You have also had today the opportunity to have the attorneys introduce themselves to you **in open court**"); 76 ("You also had today **in open court** the benefit of having all of the attorneys introduce themselves to you"); 113 ("[T]his morning **in the open courtroom** the attorneys had an opportunity to introduce themselves to you."); 133 ("Some people have been introduced to you, namely, the attorneys **in open court** this morning"); 139 ("The attorneys introduced themselves to you **in open court** this morning"); 146 ("You also had this morning the opportunity to have each attorney introduce themselves in open court"); 152 ("This morning the attorneys actually introduced themselves to you **in the open courtroom**"); 180 ("The attorneys introduced themselves to you **in open court** this morning"); 228 ("This morning the attorneys had an opportunity to introduce themselves to you **in open court**"); 292 ("The attorneys introduced themselves to you this morning **in open court**"); *Tr.* II/55 ("You also had yesterday the opportunity of having each of the attorneys in this case introduce themselves to you **in open court**"); 123 ("The lawyers introduced themselves to you yesterday **in open court**"); 137 ("The lawyers introduced themselves to you yesterday **in open court**"); 203 ("The lawyers introduced themselves to you yesterday **in open court**"); 229 ("The lawyers in this case had introduced themselves to you yesterday **in open court**") (*all emphases added*).

-21-

asked to "please step outside" while the judge and lawyers conferred. There was no mention in the transcript of any "bench conference" held at any time during the proceedings in Courtroom 8.

Following the completion of the individual *voir dire*, the proceedings were moved to Courtroom 10, where the parties exercised their peremptory challenges and the jury was sworn. *Tr.* II/247, 252-263, 279. The trial judge then informed the jurors that they would be going on a view the following day, adding: "Usually a view is not for anyone other than the lawyers and the jury and the judge with the court reporter and maybe some court staff."*Tr.* II/273. He then called the attorneys to a sidebar -- which the court reporter marked as a "BENCH CONFERENCE" on the transcript – during which he stated: "I am going to tell the press that they cannot join us for the view" *Tr.* II/279-280. After this conference with the attorneys, which the court reporter marked in the transcript as "AFTER BENCH CONFERENCE," the judge stated: "I would tell the members of the press as far as the view tomorrow is concerned, the press will not go with the judge, the attorneys, and the jurors on the view.  You are welcome to go outside the gate of Morse Pond. If you are going to photograph, I do not want faces of jurors to be photographed or videotaped." *Tr.* II/283.  The following day, the judge stated: "The view is also closed to the public because it is between the jurors, the judge, and the attorneys." *Tr.* III/18.[10]

---

[10]      Petitioner does not raise the exclusion of the public or media from the jury's view of the crime scene as a separate issue in this proceeding. However, the judge's statements excluding the public and media from attending or observing the jury's  view in a public park are indicative of his willingness to order such exclusion in the absence of any findings on the record. *Cf. State ex rel Cincinnati Enquirer v. Bronson*, 945 N.E.2d 551 (Ohio 2010) (when a member of the news media requests to be present at a jury view, the trial court must conduct a hearing, make appropriate findings and enter its decision on the record, citing *Press-Enterprise Co.*, 464 U.S. at 508); *Commonwealth v. Davis*, 635 A.2d 1062, 1066 (Pa. Super. 1993)(trial court's order prohibiting photography of jury viewing of crime scene was time, place, and manner restriction, and did not prohibit the public or media from attending or observing jury's viewing, citing *Press-Enterprise Co.*, 464 U.S. at 508; *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982)).

### 2.      Proceedings on remand.

#### a.      Remand order by the Massachusetts SJC.

In his brief-in-chief on direct appeal, Greineder claimed*, inter alia*, a denial of his right to a public trial. On October 23rd, 2009, following oral argument, the SJC issued a remand order to the trial judge in order to create a "sufficient factual record for meaningful consideration of [Greineder's] claim" that the courtroom was closed during the individual *voir dire. 2010 R.* 16.

#### b.      Trial judge's initial response and aftermath.

Five days after the issuance of the remand order, the trial judge submitted a detailed, written response, accompanied by photographs and a diagram. First Response to the Order of the SJC. 2010 R.18. Before submitting this response, the judge neither met with the parties nor invited their input. There is no indication whatsoever that the trial judge relied on anything beyond his own untested memory in preparing his response. The substance of his response was that the individual *voir dire* was open to the public, no member of the press ever requested entry, and one or more members of Greineder's family were present during the proceedings. *Id*. However, the day after submitting this response, the trial judge informed counsel that he had received some information which he wanted to discuss with them. He indicated further that he had asked the SJC not to act on this case until after he had met with counsel. Judge's Memorandum to Counsel, 2010 R. 26.

#### c.      Greineder's motion for an evidentiary hearing and motion to recuse.

On November 18, 2009, the defendant filed a motion for an evidentiary hearing along with a supporting memorandum of law and exhibits. *2010 R.* 27, 29. (At the outset of the evidentiary hearing, the trial judge indicated that anything filed by the parties was deemed to be a part of the record on remand. *Tr*. (1/14/10), p. 16). The attached exhibits consisted of materials from a variety

of sources substantially controverting the substance of the trial judge's written submission to the SJC

on October 28th, including:

- An affidavit of appellate counsel stating that he had been told by the defendant's trial counsel and trial counsel's law clerk that no member of the public or press was present at any time during the two days of individual *voir dire*. (*2010 R.*73).

- A letter from Tom Farmer, who covered Greineder's trial as *Boston Herald* reporter*,* to the trial judge dated October 28, 2009, stating, *inter alia*: "My recollection is that when we met with your [sic] prior to jury selection, you told us that the media would not be allowed to view the IV [individual *voir dire*] but if we objected, we could appeal to a Single Justice of the SJC . . . I personally sat outside the courtroom while the IV was conducted and I did not see anyone from the general public attempt to gain entry into the courtroom." (*2010 R.* 78).

- An article written by Michael Kunzelman, *MetroWest Daily News* Staff Writer, which was published on the *Town On-Line* web site on May 22, 2001, referring to the jury selection process as follows: "[Judge] Chernoff oversaw seven hours of jury selection yesterday. The process, **which has been closed to the public**, is scheduled to resume this morning." (*2010 R.* 81) (*emphasis added*).

- Affidavits executed by the defendant's three children, all indicating that they would have attended the individual *voir dire* (as they attended the remainder of the trial) if permitted to do so, but they were informed prior to the beginning of the proceedings that they would not be permitted to attend, and thus were not present at any time during individual *voir dire*. (*2010 R.* 87-94).

- Excerpts from the evidentiary hearing in *Com. v. David Cohen*, Norfolk Superior Court No. 05-129, at which Court Officer Larry Sullivan testified that it was a longstanding practice in Norfolk Superior Court to close the courtroom to the public during the jury selection process **in every case, without exception**. Further, Patricia Bellotti, Acting Chief Court Officer and Assistant Chief since 1994, testified that "[a]ll the lobby officers typically close the courtroom during empanelment . . . the way it's done here is we close the courtroom." (*2010 R*. 95-103).

- An affidavit filed in the case of *Com. v. Daniel Holland*, SJC No. 08737. Holland was being tried in the Main Courtroom of the Norfolk County Superior Courthouse when Greineder's trial commenced in late May 2001. The affidavit of Holland's trial counsel stated, in substance: (1) during the three days of jury selection in the *Holland* case, there was a sign on the door of the courtroom stating the courtroom was closed; (2) the public was not allowed in the courtroom during jury selection; and (3) based upon his experience in Norfolk Superior Court, it was common practice to close the courtroom to the public during jury selection. (2010 R.104).

In his motion for an evidentiary hearing, Greineder contended that the trial judge had made a good faith mistake in recalling that the individual *voir dire* had been open to the public. Greineder argued that an evidentiary hearing was necessary to resolve the conflict between the trial judge's recollections and the overwhelming evidence to the contrary. The trial judge allowed Greineder's motion for an evidentiary hearing by written order. *2010 R.* 111.

In addition, Greineder filed a motion to recuse or disqualify the trial judge from conducting the evidentiary hearing or making findings of fact. *2010 R*.109. The crux of Greineder's argument was that the judge had prejudged the factual issues based on his own recollection and therefore he could not reasonably be expected to objectively consider the evidence and alter his findings in accordance with contradictory evidence. The judge denied the motion by written order. *2010 R*.113.

### d.    Evidence presented at the evidentiary hearing.

### (1)    Greineder's key evidence.

Greineder presented the following witnesses at the evidentiary hearing:

- **Martin Murphy**, the defendant's trial counsel, testified that Greineder's three children were extremely supportive of their father and believed him to be innocent. As part of his trial strategy, Murphy informed the children that their presence in the courtroom would send a "powerful message" to the jury, and they agreed to be there as much as physically possible. *Tr*. (1/14/10), pp. 19-20. Murphy testified unequivocally, and without any doubt, that no members of the general public, no members of the media, and none of Greineder's three children were present in the courtroom during any portion of the individual jury *voir dire* held in courtroom 8. *Id*. at 27. He recalled that there was a piece of paper hung up at eye-level on the public door into courtroom 8, but he was not aware of what the paper said. *Id*. at 29-30. Murphy testified further that had the individual *voir dire* proceedings been open to the public, he would have done everything in his power to ensure that Greineder's children were present, and he believes they would have complied. *Id*. at 30. Murphy did not recall exactly how he came to learn that the individual *voir dire* proceedings would be closed to the public. Further, he did not recall whether it was him or someone else who had informed Greineder's children that they could not attend. *Id*. at 41-45. Murphy testified that he does not believe that he ever requested that individual *voir dire* take place in a courtroom closed to the public, nor did he recall assenting to that procedure. *Id*. at 21-22, 32. "I don't remember expressing my assent, which is really the way that I would think about it. I didn't say anything," he explained. *Id*. at 46. Murphy had no recollection of having any discussion

with Greineder about his right to insist that the proceedings remain open. *Id*. at 31-32. While Murphy did not object to the closing of the courtroom during individual *voir dire*, he did not articulate any tactical reason for his forbearance.

• **Brandon Bigelow** was Murphy's law clerk, and he assisted him throughout Greineder's trial. Bigelow testified that the persons present in courtroom 8 during the individual *voir dire* consisted of the judge, counsel, the defendant, and courtroom personnel. Bigelow testified that no member the media and none of Greineder's three children were present in the courtroom during individual *voir dire*. *Tr*. (1/14/10), pp. 56-57. Bigelow recalled that there was something on the glass door to Courtroom 8 that blocked his ability to see outside, but he did not remember what that was. *Id*. at 57.

• **Tom Farmer** - a reporter for the *Boston Herald* - covered the entirety of Greineder's trial from start to finish. *Tr*. (1/14/10), p. 127. Farmer testified that he was present at the meeting with the trial judge on the morning of May 18th, 2001. Farmer testified that during that meeting, the trial judge stated that the media would not be allowed to attend the individual *voir dire*, and that if they objected, they could appeal to a Single Justice of the SJC. Farmer checked with the editors of the *Boston Herald*, who elected not to exercise their right to appeal. Since he was not allowed in the courtroom, Farmer remained in the hallway directly outside Courtroom 8 during the entirety of both days of individual *voir dire*. He did not recall any member of the public or of the media entering the courtroom at any time during either of those two days. *Tr*. (1/14/10), pp. 129-133. After attending the oral argument on Greineder's appeal in October 2009, Farmer faxed a letter to the trial judge. *S.A*. at 78. Farmer's subsequent hearing testimony mirrored that letter in all significant respects. Farmer testified that he believes Greineder to be guilty and hopes that his conviction will be affirmed. *Id*. at 127. Nonetheless, he stands by his testimony that Courtroom 8 was closed during individual *voir dire*.

• **Mac Daniel** - who covered the entire trial as a reporter for the *Boston Globe* - had no recollection of attending the morning meeting with the trial judge on May 18th, 2001, but he did recall waiting outside in the hallway while the individual *voir dire* was taking place. He testified that had he been allowed to attend the individual *voir dire*, he would "more than likely" have done so. Further, he remembered seeing a sign outside a courtroom during trial, but he did not recall what that sign said. *Tr*. (1/14/10), pp. 146-152.

• **Bryan Lavietes** - Field Producer for Court TV during Greineder's trial, testified that "the media wasn't allowed in to see individual *voir dire*." He testified that had he been permitted into the courtroom, he "absolutely" would have been present to observe the individual *voir dire* because "we came to cover the trial, and we want to see as much of it as we can and you never know when something great is going to happen." *Tr*. (2/1/10), pp. 49-54. Lavietes did not recall who told him that the media was not allowed in the courtroom, "but I know we weren't allowed in because if we had been we would have gone in." *Id*. at 64. Court TV did not bring a legal challenge because it was understood that no video or broadcast of the jurors would be permitted, and bringing a challenge would have "sort of get us off on the wrong foot with the judge to begin with." *Id*. at 55.

• **Vinnie Politan**, who served as a correspondent at Court TV during Greineder's trial, testified via affidavit. Politan stated that upon arrival at the courthouse on the first day of jury selection, he was informed that the individual *voir dire* was closed. He spent the remainder of that day, as well as the next, outside of Courtroom 8 where the individual *voir dire* was taking place. If he had been permitted to observe the individual *voir dire*, he would have done so. *2010 R*.115.

All three of Greineder's children testified at the evidentiary hearing:

• **Britt Cavalletto** testified that she was in the courthouse during both days that the individual *voir dire* was taking place, but she was not permitted into Courtroom 8. She testified that on May 21, 2001, she remained seated outside the Main Courtroom, where public entry was barred by both a sign outside the courtroom door and the affirmative actions of the court officers. *Tr*. (1/14/10), pp. 68-72. Instead of being permitted into the courtroom, Britt was told by a court officer on May 22 to remain seated on the first floor of the courthouse, and that she would be told when she could enter the courtroom. According to Britt, she was informed by both court officers and Murphy that she could not attend *voir dire*, and as a result of those communications, she did not enter Courtroom 8 at any time during either of the days. *Id*. at 73-83.

• **Colin Greineder**, Greineder's son, recalled that he and his siblings met with Murphy shortly before trial. During that meeting, Murphy stressed the importance of all three of them being in court every day so that the jury could see them supporting their father. In furtherance of that instruction, Colin took a leave of absence from medical school so that he could be present. Colin was informed that he could not attend the individual *voir dire*. He does not recall who told him, but noted that it was probably his sister, Britt. If Colin had been permitted to attend the individual *voir dire*, he certainly would have done so. This is evidenced by the fact that he attended each and every other day of trial from the opening statements on May 24th through the return of a verdict on June 29th. *Tr*. (1/14/10), 100-104.

• **Kirsten Greineder**, Greineder's eldest daughter, also described meeting with Murphy, who stressed that it was "absolutely, critically important that I attend every and all of the court proceedings." Even though she was in the middle of her medical residency in Michigan, she agreed to Murphy's wishes. Kirsten was present for every day of the trial, with the exception of one day that she missed due to work commitments. She did not attend the individual *voir dire* because Murphy told her that she was not permitted to be present: "If Mr. Murphy had said that I was able to be present, that he wanted me to be there, I would have been there."*Id*. at 110-115.

• **Dirk Greineder**, the defendant, testified that none of his friends or family members were inside Courtoom 8 during any part of the individual *voir dire*. While he very much wanted his children to be present, Murphy had told him that the *voir dire* would be closed. He was not aware that he had a constitutional right to have the public, including his children, present in the courtroom. *Id*. at 190. He never discussed that subject with Murphy, and he never

agreed to waive that right. *Id*. He testified that had he known that he had such a right, "I would have insisted that [the courtroom] be open." *Id*. at 191.  Greineder stated that he probably learned that the courtroom would be closed during individual *voir dire* when he met with Murphy on Friday afternoon, May 18th. *Id*. at 205.

• **Patricia Bellotti**, the Chief Court Officer at Norfolk Superior Court, claimed that she could not recall much of the testimony she gave at a hearing in the *Cohen* case on February 25, 2008, but acknowledged that the following testimony given on that date was accurate: "Once the jury empanelment starts, the jury is a priority and we don't want to contaminate them, we don't want to disrupt the jury in the courtroom, the court procedures, so we close the courtroom. Once they're sworn in, we allow the rest of the people in." *Tr*. (1/14/10), p. 171. Bellotti also testified that she saw the "Do Not Enter" sign used in the *Cohen* case and had seen a sign like that before taped to a courtroom door. *Id*. at 174-175.

• **James McDermott**, a long-time Assistant Clerk at Norfolk County Superior Court - who was not involved in  Greineder's trial - testified that as a general matter, "usually the court officers would ask people to step outside for the empanelment." *Tr*. (1/14/10), p. 160. McDermott explained: "Especially on a criminal case, if there were a lot of jurors ordered, there would be a request by the clerks, by the court officers, or by the Clerk, to have everyone out of the courtroom during the empanelment we would ask people to leave the courtroom during the empanelment." *Id*. at 159.

### (2)     The Commonwealth's key evidence.

The Commonwealth called several witnesses who believed that  Greineder's daughter, Britt, was present at the individual *voir dire*, notwithstanding her unequivocal testimony to the contrary.

• **Margaret Morris**, the court reporter, testified that she "thought" Britt was present, but no other member of the public was present during individual *voir dire*. *Tr*. (1/14/10), 213-222.

• **Susan Corcoran**, one of the prosecutors at trial, was "almost certain" that Britt was present and she recalled that the courtroom was full of people. *Tr*. (1/14/10), pp. 225, 236.

• **Robert Cosgrove,** formerly a prosecutor (later a judge) testified that he sat in the back of the courtroom. Cosgrove testified that he did not have a particularly strong memory of the individual *voir dire*, but was "eighty percent" sure that Britt was there. He was unable to identify any other member of the public who was present in the courtroom. *Tr*. (1/14/10), pp. 242-258.

• **Richard Grundy**, the lead prosecutor at trial, testified that he had a clear memory of Cosgrove's sitting at counsel table with him during individual *voir dire* - notwithstanding Cosgrove's testimony to the contrary. He also testified that Britt was present, but he was unable to name any other member of the public who was there. *Tr*. (1/15/10), pp. 61, 78-80.

- **William Weed**, a court officer during the trial, testified that it was his role to take care of the defendant during the trial. He sat behind Greineder in Courtroom 8. He didn't see any paper on the doorway of Courtroom 8 or any court officer stationed at the doorway.  He did not recall if there was any member of the media or public in Courtroom 8.

- **George Berube**, a court officer in training during the trial, testified that he did not see any sign on the door saying "keep out" or personally tell anyone to stay out. *Tr.* (1/15/10), p. 4-6.

- **Elizabeth Collins**, a court officer assigned to the trial, testified that she was stationed in the back hallway with jurors waiting to go into Courtroom 8. She could not see the public entrance to Courtroom 8 from her vantage point, and did not recall seeing anyone else in the back hallway. *Tr.* (1/15/10), p. 8-15.

- **Steven Minkofsky**, the lobby officer working for Judge Chernoff during the trial, testified that his job was to bring jurors from the back hallway into Courtroom 8 individually for *voir dire* between the two attorneys and the judge. He did not see any sign on the door and did not personally keep anyone from the public out.  He believed he remembers Britt being in the courtroom during individual *voir dire* and that no other member of the public - other than one person from the media he could not name - was present. *Tr.* (1/15/10), pp. 17-18, 20, 36-37.

- **Helen Litsas**, who served as the law clerk for the trial judge, testified that there were two or three people in the spectator section of the courtroom during individual *voir dire*, including the defendant's daughter. She did not recall seeing Cosgrove or Corcoran in Courtroom 8 at all. *Tr.* (2/1/10), pp. 11, 33-36.

Several of the Commonwealth's witnesses, including Judge Cosgrove, Mr. Grundy, and Ms. Litsas, had read the trial judge's October 28, 2009 response prior to testifying. None of the Commonwealth's witnesses could name a single member of news media or of the public, other than Greineder's daughter Britt, who supposedly attended any portion of the individual *voir dire*. Their claim that Britt was present was contradicted by Britt's unequivocal testimony that she was not present. The Commonwealth did not produce any member of the public who claimed to have been present during any portion of the individual *voir dire*.

e.      **The trial judge's second response to the court's remand order.**

On February 16, 2010, the trial judge submitted his second response to the SJC, along with a separate order disposing of two motions filed after the conclusion of the evidentiary hearing. *2010*

*R*. 117, 131. The judge explained that he was making one set of findings based upon credible evidence at the evidentiary hearing and a separate set based upon his own refreshed memory. *2010 R*. at 118. He noted further that none of the witnesses who testified had "given any thought to the events surrounding the *voir dire* empanelment for a period of eight-and-one-half years . . ." *Id*.  In answering specific questions posed by the Court, the trial judge made the following key findings:

- The case generated "keen national interest." There were so many media representatives present that there was "a virtual tent city outside of the courthouse." The court staff was "concerned about a 'media frenzy.'" *2010 R*.121.

- On Friday, May 18, 2001, the trial judge met with members of the press for a discussion regarding the logistics of covering the trial. Mr. Farmer's recollection that the trial judge told the media during that Friday meeting that the courtroom would be closed to them during individual *voir dire* does not comport with the trial judge's memory. *2010  R*. 120-121.

- No member of the press was present in the courtroom during the two days of individual jury *voir dire*. "Occasionally, a few unidentified persons who may well have been members of the public were present." There is "conflicting credible evidence" as to whether Britt was present. Neither of Greineder's other two children were present. *2010 R*.118-119, 125.

- No court officer or court employee affirmatively denied entry to the courtroom to anyone. Nevertheless, members of the press were under the impression that they could not attend the individual *voir dire*. Mr. Farmer "likely communicated that impression to other members of the press . . ." *2010 R*.120-122.

- Some of Greineder's family members heard from a non-court source over the weekend preceding the *voir dire* that they could not or should not attend. If Britt Cavalletto was not in the courtroom, it was because of said communication, not because of instructions from court personnel or a posted sign. *2010 R*.118-119, 125.

- There was no sign on the door prohibiting entry to the courtroom where individual *voir dire* was being conducted. *2010 R*. 123, 125.

- Greineder's attorney "assented to the procedure." While such assent "fit into a strategy of selecting a fair jury," it was not otherwise a matter of trial strategy. *2010 R*.124.

- Greineder did not affirmatively agree or assent to the process. *Id*.

### 3.      The SJC's decision as to Greineder's public trial rights.

Following the trial judge's second response, the SJC proceeded to consider the claim on its

merits, finding that "the posture of the issue before us is similar to the review of a decision on a motion for new trial." *Greineder*, 458 Mass. at 225. The SJC focused its inquiry on whether the courtroom was *officially* closed: "The ultimate question of fact before us is whether there was a court order or other **official action** that excluded the public (or the media) from the room." *Id.* at 222. The court afforded great deference to the trial judge's findings, and ruled that the defendant had not shown that the judge clearly abused his discretion in concluding that: (1) members of the public and Britt attended portions of the individual *voir dire*; (2) the defendant failed to show that the public, including Britt, was excluded from the *voir dire* "in the constitutional sense"; and (3) the courtroom was not closed to the media, in the constitutional sense, during the individual *voir dire*. *Id.* at 219-235. As a result, the SJC did not proceed to consider whether the trial court complied with factors under *Waller v. Georgia*, 467 U.S. 39, 46 (1984), for closing the court.

Finally, the SJC ruled, rather perfunctorily, that the trial judge did not abuse his discretion in denying the motion to recuse himself, finding that Greineder had not shown that the judge was not fair or impartial, or that his impartiality might reasonably be questioned, and that there was not evidence of bias or prejudice from an extrajudicial source. *Id.* at 235.

### B.    Summary of Applicable Law.

### 1.    Constitutional right to a public trial.

The Sixth Amendment to the United States Constitution grants criminal defendants the right to a public trial, so "that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46 (1984) (*quoting Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380 (1979)). Indeed, the right to public trial is so fundamental to our system of justice that it is guaranteed to the defendant, the general public, and

the press. *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (right to public trial is protected by the First

and Sixth Amendments to the United States Constitution); *Waller*, 467 U.S. at 46 (right to public

trial functions for the benefit of the accused and the public); *Press-Enterprise Co. v. Superior Court*,

464 U.S. 501, 508 (1984) (conducting jury selection in open court permits members of the public

to observe trial proceedings and promotes fairness in the judicial system); *In re Oliver*, 333 U.S. 257,

270 (1948)("The knowledge that every criminal trial is subject to contemporaneous review in the

form of public opinion is an effective restraint on possible abuse of judicial power.");  *Herring v.

New York*, 422 U.S. 853, 856-57 (1975) (describing the Sixth Amendment right, *inter alia*, to a

"speedy and public trial" as "fundamental").

The Supreme Court has been "pristinely clear that the Sixth Amendment right to a public trial

extends to the jury *voir dire* process." *U.S. v. Agosto-Vega*, 617 F.3d 541, 546 (1st Cir. 2010), *citing*

*Presley*, 558 U.S. at 212. That is so because "[j]ury selection is the primary means by which a court

may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice...or

predisposition about the defendant's culpability..." *Owens v. United States*, 483 F.3d 48, 61 (1st Cir.

2007). This requirement applies to the states. *Presley*, 558 U.S. at 212.

The Supreme Court has held that a high standard must be met in order for a courtroom to be

closed without violating the Sixth Amendment:

> [T]he party seeking to close the hearing must advance an overriding interest that is
> likely to be prejudiced, the closure must be no broader than necessary to protect that
> interest, the trial court must consider reasonable alternatives to closing the
> proceeding, and it must make findings adequate to support the closure.

*Presley*, 558 U.S. at 214 (quoting *Waller*, 467 U.S. at 48).  When only a few members of the public

have been excluded from a courtroom, but not the public at large, such exclusion still constitutes a

closure of the courtroom. In *Presley*, the Court ordered a new trial based on the exclusion of one lone

spectator, the defendant's uncle, during only one part of the trial proceedings, without any discussion as to whether excluding one family member of the defendant was a substantial enough exclusion to rise to a violation of the right to a public trial. 558 U.S. at 209.  Under *Presley*, excluding even one spectator from one portion of the proceedings does not excuse a court from its obligation under *Waller* to make explicit findings and explore all possible alternatives before closure. *Id.  See also Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) ("it is only under the most exceptional circumstances that limited portions of a criminal trial may be closed **even partially** to the public"); *Constant v. Pennsylvania Dept. of Corrections*, 912 F.Supp.2d 279 (W.D. Pa. 2012) (defendant's right to public trial violated by exclusions of his wife and general public (but not the media) during *voir dire*; *habeas* relief granted).[11]

## 2.  *De facto* **closures of the courtroom.**

There is no rule that an unconstitutional courtroom closure can only occur as the result of an affirmative order by the judge or other official action. To the contrary, the Supreme Court has held that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley*, 558 U.S. at 215. Accordingly, a courtroom "may be closed in the constitutional sense without an express judicial order." *Cohen*, 456 Mass. at 108.  In *United States v. Negron-Sostre*, __ F.3d __ (1st Cir. 2015), 2015 WL 3898794, the First Circuit recently held that

---

[11]        Prior to *Presley*, various circuits held that partial courtroom closures required a lower level of scrutiny. *See United States v. Blanche*, 149 F.3d 763, 769-770 (8th Cir.  1998) (exclusion of three members of the public constituted partial closure); *Cosentino v. Kelly*, 926 F.Supp. 391, 394-395 (S.D.N.Y 1996), *aff'd* 102 F.3d 71 (2d. Cir. 1996) (exclusion of 4 people - both defendant's wives and both of one of the defendant's children - constituted a partial closure.).  Such courts held that a partial closure of a courtroom may still amount to a Sixth Amendment violation. *See e.g. United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005). However, in "such cases, there must only be a 'substantial reason,' rather than an 'overriding interest' justifying the closure. *Id*. (quoting *Woods v. Kuhlmann*,  977 F.2d 74, 76 (2d Cir. 1992)). See also *United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1992); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984); *Smith*, 426 F.3d at 573-574 (remaining three factors unchanged and must be satisfied).  The First Circuit has repeated that a "substantial" interest, rather than "compelling" interest, applies in "partial" closure cases, notwithstanding *Presley*. *Bucci v. United States*, 662 F.3d 18, 22 (2011).

the district court clearly erred in not finding that a *de facto* courtroom closure during jury selection

had occurred through application of a longstanding practice, in the absence of any official order:

> In our review of the district court's findings, we begin by noting that the court did not specifically determine that the courtroom was *not* closed. Instead it found that every seat in the courtroom was taken by potential jurors, the courtroom doors were not locked, and "the public was not excluded from the courtroom due to a Court order or a determination by the deputy marshal in charge." **In finding that neither the court nor the deputy marshals had "ordered' the courtroom to be closed, the district court sidestepped the issue of whether the courtroom had in fact been closed *despite* the absence of any such order.** However, the issue of whether there was an actual courtroom closure is key because, "even if the courtroom was closed because of inattention by the judge, court's have expressed concern in the past where a court officer's unauthorized closure of a courtroom impeded public access." *Owens* 483 F.3d at 63. **That the courtroom closure was the result of inaction by the judge, rather than an affirmative order, is not dispositive**. *Id.* (Whether the closure was intentional or inadvertent is constitutionally irrelevant.")(quoting *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004). What matters is that the public was barred. *Id.* (citing *Martineau v. Perrin*, 601 F.2d 1196, 1200 (1st Cir. 1979), for the proposition that the Sixth Amendment is implicated when marshals lock a courtroom without authorization).

> Here, the district court, without finding that the courtroom was closed, blamed the defense attorneys  for "informing  the family members that they could not enter." Undeniably, the lawyers were partly at fault.[]  However, it would be a misreading of the record to suggest that the lawyers were wholly to blame.  Indeed, the court's finding ignores CSO Sierra-Medina's testimony that the general practice in Puerto Rico – in other words, **the default rule – was to exclude members of the public from voir dire** unless the attorneys made "arrangements" – that is, made requests in contravention of the general practice – with the judge beforehand. And in this case Sierra-Medina did not recall taking any actions that day that were contrary to that "tendency" to exclude the public.  In that way, his testimony serves to corroborate the testimony of those family members who said that Sierra-Medina had turned them away from the door, an assertion he never denied during the hearing.  His testimony makes clear that **a courtroom closure occurred, accomplished not through locks and direct orders, but through the actions of a CSO familiar with the court's regular practice.**

> Our review of the record convinces us that the court clearly erred in not finding that a complete courtroom closure occurred during jury selection. Moreover, the closure was attributable to court personnel at least as much as to attorneys. The court clearly erred in finding that the attorneys were wholly responsible for the family members' exclusion from voir dire. . .

*Negron-Sostre*, 2015 WL 3898794 *5 (reversing conviction)(*emphasis added*).

### 3.   Violation of the public trial right is a structural error.

A violation of the right to a public trial is a "structural" error. *Negron-Sostre*, 2015 WL 3898794 *2, *citing Owens*, 483 F.3d at 64. Structural rights are "'basic protection[s]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Owens*, 483 F.3d at 64 (*quoting Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993)). Structural errors "'defy harmless-error review' and "require[] automatic reversal of the conviction because they infect the entire trial process." *Brecht v. Abrahamson*, 507 U.S. 619, 629-630 (1993) (*quoting Neder v. United States*, 527 U.S. 1, 8 (1999)). Violations of the public trial right are thus not subject to harmless error review; instead, prejudice is presumed and reversal is automatic. *Id. Accord United States v. Davila*, 133 S. Ct. 2139, 2149 (2013) ("'very limited class of errors' that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole...include[s]...denial of a public trial")(citing *United States v. Marcus*, 560 U.S. 258, 263 (2010)); *Waller*, 467 U.S. at 49 n.9; *Martineau*, 601 F.2d at 1198 ("It is a settled rule of the federal courts that a showing of prejudice is not necessary for a reversal of a conviction not had in public proceedings").

### 4.   Waiver.

In *Presley*, the Court underscored the responsibility of the courts to assure public courtrooms:

> The public has the right to be present **whether or not any party has asserted the right**. In *Press-Enterprise I*, for instance, neither the defendant nor the prosecution requested an open courtroom during juror voir dire proceedings; in fact, both specifically argued in favor of keeping the transcript of the proceedings confidential. *Id.*, at 503-504, 104 S.Ct. 819. The Court nonetheless found it was error to close the courtroom. *Id.* at 513, 1-4 S.Ct. 819.

558 U.S. at 130 (*emphasis added*). The Court also stated: "There is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege

greater rights to insist on public proceedings than the accused has." *Id.* at 203.

Even though the right to a public trial is a structural right, "a criminal defendant can 'waive his constitutional right to a public trial.' " *Martineau*, 601 F.2d at 1199-1200 (*quoting Singer v. United States*, 380 U.S. 24, 34-35 (1965)). However, where "a constitutional right is involved, there ha[s] to be an intentional and knowing waiver." *Martineau*, 601 F.2d at 1200 (*citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 (1973))  A mere failure to object by counsel is not sufficient to meet this standard; much more is required. *See, e.g., Martineau*, 601 F.2d at 1197 (where petitioner's attorney discovered part-way through trial that courtroom had been locked for several days, made a tactical decision not to seek a mistrial, informed the petitioner of the reasons for his tactical decision, and informed the petitioner that he could object on his own, which the petitioner did not do, petitioner had "intentionally and knowingly" waived his right to a public trial).

In *Walton*, 361 F.3d at 433-434, the Seventh Circuit held that a defendant cannot waive his or her right to the denial of a public trial resulting from the closure of the courtroom by simply failing to object to the closure.  The proceedings in that case continued into the night beyond the court's normal closing time, but the public was not permitted to gain entrance into the courthouse after the doors were locked. *Id*. at 432. In response to a petition for a writ of *habeas corpus* pursuant to § 2254, the lower court noted that the defendant's counsel had "failed to object to the late trial or to its effect of barring the public from attending the trial," and therefore, the right to a public trial had been waived. *Id*. at 433. On review, the Seventh Circuit reversed, noting the Supreme Court's comment in *Schneckloth*, 412 U.S. at 241-42 that "[t]he Constitution requires that every effort be made to see to it that a defendant in a criminal case has not unknowingly relinquished the basic protections that the Framers thought indispensable to a fair trial.  Accordingly, 'every reasonable

presumption should be indulged against'" waiver of a fundamental right. *Walton*, 361 F.3d at 433,

*quoting Hodges v. Easton*, 106 U.S. 408, 412 (1882).  The *Walton* court noted that this "heightened

standard of waiver has been applied to plea agreements, the right against self-incrimination, the right

to a trial, the right to a trial by jury, the right to an attorney, and the right to confront witnesses." *Id.*

at 433, *citing Brady v. United States*, 397 U.S. 742, 748 (1970); *Miranda v. Arizona*, 384 U.S. 436,

444 (1966); *Von Moltke v. Gillies*, 332 U.S. 708, 723-26 (1948).  The court noted that the common

element is that of all of these rights concern the fairness of the trial. *Id.*

> The right to a *public* trial also concerns the right to a *fair* trial . . . So, like other
> fundamental trial rights, a right to a public trial may be relinquished only upon a
> showing that the defendant knowingly and voluntarily waived such a right. . . and
> cannot be waived by failing to object at trial.

*Id.* at 434 (*emphasis in original*). Since the record did not indicate a knowing, voluntary, and

intelligent waiver, the court concluded that Walton had not waived his right to a public trial. *Id.*  In

other words, because Walton did not give an explicit and informed waiver under *Zerbst*, 304 U.S.

at 464, and *Schneckloth*, 412 U.S. at 241-242, the court had to reach the issue of closure on its

merits. The mere failure of trial counsel to object to the closure was simply not sufficient to

constitute waiver of such a grave constitutional error. The Second Circuit followed a similar

approach in *United States v. Canady*, 126 F.3d 352, 359 (2d. Cir. 1997). In determining whether the

defendant waived his right to a public trial, the court stated that a "waiver of a constitutional right

must be voluntary, knowing and intelligent, that is, the act of waiver must be shown to have been

done with awareness of its consequences." *Id.* (*quoting United States v. Morgan*, 51 F.3d 1105, 1110

(2d Cir. 1995), and found that the defendant's failure to object did not amount to waiver. The Fourth

Circuit, in *Hutchins v. Garrison*, 724 F.2d 1425, 1431 (4th Cir. 1983), in considering waiver of the

right to a public trial, noted that "a waiver of a constitutional right is effective only if it is 'an

intentional relinquishment of a known right or privilege.'" (*quoting Zerbst*, 304 U.S. at 464).[12]

Even if trial counsel's failure to object to a courtroom closure could be deemed to constitute a waiver, in the absence of a personal, voluntary, knowing, and intelligent waiver by the defendant, such a waiver must be assessed under the rubric of ineffective assistance of counsel. Every criminal defendant is guaranteed the effective assistance of counsel by the Sixth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* created a two part test for determining whether a violation of this right has occurred. The first prong seeks to determine whether counsel's performance was seriously deficient, as measured against an objective standard of reasonableness. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). However, deficient performance only amounts to a Constitutional violation if "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, when the deficient performance resulted in the denial of a structural right, prejudice is presumed, and this element is automatically satisfied. *See e.g. Johnson v. Sherry*, 586 F.3d 439 (6th Cir. 2009)(ordering evidentiary hearing on ineffective assistance of counsel claim for failure to object to courtroom closure, "if the closure were unjustified or broader than necessary, prejudice would be presumed"). *See also Brecht*, 507 U.S. at 629-630.

### 5.    Due process right to a fair and impartial tribunal.

A defendant in a criminal case is entitled "to an impartial and disinterested tribunal." *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980). "[A] fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Fairness of course requires an absence of

---

[12]    *See also United States v. Hershey*, 20 M.J. 433, 437 (U.S. Ct. Military Appeals 1985)(waiver of public trial right must be "intentional and knowing," citing *Zerbst*); *State v. Wise*, 288 P.3d 1113 (Wash. 2012)(defendant's failure to object to moving part of *voir dire* proceedings into chambers was not sufficient to waive his public trial right); *State v. Frawley*, 334 P.3d 1022 (Wash. 2014)(defendant did not knowingly, voluntarily, and intelligently waive right to public trial); *State v. Strode*, 217 P.3d 310, 315 (Wash. 2009) (public trial right can be waived only by knowing, intelligent, and voluntary waiver).

actual bias in the trial of cases.  But our system of law has always endeavored to prevent even the probability of unfairness." *Id. See also Mistretta v. United States*, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship.") This requirement of neutrality "safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process." *Id*. (*citing Carey v. Piphus*, 435 U.S. 247, 259-262, 266-267 (1978)). "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." *Id*. (*citing Matthews v. Eldridge*, 424 U.S. 319, 344 (1976)).

The Constitution requires recusal where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  The reviewing court's inquiry is objective.  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009).  The reviewing court does not ask whether the judge actually harbored subjective bias; rather, it asks whether the average judge in his or her position was likely to be neutral or whether there existed an unconstitutional potential for bias.  *Id.*  "Every procedure which would offer a possible temptation to the average ... judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the State and the accused, denies the [accused] due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

A judge is required to recuse himself when he is biased or prejudiced in such a way that he cannot impartially judge the proceedings before him. *See, e.g., Liteky v. United States*, 510 U.S. 540 (1994). Bias derived from an extrajudicial source "is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice." *Liteky*, 510 U.S. at 554. *See also Belue v. Leventhal*, 640 F.3d 567, 573 (4th Cir. 2011). A

direct pecuniary interest in convicting a defendant would obviously require recusal, *Tumey*, 273 U.S. at 523, as would other less direct financial interests. *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). However, non-pecuniary interests may also require recusal. A judge must withdraw where he or she acts as part of the accusatory process, *Murchison*, 249 U.S. at 137, "becomes embroiled in a running, bitter controversy" with one of the litigants, *Mayberry*, 400 U.S. at 465, or becomes "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit," *Johnson v. Mississippi*, 403 U.S. 212, 215-16 (1971). *See, e.g., Harrison v. McBride*, 428 F.3d 652 (7th Cir. 2005) (*habeas* relief granted on judicial bias claim where judge "abandoned the role of 'an impartial officer directing the judicial process of truth seeking and invaded the role of an advocate'")(internal citations omitted). In addition, "bias can be shown by a finding that the adjudicator prejudged the issues." *Yamaha Motor Corp. v. Riney*, 21 F.3d 793, 798 (8th Cir. 1994) (*citing Gibson*, 411 U.S. at 577). *See also Franklin v. McCaughtry*, 398 F.3d 955, 962 (7th Cir. 2005) ("when the judge has prejudged the facts or the outcome of the dispute before her... the decisionmaker 'cannot render a decision that comports with due process.'") (*citation omitted*). "The test is whether the adjudicator's situation is one 'which might lead him not to hold the balance [between the parties] nice, clear and true." *Id*. (*quoting Tumey*, 273 U.S. at 532).

In *Hurles v. Ryan*, 752 F.3d 768, 789-90 (9th Cir. 2014), the Ninth Circuit found in a *habeas* case that where a trial judge "found facts based on her untested memory of the events, putting material issues of fact into dispute," and "in effect...offered testimony," the case presented "an especially troubling example of defective fact-finding because the facts [the judge] 'found' involved her own conduct, and she based those 'findings' on her untested memory and understanding of events." *Id. See also Buffalo v. Sunn*, 854 F.2d 1158, 1165 (9th Cir. 1988)(finding error when the court relied on "personal knowledge" to resolve disputed issue of fact), *cf. Murchison*, 349 U.S. at

138 ("Thus the judge whom due process requires to be impartial in weighing the evidence presented

to him, called on his own personal knowledge and impression of what had occurred in the grand jury

room and his judgment was based in part on this impression, the accuracy of which could not be

tested by adequate cross-examination.").

### 6.    Standard of review under AEDPA. [13]

The Antiterrorism and Effective Death Penalty Act [AEDPA] provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant
to the judgment of a State court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings unless the adjudication of
the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

With regard to the first clause of Section 2254(d)(1), as the Supreme Court has explained,

a state court decision is considered **contrary to** federal law if the state court "applies a rule that

contradicts the governing law set forth" by the Supreme Court or "confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a

result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). *Accord Bell*

*v. Cone*, 535 U.S. 685, 694-698 (2002); *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014). The

"contrary to" prong "does not apply to a 'run-of-the-mill state court decision applying the correct

legal rule from [the Supreme Court's] cases to the facts of a prisoner's case."  *Hurtado v. Tucker*,

245 F.3d 7, 15 (1st Cir. 2001) (*quoting Williams*, 529 U.S. at 406).

---

[13]        This section relates to all of the legal arguments set forth in this memorandum.

With regard to the second clause of Section 2254(d)(1), the application of federal law is **unreasonable** where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. *Accord Sanchez v. Roden,* 753 F.3d 279, 299 (1st Cir. 2014). When assessing unreasonableness, "a federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. An "unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. *See White v. Woodall*, 134 S.Ct. 1697 (2014) (the application must be "objectively unreasonable," not merely wrong; even 'clear error' will not suffice," *citing Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A "habeas petitioner must do more than merely identify an incorrect result." *Jackson v. Coulter*, 337 F.3d 74, 81 (1st Cir. 2003).   In order to reach the level of "unreasonable," "some increment of incorrectness beyond error is required." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (*en banc*). This "increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Id. Accord Morgan v. Dickhaut*, 677 F.3d 39, 46-47 (1st Cir. 2012).

Section 2254(d)(2) authorizes *habeas* relief where a state court's decision is based on an "unreasonable determination" of the factual record. In contrast, 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id.*   There is some dispute as to the circumstances under which the clear and convincing evidence standard set forth in § 2254(e)(1) applies to *habeas* review under § 2254(d)(2). The Supreme Court

has never squarely addressed the relationship between the two provisions.  In *Wood v. Allen*, 558 U.S. 290 (2010), the Supreme Court granted *certiorari* for the express purpose of addressing that relationship, but ultimately declined to resolve the issue.  In expressly reserving the question for the future, the Court explained that any "statements we have made [in prior opinions] about the relationship between §§ 2254(d)(2) and (e)(1)" should not be viewed as dispositive because these prior "cases did not squarely present the issue."  *See also Rice v. Collins*, 546 U.S. 333, 339 (2006) (declining to resolve the issue); *Brumfield v. Cain*, 135 S.Ct. 2269, 2282 (2015)(same).  In the First Circuit, the relationship between § 2254(d)(2) and § 2254(e)(1) remains unclear. *See Robidoux v. O'Brien*, 643 F.3d 334, 338 n.3 (1st Cir. 2011) ("We have previously declined to delve into the relationship between subsections (d)(2) and (e)(1), ...as has the Supreme Court,... and again have no need to do so.")(internal citations omitted).[14]

A fair, persuasive, and coherent reading of the two provisions together was set forth in *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004), ruling that § 2254(d)(2) deals with cases in which no additional evidence is introduced in federal court and a federal *habeas* court's analysis is necessarily limited to an examination of what a state court did with the evidence in the existing state record. Section 2254(e)(1), on the other hand, deals with cases where extrinsic evidence is introduced for the first time in federal court. *Id.* at 1000. "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's

---

[14]    *See also Forsyth v. Spencer*, 595 F.3d 81, 85 n.3 (1st Cir. 2010) ("A different provision of the statute requires clear and convincing evidence from the petitioner in order to defeat a state court factual finding, 28 U.S.C. § 2254(e)(1), but we need not consider whether this standard applies...."). The First Circuit has declined to definitively resolve the relationship between these two provisions, but stated (prior to the Supreme Court's 2010 *Wood v. Allen* decision) that it would "follow the lead in *Miller-El*" *See Teti v. Bender*, 507 F.3d 50, 58 (1st Cir. 2007) (choosing to apply the clear and convincing evidence standard in § 2254(e)(1) to the state court's individual factual findings and applying § 2254(d)(2) to the final decision reached by the state court). *See Miller-El v. Cockrell*, 537 U.S. 322, 341-42 (2003)("AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence"...."The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions. Subsection (d)(2) contains the unreasonable requirement and applies to the granting of habeas relief rather than to the granting of a COA.")

fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." *Id.* *See* Hertz, R. and Liebman, J., *Federal Habeas Corpus Practice and Procedure*, Sixth Edition § 20.2[c] (Matthew Bender), pp. 1047-1048.

Deference to state court fact-findings "does not require that the federal court place blinders on its eyes before conducting habeas corpus review of a state court record." *Moore v. Johnson*, 194 F.3d 586, 602-604 (5th Cir. 1999). The Supreme Court has stated that AEDPA deference "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable."). *See, Brumfield v. Cain*, 135 S.Ct. 2269 (2015) (state court's findings that prisoner's IQ score of 75 demonstrated that he could not possess sub-average intelligence and that record failed to raise any question as to his impairment in adaptive skills were unreasonable); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (state court's finding regarding the content of social service records refuted by the Court's independent examination of the records and was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.").[15] In sum, if the state court's decision was based on an unreasonable determination of the facts, it is not entitled to deference.

The provisions of AEDPA ordinarily require deference to a state court's legal and factual determinations. However, AEDPA deference is only due claims "adjudicated on the merits" in state court. 28 U.S.C. §2254(d). The Supreme Court in *Harrington*, 131 S.Ct. at 780 set up a rebuttable presumption: "When a federal claim has been presented to a state court and the state court has denied

---

[15]        *See also Nara v. Frank*, 488 F.3d 187, 203 (3rd Cir. 2007) (petitioner rebutted the presumption of correctness as to trial court's competency determination); *Mastracchio v. Vose*, 274 F.3d 590, 598-99 (1st Cir. 2001) (petitioner demonstrated clear and convincing evidence to rebut state factfindings).

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state law procedural principles to the contrary." *Id.* at 784-85. *Harrington* was subsequently refined by the Supreme Court's decision in *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013), which held (in a case not involving a summary denial) that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." *Id.* at 1096. The Court in *Williams* held that a number of factors in the case supported the presumption that the federal claims had been adjudicated: the close similarity between the state law and Sixth Amendment claims; the state appeals court's reliance on Supreme Court precedent, as well as state case law which discussed Supreme Court precedent; and the fact that the defendant treated her state and federal claims as interchangeable. *Id.* at 1098-99. The presumption must be rebuttable, the Court cautioned, because "an irrebuttable presumption that state court never overlook federal claims would occasionally miss the mark." *Id.* at 1097.[16]

If a constitutional trial error has been established, the *habeas* court must determine whether that error was "harmless." The Supreme Court has made clear that a *habeas* petitioner's claims of

---

[16]     There have been a number of cases where this presumption has been rebutted. *See e.g. McLellan v. Rapelje*, 703 F.3d 344, 348-351 (6th Cir. 2013)(*Harrington*'s presumption did not apply because state post-conviction trial court had "explicitly' rejected claim on procedural grounds and state court of appeals' reviewed only application and lower court order, not trial record, and thus "only reasonable inference to be drawn" is that court of appeals could not have denied petitioner's claim on the merits); *Wooley v. Rednour*, 702 F,3d 411, 421-422 (7th Cir. 2012) (*Harrington* presumption did not apply to state court's denial of *Strickland* on performance prong, where state court "explicitly considered *Strickland*'s prejudice prong in isolation, deeming it 'unnecessary' to address any other issues raised by the State regarding [trial] court's findings on ineffectiveness,'" and "[i]t would be perverse, to say the least, if AEDPA deference required this court to disregard a state's expressed rationale for a decision"); *Harris v. Thompson*, 698 F.3d 609, 623-25 (7th Cir. 2012) (*"Richter* presumption and AEDPA deference...do not apply" because "we have ample reason to think" that "appellate court's silence" on claim of violation of right to present defense stemmed from "the very reasons the state court actually gave, which were all based on state evidence law, not federal constitutional law"; "AEDPA deference" does not "apply when the state court's decision simply overlooked the constitutional issue, as happened here."); *Balsavage v. Wetzel*, 936 F.Supp.2d 505, 514-15 (E.D. Pa. 2013) (Petitioner rebutted the presumption that his judicial vindictiveness claim had been adjudicated on the merits because "[i]n its decision, the Superior Court never referred to any opinion of the United States Supreme Court, or any other federal court, nor did it refer to any state or federal constitutional claims." Instead, its entire decision revolved around "a state law claim that the trial court abused its discretion."), *affirmed in part and vacated in part on other grounds in* 545 Fed.Appx. 151 (2013).

constitutional error in a state criminal trial are reviewed under the *Brecht* standard. *Fry v. Pliler*, 551

U.S. 112, 121-122 (2007), *citing Brecht*, 507 U.S. at 638.   In *Brecht*, the Supreme Court found that

to obtain *habeas* corpus relief, a petitioner alleging a constitutional error must establish that the error

"had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 631;

*see Sanna v. DiPaulo*, 265 F.3d 1, 14 (1st Cir. 2001).[17]  When the reviewing court "is in grave doubt

about whether a trial error of federal law had 'substantial and injurious effect or influence in

determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v.

McAninch*, 513 U.S. 432, 436 (1995).

**C.     Application of Law to Facts.**

**1.     Greineder was deprived of a fair and impartial tribunal.**

There can be no doubt that the trial judge prejudged the issues and was thereby incapable of

impartially weighing the testimony given at the evidentiary hearing. His prejudgment is evidenced

by his First Response to the Order of the SJC, in which he made findings of fact **before** considering

anything other than his own untested memory.[18] These findings read, in pertinent part:

> It is my memory that there were a few other persons seated on a spectator bench
> during at least portions of the individual voir dire proceedings. My memory is that
> one or more members of the defendant's family were present. I have a memory of a
> daughter sitting in the courtroom during the voir dire proceedings. . . .No [there was
> not a sign on the door to Room 8 stating that entry was not permitted]. . . . To my
> knowledge, the court officers and other court staff denied no one entry.

---

[17]     *Fry,* 551 U.S. at 119, established that the *Brecht* standard is harder to satisfy than the standard under *Mitchell v. Esparza*, 540 U.S. 12, 18-19 (2003) ("when a state court determines that a constitutional violation is harmless [under *Chapman v. California*, 386 U.S. 18, 24 (1967)] a federal court may not award habeas relief under §2254 unless the harmlessness  determination itself was unreasonable"), therefore the Brecht standard "obviously subsumes" the Esparza standard, and the federal courts need not formally apply both tests.  In *Connolly v. Roden*, 752 F.3d 505, 511 (1st Cir. 2014), the First Circuit held that a federal court on *habeas* review may choose between two equally valid options: the court may apply *Esparza* and then move on to the *Brecht* test only if the state court's decision was an unreasonable application of *Chapman*. Alternatively, the court may begin with the *Brecht* test directly. *Id.*

[18]     And further, as demonstrated herein, there can be no doubt that these findings of fact influenced the testimony of some of the Commonwealth's witnesses, who had read his response prior to testifying.

First Response to the Order of the SJC at 3, 4, *3/10 S.A.* 20-21.  Even if the trial judge subjectively

believed that he could somehow set aside his prior findings of fact and objectively evaluate the

conflicting evidence, such a subjective belief is insufficient.  *See Yamaha Motor Corp.*, 21 F.3d at

798 ("bias can be shown by a finding that the adjudicator prejudged the issues"; *Franklin*, 398 F.3d

at 962 ("when the judge has prejudged the facts or the outcome of the dispute before her... the

decisionmaker 'cannot render a decision that comports with due process.'"); *Oquendo-Rivera*, 586

F.3d at 69 ("Where the judge is the decider of the facts, it is hard to ask him to put aside a belief

sincerely arrived at and look at the evidence through fresh eyes.").

Moreover, over Greineder's objection, Judge Chernoff here presided over an evidentiary

hearing about a matter as to which he was also a percipient witness.  Indeed, the prosecutor argued

that the defense position was "contradicted, your Honor, by six percipient witnesses **and your**

**Honor as well makes seven**." *Tr.* (2/1/10) p. 116 (*emphasis added*).  Although defense counsel was

permitted to cross-examine each of the other eleven witnesses called by the Commonwealth at the

evidentiary hearing *Tr.* (1/14/10), pp. 207-259, *Tr.* (1/15/10), pp. 4-84; *Tr.* (2/1/10), pp. 4-99, defense

counsel was not permitted to cross-examine Judge Chernoff, the most important percipient witness

in the case, regarding his potential bias, the quality of his memory, or the accuracy of his

observations, before Judge Chernoff himself made an adverse ruling regarding petitioner's claim.

As in *Hurles*, 752 F.3d at 789-90, the trial judge here "found facts based on [his] untested memory

of the events, putting material issues of fact into dispute" and "in effect...offered testimony."  Just

like *Hurles*, this case presents "an especially troubling example of defective fact-finding because the

facts [the judge] 'found' involved [his] own conduct, and [he] based those 'findings' [at least in part]

on [his] untested memory and understanding of events."  *Id.  See also Buffalo*, 854 F.2d at 1165

(finding error when the court relied on "personal knowledge" to resolve disputed issue of fact), *cf.*

*Murchison*, 349 U.S. at 138 ("Thus the judge whom due process requires to be impartial in weighing the evidence presented to him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination."). *Cf. Brown v. Lynaugh*, 843 F.2d 849, 850-851 (5th Cir. 1988)(defendant denied fair trial when prosecution established essential elements of escape charge through testimony of the presiding judge; "It is difficult to see how the neutral role of the court could be more compromised").

The blatant inappropriateness of Judge Chernoff's dual role was highlighted at the evidentiary hearing during the awkward testimony of Helen Litsas, Judge Chernoff's law clerk during Greineder's trial. When asked on cross-examination when she first learned that Greineder had raised an issue regarding courtroom closure, she was reluctant to answer, stating:

> I received a phone call, I believe - I struggle in answering that question because I still maintain an attorney/client or a confidentiality commitment to Judge Chernoff and to the superior court in terms of what I can and cannot answer. So if I disclose – I just caution you, I certainly want to tread lightly in that area.

*Tr.* (2/1/10) p. 18. After defense counsel requested that the witness be instructed to answer the question, Judge Chernoff instructed the witness: "You may answer the question." Ms. Litsas then answered: "I received a telephone call from Judge Chernoff." *Tr.* (2/1/10) p. 19. She went on, after further being instructed by Judge Chernoff to answer:

> My memory is that Judge Chernoff told me that there was this issue that had been raised and he was informing me that I may – I may be contacted regarding this issue by one of the attorneys involved. . . . He asked me my memory of what I recall during the voir dire process. . . . I shared [my memories] with him.

*Tr.* (2/1/10) p. 19-20. Judge Chernoff "very minimally" shared his memories with her. *Id.* However, she was later provided with a copy of Judge Chernoff's First Response, although she did not recall whether that was at her request or *sua sponte*. She then had a second phone call with Judge Chernoff:

What [the second telephone call] entailed was whether it was appropriate for me to speak to defense counsel about – because I believe you had called me and I did not feel it was appropriate for me to conduct an ex parte conversation, since I had an obligation that remained as a member of the court and as the law clerk to Judge Chernoff, and my interest is in remaining impartial because I am a member of – for purposes of this proceeding, I remain a member of the court.   And so I contacted Judge Chernoff to inform him of this development **and to ask his advice in terms of what he would like me to do.**   Would he like me to call you back or contact the attorney general's office regarding this proceeding for the – general counsel for the superior court.   And that is what I did.

*Tr.* (2/1/10) p. 21-22 (emphasis added).

Thus, it is clear that Judge Chernoff contacted a potential witness who had a "confidentiality commitment" to him and over whom he had a profound supervisory relationship, interviewed that witness, "minimally" shared his own memories with that witness verbally, provided that witness with a detailed typewritten memorandum regarding his specific recollections, and then advised her as to her response to a defense request for information. As in *Harrison*, 428 F.3d at 670, the judge here "invaded the role of an advocate'" and became "personally embroiled with the petitioner." *Cf. Anderson v. Warden*, 696 F.2d 296, 299 (4th Cir. 1982)(trial judge's conduct in successfully pressing two key witnesses to change their testimony violated defendant's due process rights). Where a judge becomes "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit," the judge should be recused. *Johnson*, 403 U.S. at 215-16.   "The test is whether the adjudicator's situation is one 'which might lead him not to hold the balance [between the parties] nice, clear and true." *Id*. (quoting *Tumey*, 273 U.S. at 532). An objective observer would here reasonably question the trial judge's impartiality, therefore recusal was mandatory.

Having refused to recuse himself, the trial judge later prepared his second response in a "hybrid," bifurcated format. For each question posed, he answered in two ways: one "based on the evidence from the evidentiary hearing alone" and the second "[b]ased on the trial judge's present

memory." That is, he tried to separate his dual roles of percipient witness and fact-finder. This was a creative solution to a knotty problem, but a deeply flawed one. Essentially, the judge's present memory was a reflection of his memories from the initial response, as modified by having presided over the evidentiary hearing. Yet permitting a witness to change his testimony after hearing the testimony of other witnesses is generally deemed improper. The trial judge candidly admitted that the testimony of other witnesses at the hearing "served to refresh my memory . . . ." *2010 R.* at 118. He was thus, effectively, the only unsequestered witness. Setting out his findings in this unusual way only served to emphasize the conflict inherent in his presiding over this hearing. To suppose that even an experienced trial judge with the best of intentions could perform the mental gymnastics required to avoid tainting the fact-finding process would ignore basic human nature. Having set forth his own recollections in detail as a witness, the trial judge should have recused himself from conducting the evidentiary hearing and from making findings of fact. His failure to do so denied Greineder's constitutional right to a fair and impartial tribunal in deciding his public trial claim.

> **2.      A federal evidentiary hearing as to the public trial claim is warranted due to the denial of a fair and impartial tribunal in deciding the public trial claim.**

There can be no doubt that given the trial judge's partiality, as in *Hurles*, 752 F.3d at 789-90, "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing," and thus, a federal hearing is required. *Townsend v. Sain*, 372 U.S.293, 313 (1992). Pursuant to Rule 8 of the Rules Governing § 2254 Cases, "the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Whether an evidentiary hearing must be held is governed by *Townsend*, 372 U.S. at 312, as modified by *Keeney v. Tomayo-Reyes*, 504 U.S. 1 (1992), and as further modified by 28 U.S.C. § 2254(e)(2). The court in *Townsend*, 372 U.S. at

312, held that "the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." In further elaborating on this principle, the Court held that there are six circumstances in which a federal court *must* hold an evidentiary hearing, including, *inter alia*,[19] when "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing[, and] for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Id*. at 313.[20]

When a *habeas* petitioner has raised concerns with judicial bias and impartiality relating to

---

[19]    The six circumstances in which a hearing on *habeas* corpus is mandatory are: "If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing." 372 U.S. at 313.

[20]    The court in *Keeney*, 504 U.S. at 4-6, modified this test only with regards to the fifth circumstance requiring an evidentiary hearing when "the material facts were not adequately developed at the state court hearing." In that respect the court held that when the state court's failure to develop material facts was attributable to either the defendant or their counsel, it constitutes a procedural default that eliminates the right to a mandatory federal hearing, unless the petitioner can establish "cause" and "prejudice" or that a denial to hold a hearing will result in a "fundamental miscarriage of justice." *Id*. at 11. This standard was further modified by 28 U.S.C. § 2254(e)(2), which provides:

If the applicant has failed to develop the factual basis of the claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
(A) the claim relies on-
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In interpreting this provision, the Supreme Court has held that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). AEDPA's 28 U.S.C. § 2254(e)(2) thus supercedes *Tamayo-Reyes* and the portion of *Townsend* that *Tomayo-Reyes* itself had superceded respecting cases where petitioner neglected to meet his or her responsibility to develop the relevant facts in state court. As such, *Townsend* remains good law with regards to the other five situations calling for a mandatory hearing, and neither the modification in *Tomayo-Reyes* nor in the AEDPA has any bearing on whether or not a hearing is required in the case at bar. Therefore, when "Section 2254(e)(2) does not apply...it is then necessary to evaluate the request for an evidentiary hearing under pre-AEDPA standards." *Matheney v. Anderson*, 253 F.3d 1025, 1039 (7th Cir. 2001), *cert. den.* 535 U.S. 1030 (2002). *See also Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000) (when § 2254(e)(2) does not apply, assessment of petitioner's entitlement to federal hearing is governed by rules established in "[o]ur pre-AEDPA jurisprudence"); *Wolfe v. Johnson*, 565 F.3d 140, 168-169 (4th Cir. 2009) (If "§ 2254(e)(2) does not proscribe an evidentiary hearing, the court must then assess whether [the petitioner] is entitled to one" under *Townsend*.).

the findings of fact in the state court proceeding below such that the fact-finding procedure was not adequate to afford a full and fair hearing, the *habeas* court must conduct an evidentiary hearing and make independent findings of fact. *Hurles*, 752 F.3d at 791-792. In *Hurles*, the defendant moved for the state trial judge to recuse herself from conducting the trial due to allegations of judicial bias. This motion was denied, and on a petition for *habeas* corpus the District Court denied the claim without holding an evidentiary hearing. On review, the Ninth Circuit noted that "[t]his case presents an especially troubling example of defective fact-finding because the facts [the judge] 'found' involved her own conduct, and she based those 'findings' on her untested memory and understanding of the events." *Id*. at 791. Because of these "flaws in the state court's fact-finding process," the court concluded that the "decision resulted in an 'unreasonable determination of the facts' and is not entitled to a presumption of correctness." *Id*. Instead, the court remanded for an evidentiary hearing because the petitioner had established "his entitlement to an evidentiary hearing pursuant to [*Townsend*], and [that] the allegations, if true, would entitle him to relief." *Id. See also Rose v. Mitchell*, 443 U.S. 545, 563 (1979) (When there are concerns with judicial integrity relating to the state court findings of fact, "independent federal habeas review of the allegation that federal rights have been transgressed" must be undergone.); *Murchu v. United States*, 926 F.2d 50, 57 (1st Cir. 1991) (in reviewing trial judge's summary dismissal of a claim of judicial vindictiveness based on the trial judge's own conduct, the court ruled that in order "to avoid any appearance of impropriety, the matter should be decided by another factfinder" in a new hearing.). Accordingly, an evidentiary hearing on Greineder's public trial claim is warranted.

3.    **Alternatively, *de novo* review of the record by the federal court is required because the state court never addressed the *Waller* factors.**

Even apart from Greineder's claim that the trial judge was not a fair and impartial

decisionmaker as to his public trial claim, he is entitled to *de novo* review of his claim due to the failure of the state court to consider compliance with the *Waller* factors.  As in *Negron-Sostre*, 2015 WL 3898794 at *6, "given the peculiar posture of this case – where no party affirmatively sought to close the courtroom, and where the [trial court] erroneously found that there was no closure – the *Waller* test was never applied."  Similarly, here, due to the state court's unreasonable factual finding that the courtroom was not closed, the *Waller* test was never applied.  Accordingly, Greineder's federal constitutional claim –  that the courtroom closure violated *Waller* and its progeny -- was never adjudicated on the merits. *See, e.g., Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim...the claim is reviewed *de novo*."); *Johnson*, 133 S.Ct. at 1090.

**4.      Under any standard of review, Greineder is entitled to *habeas* relief due to violation of his constitutional right to a public trial.**

Even under AEDPA's deferential standard of review, the SJC decision denying Greineder's public trial claim was an unreasonable application of clearly established federal law under *Waller*, 467 U.S. at 46 (6th Amendment expressly grants defendants right to public trial); *Press-Enterprise Co.*, 464 U.S. at 508 (conducting jury selection in open court permits members of the public to observe trial proceedings and promotes fairness in the judicial system), and *Presley*, 558 U.S. at 214 ("trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials").  In ruling that the courtroom was not closed, the SJC claimed that the presence or absence of the public during jury *voir dire* was insignificant, focusing instead solely on whether there had been an "official" exclusion by stating: "The ultimate question of fact before us is **whether there was a court order or other official action** that excluded the public (or the media) from the room." *Greineder*, 458 Mass. at 226 (emphasis added). That very formulation constituted an

unreasonable application of the principles of *Waller*, *Press-Enterprise*, and *Presley* to the facts of this case. As set forth in *Negron-Sostre*, a courtroom may be closed "despite the absence of any such order," "due to inattention by the judge" "inadvertent[ly]," "accomplished not through locks and direct orders" but rather via "default rule" and the court's "general practice," "attributable to court personnel at least as much as to attorneys." 2015 WL 3898794, * 5-6. "We reiterate, the ultimate responsibility of avoiding 'even the appearance that our nation's courtrooms are closed or inaccessible to the public' lies with the judge." *Id.* at *7. *See also Owens*, 483 F.3d at 63 (even if courtroom was closed "because of inattention by the judge" violation of public trial right may be found); *Walton*, 361 F.3d at 433 ("Whether the closure was intentional or inadvertent is constitutionally irrelevant").[21] As in *Negron-Sostre*, this Court must conclude that Courtroom 8 was **in fact closed** during the jury *voir dire*, for the reasons set out below.

> **a.**     **The individual *voir dire* was, in fact, closed to the public.**
>
> **(1)**     **Jury selection in this case took place in the context of the longstanding practice of the Norfolk Superior Court to close the courtroom during individual *voir dire*.**

It was the longstanding practice of the Norfolk County Superior Court to exclude the public from jury *voir dire*. In *Commonwealth v. Cohen*, 456 Mass. 94, 114 (2010), a defendant who had been tried in 2007 in the Norfolk Superior Court (the same court where Greineder's 2001 trial occurred) claimed that he had been denied the right to a public trial due to courtroom closure during

---

[21]     It is well established that circuit precedents can shed light on the reasonableness of the state court's application of existing Supreme Court precedents. *See, Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003)("factually similar cases from the lower federal courts may inform...[the section 2254(d)(1)] determination, providing a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns."); *Coningford v. Rhode Island*, 640 F.3d 478, 485 (1st Cir. 2011) (lower court precedents may provide a "valuable reference point" so long as they are not used to "fill a gap" where the Supreme Court has "expressly declined to lay down a rule"). *See also Phoenix v. Matesanz*, 233 F.3d 77, 83 n. 3 (1st Cir. 2000) ("Although decisions issuing from [courts of appeals] are not 'clearly established' for the purposes of § 2254(d)(1) because they do not issue from the Supreme Court, they provide significant insight on what constitutes reasonableness for a particular fact pattern."); *White v. Coplan*, 399 F.3d 18, 25 (1st Cir. 2005)("There is no need for there to be a Supreme Court case on all fours for a state decision to be unreasonable.").

jury impanelment.  During a 2008 hearing on Cohen's motion for new trial,  Patricia Bellotti, Acting Chief Court Officer and Assistant Chief since 1994, testified that "[a]ll the lobby officers typically close the courtroom during impanelment...the way it's done here is we close the courtroom." *Cohen transcript excerpt,* 2010 R. 95-103.  The lobby court officer, Larry Sullivan, testified at the *Cohen* hearing that it was his "practice as a court officer in the Norfolk Superior Court to close the courtroom to the public during jury selection" "on each and every occasion" "without exception," meaning that he would "exclude all members of the public from the jury selection process." *Cohen*, 456 Mass. at 102 n. 12. When asked how long that had been the practice of the court, Court Officer Sullivan answered: "I've been a Court Officer since 1982...It's been the practice since I've been a Court Officer."  *See Cohen transcript excerpt*, *2010 R.* 95.

The Massachusetts SJC in *Cohen* credited that testimony and found that "the public consistently was excluded from the court room based on established court policy." 456 Mass. at 114. That this established court policy was in effect during Greineder's trial was supported by a plethora of evidence. The defense lawyer in the case on trial in the Main Courtroom of the Norfolk Superior Courthouse when the Greineder trial began attested that (1) during the three days of jury selection in his case, there was a sign on the door of the courtroom stating the courtroom was closed; (2) the public was not allowed in the courtroom during jury selection; and (3) based upon his experience in Norfolk Superior Court, it was common practice to close the courtroom to the public during jury selection. (2010 R. 104). Chief Court Officer Patricia Belloti acknowledged the accuracy of her prior testimony from February 2008 that once jury impanelment starts "we close the courtroom." *Tr.* 1/14/10, p. 171. Long-time Assistant Clerk James McDermott testified that as a general matter "we would ask people to leave the courtroom during jury impanelment." *Tr.* 1/14/10, p. 160.

Whereas this established court policy was clearly in effect at the time of  Greineder's 2001

jury *voir dire* and was not condemned by the SJC until 2010, it follows that the Norfolk Superior Court likewise excluded the public from the courtroom during Greineder's jury *voir dire*. To suggest that this was the one case in which the Norfolk Superior Court did not follow its longstanding established procedure to exclude the public from *voir dire* is far-fetched, to say the least. As in *Negron-Sostre*, the state court here sidestepped the issue of whether the courtroom had, in fact, been closed by focusing solely on whether there was a "court order or other official action," *Greineder*, 458 Mass. at 226, completely ignoring the overwhelming evidence that it was the Norfolk Superior Court's practice from at least 1982 until at least the time of the *Cohen* evidentiary hearing in 2008 to close the courtroom during jury impanelment "on each and every occasion," and that Greineder's 2001 trial fell squarely within the time period when such courtroom closure was the normal practice of that court, as previously judicially determined by the SJC in *Cohen*. At the very least, this pattern and practice evidence was important context and backdrop against which all of the other evidence in this case must be viewed.

### (2)     The courtroom was, in fact, closed to the media.

Any claim that the long-standing general practice of the Norfolk Superior Court was uncharacteristically violated in this particular case is dispelled upon consideration of the uncontested fact that **no member of the media was present** in courtroom 8 during the individual jury *voir dire*. *See* Second Response to the Order of the SJC at 9 (*2010 R. 125)*; *Greineder*, 458 Mass.at 223-224 ("No member of the media was ever present during the individual *voir dire*."). This is despite the fact that the trial judge noted that this case drew "keen national interest" which led to the creation of a "virtual tent city" outside the courthouse causing concern among the courthouse staff about a "media frenzy." Second Response to the Order of the SJC at 5 (*2010 R. 121)*. This finding is corroborated by the testimony of several media representatives, namely Farmer, Daniel, Lavietes,

and Politan, as well as both defense counsel Murphy and his law-clerk Bigelow. Clearly, the absence

of the media from *voir dire* was not the result of a lack of interest in this particular phase of the trial;

to the contrary, media representatives including as Farmer, Daniel, Lavietes, and Politan waited right

outside the courtroom, staying as close as possible to the proceedings so that they could interact with

the participants during breaks and not miss anything. *See Tr.* (1/14/10), 133-134. There can be no

doubt that had they been permitted to enter the courtroom during *voir dire*, they certainly would have

done so. They did not do so only because they believed they had been excluded. There is simply no

other reasonable explanation for why members of a "media frenzy" would not attempt to gain access

to the courtroom during a key phase of the trial. The trial judge admitted that "there were some press

persons who felt that the courtroom was closed to the press." Second Response, p. 4 (*2010 R.* 120)

The media's absence from the courtroom followed an un-transcribed, off-the-record meeting

between the trial judge and media representatives. We can never know for sure what was said at the

judge's off-the-record meeting with the media. But what was transcribed was the trial judge's

statement immediately following that meeting that he had a discussion with members of the media

"who have an interest **in being present** during the **public part** of this case" (emphasis added). That

statement implied two things: (1) that there was a non-public part of the case; and (2) that the media

would not be allowed to be present during those non-public proceedings. This was further supported

by Judge Chernoff's statements at the beginning of the individual *voir dire* that the proceedings were

"**non-public**"-- the very non-public phase of the trial to which he was referring earlier when

indicating that the media would not be allowed.

Eight years later, the trial judge claimed these clear statements did not mean what they said:

> What I meant by that was I would take action, if necessary, to encourage candid
> answers from perspective jurors on sensitive issues.  I was retaining the right to limit
> attendance of spectators if I saw that the presence of members of the public had a

> chilling effect on a prospective juror's ability to answer questions fully or honestly. It was not my intention to close the courtroom to the public or the press. It was my intention to be very attentive to any impact the presence of a spectator or spectators would have on prospective jurors. I was prepared to address the concerns of either the attorneys as well as my own concerns about the presence of any particular person or persons. It turned out I had no cause to limit access so I did not.

First Response to the Order of the SJC at 3-4, *2010 R. 20-21*. This purported explanation simply does not make sense. A courtroom cannot be considered "non-public" simply because the judge is prepared to make it non-public if jurors are not being candid. On the contrary, it is only "non-public" if the judge has already taken action to bar entry.

Perhaps acknowledging that his first explanation amounted to near gibberish, in his Second Response, the judge claimed that what he *really* meant was:

> In retrospect, I was referring to the fact that the many video and still photo media people, who were visible inside and outside of the courthouse and intended to video the trial for national consumption, were not going to be working either in a courtroom filled with jurors or in one hosting only an individual *voir dire*.

He further explained (to neatly coincide with his first nonsensical explanation):

> On Monday, I was also keeping my options open to exclude people from the courtroom should any of the prospective jurors feel inhibited when answering sensitive questions. I did not have to exercise that option and no one was excluded.

Second Response to the Order of the SJC, p. 6 (*2010 R. 121-122*).[22]

Tom Farmer (who stated that he believes that Greineder is guilty and thus had no interest in helping Greineder's cause) had a recollection of the meeting that was quite clear: "I believe that [the trial judge] said this hearing would be closed to the media and did anybody have a problem with that" and further stated that if the media objected, they could appeal to the single justice of the SJC. Farmer checked with his editors, who did not want to appeal. *Tr.*(1/14/10), 131. The off-the-record

---

[22] One wonders how the trial judge would have fared on cross-examination regarding these various strained and evolving explanations, if defense counsel had been allowed to cross-examine him as a witness like all of the other witnesses at the evidentiary hearing! That, however, did not occur, since the witness and the presiding judicial officer was one and the same!

meeting thus conveyed to at least one member of the media that he could not, or should not, attend the individual *voir dire*. The trial judge claims that Farmer was mistaken, and that the other members of the media who believed they were excluded must have gotten that impression from Farmer rather than the judge, who insists that he did not "intend" to close the courtroom.[23]

The dispute between the trial judge's recollection and Farmer's recollection, however, is immaterial. Regardless of what the trial judge may have *meant* in his own mind, he did not state on the record that video or still camera photography would not be permitted at the individual *voir dire*. That order  would have been unobjectionable. *See Commonwealth v. Winfield*, 464 Mass 672, 677 (2013) ("There is no constitutional right to bring cameras into or make audio or video recordings of courtroom proceedings"), *citing Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 610 (1978). Rather, he referred to "the media's **presence** at trial" (*PT Tr.* 5/17/01, 127-128) and spoke of having had a meeting about members of the media "who have an interest in **being present**" during the "**public part**"of the case (*PT Tr.* 5/18/01, 3-4), mentioning that the jurors would either be brought to sidebar or "**off to the side in a sideroom for juror's private conversations with the Court**." (*PT Tr.* 5/18/01, 36).  On the first day of trial, the judge told the jurors in open court: "**we will invite you one-at-a-time to come into a side room**." *Tr.* I/5 (*all emphases added*).  Individual *voir dire* then commenced in the "sideroom" of Courtroom 8, a small courtroom up a "narrow steep staircase" that is  "so situated that it seldom attracts the general public." Is it any wonder that members of the

---

[23]       The notion that the complete absence of the media was attributable solely to Farmer was ludicrous, to say the least. It is unfathomable that every media representative - who were theoretically in competition with Farmer - would take him at his word, without attempting to gain entry by themselves. Further, there was no evidence that Farmer even communicated the fact that the courtroom was closed to other media representatives. The fact that these media representatives were present at every single stage of the trial - and even waited in the hallway during the *voir dire* - demonstrates that they would not have voluntarily chosen to stay outside the courtroom during *voir dire* unless they believed they had been excluded, either due to the longstanding practice of the court, by inference (based on the sign on the door of the simultaneous jury impanelment in the *Holland* case), due to the judge's off-the-record or on-the-record comments,  or some combination thereof. There was no evidence that Farmer had anything to do with it!

media, who camped immediately outside the door so as to catch any snippet of information from the participants during breaks, believed that their presence in the courtroom was not permitted?

In sum, it matters not what Judge Chernoff "meant" or "intended" in his own mind by referring to the "non-public" part of the case. "[T]he ultimate responsibility of avoiding 'even the appearance that our nation's courtrooms are closed or inaccessible to the public' lies with the judge." *Negron-Sostre*, 2015 WL 3898794, *7; *Owens*, 483 F.3d at 63 (even if courtroom was closed "because of inattention by the judge" violation of public trial right may be found); *Walton*, 361 F.3d at 433 ("Whether the closure was intentional or inadvertent is constitutionally irrelevant"). Under all of the circumstances, any member of the media hearing the judge's remarks would have reasonably believed, in accordance with common sense understanding of the English language, that the jury *voir dire* was a "non-public" part of the trial, meaning that the public, including the media, was excluded! Accordingly, members of the media camped themselves right by the door of the courtroom, reasonably believing that they had been excluded. In the context of the longstanding practice of the Norfolk Superior Court, in conjunction with the simultaneous closure of the main courtroom for jury selection in the unrelated *Holland* case (complete with signs), and in light of the judge's public comments (regardless of what the judge subjectively "meant"), the media was, in fact, excluded.  The fact that the trial judge did not issue an express judicial order barring entry by the media, and perhaps only politely elicited their absence is inapposite: "The mere fact that the members of the press politely responded to a judicial request, rather than waiting to be compelled by order, should not inure to their detriment." *United States v. Antar*, 38 F.3d 1348, 1359 (3d. Cir. 1994). The state court's ruling, despite overwhelming evidence to the contrary, that the absence of the media was not attributable to the court was an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

**(3)**     **The courtroom was, in fact, closed to members of the defendant's family and the general public.**

While there was some conflicting testimony regarding whether or not any members of the public were present in the courtroom, this Court should conclude, notwithstanding such conflicting testimony, based on the overwhelming weight of the evidence, that the courtroom was, in fact, closed to the public during the individual jury *voir dire*. To start, the judge's statements referring to the just-concluded meeting with members of the media "who have an interest in being present during the **public part** of this case" (2010 R. 8) strongly implies that there was a non-public part of the case, from which the public would be excluded. The judge's statement that the individual *voir dire* was to be held "**in a side room**" in order for the jurors to have "**private** conversations with the Court" (2010 R. 10) would surely be understood by any member of the public sitting in the courtroom with a common sense understanding of the English language that they were not welcome to attend. Having removed the jurors to a back hallway in small groups of 4 or 5 jurors, then up a steep, narrow staircase to enter this "side room" one at a time, the trial judge then referred to the proceedings on-the-record as a "**non-public** individual *voir dire* of the jurors," and mentioned some fourteen times to individual jurors that they had previously been introduced to the attorneys "**in open court**" or "**in the open courtroom**" in contrast to where they were now located in Courtroom 8 (*all emphases added*).   Further evidence of courtroom closure lies within the transcript itself, which does not mention the term "bench conference" at all during proceedings held in Room 8, but does boldly identify as a "BENCH CONFERENCE" a conversation between the judge and attorneys taking place in Courtroom 10 (the "open courtroom") after the conclusion of the individual *voir dire*.   If Courtroom 8 had indeed been open to the public, the judge's conversations with the individual jurors and counsel would surely have taken place during similarly marked "bench conferences."   *See*

*Cohen*, 456 Mass at 117 (individual *voir dire* conducted out of hearing of the public permissible if conducted in open court where public may observe process).  That did not occur.  There was no need for bench conferences, because the proceedings were "non-public" and there were thus no members of the public present to hear them!  Once again, regardless of what the trial judge claims he "meant" by these statements, where "the ultimate responsibility of avoiding 'even the appearance that our nation's courtrooms are closed or inaccessible to the public' lies with the judge," *Negron-Sostre*, 2015 WL 3898794,  *7, the judge here unmistakably gave the appearance of closing the courtroom to any member of the public who may have wished to attend.

That appearance of closure was strongly corroborated by the testimony given at the evidentiary hearing.  Both Greineder's trial counsel, Murphy, and his law clerk, Bigelow, who testified that no member of the public was in courtroom 8 during the individual *voir dire*.  Further, Farmer, who sat outside of courtroom 8 for the entire individual *voir dire* - because he reasonably believed he had been excluded from entering - testified unequivocally that no member of the public or the media entered the courtroom at any time.  There is no evidence that either Greineder's eldest daughter, Kirsten, nor his son, Colin, were present in the courtroom during the individual *voir dire*.  The SJC so found. *See Greineder*, 458 Mass. at 231-232.

Greineder's youngest daughter, Britt, testified to being affirmatively denied entry into the courtroom and forced to wait in a chair in the lobby of the courthouse despite her wish to be as near to her father as possible.  Britt's unequivocal testimony that she was not present during *voir dire* was supported by the testimony of Murphy, Bigelow, and  Greineder.  There were some Commonwealth witnesses who *believed* that Britt was present during *voir dire*.  Putting aside the fact that Britt would know much better than these other witnesses - who would have seen her present in the courtroom throughout the trial and could easily have mistakenly believed she was similarly present during *voir*

*dire*,[24] the fact that the public at large and the media were excluded from *voir dire* still constituted a closure of the courtroom, regardless of Britt's presence or absence. While it is true that the Commonwealth was able to present the testimony of certain individuals who "thought" they may have seen people in the courtroom, it was clearly an unreasonable determination of the facts for the trial judge to find from that ambiguous and sparse testimony that the courtroom was not generally closed to the public.[25]   The trial judge found, at best, that "occasionally, a few unidentified persons who may well have been members of the public were present." Second Response to the Order of the SJC at 2. (*2010 R.* 118) It just simply does not follow logically that only a few members of the public would be present during such a high profile case if the courtroom were not closed. Further support for the conclusion that the courtroom was closed during *voir dire* can be found in the article published on May 22, 2001, stating that the jury selection process "has been closed to the public." *See* Kunzelman (2001), *Townonline*, *2010 R.* at 81. Even if a few unidentified spectators entered the room, that has no bearing on whether the courtroom was, in fact, closed. *See Peterson v. Williams*, 85 F.3d 39, 44 n. 7 (2nd Cir.), *cert denied*, 519 U.S. 878 (1996)("possible existence of some

---

[24]     This court should consider who would be most likely to remember accurately whether or not a particular individual was seated in the spectator section of a courtroom during two days of individual *voir dire* at a trial that occurred eight-and-one-half years prior to the evidentiary hearing.  It was uncontested that Britt attended the entire trial from May 24th through June 29th, 2001, and thus would have been a familiar face to those in the courtroom. There is virtually no way that the Commonwealth's witnesses could discern eight-and-one-half years later whether there were certain phases of the trial that Britt was not present for. It is noteworthy that several of the Commonwealth's witnesses who now claim to remember seeing Britt, including Grundy, Cosgrove, and Litsas, read the trial judge's first response - which stated that Britt was present during *voir dire* - before testifying and they likely were subconsciously influenced by what they had read. Finally, there was significant conflict in the testimony of the Commonwealth's witnesses. Specifically, while Corcoran and Cosgrove remember that the courtroom was quite full, Morris, Minkofsky, and Litsas remember that it was nearly empty. Cosgrove remembered sitting in the back of the courtroom, yet Grundy had a clear memory that Cosgrove sat at counsel table, and Litsas didn't even remember seeing Corcoran or Cosgrove there at all. To credit the testimony of these witnesses - whose stories greatly contradicted one another's - while discrediting Greineder's witnesses - whose testimony all corroborated one another's - is wholly unreasonable, to say the least.

[25]     Morris testified that she "thought" Britt was present, but that no other member of the public was present. Litsas testified that there were two or three people - including Britt - who were present in the spectator section. Minkofsky was unable to recall any member of the public being present, though he believed that Britt and one other unidentified person were present. Cosgrove testified that he was "eighty percent" sure that Britt was present. The judge credited this testimony - despite the complete lack of confidence in any of the witnesses' testimony.

spectators brave or arrogant enough to seek admission does not convert the court room into an open one."); *Commonwealth v. Cohen*, 456 Mass. 94 (2010) (courtroom closure found despite presence of three spectators who "saw the sign, but ignored it").  Based on the record as a whole, this Court must find that the courtroom was, in fact, closed during individual juror *voir dire*.

The trial judge, insisting that his words "non-public"were not to be accorded their plain meaning due to his own contrary subjective intent, offered no explanation for the absence of the general public from the individual jury *voir dire*. Instead, while crediting the fact that two of Greineder's children were not present, he found that "some Greineder family members heard from a non-court source over the weekend preceding the *voir dire* that they could not or should not attend the individual *voir dire*." Second Response to the Order of the SJC at 9. (*2010 R*. 125) The trial judge thus attempted to deflect blame for the closure of the courtroom away from the court itself and onto some non-court source. That non-court source would appear to be defense counsel Murphy. It is unclear precisely when Murphy learned that the courtroom would be closed, but the evidence suggests that it was Friday, May 18, the same day that the trial judge informed the media off-the-record as to their interest "in being present" during the "public part" of the case, and describing the process of the individual *voir dire* as occurring either "up at sidebar" or "off to the side in a sideroom" for juror's "private conversations" with the court. The trial judge noted that it was likely late on the 18th that he informed Murphy that the *voir dire* would take place in Courtroom 8 (the "sideroom" option). Both Britt Cavalletto and Dirk Greineder recalled that Murphy informed them about the closure. It does not follow logically that Murphy would have told Britt and Dirk that the proceedings were closed if he did not receive that understanding from the court, in the context of the longstanding practice of the Norfolk Superior Court, in conjunction with the simultaneous closure of the main courtroom for jury selection in the unrelated *Holland* case (complete with signs), and

in light of the judge's public comments (regardless the judge subjective "intent").  This notion is supported by the fact that part of Murphy's trial strategy was to have Dirk's children present in the courtroom as often as possible in order to show the jury that they supported their father and believed in his innocence. So why then would Murphy inform Dirk and his children that the proceedings were closed if they were not, in fact, closed? The simple answer is that he wouldn't have!

One can debate whether or not the judge's public statements on the record constituted a formal order of exclusion, but in any event such a formal order is not necessary to keep the public and the media out. A courtroom "may be closed in the constitutional sense without an express judicial order." *Cohen*, 456 Mass. at 108. Indeed, "trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley*, 558 U.S. at 215.  Farmer's disputed testimony that the trial judge told the media not to attend and Britt's disputed testimony that there was a sign on the door and that she was told to remain seated in the hallway are not necessary to the analysis.  In sum, whether by stating on-the-record that the individual *voir dire* would be "non-public" and that jurors' "private conversations" would be held "in a sideroom," by holding *voir dire* in a courtroom "so situated that it seldom attracts the general public," by the simple inaction of the trial judge in failing to alter the longstanding default rule in Norfolk Superior Court, well-known to attorneys, court officers, and court clerks, that "what we do is close the courtroom," or by the combination of those factors, it is clear that a courtroom closure occurred regardless of the judge's "intentions," and that court personnel bear at least as much responsibility as the trial attorney for the absence of the general public from two days of *voir dire* at this high profile trial. *Cf. Negron-Sostre*, 2015 WL 3898794 *5. To the extent that the state court below found otherwise, such a finding was clearly an "unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2).

**b.     The closure violated Greineder's constitutional right to a public trial.**

Greineder had a constitutional right to have individual *voir dire* open to the public. Despite this right, both the media and the general public were, in fact, excluded from courtroom 8, regardless of the trial judge's subjective intent. Such closure amounted to a violation of Greineder's 6th Amendment right, unless the four *Waller* factors were met. *See Owens*, 483 F.3d at 66 ("[C]losure of jury selection to the public for an entire day without meeting the strict requirements of *Waller* would violate a defendant's right to a public trial.") However, the trial judge made no effort to consider those factors before closing the courtroom. There was no overriding interest that justified closing the courtroom. There was no "substantial reason" either, thus even if this Court finds that only a partial closure occurred, Greineder's constitutional right to a public trial was still violated.

Individual *voir dire* can be conducted at sidebar out of hearing of the public, so long as the public may observe the process.  *See Cohen*, 456 Mass at 117 (individual *voir dire* conducted out of hearing of the public permissible if conducted in open court where public may observe the process).  In effect, what the trial judge did was to convert Courtroom 8 -- a small out-of-the-way courtroom -- into a non-public "sideroom" that functioned as a "sidebar," for the convenience of the court.  However, even if one could justify holding the individual *voir dire* in a separate courtroom so that the remaining jurors can relax, that does not justify the *de facto* exclusion of the media and the public from observing the proceedings held in that separate courtroom. There was no evidence of a lack  of space requiring exclusion of observers in Courtroom 8.  There were four benches that would accommodate about 20 people and room for an additional ten single chairs. *Second Response*, p. 3 (*2010 R.* 119).  In any event, a generalized lack of space will rarely, if ever, suffice to justify any but the most temporary closures, if in fact, the room is filled to capacity. *See Bucci*, 662 F.3d at 26

("even if the courtroom were completely filled with prospective jurors, it would likely not justify...closure...*Presley* made clear that alternative methods of increasing the available public seating, such as splitting the venire, must be adopted if reasonable."); *Owens*, 483 F.3d at 62 (in absence of on-the-record findings, "it is difficult for us to discern whether it was necessary for the entire courtroom to be cleared of spectators to permit the jury pool to enter...Most justifications for trial closure have involved the need to protect witnesses or maintain courtroom order...[and not] on the basis of convenience to the court...Given the strong interest courts have in providing public access to trials, the district court could have considered whether a larger courtroom was available for jury selection.") No reasonable alternatives to a closure were considered, and no specific findings were made. *Cf Negron-Sostre*, 2015 WL 3898794 *6 ("Because the courtroom was in fact closed absent the balancing of interests required by *Waller*, that closure was a clear and obvious error").

Finally, since this violation was a structural error, which defies harmless error review, if Courtroom 8 was in fact closed, reversal of Greineder's conviction is required without any further showing of prejudice. *Neder*, 527 U.S. at 8. "Unlike trial rights, structural rights are 'basic protection[s] whose precise effects are unmeasureable.'" *Owens*, 483 F.3d at 64 (quoting *Sullivan*, 508 U.S. at 281). "Structural error in the form of a denial of the public trial right prejudices a defendant notwithstanding that the prejudice may be difficult to detect." *Negron-Sostre*, 2015 WL 3898794 *6. Because denial of a public trial is a structural error, "it would be impossible for [petitioner] to establish prejudice, and as such, it must be presumed."*Owens*, 483 F.3d at 66.

### c.      Greineder is entitled to relief.

In his second response to the SJC of Massachusetts, the trial judge asserted: "The defendant's attorney assented to the procedure." *2010 R.* 124 However, to the extent that the trial judge was claiming that defense counsel assented to the closure of the courtroom to the public, such an

assertion was clearly erroneous. While defense counsel may have assented to the individual *voir dire* being held in courtroom 8, that is beside the point. If such a finding was intended to suggest that by failing to explicitly voice an objection, counsel "assented" to the closure of the courtroom, such a claim is erroneous as a matter of law. And in any event, even if counsel had assented to the closure of the courtroom, such assent would be insufficient as a matter of law to establish a waiver of Greineder's constitutional right to a public trial. Further, there was an inherent contradiction in the trial judge's second response, suggesting both that the courtroom was not closed and that the defendant assented to the closure of the courtroom. Obviously, both cannot be true. There was no evidence that either defense counsel or Greineder affirmatively agreed to closing the courtroom. A review of the record makes it clear that any such finding would be unreasonable.

As noted above, the right to a public trial is a constitutional right of structural dimension. Consequently, an affirmative knowing, voluntary, and intelligent waiver is required by *the defendant himself* in order to waive that right. *Martineau*, 601 F.2d at 1200; *Walton*, 361 F.3d at 433. Accordingly, even if it could be said that defense counsel assented to the closure of the courtroom, in the absence of a knowing, voluntary, and intelligent waiver by *Greineder himself*, the public trial right was not waived. Here, there was no evidence whatsoever suggesting that Greineder waived his right to a public trial. Nor did he submit to a colloquy in which he waived his right to a public trial. On the contrary, Greineder's testimony strongly suggests that not only did he not affirmatively waive this right, but he was not even aware that he had such a right! Indeed, the trial judge so found. See Second Response to the Order of the SJC at 8 ("The defendant did not affirmatively agree or assent to the process."). Therefore, it must be said as a matter of law that Greineder could not have knowingly, voluntarily, and intelligently waived that right. Since there was an unwaived structural error at Greineder's trial, reversal of his conviction by the state court was mandated.

In the alternative, if counsel were required to object at trial, his failure to do so constituted ineffective assistance. There was no evidence presented at the evidentiary hearing that defense counsel made a tactical decision not to object to the closure of the courtroom, nor was there any obvious strategic justification for his failure to object. Indeed, the trial judge so found. See Second Response to the Order of the SJC at 9 (in response to a question about whether any assent to the conduct of non-public individual *voir dire* was done as a matter of trial strategy, the judge responded: "Defense counsel's assent to the procedure used fit into a strategy for selecting a fair jury. Other than that, the answer is no."). *2010 R.* 125. Based on the trial strategy which defense counsel disclosed at the hearing - namely, to have  Greineder's children present at all stages of the trial - it would have furthered that strategy for the proceeding to be open, so that  Greineder's children could attend and be seen as supporting their father by the potential jurors. On this record, there can be no finding that counsel acted pursuant to any deliberate strategy with regard to the closure of the courtroom. In addition, the trial judge found that trial counsel "did not request or assent to a procedure because of its potential for creating an appellate issue." *2010 R.* 125.

If indeed counsel's failure to object to the closure of the courtroom constituted a waiver of Greineder's right to a public trial, such failure to object constituted ineffective assistance of counsel in violation of the Sixth Amendment. As in *Owens*: "Counsel's failure to object to closing the trial for an entire day of jury selection, one of the most important phases of a criminal trial, deprived Owens of a substantial fair trial right . . . [W]e do not see how the failure to object to the closure could have been sound trial strategy." 483 F.3d at 64; *see also Owens v. United States*, 517 F.Supp.2d 570, 575 (D. Mass. 2007) ("Owen's counsel should have known the applicable law, and should have objected to the courtroom closure. Their failure to do so fell below an objective standard of reasonableness."). Indeed, defense counsel's acknowledged failure to inform his client that he had

a constitutional right to insist that the courtroom was open to the public during individual *voir dire* constituted ineffective assistance of counsel in and of itself. Such a failing leads to a presumption of prejudice, warranting relief. *McGurk v. Stenberg*, 163 F.3d 470 (8th Cir. 1998).[26] Greineder is entitled to relief under this analysis as well.

## II.   GREINEDER'S CONFRONTATION CLAUSE RIGHTS WERE VIOLATED BY ADMISSION OF TESTIMONY OF A DNA EXPERT REGARDING THE DNA TEST RESULTS OBTAINED BY A NON-TESTIFYING ANALYST.

### A.   Statement of Relevant Facts.

#### 1.   DNA evidence presented at trial.

##### a.   Overview.

A key component of the Commonwealth's case at trial was DNA test results linking Greineder to the knife and brown work gloves presumably used by his wife's killer. The Commonwealth presented those results through the testimony of Dr. Robin Cotton ["Cotton"], the laboratory director of Cellmark Diagnostics, which conducted the testing. Charts detailing the specific test results were marked as chalks, displayed during Cotton's testimony, and distributed to each juror during her testimony and again during deliberations. All of Cellmark's testing in this case was conducted by Wendy Magee and reviewed by Jennifer Reynolds or Lewis Maddox, none of whom testified at trial.

Over two days of direct examination, Cotton testified (over objection) about the specific test results reported by Magee which, she told the jury, matched portions of Greineder's DNA profile to tiny mixtures of DNA recovered from the knife and gloves. She also described those partial matches in statistical terms which established that it would be extremely unlikely for a random individual's

---

[26]   *See also Com. v. Patry*, 48 Mass. App. Ct. 470, 475 (2000) (Defense counsel waived defendant's presence and agreed to trial judge's presentation of supplemental instructions to jury in deliberation room without ever discussing with defendant his right to a public trial; relief required.).

DNA profile to match the DNA found on the knife and gloves at as many loci as Greineder's. On cross-examination, defense counsel challenged the reliability of Cellmark's testing process and the accuracy of its test results.

### b.   Testimony of Dr. Cotton on direct examination.

#### (1)   Forensic DNA testing in general.

Cotton, an experienced forensic scientist, described the overall process of DNA testing to the jury. As she explained, STR-testing involves identifying specific alleles at 13 designated loci on the DNA molecule found in cellular material. Tr. XI/183-185; *2012 R.* 46-48. The testing laboratory receives evidentiary samples, extracts the DNA, quantitates it, amplifies it, and subjects it to mechanical analysis, resulting in the production of computer-generated electropherograms containing identifiable peaks at each locus. *Id.* at 178-185; *2012 R.* 41-48. Filters applied by the analyst limit which peaks will actually appear on the electropherograms. *Id.* at 194-195; *2012 R.* 57-58. Unfiltered or raw electronic data, on the other hand, would show all peaks detected by the machine. *Id.* at 243; *2012 R.* 106. As Cotton noted on *voir dire*: "It's possible to display the data in a lot of different ways, and adjust the scales of the data...." Tr. XII/7; *2012 R.* 130.

#### (2)   Interpretation of DNA results in general.

Cotton explained that the analyst conducting the testing instructs the computer which peaks to label as alleles and which to ignore, based on the analyst's own interpretation of the data. Tr. XI/190; *2012 R.* 53. Actually, the computer makes the allelic calls initially, but the analyst can override them. *Id.* at 190-191; *2012 R.* 53-54. It is quite common, she testified, for the computer to label a peak as an allele, and the analyst to override that call. *Id.* at 195; *2012 R.* 58. Once alleles are identified at some or all of the 13 loci tested, a statistical calculation is carried out, quantifying how frequently the particular combination of alleles identified by the analyst appears in the general

population. *Id.* at 202-206; *2012 R.* 65-69.

### (3)    Testing conducted by Cellmark in this case.

Cotton testified that Cellmark received evidence samples in this case and tested them on six different dates. *Id.* at 206; *2012 R.* 69. All of the testing was conducted by Wendy Magee. *Id.* at 207; *2012 R.* 70. During the first test run, conducted in January, 2000, Cellmark identified Greineder's DNA profile from his fingernail clippings. *Id.* at 230-234; *2012 R.* 93-97. Cotton acknowledged that in the midst of carrying out testing in this case, Cellmark changed its peak threshold (the level at which it would make allelic calls) from 40 RFUs to 60 RFUs. Tr. XII/79-83; *2012 R.* 200-206.

### (4)    Test results in this case.

### (a)    Overview.

Cotton proceeded (over objection)[27] to testify in great detail about the test results reported by Cellmark on the three key pieces of evidence (knife and two work gloves), as well as other items. Tr. XI/211-234; Tr. XII/12-100; *2012 R.* 74-97, 135-223. Her allele-by-allele and locus-by-locus comparison of those results with Greineder's DNA profile was illustrated by blown-up charts, marked as chalks, which were distributed to the jurors during her testimony. "CC"(knife); ""GG" (right work glove), "HH" (left work glove); *2012 R.* 609-611. Cotton's recounting of the test results on the knife and two work gloves appears at Tr. XII/17-27, 27-36, and 51-59, respectively; *2012 R.* 140-150, 150-159, 174-182. After detailing the results on each, she presented an estimate of the likelihood in statistical terms (as calculated by Cellmark and set forth *verbatim* in Magee's reports, *2012 R.* 612-655) that the particular combination of alleles in those items matching Greineder's

---

[27]    Just before Cotton began recounting the specific test results on direct-examination, defense counsel stated at sidebar: "I would like to register my objection to Dr. Cotton's testifying about the data in this case given the fact that she hasn't done any of the work on it." Tr. XI/208; *2012 R.* 71. In response, the trial judge noted that Wendy Magee was on the witness list, and the prosecutor indicated: "She may very well be called." *Id.* at 209; *2012 R.* 72. But she never was.

DNA profile would match someone randomly selected from the general population. Tr. XII/38-47 (knife); 47-51 (right glove); 59-60 (left glove); *2012 R.* 161-170, 170-174, 182-183.

**(b)      Test results on the knife.**

Cotton recited the test results on all three key pieces of evidence, utilizing blown-up charts which presented those results visually. Her direct testimony about the test results on the knife commenced as follows:

> Q:      Dr. Cotton, I have now placed a chalk in front of the jury and before you, indicating two particular items -- a hammer and a knife, with the Massachusetts Criminal Laboratory numbers of 1 and 2.  And that was reported in the Cellmark report of January 6th, as amended on February 22nd. Is that correct?
>
> A:      Yes.

Tr. *XII*/13; *2012 R.*136. She continued: "The data from the knife indicates that there's a primary source and a secondary source. And the primary source is from a female, and the secondary source is from a male." *Id.* at 19; *2012 R.*142. She noted that the "primary profile includes Mabel Greineder, using eight of the nine locations." *Id.* at 20; *2012 R.*143. She then painstakingly described the secondary profile using the chart:

> So, in the chart that you see here we have a 15.17 listed.  When you look at the profile, the 15 is a primary.  The peak height is quite large. And the 17 is very much smaller. So, **we** know that **we** have the presence of a 15. And **we** have a large 15, and a small 17.  That presence of that 15 includes Mabel Greineder. Dr. Greineder has a 17, and therefore he also is included at that locus.
>
> When you go to the next locus, there's a 15.17. Mabel Greineder is a 15.17. And both of these peaks are large. So **we** know **we** have a lot of them. Because Dr. Greineder is a 17, he is also included at that locus. There is no secondary source observed at FGA.
>
> The next area where there's a secondary source is D8. And at D8 there is a large 12, and a large 13, and a small 15. So Mabel is included because she is a 12.13.... Dr. Greineder is included because he is a 13-15.
>
> The next locus where there is a secondary source observed is D5, shown here. There's a large 9-10, and a small 11-13. And at D5 Mabel Greineder is a 9-10. Dr. Greineder is a 11-13.  So they are both included. Those are the only four locations where we see a secondary source. There is no other secondary source information.

–73–

And, therefore, he cannot be excluded as a secondary source.

*Id.* at 22-23; *2012 R*.145-146 (*emphasis added*).

Cotton proceeded to recount the statistical significance of the secondary source results as set forth in Magee's report of February 23, 2000 (*2012 R.* 618-619)[28]:

Q:   With respect to the knife, there were actually two different calculations made. Is that correct?
A:   Yes.
Q:   And the first calculation indicated that it made no assumptions at all. Is that correct?
A:   Yes.

...

So, for the knife, using only the four locations that indicate there is a mixture, where both Mr. and Mrs. Greineder are included, **a calculation like that was done.**

Q:   And what were the results of that calculation – making no assumption at any of those locations?
A:   Making no assumptions – and this calculation is broken down into figures that would represent Caucasians and figures that would represent African Americans, as those two groups may not always have the same frequency of a particular allele. The calculation for African Americans is that approximately 1 in 210 individuals would be included as possible contributors to the mixture seen at D3, vWA, D8 and D5.
     And that same figure for Caucasians is 1 in 160 people -- approximately 1 in 160 people would be included as possible contributors to the mixture that was observed at the four loci that I just mentioned.

...

Q:   And again, Dr. Cotton, you made a second calculation. Is that correct?
A:   Yes, **we** did.[29]
Q:   And again now we're referring to the knife – excuse me, the sample 2.2 still. Is that correct?
A:   Yes.
Q:   Could you tell the jurors what, if any, assumptions you made, and how that would change how you would conduct the statistical analysis?

---

[28]     It is not clear from the record whether Cotton was literally reading from Magee's report when she recounted the results of the statistical analysis. It seems quite likely that she was, given that she had the reports with her on the witness stand.  For the knife as well as the two other key pieces of evidence, the random match probabilities as stated by Cotton were identical to those detailed in Magee's reports, and there was no suggestion that Cotton redid the mathematical computations herself.

[29]     By "we", Cotton presumably meant Cellmark. In this case, the work at Cellmark was carried out by Wendy Magee, who signed all the reports detailed the test results and statistical calculations.

A:     I already described the first calculation **we** did, which was a very general one. **We** did a second calculation and stated the assumptions that **we** used along with that second calculation. And those assumptions were that there were only two contributors, and that Mabel Greineder was one of the contributors. Using that assumption, **we** went back to then figure out what are all the possible secondary sources that could be in there....

With the assumption there are only two sources, and Mabel Greineder is one of them, is that 1 in 1,400 African Americans would be included in -- and, again, these numbers are approximations. And the figure for Caucasian is approximately 1 in 2,200 individuals who are Caucasian would be included as a possible secondary donor.

Tr. XII/38-40,44-46; *2012 R.* 161-163, 167-169 (*emphasis added*).

**(c)     Test results on the right-hand work glove.**

Cotton presented Magee's test results on the right-hand work glove in a similar fashion:

Q:     Dr. Cotton, I've placed before you at this time what is designated by the Massachusetts Crime Laboratory as samples from an item labeled 3, and also reported in the Cellmark report of January 6, 2000, as amended on February 22nd. Now, with respect to what is identified as a brown work glove, right-handed, samples 3.2 and 3.3 were provided to you. Is that correct?

A:     Yes, that's correct.

*Id.* at 27-28; *2012 R.* 150-151. As to 3.3, a profile was developed. The primary source was a female, and the secondary source was a male. The primary source matched Mabel Greineder. Cotton stated: "With regard to the secondary source, using eight out of the thirteen loci, Dr. Greineder cannot be excluded as a secondary source." *Id.* at 29-30; *2012 R.*152-153.

She continued:

The profile on the glove is shown [on the chart] at the top here. And the profile has a 15, a weaker 17, and also a weaker 19. I need to point out [the] 19 is not consistent with either Mabel or Dirk Greineder, and the 19 is in parentheses, indicating that **we're** not sure whether it's an artifact or real. The 17 at D3 is consistent with the profile from Dr. Greineder.

[T]he vWA is a strong 15-17. Mabel Greineder is included at that 15-17. Because Dr. Greineder is a 17, he is also included. At FGA there is a 20, a 22, and a much smaller 26 observed. Mabel Greineder is a 20-22. Dr. Greineder is a 23-26. His 26 is consistent with this 26. His 23 is not observed. So that locus is inconclusive with regard to whether he's included, because **we're** not seeing the 23.... At D18

there's a 12, 13 and 15. Mabel Greineder is a 12-13. Dr. Greineder is a 13-15. The 15 is small. The 12 and 13 are primary. So he's included here.

At D21 there is a 28 and 29 that are small, and a 30 and 31 that are primary. Mabel Greineder has a 30.31. Dr. Greineder has a 28-29. So he is included as a secondary at that locus; and she is included as a primary.

A D18 is the next one. There are four alleles observed – a 12, 14, 16 and 19. Mabel Greineder is a 16-19. Dr. Greineder is a 12-14. So he is included as a secondary source at that locus....

At D5 there's a 10, a possible 11 that's shown in parentheses, and a 13, parentheses, same meaning that I've discussed before. Mabel Greineder is a 9-10. She's included as the primary. Dr. Greineder is an 11-13. Because that 11 is in parentheses that locus is inconclusive with respect to whether he's included as a secondary source there.

The next locus is D13. There's a small 8 and a large 12.14. Mabel Greineder is a 12.14. Dr. Greineder is an 8.11. That locus is also inconclusive with respect to him as a secondary source. At D7 in profiler plus **we** observed a minor type of a 7.9 and a primary type of an 11. Mabel Greineder is an 11. Dr. Greineder is a 7.9....

At TH01 there's a 7, a 9, and a 9.3. And Mabel is a 7-9.3. Dr. Greineder – Dr. Greineder is a 9-9.3. So he is included at that locus.

*Id.* at 30-33; *2012 R* 153-156 (*emphasis added*).

Cotton proceeded to recount the statistical significance of that "inclusion," exactly as set forth in Magee's February 23, 2000 report. (*2012 R.*618-619) With no assumptions, 1 in 59,000 African Americans would be included, and 1 in 20,000 Caucasians. Assuming only two contributors, including Mabel Greineder, the random match probability diminishes to 1 in 680,000 African Americans and 1 in 170,000,000 Caucasians. Tr. XII/48-49; *2012 R.* 171-172.

### (d)     Test results on the left-hand work glove.

Cotton's testimony about the test results on the left-hand work glove followed the same sequence. First she recounted the results reported by Magee, locus-by-locus, using a chart:

The chart here in the middle are the results from the evidence sample. And at D3 there is a 17, which is consistent with the type from Dr. Greineder. At vWA there's a 17 also consistent with a type at vWA from Dr. Greineder. At FGA there is a 22, a 23 and a 26. The 23 and the 26 are consistent with Dr. Greineder's types at that locus. A 22 is present. Mabel Greineder is a type 20-22. **We** only see a 22. So that would be inconclusive with regards to her. There's an X and Y observed, a 12, 13 and 15. The 13 and 15 are consistent with the types from Dr. Greineder. At D21

–76–

> there's a 28 in parentheses, and a 29. Dr. Greineder is a 28-29. Because this 28 is in parentheses, that locus is inconclusive with regard to Dr. Greineder.
>
> At D18 there's a 12-14. That's consistent with Dr. Greineder's types. At D5 a 9, 11 and 13 are observed. Dr. Greineder is an 11-13, so he is included. At D13 an 8 and an 11 are observed. Dr. Greineder's types at that locus are an 8 and a 11. And at D7 a 9 is observed. And I don't know that you can see this, but there's a little asterisk beside that 9. That reflects the little asterisk that's in **our** report. And what that's indicating is that the peak height is low, and **we** would be unable to tell if that 9 was a 9-9 or a 9-something else. And therefore, that locus – Dr. Greineder is a 7-9. So with regard to him that locus would be inconclusive.

Tr. XII/55-56; *2012 R.* 178-179 (*emphasis added*). Cotton then recounted the statistical significance of the seven loci matching Greineder's profile, exactly as set forth in Magee's report dated March 27, 2000 *(2012 R.*623): "The calculation for African Americans is one in fifteen million. And the calculation for Caucasians is one in 680,000." Tr. XII/60; *2012 R.* 183.

### c.    Testimony of Dr. Cotton on cross-examination.

In cross-examining Cotton, defense counsel reviewed the entire DNA testing process employed by Cellmark, including the role of the analyst in interpreting the data. Tr. XII/133-198; Tr. XIII/20-26; *2012 R.* 256-321, 380-386. Cotton acknowledged that Cellmark had no protocol in place delineating the peak shape of a true allele, as opposed to an artifact. *Id.* at 179; *2012 R.* 539. Electropherograms reflecting the test results did not include all of the electronic data, as some had been filtered out at the analyst's direction. Tr. XII/196-197; *2012 R.*319-320.

Defense counsel challenged Cotton on Cellmark's validation studies, its reliance upon an RFU threshold for allelic calls substantially below that recommended by the manufacturer of the testing kits (150) or employed by the FBI (200), and its mid-case shift in RFU threshold from 40 to 60. Tr. XII/203-231; *2012 R.*326-354. Cotton acknowledged that had the evidence been analyzed at an RFU level of 200, all of the allele calls linking Greineder's DNA profile to the knife and left work glove would disappear. Tr. XII/237-239; Tr. XIII/53-57; *2012 R.* 360-362, 413-417. Regarding the

right work glove, defense counsel challenged Cellmark's failure to exclude Greineder as a possible contributor, since six of his alleles were not detected. *Id.* at 57-81; *2012 R.*417-441. Cotton acknowledged that Cellmark knew Greineder's DNA profile when it tested the samples in this case, stating: "In this case **we** knew who the knowns were." *Id.* at 194; *2012 R.* 555 (*emphasis added*).

 Cotton explained that it was up to the analyst and the technical reviewer "to decide how deeply into the [electronic] data to look." *Id.* at 175-176; *2012 R.* 535-536. For example, they could choose to "zoom in" on a particular region to help decide whether a particular peak detected by the computer should be characterized as a true allele. *Id.* at 180-182; *2012 R.* 540-542. She agreed that making the correct decision about whether to look more deeply into the data was important. *Id.* at 190; *2012 R.* 551.

In sum, the bulk of defense counsel's cross-examination of Cotton was devoted to attacking the reliability and accuracy of Cellmark's reported test results. Using hypothetical questions, as required by the trial judge, he also asked Cotton about unfiltered electropherograms prepared by the defense from Cellmark's electronic data, seeking to show the presence of peaks on several items tested inconsistent with the DNA of Dirk or Mabel Greineder. Tr. XIII/93-191; *2012 R.* 453-552.

### d.    Dr. Cotton's role.

As noted above, all of Cellmark's testing in this case was carried out by Wendy Magee. Tr. XI/207; *2012 R.*70. Cotton did not perform any of the testing, nor did she serve as a technical reviewer. *Id.*; Tr. XIII/26-27; *2012 R.*386-387. She did not personally review the underlying electronic evidence with the filters applied by Magee removed, either. *Id.* at 28, 163-164; *2012 R.* 388, 523-524. She did not know whether or when Magee chose to look more deeply into the electronic data before making her allele calls. *Id.* at 23-25, 175-176; *2012 R.* 383-385, 535-536. Cotton testified that she did review the documentary casefile, including the electropherograms

printed by Magee, prior to testifying. Tr. XI/207; Tr. XIII/23-24; *2012 R.*70, 383-384.[30]

            **e.**        **Testimony of DNA defense experts.**

The defendant called two DNA experts at trial in an effort to blunt the force of Cellmark's inculpatory test results. Dr. Daniel Krane, an associate professor of biological sciences, testifed that he reviewed the underlying electronic data produced by Cellmark, as well as its written file. Tr. XXII/23; *2012 R.* 682. In his opinion, allelic calls should not be made based solely upon a review of paper electropherograms containing filtered data, particularly in a case like this one involving DNA mixtures detected in tiny quantities. *Id.* at 29-30; *2012 R.* 688-689. Krane criticized Cellmark for changing its RFU threshold in the middle of the case. *Id.* at 31-32; *2012 R.* 690-691. He also described a number of low-RFU peaks present in the electronic data on some of the items tested by Cellmark, inconsistent with the DNA profiles of Dirk and Mabel Greineder and not characterized by Cellmark as true alleles. *Id.* at 33-59, 86-87,94; *2012 R.* 692-718, 745-746, 753. On cross-examination, Krane opined that the RFU threshold employed by Cellmark was too low and acknowledged that the presence of a third contributor to a DNA sample was unlikely based upon the detection of a single unexplained allele. *Id.* at 123, 197; *2012 R.* 783, 857. Krane also stated that the presence of Greineder's DNA in minute quantities on the key items tested could possibly be explained by the phenomenon of secondary or tertiary DNA transfer from one surface to another. *Id.* at 65-82, 91-92, 94-98; *2012 R.* 724-741, 750-751, 753-757.

Marc Taylor, a forensic scientist, testified for the defense about experiments he conducted involving the phenomenon of DNA transfer. Tr. XXII/224-228; *2012 R.* 875-879. Responding to

---

[30]    When older forensic DNA technology was in use, the laboratory's case file generally contained all of the raw, empirical data relied upon by the analyst in interpreting test results. *See, e.g., Commonwealth v. Hill*, 54 Mass. App. Ct. 690, 695 n.5 (2002). With the mechanized STR analysis employed here, however, the printed electropherograms constituted abridged, filtered versions of the underlying electronic data, produced according to the parameters set by the testing analyst.

hypothetical questions, Taylor opined that Dirk Greineder's DNA could have been transferred to Mabel Greineder's face by a towel they shared, and then from her face to the gloves and knife used by Mabel's assailant. *Id.* at 228-237; *2012 R.* 879-888. On cross-examination, Taylor acknowledged that there were no published, peer-reviewed studies on the phenomenon of DNA transfer,[31] and that he wasn't able to assess the likelihood of its occurrence in any particular set of circumstances. *Id.* at 241-247; *2012 R.* 892-898.

### f.    Closing arguments and jury deliberations.

In his closing, defense counsel criticized Cellmark for its low RFU threshold and for changing that threshold mid-case. Tr. XXV/43; *2012 R.* 958. He also criticized the Commonwealth for presenting a DNA witness who had not examined the underlying electronic data. *Id.* at 44; *2012 R.* 959. Defense counsel argued that the trace amounts of DNA extracted from the key items of evidence were too small to justify allelic calls, and that any of Greineder's DNA which may have been present on those items could be innocently explained by transfer. *Id.* at 44-47; *2012 R.* 959-962. He also argued that the presence of alleles inconsistent with Dirk or Mabel Greineder warranted the jury in having a reasonable doubt as to the defendant's guilt. *Id.* at 48-50; *2012 R.* 963-965.

In his closing, the prosecutor repeatedly attacked the defense DNA transfer theory. Tr. XXV/62-63,77-83,85-87; *2012R.*977-978, 992-998, 1000-1002. He briefly discounted the significance of alleles inconsistent with Dirk or Mabel. *Id.* at 84-85; *2012 R.* 999-1000. He told the jury that Greineder's DNA "was in those gloves, on the murder weapon." *Id.* at 94; *2012 R.* 1009. "The defendant's DNA is all over her," he exclaimed. *Id.* at 80; *2012 R.* 995.

---

[31]    Since Greineder's trial, however, there have been a number of peer-reviewed, published articles about DNA transfer and the dangers of relying upon LCN mixtures. *E.g.* Lowe, *et al.*, "The Propensity of Individuals to Deposit DNA and Secondary Transfer of Low-Level DNA from Individuals to Inert Surfaces," *Forensic Science Int'l.*, Vol. 129, pp. 25-34 (2002).

During jury deliberations on June 27 and June 28, 2001, respectively, the jurors asked for and received copies of the DNA results charts, which had been marked as "chalks". Exhibits ZZZZZ, BBBBBB, and CCCCCC for identification; *2012 R.* 1012-1014. The jury also requested copies of the electropherograms, which were not provided. *Id.* The jury returned its verdict on June 29th.

## 2.    Cellmark's reports.[32]

All of Cellmark's reports follow a similar format. As a representative example, consider the first report, dated January 6, 2000. *2012 R.* 612. It is on Cellmark letterhead and entitled "REPORT OF LABORATORY EXAMINATION." The footer states: "Accredited by the American Society of Crime Laboratory Directors/ Laboratory Accreditation Board." The report begins:

> Polymerase chain reaction (PCR) testing was performed on the following items which were received for analysis on November 29, 1999:
>
> ...
>
> I-3.3    One material cutting labelled "I-3.3 Glove..."
>
> It then describes the testing process:
>
> DNA isolated from the material cutting labelled I-3.3 glove, the two nail clippings labelled I-15 fingernails, and the blood swatch labelled Mabel Greineder was amplified using the PCR and typed for thirteen STR loci and Amelogenin. The samples were amplified using the AmpFlSTR Profiler Plus and the AmpFlSTR Cofiler PCR Amplification Kits. The appendices attached to this report list the STR loci tested and the types obtained for each sample.

*Id.*

> The section labeled "CONCLUSION" reads:
>
> The data indicate that DNA from more than one individual was obtained from the material cutting labelled I-3.3 glove. The primary source of the DNA obtained from the material cutting labelled I-3.3 glove is from a female; a secondary source is male.

---

[32]    The written reports prepared by Cellmark detailing Magee's test results and statistical calculations were not introduced at trial, but were included in the post-trial record as Exhibit 5 to the Affidavit of Arthur J. Eisenberg, discussed *infra*. Those reports are important here for comparison to Dr. Cotton's testimony respecting the test results, including the statistical significance of those results, to assist the Court in determining the extent to which Dr. Cotton served as a conduit of Magee's reports.

> The primary DNA profile obtained from the material cutting labelled I-3.3 glove matches the DNA profile obtained from the blood swatch labelled Mabel Greineder....

*Id.*

The report then provides random match statistics regarding the inclusion of Mabel Greineder.

*Id.* The report is signed by "Wendy C. Magee, Staff DNA Analyst," and "Jennifer E. Reynolds, Ph.D., Identity Laboratory Director." *Id.*

Charts listing the exact alleles identified at each locus are appended to the report. These charts formed the basis for the chalks shown to the jury at trial:

### ALLELES DETECTED - COfiler

| Sample | D3S1358 | D16S539 | AMEL | TH01 | TPOX | CSF1PO1 | D7S820 |
|--------|---------|---------|------|------|------|---------|--------|
| I-3.3 Glove | 15,17 | 10,12 | X,Y | 7,9, 9.3 | 6,8 | 10 | 11 |

### ALLELES DETECTED - PROFILER PLUS

| Sample | D3S1358 | vWA | FGA | AMEL | DS81179 | D21S11 | D18S51 |
|--------|---------|-----|-----|------|---------|--------|--------|
| I-3.3 Glove | 15,17 (19) | 15,17 | 20,22,26 | X,Y | 12,13,15 | 28,29,30,31 | 12,14,16,19 |

| D5S818 | D13S317 | D7S820 | | | | | |
|--------|---------|--------|--|--|--|--|--|
| 9,10, (11), 13 | 8,12, 14 | 7,9,11 | | | | | |

A follow-up report was prepared by Magee on February 23, 2000, apparently in response to a request. It states:

> As you requested, an alternative statistical calculation was performed to determine the frequency of the occurrence within the general population of possible DNA donors to the I-2.2 knife swab and the material cutting labelled I-3.3 glove.
> Using the ... data previously reported in the Report of Laboratory

Examination dated January 6, 2000, the approximate frequencies of individuals in the African American and Caucasian populations who could be included as possible sources of the DNA obtained from the material cutting labelled I-3.3 glove, making no assumptions regarding the number of DNA sources, are as follows:

| Population Database | Frequency |
|---|---|
| African American | 1 in 59,000 |
| Caucasian | 1 in 20,000 |

Using the assumptions that: 1) there were only two sources of DNA obtained from the material cutting labelled I-3.3 glove and 2) Mabel Greineder is one of the sources of the DNA obtained from the material cutting labelled I-3.3 glove, the approximate frequencies of individuals in the African American and Caucasian populations who could be possible secondary sources of the DNA obtained from the material cutting labelled I-3.3 glove are as follows:

| Population Database | Frequency |
|---|---|
| African American | 1 in 680 million |
| Caucasian | 1 in 170 million |

The statistical frequencies provided in this letter were calculated using Recommendation 4.1 from the 1996 National Research Council report.

*2012 R.* 61-62. This report is also signed by Magee and Reynolds.

### 3.    Critique of Cellmark testing by Dr. Eisenberg.[33]

Dr. Eisenberg ["Eisenberg"] noted that minute quantities of DNA from more than one source are known as Low Copy Number or "LCN" mixtures. He described the analysis of such samples as "fraught with peril," explaining that "[t]he critical problem, as yet unsolved by the forensic community, is how to distinguish reliably" between true alleles and artifacts in LCN mixtures. *2012 R.* 1050, 1052. Much of the DNA analyzed by Cellmark on the key pieces of evidence in this case falls into the category of LCN mixtures. *2012 R.* 1021.

---

[33]    Following Greineder's conviction, Dr. Arthur J. Eisenberg, former Chairman of the United States DNA Advisory Board to the Director of the FBI, *see* 42 U.S.C. § 14131, was retained by the defense to analyze Cellmark's work in this case, including its underlying electronic data and reported results. Dr. Eisenberg detailed his findings in a lengthy affidavit and exhibits filed in support of a motion for new trial (*2012 R.* 1015-1321), which sheds substantial light on the particular problems posed by the  testing in this case.

Eisenberg found that Cellmark's validation studies were "seriously flawed" and its interpretation guidelines "woefully inadequate." *2012R*.1066,1072. He noted that Cellmark "committed numerous errors in the interpretation of its own mixture validation studies," *2012 R*. 1068, adding that those studies demonstrated that it was not possible to determine reliably whether a peak appearing on an electropherogram was a true allele or an artifact. *2012 R*.1069. Cellmark produced no validation studies of LCN mixture testing at interpretation thresholds of less than 100 RFUs and did not validate either the 40 RFU or 60 RFU interpretation thresholds it employed during its work in the Greineder case. *2012 R*.1066-1071.[34]

Eisenberg found that Cellmark's interpretation guidelines lacked virtually all of the essential criteria required to make consistent and reliable interpretations of DNA test results. Rather, they "invited analysts to make biased and inconsistent calls." *2012 R*.1073-1074. As Eisenberg noted:

> When the key pieces of evidence were analyzed by Cellmark, there were no written guidelines specifying when a particular peak should be labeled as an allele and when it should be labeled as an artifact. That key determination was left to the undirected discretion of the analyst and technical reviewer.

*2012 R*.1023.

Eisenberg found that Magee knew the DNA profiles of Dirk and Mabel Greineder before making allelic calls on the key pieces of evidence. *2012 R.* 1078-1081. "In exercising her discretion in analyzing the evidence in this case," he noted, "Cellmark's technical analyst [Magee] made inconsistent calls from locus to locus and sample to sample for no apparent reason.... These subjective calls left entirely to the discretion of the analyst consistently induced bias against the accused." *2012 R*.1023. In sum, according to Eisenberg:

> The data suggests that Cellmark committed an egregious bias in the interpretation of results based on the known reference samples. This was scientifically unacceptable

---

[34]     An interpretation threshold denotes the minimum level below which any possible peaks will not be regarded as reportable alleles. The height of a peak is measured in "Relative Fluorescence Units," or RFUs. *2012 R*.1050.

and grossly improper.

*2012 R*.1081.

After analyzing all of the underlying electronic data on the three key items of evidence (knife and work gloves), Eisenberg concluded that the test results should have been reported as "inconclusive," adding:

> Absolutely no statistical data indicating any likelihood of association between Dirk Greineder and the three key pieces of evidence should have been calculated or presented.

*2012 R*.1110.

### 4. Resolution of the issue by the Massachusetts SJC.

#### a. Issue raised on appeal.

On direct appeal to the Massachusetts SJC, Greineder argued that Cotton's testimony reporting the inculpatory DNA test results produced by Wendy Magee was testimonial hearsay. Thus, the admission of that evidence, over objection, violated Greineder's right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution. While Cotton did review the case file prior to testifying, she admitted that she did not examine the raw, unfiltered, empirical data. Rather, she only saw what remained after Magee instructed the computer which data to filter out, which peaks to label as actual DNA alleles, and which to treat as artifacts of the amplification process. Cotton was simply parroting the results of another scientist's exercise of judgment and discretion. Given the importance of the inculpatory DNA evidence to the Commonwealth's overall case, Greineder argued, this preserved constitutional error was clearly not harmless beyond a reasonable doubt and required reversal.

#### b. The Massachusetts SJC's resolution of the issue prior to remand.

In its 2010 decision, the SJC rejected Greineder's claim. *Greineder*, 458 Mass. at 239. The

SJC addressed the confrontation issue by separating it into two distinct parts. First, it addressed what it characterized as Greineder's challenge to the admission of Cotton's "opinion" testimony detailing statistical likelihoods based on the DNA testing. It found no error, holding that this was admissible expert opinion testimony:

> Opinion testimony may, as here, be based on hearsay and not offend the Sixth Amendment. If the particular hearsay is independently admissible (the defendant does not argue that Magee could not have testified as to details contained in her reports and on which Dr. Cotton relied) and if it is the kind of evidence on which experts customarily rely as a basis for opinion testimony (which it is ...), then an expert may give opinion testimony based on such material.... Such testimony does not violate the Sixth Amendment because the expert witness is subject to cross-examination about her opinion, as well as "the risk of evidence being mishandled or mislabeled, or of data being fabricated or manipulated, and as to whether the expert's opinion is vulnerable to these risks."... The defendant had an adequate opportunity to conduct such cross-examination, and he availed himself of that opportunity, with vigor, for the better part of two days.

458 Mass. at 236 (*citations omitted*).

Having found no error in the admission of the inculpatory "opinion" testimony, the SJC then separately addressed the admission of Cotton's testimony enumerating the specific DNA test results, including the allele calls made by Wendy Magee on each item of evidence. The SJC found that the admission of this evidence was error. It wrote:

> The defendant next challenges Dr. Cotton's testimony as to the details and results of DNA tests conducted by Magee. His objection at trial to such testimony was precise: "I would like to register my objection to Doctor Cotton's testifying about the data in this case given the fact that she hasn't done any of the work on it." This evidence, while providing basis for Dr. Cotton's opinion, was hearsay. As such, it was error to permit her to testify on direct examination to the details of the test results obtained by Magee.... Inquiry into the hearsay basis for expert opinion is the decision of the cross-examiner.

*Id.* at 236-237. The SJC held that this error was not prejudicial, reasoning that the evidence would likely have been admitted anyway, either to support a defense of third-party involvement or to "reduce some of the sting of Dr. Cotton's opinion" by attacking her credibility. *Id.* at 239.

### c.       Arguments presented to SJC on remand.

After the defendant filed a petition for writ of *certiorari*, the Supreme Court vacated the judgment of the SJC and remanded it for further consideration in light of *Williams*, 132 S.Ct. 2221. *See Greineder v. Massachusetts*, 133 S.Ct. 55 (2012).   On remand, Greineder presented similar constitutional arguments, refined by the Supreme Court's intervening decisions in *Bullcoming*, 131 S.Ct. 2705, and *Williams*.   He argued that Dr. Cotton's testimony essentially parroted the reports from Magee since Cotton told the jury, locus-by-locus and allele-by-allele, exactly what portions of Greineder's DNA profile Magee had identified in the Low Copy Number DNA mixtures on the knife and brown work gloves Magee had extracted, quantitated, amplified, tested, and interpreted.

Greineder also argued that characterizing Cotton's testimony about the random match probabilities of the portion of Greineder's DNA profile identified by Magee on each of those three key pieces of evidence as an "independent" "opinion" was specious.   In fact, those same statistics were all set forth in Magee's reports and repeated word-for-word and number-by-number by Cotton in her direct testimony. Further, the random match probabilities reported by Cotton were not presented to the jury as "opinion," let alone as *her* opinion. Rather, as Cotton acknowledged, they reflected merely rote mechanical computations carried out by computer.   "You could do it by hand," she testified, "but it's kind of tedious."  Tr. XII/236-237; *2012 R.* 359-360.   Indeed, if any portion of Dr. Cotton's testimony reflected "opinion," it was Magee's interpretive  calls, duly reported by Cotton, about which peaks detected in the raw electronic data on the key pieces of evidence represented true alleles and which did not.  Consequently, he argued, the SJC's bifurcated analysis, which separately addressed the test results and an "opinion" based entirely on those results, was an invalid means of circumventing the requirements of the Confrontation Clause.

For these reasons,  Greineder argued, based on the Supreme Court's majority opinion in

*Bullcoming* and a combination of opinions expressing the views of a majority of the Court in *Williams*, Dr. Cotton's direct testimony recounting the substance of Magee's written reports regarding the key pieces of evidence was testimonial hearsay, admitted in violation of the Confrontation Clause of the Sixth Amendment.  She told the jurors what evidence Magee tested; she told them what alleles Magee identified on those items; she told them which of those alleles matched Greineder's DNA profile (as determined by Magee); and she told them what Magee determined to be the random likelihood of these partial matches.  That was constitutional error.

### d.     The SJC's decision on remand.

On remand, the SJC again rejected Greineder's arguments, largely endorsing its earlier decision and relying on it directly in certain respects.  The SJC began by examining its longstanding precedent dealing with expert testimony, stressing the distinction drawn between underlying facts and resulting opinions:

> In Massachusetts, we draw a distinction between an expert's opinion on the one hand and the hearsay information that formed the basis of the opinion on the other, holding the former admissible and the latter inadmissible....The admission of expert opinion but exclusion of its hearsay basis protects a criminal defendant's Federal and State constitutional right to confront witnesses....  Expert opinion testimony, even if based on facts and data not in evidence, does not violate the right of confrontation because the witness is subject to cross-examination concerning his or her expert opinion and the reliability of the underlying facts and data.

464 Mass. at 584.  After discussing recent confrontation decisions by the Supreme Court, the SJC turned to the "import" of *Williams*:

> Of great significance for our present purposes is that *Williams* focused on the admissibility of evidence of the basis of the expert's independent opinion, and not the admissibility of the expert opinion itself....  Five members of the Supreme Court concluded, albeit for different reasons, that such basis evidence is admissible without violating a defendant's confrontation right....  As we explained earlier, under Massachusetts jurisprudence, a forensic expert's opinion that relies on the data or conclusions of a nontestifying analysis is bifurcated from its basis. We allow an expert to testify to his or her independent opinion even if based on data not in evidence; we do not allow expert witnesses to testify to the specifics of hearsay

–88–

information underlying the opinion on direct examination.

*Id.* at 592.  Based on this, it concluded: "Thus, our rules of evidence and the protections they afford

are not inconsistent with *Williams*. *Williams* does not interpret the confrontation clause to exclude

an expert's independent opinion testimony, even if based on facts or data not in evidence and

prepared by a nontestifying analyst." *Id.* at 592-593.  It continued:

> Moreover, where five Justices concluded that admission of underlying facts that
> formed the basis of an expert's opinion did not offend the confrontation clause,
> *Williams* allows even more than an expert's independent opinion in evidence.... As
> is clear by now, our evidentiary rules afford a defendant more protection than the
> Sixth Amendment.

*Id.*

The SJC went on to reiterate its "bifurcation of admissible expert opinion from its

inadmissible, hearsay basis," rejecting Greineder's claim that the two were inextricably linked in the

context of DNA analysis.  It wrote:

> We disagree. There is a clear distinction between the allelic information that
> establishes genetic makeup and the statistical significance of the data that establishes
> how frequently a genetic combination appears in the population at large....  As we
> said in *Barbosa* ..., it is the statistical significance of a DNA match that is of greatest
> use to a jury; information about the prevalence of a particular gene combination gives
> meaning to the underlying fact of allelic presence.

*Id.* at 599.  The SJC also stated that "with DNA analysis, the testing techniques are so reliable and

the science so sound that fraud and errors in labeling or handling may be the *only* reasons why an

opinion is flawed."  *Id.* at 587, *quoting Commonwealth v. Barbosa*, 457 Mass. 773, 790 (2010).

The SJC acknowledged that Justice Kagan's dissent in *Williams* both implicitly rejected the

bifurcation of underlying data from the expert "opinion" based on that data and emphasized that  the

factfinder would necessarily need the underlying data in order to evaluate the expert's conclusion.

*Id.* at 599-600.  It reasoned, however, that this simply meant that, unless the defendant opened the

door on cross-examination, the underlying data would not be presented, and  the jury "may properly

accord less weight to the expert's opinion." *Id.* at 600.

As to the numerous violations of the SJC's own rule in reported case law,[35] where prosecutors introduced basis evidence during their case-in-chief with impunity, the SJC rejected the suggestion that this was a sign of a "flawed system" warranting remedial action.  It concluded, rather, that better training for prosecutors would resolve this problem:

> It merely reveals either a lack of emphasis on the prohibition of expert basis evidence on direct examination, or the scarcity of practical skills training to aid prosecutors in eliciting only opinion and not its hearsay basis from expert witnesses.

*Id.* at 601.

The SJC went on to apply its unchanged legal standard to the facts of this case.  It recognized that the analyst's report was testimonial, given that "the defendant was targeted as a suspect at the time Cellmark conducted DNA testing, and demonstrates that the DNA testing was conducted for the purpose of obtaining evidence for later use at trial," and that the analyst would reasonably anticipate her conclusions being used against him.  *Id.* at 594 n.15. As to the argument that Cotton had merely repeated Magee's opinions or findings, it concluded that she was not just a conduit:

> Nonetheless, and as we determined previously, the record reflects that Dr. Cotton reviewed the nontestifying analyst's work, including six prepared reports, and then conducted an independent evaluation of the data.... She then "expressed her own opinion, and did not merely act as a conduit for the opinions of others."... Moreover, we will not exclude expert opinion just because statistics indicating the significance of the genetic information have been included in the report provided to the expert.... In fact, similar views on the statistical significance of allelic information extrapolated from test samples only lends credence to an expert's independent opinion.

*Id.* at 595.  It did so while acknowledging that "the expert had only reviewed the filtered, printed data (as opposed to the raw, electronic data)." *Id.* at 595 n.16.  The SJC then reasoned that, because Greineder could cross-examine the lab director about Cellmark's testing procedures, his

---

[35]     An *amicus* brief detailed some twenty-one violations of this principle reflected in reported Massachusetts case law.

confrontation rights were fulfilled. Indeed, the SJC claimed,  Dr. Cotton was actually "in a better position" than Magee to answer certain questions about the testing process. *Id.* at 597-598.  *See also id.* at 584, 585, 586, 595, 596, 599 (asserting that cross-examining substitute analyst is sufficient).

With respect to the admission of the underlying data on Cotton's direct examination, the SJC merely reiterated its prior conclusion that there was no prejudice since the defense used some of the data to support a theory that there was a third party who committed the murder and to attack Dr. Cotton's credibility. *Id.* at 602-603. Accordingly, the SJC refused on remand to alter either its legal standard for determining the admissibility of substitute expert testimony or its decision affirming Greineder's conviction.

### B.  Summary of Applicable Law.

#### 1.  *Melendez-Diaz.*

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the Court held that the Confrontation Clause, as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004), barred introduction of drug certificates in the absence of live testimony by a laboratory analyst. Justice Scalia, writing for the majority, explained:

> In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to "'be confronted with'" the analysts at trial.

557 U.S. at 311.

The Court specifically addressed the argument that, because of its special nature, scientific evidence should be exempt from the constitutional requirement of confrontation. Surveying recent studies and cases, it rejected the suggestion that "[f]orensic evidence is [] uniquely immune from the risk of manipulation." *Id.* at 318. The Court went on to emphasize the particular importance of

confrontation in this area:

> Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well. Serious deficiencies have been found in the forensic evidence used in criminal trials. One commentator asserts that "[t]he legal community now concedes, with  varying degrees of urgency, that our system produces erroneous convictions based on  discredited forensics."

*Id.* at 319.

### 2.    *Bullcoming*.

Just two years later, the  Court again addressed the interaction of the Sixth Amendment and scientific evidence. In *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), the defendant was charged with DWI. At trial, the principal piece of evidence against him was a forensic laboratory certificate specifying his blood-alcohol level. The analyst who did the testing and signed the certificate was not called as a witness. Instead, another analyst who was familiar with the testing procedures, but not involved in the analysis of Bullcoming's sample, testified for the prosecution about the testing results as set forth in the report, which was admitted into evidence as a business record.

 The Court found this to be violative of the Sixth Amendment, once again rejecting the argument that the inherent reliability of the evidence made it admissible.  It summarized its decision:

> The question presented is whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification. We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.

*I*d. at 2710.  It noted that its evaluation was not dependent on the quality of the underlying analysis:

> [T]he analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess "the scientific acumen of Mme. Curie and the veracity of Mother Teresa."

*Id.* at 2715, *quoting Melendez-Diaz*, 557 U.S. at 319, n.6. The Court noted that "surrogate testimony"

would not enable a defendant to probe the details of the testing process or explore questions of competence or dishonesty of the non-testifying analyst. *Id.* Finally, the Court held that the report was testimonial even though it was not notarized. *Id.* at 2717.

In a concurring opinion, Justice Sotomayor wrote, in part to "emphasize the limited reach of the Court's opinion." To do so, she "highlight[ed] some of the factual circumstances that this case does not present." *Id.* at 2721-2722 (Sotomayor, J., concurring). First, she wrote, this was not a case with an alternate purpose or alternate primary purpose for the report. Second, it was not a case "in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue," but rather one where the testifying witness did not observe any part of the conduct of the testing. *Id.* at 2722. Third, it was not a case "in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 2722. Finally, it was not a case where the prosecution introduced "only machine-generated results." *Id.*

Justice Kennedy, joined by three other justices, dissented. He wrote: "Before today, the Court had not held that the Confrontation Clause bars admission of scientific findings when an employee of the testing laboratory authenticates the findings, testifies to the laboratory's methods and practices, and is cross-examined at trial." *Id.* at 2723 (Kennedy, J., dissenting).

3.     ***Williams*.**

Less than one year later, on June 18, 2012, the Supreme Court decided *Williams v. Illinois*, 132 S.Ct. 2221 (2012).

a.     **The facts in *Williams*.**

The defendant in *Williams* was charged with rape. At his bench trial, the prosecutor called an expert from the state police lab who testified that a male DNA profile obtained by Cellmark from

the victim's vaginal swab matched the  profile produced by the state police lab from a sample of the

defendant's blood. The defendant moved to exclude the expert's testimony "with regards to testing

done by [Cellmark]" under the Confrontation Clause. 132 S.Ct. at 2229. The trial judge refused to

exclude the expert's testimony and found the defendant guilty.

Cellmark had conducted its testing at a time when no suspect had been identified, and it had

no access to the defendant's DNA profile. After Cellmark reported the DNA profile found in the

vaginal swab, it was compared to the state DNA database, resulting in a "cold hit" on the defendant's

profile. The victim subsequently picked the defendant out of a lineup. The DNA evidence was

introduced under Illinois Rule 703, which, like FRE 703, admits expert opinion testimony based on

information not in evidence, as well as underlying facts supporting that opinion testimony, though

not for their truth.

### b.      The plurality opinion ("targeted accusation" requirement).

Justice Alito authored an opinion on behalf of himself, along with Chief Justice Roberts and

Justices Kennedy and Breyer,[36] affirming the conviction. The plurality concluded that the expert's

testimony about the source of the DNA tested by Cellmark was not admitted for its truth and, in any

event, that Cellmark's report was non-testimonial because it had been prepared before any suspect

had been identified, so it was not intended to produce evidence against a targeted individual. 132

S.Ct. at 2228, 2243-2244. That contrasted with the circumstances present in *Melendez-Diaz* and

*Bullcoming,* where the lab reports were prepared "for the purpose of proving the guilt of a particular

criminal defendant at trial*." Id.* at 2243-2244. Moreover, there was "no suggestion that anyone at

---

[36]      Justice Breyer also wrote a separate concurring opinion, in which he lamented the Court's failure to
delineate a "generally applicable" rule respecting the admissibility of forensic evidence produced by crime labs under
the Confrontation Clause and advocated setting the case for reargument. Alternatively, he adhered to his dissenting views
as set forth in *Melendez-Diaz* and *Bullcoming* and reiterated his position that reports documenting laboratory testing,
which "takes place behind a veil of ignorance," should be deemed reliable and admissible for all purposes. 132 S.Ct. at
2244-2254.

Cellmark had a sample of [Williams'] DNA to swap in by malice or mistake." *Id.* Under the circumstances, "there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile." *Id.* The plurality also noted that the trial witness didn't quote from or read from the Cellmark report, nor did she identify it as the source of any of her opinions. *Id.* at 2230. The plurality noted also the importance of the fact that the trial was in front of a judge instead of a jury. *Id.* at 2236-2237.

### c.    Justice Thomas's concurrence ("formality" requirement).

In a separate concurrence, Justice Thomas rejected the plurality's conclusion that the statements from Cellmark's report were not introduced for their truth. He stated:

> There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may  evaluate the expert's opinion and disclosing that  statement for its truth.

*Id.* at 2257. Justice Thomas noted that "[t]he validity of [the testifying expert's] opinion ultimately turned on the truth of Cellmark's statements." *Id.* at 2258. He also described the potential dangers of the plurality's approach:

> It is no answer to say that "safeguards" in the rules of evidence will prevent the abuse of basis testimony.... To begin with, courts may be willing to conclude that an expert is not acting as a "mere condui[t]" for hearsay ... as long as he simply provides some opinion based on that hearsay.

*Id.* at 2259. "I share the dissent's view of the plurality's flawed analysis," he added. *Id.* at 2255.

Yet despite his general agreement with the dissenting Justices and his disagreement with the plurality opinion of Justice Alito, Justice Thomas concluded that, in his view, the signed, yet unsworn, Cellmark report underlying the expert's trial testimony lacked sufficient indicia of formality to qualify as "testimonial" evidence under the Confrontation Clause. Accordingly, on that specific ground, adopted by no other member of the Court, he concurred that the admission of the testimony at issue did not violate the Constitution and joined the plurality in voting to affirm the

defendant's conviction. *Id.* at 2259-2264.

> **d.      The dissenting opinion (basic "evidentiary purpose" test).**

Four Justices (Kagan, Scalia, Ginsburg, and Sotomayor) dissented in an opinion written by

Justice Kagan. They noted at the outset:

> In two decisions issued in the last 3 years [*Melendez-Diaz and Bullcoming*]*,* this
> Court held that if a prosecutor wants to introduce the results of forensic testing into
> evidence, he must afford the defendant an opportunity to cross-examine an analyst
> responsible for the test.

132 S.Ct. at 2264. "Under our Confrontation Clause precedent," they declared, "this is an open and

shut case." *Id.*

Justice Kagan proceeded to explain why the defendant clearly had the right to cross-examine

the analyst who conducted Cellmark's testing and why a substitute expert would not pass

constitutional muster:

> "[W]hen the State elected to introduce" the substance of Cellmark's report into
> evidence, the analyst who generated that report "became a witness" whom Williams
> "had the right to confront." *Bullcoming*, 564 U.S., at ——, 131 S.Ct., at 2716. As we
> stated just last year, "Our precedent[s] cannot sensibly be read any other way." *Ibid.*....
>        Williams's attorney could not ask questions about that analyst's "proficiency,
> the care he took in performing his work, and his veracity." 564 U.S., at ——, n. 7,
> 131 S.Ct., at 2716, n. 7. He could not probe whether the analyst had tested the wrong
> vial, inverted the labels on the samples, committed some more technical error, or
> simply made up the results.... "Nor could such surrogate testimony expose any lapses
> or lies" on the testing analyst's part.

132 S.Ct. at 2267.

> **C.      Application of Law to Facts.**

>> **1.      The introduction of Dr. Cotton's testimony violated Dr. Greineder's
>>          Sixth Amendment rights as set forth in *Bullcoming*.**

>>> **a.      Greineder's right to confront the witnesses against him was
>>>          violated.**

This is a straightforward case under federal precedent.  The SJC's evasion of that precedent

was deeply flawed, both in its factual predicates, its logic, and its legal applications.   Before

discussing these flaws, it is appropriate to set out the proper analysis of the issue under governing

Supreme Court precedent.

The facts supporting this argument are clear.  As even the SJC acknowledged on remand: (1)

the non-testifying laboratory analyst prepared reports which, based on their anticipated use against

an already-identified defendant, were "testimonial"; (2) information regarding the alleles as well as

the statistics about the likelihood of the match were contained in the reports generated by the

laboratory analyst; (3) the testifying expert witness repeated the information contained in the reports,

both details and results, including allele calls as well as their statistical significance, to the jury; and

(4) the testifying expert witness had never reviewed the unfiltered electronic data, and had reviewed

only the data as limited and filtered by the analyst through the use of the analyst's independent

judgment.[37]  Under *Bullcoming*, these facts -- that testimonial statements were introduced for their

truth without an opportunity to cross-examine the person who made them -- establish a clear

violation of the Confrontation Clause.  *See* 131 S.Ct. at 2716.  The only difference from *Bullcoming*

-- that the content of the reports was repeated orally by a witness rather than simply introduced into

evidence as a business record -- is without constitutional significance.  *See Young v. United States*,

63 A.3d 1033, 1044 (D.C. 2013) ("[L]awyers may not circumvent the Confrontation Clause by

introducing the same substantive testimony in a different form").  Indeed, Justice Sotomayor's

concurring opinion in *Bullcoming*, offered to limit the scope of that decision, makes it abundantly

clear that the present case falls squarely within its ambit: the report here was generated with the

---

[37]     See 464 Mass. at 594 n.15 ("we also conclude that Dr. Cotton's testimony regarding the DNA analyst's test results was admitted in error for the additional reason that the nontestifying analyst's report was testimonial"); *id.* at 595 ("The multiple reports submitted by Cellmark included statistical calculations on the frequency that the genetic makeup recovered from evidence collected from the crime scene appears in the population, as well as conclusions regarding whether the defendant could be excluded as a source of DNA obtained from these samples"); *id.* at 602 ("Granted, in this case, Dr. Cotton did testify, to the details and results of the nontestifying analyst's DNA test results"); *id.* at 595 n.16 ("the expert had only reviewed the filtered, printed data (as opposed to the raw, electronic data)").

purpose of incriminating Dr. Greineder; Cotton had no personal involvement in the testing; Cotton was not asked for an independent opinion about unadmitted underlying information; and it did not involve only machine-generated results. *See* 131 S.Ct. at 2721-2722 (Sotomayor, J., concurring). *Compare State v. Lopez*, 45 A.3d 1, 13 (R.I. 2015) (no confrontation issue where testifying analyst from Cellmark "personally reviewed and independently analyzed all the raw data, formulated the allele table, and then articulated his own final conclusions concerning the DNA profiles and their corresponding matches").

This application of the holding of *Bullcoming* is not changed by *Williams*. Indeed, *Williams* reinforces this conclusion, based upon the reasoning expressed by a majority of the members of the Court. Based upon the views of Justice Kagan and her three colleagues who joined her opinion, this, too, should be "an open and shut case." 132 S.Ct. at 2264. For all of the reasons expressed in that opinion, Greineder had the right to challenge the DNA test results introduced at trial by confronting the analyst who produced those results, not someone else.  Further, the plurality opinion of four other Justices authored by Justice Alito also supports  Greineder here.  The plurality deemed Cellmark's report in *Williams* non-testimonial because it was produced before a suspect had been identified, it was not intended for use against the defendant at trial, and the lab neither knew the defendant's DNA profile nor possessed a sample of his DNA when it tested the crime scene sample. 132 S.Ct. at 2228, 2243-2244. Here, by contrast, Greineder had already been targeted as the suspect, the testing was performed to buttress the Commonwealth's case against him at trial, and Cellmark had a sample of his DNA which it used to determine his DNA profile *before* Magee tested the key pieces of evidence and made her allele calls. That makes the substance of Magee's reports, as recounted by Dr. Cotton, testimonial under the plurality's "primary purpose" test.[38]

---

[38]        Justice Alito's opinion made much of the fact that *Williams* was tried by a judge, not a jury, so the

(continued...)

In sum, under *Williams*, seven[39] members of the U.S. Supreme Court would presumably characterize Cotton's direct testimony as testimonial hearsay admitted in violation of the Confrontation Clause.  One court has characterized the result of *Williams* as follows: "While Justice Alito's rationale and Justice Thomas's rationale may not be includible *within each other*, the different tests they utilize to determine whether a statement is testimonial are subsumed within and narrower than *the dissenters'* test." *Young*, A.3d at 1043.   When these various positions are considered together, a meaningful rule -- at least to some sets of facts -- can be deduced:

> It therefore is logically coherent and faithful to the Justices' expressed views to understand *Williams* as establishing – at a minimum – a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus *either* the plurality's targeted accusation requirement or Justice Thomas's formality criterion. Otherwise put, if *Williams* does have precedential value as the government contends, an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

*Id.* Under *Williams*, regardless of which test is applied, Magee's reports must be considered testimonial because they were made with anticipation of their likely use at the jury trial of a known suspect.  *See also State v. Kennedy*, 735 S.E.2d 905, 917 (W.Va. 2012) (unnecessary to determine "narrowest grounds" of *Williams* where autopsy report qualified as testimonial under both a "primary purpose" test and a "targeted individual" test); *Martin v. State*, 60 A.3d 1100 (Del. 2013) (relying on *Williams* and *Bullcoming* to require testimony of testing analyst, not just substitute analyst, where statements would qualify as testimonial both under dissent's test and plurality's primary purpose

---

[38] (...continued)
information from Cellmark would presumably not have been (improperly) considered for its truth. Here, Greineder was tried by a jury, and the prosecution did everything it could (including blown-up color charts displayed and distributed to the jurors during Cotton's testimony and deliberations) to ensure that the finder-of-fact would rely substantively on Magee's test results.

[39]     Based on his separate concurrence, Justice Breyer might have no problem with Cotton's testimony. *But see* 132 S.Ct. at 2250 (emphasizing "veil of ignorance," which does not exist in this case).  Justice Thomas might adhere to his uniquely-held position that the absence of a formal sworn certification or attestation from Magee's official, signed reports somehow insulated their contents from being characterized as "testimonial" when repeated by someone else -- even though the SJC concluded that the reports were testimonial.

test); *State v. Norton*, --- A.3d ----, 2015 WL 4130230 (Md. July 9, 2015) (finding forensic DNA case report to be testimonial both under test derived from opinions in *Williams* and *Bullcoming*).[40]

### b.      The constitutional error was preserved.

Just before Cotton began her detailed testimony about Cellmark's test results, defense counsel objected at sidebar to her "testifying about the data in this case given the fact that she hasn't done any of the work on it." Tr. XI/208. That "data" included both the allele calls and the resulting random match probability statistics as set forth in Magee's reports. This objection clearly put the trial judge on notice that it was defense counsel's position that the results of Magee's testing could not properly be presented through Cotton. Indeed, the trial judge, in response to defense counsel's objection, wondered aloud whether the Commonwealth was planning on calling Magee as a trial witness. Under the circumstances, where defense counsel timely objected to a witness testifying about test results contained in reports written by a non-testifying analyst, counsel's objection was adequate to preserve the issue.

### c.      The error was prejudicial.

While the Commonwealth's circumstantial case against Greineder was comprised of several components, the inculpatory DNA test results were its centerpiece. If the jury concluded that Greineder's DNA was on the knife and brown work gloves ostensibly used by Mabel's killer, then the defense faced an exceedingly difficult task (which ultimately proved insurmountable) to engender doubt that Greineder was, in fact, that killer. Defense counsel surely tried -- by suggesting that Greineder's DNA could somehow have been transferred onto those items from other surfaces -- but

---

[40]      *See also United States v. Dollar*, 69 M.J. 411 (C.A.A.F. 2011) (*per curiam*) (admission of drug testing reports during testimony of government expert witness was error, where author of drug testing reports did not testify and expert acted as "surrogate" witness for the author of the reports); *United States v. Cavitt*, 69 M.J. 413 (C.A.A.F. 2011) (*per curiam*) (admission of testimony of expert who relied on and relayed information contained within urinalysis report was error because author of report did not testify); *United States v. Trotman*, 406 Fed. Appx. 799 (4th Cir. 2011) (unpublished) (reversal of conviction where testifying chemist had not actually tested substances or observed the testing).

that speculative theory fizzled during cross-examination of the two defense experts. More importantly, no "innocent explanation" of Magee's test results on the key pieces of evidence would have been necessary had the trial judge prohibited Cotton from presenting them.[41] There can be no serious dispute that the DNA test results played an important role in the outcome of this trial. Its admission had a "substantial and injurious effect" on the jury's verdict. The writ should be issued. *Cf. Merolillo v. Yates*, 663 F.3d 444 (9th Cir. 2011) (admission at trial of non-testifying autopsy pathologist's opinion violated Sixth Amendment right to confront witnesses and was not harmless where pathologist's opinion was the only expert testimony supporting prosecution's causation theory; *habeas* relief granted).

### d.        The importance of confrontation as to forensic evidence.

It should be understood that the right of confrontation is not, and was not in this case, merely a technicality without significant practical importance. The ability to cross-examine the forensic analyst who provides inculpatory conclusions can be critical. As forensic evidence plays an ever-growing role in criminal prosecutions, courts have become increasingly attuned to both the power of such evidence in producing convictions and the potential for mistakes which may lead to grave miscarriages of justice. As recently as 2005, the SJC erroneously characterized reports memorializing the results of drug testing as "neither discretionary nor based on opinion; rather, they merely state the results of a well-recognized scientific test determining the composition and quantity of the substance." *Commonwealth v. Verde*, 444 Mass. 279, 283 (2005). Since then, the Supreme Court has repeatedly emphasized the myriad errors which can occur at various stages of the forensic testing process. *See, e.g., Melendez-Diaz,* 557 U.S. at 319; *Bullcoming*, 564 U.S. at 2711,n.1. *See*

---

[41]        The defense also tried to make something of the presence of a handful of peaks on items tested by Cellmark (for the most part on items other than the three key pieces of evidence) which matched the alleles of neither Dirk nor Mabel Greineder, suggesting that a third person may have been present at the scene. Once again, this highly speculative theory, which did not exculpate Greineder in any event, fell flat at trial. Surely, the defense would have been infinitely better off had there been no DNA test results in the case at all to contend with!

*also* National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (chronicling deficiencies). We now know that the end product of forensic testing (the results) can be rendered utterly invalid by deliberate malfeasance or negligent mistakes occurring anywhere during the testing process.[42]

In the field of forensic DNA analysis of LCN mixtures, the risk of error is at its lowest at the

---

[42]    A dramatic and recent illustration of this very real phenomenon is the unraveling of numerous drug convictions which relied upon tainted testing carried out by Annie Dookhan at the DPH crime lab in Boston. *See Bridgeman v. District Att'y for Suffolk Dist.*, 471 Mass. 465 (2015), *Commonwealth v. Scott*, 467 Mass. 336 (2014). Ms. Dookhan admitted to "dry-labbing," altering, and faking test results, compromising tens of thousands of cases, and was convicted and sentenced after pleading guilty to falsifying drug tests. *See* http://www.boston.com/news/local/massachusetts.2013/11/22/annie-dookhan-former-state-chemist-who-mishandled-drug-evidence-agrees-plead-guilty/1hgmwd9U3J8eh4tNBS63N/story.html. A similar scandal is currently ongoing involving whether former state crime lab chemist Sonja Farak, who pleaded guilty in 2014 to charges of stealing cocaine from the lab, may have tampered with  thousands of samples going back in time as much as nine years earlier than previously thought. See http://www.westernmassnews.com/story/29495486/thousands-of-cases-possibly-impacted-by-drug-tampering-case#ixzz3fJBF0txb Similarly, the FBI recently admitted, as to forensic hair analysis, that "nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-decade period before 2000."  Spencer Hsu, "FBI admits flaws in hair analysis over decades," *Washington Post*, April 18, 2015 (http://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches- in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html).

Such problems are not limited to drug labs or hair analysis.  Numerous problems relating to forensic DNA laboratories have also come to light.  *See* "Tarnish on the Gold Standard: Understanding Recent Problems in Forensic DNA Testing," *The Champion,* January/February 2006 (collecting cases).  For example, the Houston Police Department (HPD) shut down the DNA and serology section of its crime laboratory in early 2003 after a television expose revealed serious deficiencies in the lab's procedures which were confirmed by subsequent investigation. *See* www.chron.com/content/chronicle/special/03/crimelab/index.html  In Virginia, post-conviction DNA testing in the high profile case of Earl Washington, Jr. (who was falsely convicted and came within hours of execution) contradicted DNA tests on the same samples performed earlier by the State Division of Forensic Sciences.  An outside investigation concluded that the state crime lab had botched the analysis of the case, failing to follow proper procedures and misinterpreting its own test results. *See, e.g., Confusion over DNA a threat to Justice, Virginian-Pilot,* Aug. 29, 2005; Frank Green, *Study will assess whether errors in Washington case are 'endemic to the system.' Richmond Times-Dispatch*, June 14, 2005; In 2004, an investigation by the Seattle Post-Intelligencer documented 23 DNA testing errors in serious criminal cases handled by the Washington State Patrol laboratory. *See* http://seattlepi.nwsource.com/specials/crimelab. In North Carolina, the *Winston-Salem Journal* published a series of articles documenting numerous DNA testing errors by the North Carolina Bureau of Investigation.  *See* http://crimeandscience.journalnow.com/ and Phoebe Zerwick, *State crime lab is faulted: Lawyer's Group calls for probe, cites DNA errors in three cases,* Winston-Salem Journal, July 20, 2005.  The Illinois State Police cancelled a contract with Bode Technology Group, one of the largest independent DNA labs in the country, expressing "outrage" over poor quality work. *See Frank Green, Mistakes by state DNA firm alleged: The Illinois State Police 'outraged' by findings, end their contract with the firm, Richmond Times-Dispatch*, August 20, 2005.

Moreover, DNA analysts have been fired for scientific misconduct, specifically falsification of test results, by a number of forensic laboratories, including labs operated by the FBI (*see* U.S. Department of Justice Office of the Inspector General, *The FBI DNA Laboratory: A Review of Protocol and Practoce Vulnerabilities*, available at http://www.usdoj.gov/oig/special/0405/index.html , Orchid  Cellmark  (*see* Laura Cadiz, *Md.-based DNA lab fires analyst over falsified tests*, Baltimore Sun, Nov. 18, 2004), and the United States Army (*see* Associated Press, *Worker in Army la may have falisified DNA test result, August 27, 2005*).  In all of these cases, the analysts were caught faking the results of control samples designed to detect instances in which cross-contamination of DNA samples occurred.

end of the testing process -- when someone simply plugs the allele calls made on the evidentiary sample along with the suspect's reference DNA profile into a software program which automatically computes the random match probability statistics. Indeed, that part of the process is "neither discretionary nor based on opinion." But there are numerous steps before that final mechanical one where critical mistakes may be made -- in cutting the sample, extracting the DNA, quantitating it, amplifying it, running it through the testing apparatus, and interpreting the results by deciding which peaks to treat as alleles and which to ignore as artifacts. Many of these steps require the proper application of specific testing protocols, and some involve the exercise of discretion and judgment. If any of the steps along the way are infected with error, the test results ultimately translated into statistical terms will be utterly invalid. "Garbage in, garbage out."

As Dr. Eisenberg explained in his affidavit in this case, the potential for error and extent of unguided discretion were particularly acute in the instant case. Given the LCN mixtures she was interpreting at unusually low RFU thresholds, Magee had to make subjective calls on numerous peaks in the underlying electronic data to decide which ones to treat as alleles. There were no objective protocols in place to assist her in making those calls, which may well have been influenced by her prior knowledge of Greineder's DNA profile. It was Magee's interpretation of the electronic data, resulting in her allele calls, which determined the random match probabilities reported by Cotton at trial.  Those calls, right or wrong, led inexorably to the inculpatory statistics used to convict the defendant.

Yet Cotton, who had never seen the underlying, unfiltered data, was in no position to justify Magee's allele calls. As Eisenberg noted:

> There is no way to determine from the Genotyper  electropherograms produced by Cellmark why each of those subjective calls were made. Only the analyst herself (or someone who had examined the electronic data interpreted by the analyst) could explain and defend those critical calls.

*2012 R.* 1116. Cotton couldn't say, for example, whether or to what extent Magee had "looked more deeply" into the data, or whether Magee had Greineder's DNA profile in mind when she made her calls. In short, Magee's absence from the witness stand effectively insulated her critical allele calls and the process by which she made them from meaningful inquiry or review of any kind, and Greineder was deprived of an opportunity to challenge the validity of her work before the jury. Cross-examining Cotton was a grossly inadequate substitute.[43]

> ### 2.  *Habeas* relief is required.

The SJC erred in refusing to accept this straightforward logic.  In doing so, it adopted an approach quite different from that used by the Supreme Court.  That approach was based on a twisted evaluation of the trial transcript and on a logical progression that, frankly, makes little sense.  The SJC acknowledged some of the federal precedent before essentially ignoring it in favor of its own jurisprudence.  Given its misreading and misapplication both of the transcript and of legal precedent, it is much easier to explain the confrontation violation than it is to explain exactly where the SJC's internally-inconsistent and careless opinion departed from correct analysis.  That is, it is hard to say precisely what the SJC did wrong because it is hard to comprehend what the SJC actually did.  In any event, the errors of the SJC can be approached through a variety of lenses, corresponding to the different theories of relief under AEDPA.

> ### a.  The SJC decision was based on an unreasonable determination of the facts.

First, the SJC's decision is based on factual determinations which are not defensible on the

---

[43]    It is noteworthy that in opposing defense counsel's efforts to put electropheragrams prepared by the defense from Cellmark's underlying electronic data into evidence without calling the person who produced them as a witness, the **prosecutor** argued:

> This is a complex set of information, run through a complex program.  And there's a lot of variables, including the filters ... to take out stutter, to take out artifacts. **And the person who did this and made those decisions to run it in a certain way needs to get up there and verify that: This is what I did; and this is why it appears in this way.**

Tr. XIII/7; *2012 R.* 376D (*emphasis added*). That is precisely why Cotton could not serve as a substitute for Magee as a prosecution witness at this trial.

record in this case. The SJC explicitly based its reasoning on several related factual statements as to Dr. Cotton's testimony. It stated that "Dr. Cotton reviewed the nontestifying analyst's work...and then conducted an independent evaluation of the data." 464 Mass. at 595. It stated that she "expressed her own opinion," and was not "a conduit for the opinions of others." *Id.* It also stated that Cotton had reached "similar views on the statistical significance of allelic information" as Magee. *Id.* These statements, which form the predicate for the SJC's analysis, are not supported by the record.

Cotton was a conduit for Magee's work. Contrary to the SJC, Cotton was not presented to the jury as having produced her own independent opinions. This is not to make a sophisticated argument that her conclusions were somehow subconsciously altered by her review of Wendy Magee's reports. This is not to argue that the SJC should have disbelieved Cotton in some way as to what she did. It is simply to argue that when she testified on direct examination as to the DNA results in this case, Cotton did not even claim to have reached independent opinions. Rather, she repeated, based on the reports, the information and conclusions generated by Wendy Magee. When her testimony first turned to the specific results in this case, in explaining her role in the case, she was questioned as follows:

> Q:     Now, Doctor Cotton, did Cellmark Diagnostics receive samples in this case, the case of the Commonwealth versus Dirk Greineder, the Commonwealth of Massachusetts, for testing?
> A:     Yes, we did.
> Q:     And, in fact, you received samples on six separate dates; is that correct?
> A:     Yes.
> Q:     Over a period of time, correct?
> A:     Yes.
> Q:     And at some point each of those were tested and responded to by Cellmark in the form of a report; is that correct?
> ...
> A:     Yes, that's correct.
> Q:     And have you had an opportunity to review those reports?
> A:     Yes, I have.
> Q:     And did you actually conduct the individual testing?
> A:     No, I did not.

-105-

Q:     And do you know who, in fact, did conduct the individual testing?
A:     Yes, I do.
Q:     And who was that?
A:     Wendy Magee.
Q:     And what else did you have an opportunity to review, other than the reports with respect to all of the items that were submitted on this case?
A:     The information that I have reviewed – there are a lot of items in this case, so the black binder that I'm holding onto right here and the white binder that's at my feet contain the entirety of the data that was produced in this case.

Wendy did the work.  It was initially reviewed by two other Ph.D. scientists in our lab.  They are unavailable for court, and I have reviewed the information in preparation for coming to court.

Tr. XI/206-208.

From this, and the rest of her testimony, it was clear to the jury that she was conveying results obtained by someone else. Cotton told the jury that items had been sent to Cellmark, that employees at Cellmark had generated electropherograms, that based on those the employees had generated tables of alleles, and then they had produced statistical calculations, by computer, of random match probabilities.  She never claimed to have done any of these things personally.  Her role at the trial was to present, and attempt to defend, Cellmark's (*i.e.*, Wendy Magee's) work.  She was there to explain Cellmark's reports, and her testimony was based around those reports which were specifically referenced. Cotton she was very careful in couching her testimony, as to each step of the work, either in the passive voice (i.e., these steps were done) or in the plural (i.e., "we" [meaning Cellmark] did this).  She never asserted that she had done anything prior to testifying, other than review some (though not all) of the raw data and read Magee's reports.[44]  To conclude that Cotton's testimony was presented to the jury as an independent evaluation or that she expressed her own expert opinion is to disregard the record.

Similarly, it makes no sense to assert that Cotton reached "similar views" regarding the

---

[44]     It was never made clear exactly how much time Dr. Cotton had spent with the files in this case (other that she had never seen the unfiltered data nor had she done any statistical calculations).  What is clear is that the she was never presented to the jury as an expert having independent opinions.  She was presented to the jury as defending Cellmark's data and conclusions.

"statistical significance" of the allelic information, when it was clear that she had not herself done *any* statistical evaluations herself and was merely repeating the computer-generated statistics supplied in Magee's reports.  There were not two sets of statistical analyses that happened to come to the same result. There was only one, done by Wendy Magee, and read into evidence by Cotton.

In sum, the SJC's conclusion that Cotton had offered "her own opinion" or conducted "an independent evaluation" is simply not borne out by the testimony given at trial. The SJC's analysis depends on a fantasy that Cotton somehow was presented to the jury as having herself repeated all of Magee's analytical thought-processes and having reached the exact same conclusions.  This is not what the jury was told. The jury was not asked to accept her opinions. It was asked to accept Cellmark's opinions as developed by Magee.  The SJC's determination on these critical points was unreasonable under AEDPA.  Yet without those factual predicates, the SJC's analysis collapses.

There is perhaps a reason for this otherwise inexplicable treatment of the trial transcript. After *Bullcoming* and *Williams*, there are some knotty legal issues lurking regarding the admissibility of forensic opinion testimony.  Those issues relates to the exact limits that an expert, in formulating opinion testimony, can rely on analytical work performed by a separate, non-testifying witness.  This can present a difficult question of line-drawing.  Must the expert have been involved in some way in the underlying testing?  If not, how much of the analytical process can be performed by non-testifying witnesses? Can the data generated by those witnesses be directly introduced into evidence? What if the generation of that data involves discretionary decisions?  What if there are multiple non-testifying analysts?  Despite repeated requests, and frustration from the lower courts, *see People v. Lopez*, 286 P.3d 469, 483 (Cal. 2012) (Liu, J., dissenting), the Supreme Court has declined to address these kinds of questions after *Williams*. It was these issues, perhaps, that the SJC was trying (unsuccessfully) to wrestle with in *Greineder*.

The problem in this present case is that, despite the SJC's assumptions to the contrary, this trial simply did not present those issues.  Had Cotton indicated while presenting the results from the reports that she used Magee's underlying data to reach an independent opinion of her own and that she was called as a witness for that purpose, then that issue would have arisen.  But she didn't.  She was presented, and understood by the jury to be, merely a conduit -- a highly-educated, qualified, knowledgeable conduit, but a conduit nonetheless.  The SJC's decision addressed a hypothetical trial that never happened.

> **b.**      **The SJC decision was contrary to clearly established Federal law.**

As explained above, the SJC's decision is contrary to clearly established Federal law, as set out in the decisions of the Supreme Court. *Bullcoming* made it clear that the prosecution cannot introduce the results of a non-testifying analyst into evidence against a defendant without affording the defendant an opportunity to cross-examine the analyst. This case is virtually identical to *Bullcoming*. The only difference is that Magee's reports were not introduced into evidence, but simply repeated (indeed, likely simply *read*) into evidence by Dr. Cotton. *See United States v. Ramos-Gonzalez*, 664 F.3d 1 (1st Cir. 2011) (introduction of drug testimony of analyst familiar with official procedure and who merely "recit[ed]" the testing analyst's report was wrongly admitted in light of *Bullcoming*). The Supreme Court has never held, or even hinted, that such a distinction has constitutional relevance. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied'."). Although *Williams* does not lend itself to a clear rule in all situations, it reinforces the holding of *Bullcoming* as to the instant situation, where the logic of at least seven of the justices supports finding of a constitutional violation here. The holding of *Bullcoming*, as confirmed by *Williams*, mandates a conclusion of a constitutional violation.  Based on the clear

misapplication of the Supreme Court's precedent, *habeas* relief is warranted here.

c.     **The SJC decision involved an unreasonable application of clearly established Federal law.**

For many of the same reasons outlined above, the SJC unreasonably applied federal law in developing a phony distinction between data and opinions (between Magee's laboratory work and Cotton's in-court statistical conclusions).  That is, even putting aside the factual mistakes outlined above, the SJC's opinion does not stand on its own terms.  To be sure, a bifurcation between data and opinion does make sense in some contexts.  For example,  the following testimony from an expert would likely not violate the Confrontation Clause: "I have looked at both DNA Profile X and DNA Profile Y.  I do not know where these profiles derive from nor anything about the DNA testing processes that produced them.  Based on the profiles alone, I can state that they correspond to a degree that would occur in 1 in 10,000  randomly selected profiles."  This was essentially the example given by Justice Kagan in her *Williams* dissent, which she characterized  as a "straightforward application" of expertise.  132 S.Ct. at 591.  Yet such testimony, absent other testimony or evidence establishing the provenance of the two DNA profiles, would be of no value to the jury.  *See Young,* 63 A.3d at 1045 ("Without [repetition of the substance of out-of-court statements by absent technicians], what would have been left of [the expert's] testimony – that she matched two DNA profiles she could not herself identify – would have been meaningless").  It is without value standing alone for the same reason that it is constitutionally permissible – it conveys no information about the truth of any out-of-court statements.[45]

The SJC's approach, however, draws the line between fact and opinion in a DNA case at an

_____

[45]     As the *Young* court observed: "Craig acknowledged in the course of her testimony that she did not personally perform the DNA testing and computer analysis that generated the DNA profiles she compared and the RMP [random match probabilities] she reported. Nor did Craig claim that she personally observed the receipt and handling of the evidence and the performance of the lab work preparatory to the DNA testing.... In other words, all Craig could say from personal knowledge was that she compared electropherograms and they matched; she could not say from personal knowledge whose electropherograms they were or how they were derived." *Id.* at *3.

entirely different point.  It considers the witness's "opinion" to be something like: "I have compared DNA Profile X, an *accurate* profile generated from the defendant's blood, and DNA Profile Y, an *accurate* profile generated from the glove found at the scene, and they correspond to a degree that would occur in 1 in 10,000 randomly selected profiles."  That opinion, even in the absence of other information, is hardly meaningless.  It conveys to the jury all the information necessary to convict – *i.e.*, that the profiles accurately reflect significant pieces of evidence and correspond in a powerful way.  Absent effective rebuttal, such testimony may well prove dispositive.

Those two lines are obviously very different.  However, in its decision on remand, the SJC took the *Williams* dissent's straightforward explication of a possible fact/opinion division and relied upon it as confirming its own, entirely different bifurcation.  The SJC opined:

> The four dissenters also determined that the laboratory report that included the DNA test results ostensibly offered for the limited purpose of explaining the basis of the expert opinion was testimonial and, therefore, statements that implicated it were admitted in violation of the confrontation clause.... Importantly, however, the dissent concluded:
>
> "There was nothing wrong with [the expert's] testifying that two DNA profiles – the one shown in the ... report and the one derived from [the defendant's] blood – matched each other; that was a straightforward application of [the expert's] expertise. Similarly, [the expert] could have added that *if* the ... report resulted from scientifically sound testing of [a DNA sample recovered from the victim], *then* it would link [the defendant] to the assault. What [the expert] could not do was what she did: indicate that the ... report *was* produced in [a particular] way...." *Id.* at 2270 (Kagan, J., dissenting).
>
> Thus, no member of the Supreme Court plainly concluded that the expert opinion testimony was improper.

*Id.* at 591. The SJC continued, again citing this passage from the dissent: "*Williams* does not interpret the confrontation clause to exclude an expert's independent opinion testimony, even if based on facts or data not in evidence and prepared by a nontestifying analyst." *Id.* at 593.  The SJC thus concluded that, based on *Williams*, there are no constitutional problems presented by such "opinion" testimony.

This constitutes a gross misreading of the dissent in *Williams*, and is not supported by *Bullcoming*. The dissent in *Williams* was making an obvious point, not implicitly abandoning longstanding precedent. It was certainly not condoning the SJC's fact / opinion split. This is evidenced by the relevant footnote in *Williams*, where Justice Kagan explained:

> But the statement "if X is true, then Y follows" differs materially—and constitutionally—from the statement "Y is true because X is true (according to Z)." The former statement is merely a logical proposition, whose validity the defendant can contest by questioning the speaker. And then, assuming the prosecutor tries to prove the statement's premise through some other witness, the defendant can rebut that effort through cross-examination. By contrast, the latter statement as well contains a factual allegation (that X is true), which the defendant can only effectively challenge by confronting the person who made it (Z). That is why recognizing the difference between these two forms of testimony is not to insist on an archaism or a formality, but to ensure, in line with the Constitution, that defendants have the ability to confront their accusers.

*Id.* at 2270 n.2. The dissent could not have been clearer that it was approving only opinion testimony that did not implicitly convey as true a portion of the factual predicate -- which is exactly what "opinion" as defined by the SJC does.[46]

In sum, the validity of a distinction between fact and opinion necessarily depends on where the line is drawn. The *Williams* dissent made the unremarkable observation that, if the line is drawn where the expert conveys *none* of the underlying information as true, then the opinion itself may not violate the Confrontation Clause. However, the SJC misinterpreted this observation to condone an entirely different practice, concluding that even if the expert conveys much of (or at least the crucial portion of) the underlying information itself, the testimony does not violate the Confrontation Clause -- so long as it is characterized as an "opinion." The SJC divorced this language from its context and interpreted it as essentially an abandonment of *Bullcoming* and other precedent by the dissenting

---

[46] In the context of this case, the "opinion" referred to by the SJC is something like: "Dr. Greineder's profile matches the profile *accurately* derived from the sample taken from the knife at a level that would be matched only by 1 in 2,200 randomly-selected individuals."

justices in *Williams* (and thus implicitly by the entire Court). It has misinterpreted the *Williams* dissent to support the opposite of what it said and what it meant.

Indeed, and relatedly, focusing on the line between fact and opinion is something of a fool's errand in the context of forensic DNA analysis. Other than in the hypothetical situation outlined above (which probably never occurs in an actual courtroom), it is in practice with respect to DNA almost impossible to separate the two. Testimony regarding DNA is almost always presented in an intertwined manner, as it was here. That is, Dr. Cotton did not tell the jury that she was going to present some facts and then offer an opinion based on them. Rather, she provided lengthy answers (based directly on Magee's reports) that described in detail all the critical results, from allele calls to statistical calculations, that Cellmark had generated. There was no differentiation in how these facts from the reports (allele calls versus statistical comparisons) were stated to the jury. Any juror asked to specify what were Cotton's "opinions" and what was merely the "basis" for those opinions would have been completely flummoxed. The statistics were presented just as factually as the allele calls, if not more so. As one court has correctly explained, the two cannot be bifurcated:

> [T]he government suggests we break down the expert testimony, ignoring direct references to the inadmissible hearsay conclusions of the analysts who conducted the testing, and solely consider the independent opinions of the experts. This would require an impossible feat of mental gymnastics. Dr. Cotton's and [another expert's] explicit reliance on and references to the reports prepared by third parties make it impossible to disaggregate their opinion testimony from evidence admitted in violation of the Confrontation Clause.

*Gardner v. United States*, 999 A.2d 55, 62 (D.C. 2010).

To put it another way, the SJC labeled certain statistics that Dr. Cotton apparently simply read from Magee's report, and which she had not personally calculated or even double-checked, her "independent opinion," rendering it admissible. The SJC had to call this testimony "opinion" or its entire analysis would fall apart. But it was not an opinion in any ordinary sense of the word. It

differed from the so-called data only in that someone (not Cotton) had run that data through one additional computerized calculation, an automated step involving no exercise of judgment whatsoever, and quantified it.[47]  Yet that "opinion" was effectively insulated from meaningful cross-examination since Cotton had not even reviewed the raw data which produced those statistics.

### 4.  Even if its legal analysis were accepted, the SJC's harmlessness evaluation was unreasonable.

Finally, and largely independent from the arguments made above, the SJC erred in concluding that the admission of the details of the DNA test results was harmless.  That is, even accepting the SJC's reasoning as to the admission of the (largely nonexistent) "opinion" testimony, the SJC also held that the other DNA data, such as the reports of the allele calls, was improperly admitted.  It went on to conclude, however, that such admission was harmless.  The Supreme Court has indicated that, in evaluating this question, the issue is whether the harmlessness decision under *Chapman* was unreasonable.  *Davis v. Ayala*, 135 S.Ct. 2187, 2199 (2015).  The SJC's decision was indeed unreasonable.  The admission of the DNA data (even apart from the statistical information) had an enormous impact on the case.

It is important here to be very precise.  Under the SJC's analysis, the only part of Dr. Cotton's testimony that was admissible was the statistical opinion.  Therefore, under the SJC's analysis, Dr. Cotton was permitted to say that she had concluded that Dr. Greineder's DNA corresponded to the sample from the left-hand work glove at a level expected of 1 in 170,000,000 randomly selected Caucasians. She was not permitted, however, to testify that the sample had a 17 at locus D3, a 26 at

---

[47]     As an example of how far the SJC's decision in this case was divorced from reality, consider its statement that "similar views on the statistical significance of allelic information extrapolated from test samples only lends credence to an expert's independent opinion." 464 Mass. At 595.  Plausible on its face, in context that statement becomes ridiculous.  On the facts of this case, that means that Dr. Cotton's repetition of the statistics, which she read from Magee's report, was somehow "len[t] credence" by the fact that Magee agreed with them.  Of course Magee would agree – they were her calculations!  Dr. Cotton never suggested that she had herself done any of the calculations.  To put it another way, even if the Commonwealth had called a hundred different experts to read Magee's report verbatim to the jury, that sheer repetition would not have increased the reliability of the statistics in that report in any way or complied with the Confrontation Clause.

locus FGA, a 15 at locus D18, *etc.*, which corresponded with Dr. Greineder's DNA profile. The question therefore is whether the introduction of this DNA data, the allelic comparison, likely had an impact on the outcome of the case. Is there a possibility that the case would have ended differently had Cotton testified, on direct examination, only to the statistical opinion and not to the allele calls?

The simplest way to approach this question is in a practical way. The Commonwealth clearly understood the importance of the inculpatory DNA test results on the three key items of evidence. It presented those results through Cotton in great detail, allele-by-allele, using blown-up charts to display the partial matches to the jury while Cotton was reporting them. The Commonwealth even distributed color copies of those charts to the individual jurors to help them follow along. There was nothing haphazard or impromptu about the Commonwealth's presentation of this evidence. It was designed to maximize its impact upon the jury. During their deliberations, the jurors twice specifically requested (and received) those same DNA results charts to assist them in reaching a verdict. Is it likely that the Commonwealth would have gone the expense of preparing extensive chalks, and then spent the jury's time (hours of testimony) painstakingly walking through all the DNA data, if that was going to be irrelevant to the jury's evaluation of the case? Of course not. The Commonwealth went to those lengths precisely because they were important. The Commonwealth introduced the detailed, step-by-step data in order to have the jury view the Cellmark analysis and Dr. Cotton's statistical "opinion" as rigorously scientific.

To look at it another way, if all Dr. Cotton had testified to was her statistical "opinion," unsupported by any recitation of the data consistent with that opinion, then jury would likely have given it far less weight. As even Justice Alito wrote in *Williams*, disclosure of underlying data serves to "help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." 132 S.Ct. at 2240. Absent any factual support or explanation of how the

statistical "opinion" was reached, the jury would surely have regarded Dr. Cotton's "opinion" with a significant measure of skepticism. If none of the "data" had been presented, defense counsel could surely have developed a devastating attack in closing argument on the Commonwealth's key expert witness. He could have argued that she had been handsomely paid to provide inculpatory evidence against Dr. Greineder, and had duly done so in the form of a statistical comparison, yet had failed to offer any justification for how that comparison was reached. An expert who cannot "show her work" -- indeed, who makes no attempt to show her work -- is unlikely to be trusted by a jury.

The SJC avoided this conclusion by reasoning that the Magee data would have come into evidence anyway, given its use at trial by the defense in attacking Cellmark's credibility and in presenting the stranger-allele argument. 464 Mass. at 602-603. But this is an unwarranted assumption. If the prosecution had merely presented an unsupported statistic from Dr. Cotton, the defense might well have chosen not to elicit the related data in cross-examination (thereby waiving the confrontation issue). It might have chosen to present data only through Dr. Krane, or even not at all. The defense might have recognized that a jury would simply not credit unsupported, unexplained statistical "opinions." In short, the entire trial might have proceeded quite differently, and much more favorably for the defense, had the DNA data (which even the SJC recognized was wrongly admitted) not been presented to the jury. The SJC's determination to the contrary was unreasonable.

## III.   GREINEDER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

### A.   Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to Exclude or Challenge Scientifically Unreliable DNA Results.

#### 1.   Statement of Relevant Facts.

##### a.   Post-trial expert analysis.

As mentioned at pp. 83-85, *supra*, following Greineder's conviction, the Commonwealth's

DNA evidence and discovery was reviewed by Arthur J. Eisenberg, Ph.D., former chairman of the

United States DNA Advisory Board to the Director of the FBI.  Dr. Eisenberg's detailed findings and

analysis are set forth in his affidavit and exhibits.  *2009 R.* 368-682. Dr. Eisenberg concluded that

Cellmark's reported results in this case on the knife and brown work gloves were "unscientific,

unreliable, and unfairly biased."  He further opined that those results properly should have been

reported as "inconclusive." *Eisenberg Aff.* 99 (*2009 R.* 471).

The Commonwealth's DNA evidence was also submitted post-trial to Charles M. Brenner,

Ph.D. for his review.  Dr. Brenner's findings and analysis are set forth in his affidavit. *2009 R* 258-

276. Dr. Brenner, a forensic mathematician, concluded that Cellmark violated elementary statistical

principles in its analysis and employed a methodology which was unfairly biased and scientifically

invalid. *2009 R.* 269-270.

> **(1)  The scientific unreliability of interpreting DNA test results based upon low copy number ("LCN" DNA mixtures.**

In his affidavit, Dr. Eisenberg discussed the particular problems involved in interpreting the

results of testing extremely minute quantities of DNA from more than one source. Such analysis is

generally known in the forensic DNA field as Low Copy Number or "LCN."[48] That is precisely the

type of analysis employed by Cellmark on the key evidentiary samples in this case. *Eisenberg Aff.*

31-42 (*2009 R.* 403-414).

Dr. Eisenberg described the forensic analysis of LCN mixtures as "fraught with peril."

*Eisenberg Aff.* 31 (*2009 R.* 403). He explained: "The critical problem, as yet unsolved by the forensic

community, is how to distinguish reliably between [true alleles and artifacts] in LCN mixtures."

Many problems can occur during the analysis of LCN mixtures, including allelic drop-out, allelic

---

[48]     Some courts and commentators have also referred to such DNA tst results as "high sensitivity analysis." *See, e.g., People v. Collins*, 2015 WL 4077176 (N.Y. Supp. July 2, 2015).

drop-in, and increased prevalence of stutter. Although these problems can occur with any LCN

testing, they are "greatly magnified for evidentiary samples which may contain DNA from more than

one source." *Eisenberg Aff.* 36 (*2009 R.* 408). As Dr. Eisenberg explained:

> Mixture analysis of LCN samples is generally not reliable because of the increased
> imbalance of heterozygous alleles, increased production of stutter products, and
> prevalence of allelic drop-in. Absent specific validation for LCN analysis of DNA
> mixtures by a forensic laboratory ... such analysis must be deemed scientifically
> unreliable and the results reported as "inconclusive."

*Eisenberg Aff.* 36-37 (*2009 R.* 408-409).[49]

### (2)     Cellmark's flawed validation studies and  interpretation guidelines for LCN analysis.

Dr. Eisenberg found that Cellmark's validation studies were "seriously flawed" and its

interpretation guidelines "woefully inadequate." *Eisenberg Aff.* 47, 53 (*2009 R.* 419, 425). He noted

that Cellmark "committed numerous errors in the interpretation of its own mixture validation

studies." *Eisenberg Aff.* 49 (*2009 R.* 421) According to Dr. Eisenberg, Cellmark's validation studies

demonstrated that it was not possible to determine reliably whether a peak appearing on an

electropherogram was a true allele or an artifact in the mixtures present in the evidentiary samples

tested here. Cellmark produced no validation studies of LCN testing at interpretation thresholds of

less than 100 RFUs and did not validate either the 40 RFU or 60 RFU interpretation thresholds it

employed during its work in the *Greineder* case. *Eisenberg Aff.* 50-53 (*2009 R.* 422-425).

Dr. Eisenberg found that Cellmark's interpretation guidelines lacked virtually all of the

essential criteria required to make consistent and reliable interpretations of DNA test results.

*Eisenberg Aff.* 54 (*2009 R.* 426). Rather, they "invited analysts to make erroneous or unsupportable

---

[49]   In addition, the risk of inadvertent, innocent transfer of DNA is greatly increased when analyzing LCN
samples. As Dr. Eisenberg explains: "Transfer of cells can occur by casual contact between two or more people and/or
objects and result in mixed DNA profiles. Therefore, DNA profiles obtained from LCN evidentiary samples following
PCR amplification may not necessarily be relevant to the identification of the appropriate perpetrator of the crime."
*Eisenberg Aff,* p. 2., *2009 R.* 374.

conclusions on forensic casework samples in *Commonwealth v. Greineder*." *Eisenberg Aff.* 53 (*2009 R.* 425). Cellmark's 1999 interpretation guidelines, presumably in effect when the critical evidence in this case was analyzed by Cellmark in early 2000, gave unguided discretion to the analyst to reduce the peak detection threshold from 100 RFUs to as low as 40 RFUs. Cellmark failed to provide objective criteria for the exercise of that discretion or require that such interpretations be conducted prior to analyzing known samples from potential suspects in order to prevent the injection of analyst bias into the process. *Eisenberg Aff.* 55 (*2009 R.* 427).

**(3)     Cellmark's reported results were scientifically unreliable and invalid.**

Dr. Eisenberg concluded that the only verifiable interpretation threshold which Cellmark could reliably employ in this case was 100 RFUs. That was the minimum threshold which Cellmark validated for its own equipment.   Moreover, the overwhelming majority of forensic DNA laboratories in the United States will not make allele calls to include a potential contributor below 100 RFUs.   Yet, in the midst of analyzing the critical evidence in this case, Cellmark arbitrarily and unjustifiably lowered its threshold to 40 and later 60 RFUs, generating "grossly unreliable test results." According to Dr. Eisenberg: "That lowering of the RFU threshold was contrary to accepted scientific practice and virtually unprecedented in my experience as a forensic scientist." *Eisenberg Aff.* 84-85 (*2009 R.* 456-457) To make matters worse, after lowering the RFU peak detection threshold, Cellmark arbitrarily treated peaks between 40 and 100 RFUs as alleles when they matched Greineder's DNA profile, but ignored peaks at those same RFU levels which did not match his DNA. *Id.*   Cellmarks interpretations were consistently and unscientifically biased in favor of the prosecution's theory of the case. *Eisenberg Aff.* 66, 76 (*2009 R.* 438, 448)

Dr. Eisenberg noted that at a peak detection threshold of 100 RFUs, no reliable scientific conclusion could have been drawn that Greineder was a potential contributor to any of the three key

items of evidence – the knife or the two brown work gloves: "Absolutely no statistical data indicating any likelihood of association between Dirk Greineder and the three key pieces of evidence should have been calculated or presented."  Nevertheless, the jury was provided with "biased and scientifically unreliable statistics which incorrectly included the defendant as a potential, and indeed likely, contributor to the DNA extracted from those items." *Eisenberg Aff.* 85-91 (*2009 R.*457-463).

**(4)     Scientific errors committed by Cellmark in its statistical analysis of the Greineder evidence.**

Based on his analysis of Cellmark's work, Dr. Brenner, a Ph.D. forensic mathematician who specializes in the combination of mathematics, statistics, population genetics, and computer software applied to DNA identification (see *2009 R.* 258), found that Cellmark often failed to take into account the possibility that peaks located in a stutter position actually masked true alleles.  Cellmark did so, according to Dr. Brenner, only when the potentially masked alleles matched Greineder's DNA profile. Similarly, Dr. Brenner found that Cellmark only considered the possibility of allelic drop-out when such drop-out inculpated Greineder, not when it resulted in a call inconsistent with his DNA profile. "These errors committed by Cellmark," Dr. Brenner opined," violated basic scientific principles and unfairly biased the statistical results against the defendant." *Brenner Aff.* 9 (*2009 R.* 266). Under the circumstances presented here, "there is no objective way to quantify accurately the random inclusion probability on the right-hand work glove and other pieces of evidence tested by Cellmark." *Id.* The DNA statistics provided by Dr. Cotton to the jury "were erroneous" and "greatly inflated the inclusion probabilities ... to the detriment of the defendant." *Brenner Aff.* 12-13 (*2009 R.* 269-270).

**b.    The DNA defense investigation prior to April 17, 2001.**[50]

This was the very first case involving DNA evidence which Greineder's trial counsel, Martin F. Murphy, had been involved in. He had no scientific background and no training or experience with the Cofiler/Profiler testing kits employed by Cellmark. *Tr.*(8/14/06)/10-12. Murphy knew that DNA evidence was an important part of the Commonwealth's case against Greineder. On May 8, 2000, he retained William Thompson, a California lawyer, to consult with him about DNA-related issues. On Thompson's recommendation, Murphy retained Dr. Christie Davis, a forensic scientist. Murphy sent Dr. Davis DNA discovery materials, including Cellmark's validation studies, on September 22, 2000. At that time, it was Murphy's intention to call Dr. Davis as a defense witness at trial. *Tr.* (8/14/06)/16-23.

The court set a trial date of mid-May 2001. On February 13, 2001, Murphy retained Marc Taylor. Taylor, who had no graduate degree, was asked to conduct defense experiments involving the innocent transfer of DNA from one surface to another. *Tr.* (8/14/06)/30-32.

On March 17, 2001, two months before trial, Murphy retained Daniel Krane as a DNA expert. Murphy knew that Krane was an academic, not a forensic scientist, and that he had never worked in a forensic lab. Murphy did not send Krane Cellmark's validation studies or its standard operating procedures. When he retained Krane, Murphy expected that Davis would testify as the lead DNA defense expert at trial and that Krane would "backstop" her testimony and present the defense theory respecting the innocent transfer of DNA. Murphy never retained an expert in DNA statistics. *Tr.* (8/14/06)/24-35.

---

[50]    April 17, 2001 is the date on which defense counsel informed the trial court in writing that the defendant was not challenging the admissibility of the Commonwealth's DNA evidence on *Daubert/Lanigan* grounds.

c.    **Defense counsel's state of mind respecting DNA evidence on April 17, 2001.**

(1)    **What defense counsel knew.**

Mr. Murphy testified that as of April 17, 2001 [hereinafter "the waiver date"], he knew that DNA test results produced by Cellmark on three key items of evidence (knife and two brown work gloves) inculpated Greineder. He knew that Cellmark's results were based upon an analysis of DNA mixtures containing an extremely tiny quantity of DNA. He understood that analysis of low-RFU or Low Copy Number "LCN" DNA was particularly problematic, that it was difficult to distinguish real alleles from artifacts in such mixtures, and that LCN alleles might represent innocent transfer of trace DNA. He knew about specific problems associated with low-RFU DNA analysis, including stutter, allelic dropout, and stochastic effects. He also understood that a laboratory's internal validation was critical to establishing the scientific reliability of its testing. *Tr.* (8/14/06)/39-46.

 Murphy testified that he knew Cellmark had conducted its first two rounds of testing, when the three key items were analyzed, using a threshold of 40 RFUs to make allelic calls. He knew that Cellmark's protocols gave its DNA analysts discretion to lower the RFU threshold from 100 to 40, and that no specific criteria were set forth in those protocols as to when the threshold should be lowered. Murphy knew that different DNA forensic labs used different RFU thresholds, but he was not aware of any other laboratory making allelic calls using an ABI 310 at a threshold of under 100 RFUs. He knew that the hardware manufacturer recommended an RFU threshold of 150 or 200. He also knew that the FBI would not make inclusionary allelic calls at an RFU threshold below 150 or 200. Both Dr. Davis and Thompson told Murphy that Cellmark's RFU threshold was lower than that employed by other laboratories. *Tr.* (8/14/06)/41-60; *Tr.* (9/13/06)/69.

Murphy testified about a lot of other information casting doubt on the scientific reliability and validity of Cellmark's testing that he knew of by the waiver date. On January 8, 2001, Dr. Davis

told Murphy that the lowest threshold at which Cellmark had validated its DNA analysis work with mixtures was 100 RFUs, and he had no information to the contrary. Dr. Davis told Murphy on that same date that Cellmark had not run a substrate control in this case. Murphy knew that Cellmark had made its inculpatory allelic calls on the knife and brown work gloves only after first typing the reference samples for Dirk and Mae Greineder. Dr. Davis told Murphy before the waiver date that Cellmark had made inconsistent allelic calls in this case, and that Cellmark had improperly combined the results from two different injections of the same sample. *Tr.* (8/14/01)/53-67.

In their communications with Murphy prior to the waiver date, both Dr. Davis and Thompson were sharply critical of Cellmark's work in this case. Dr. Davis described Cellmark's testing methodology as "the shot in the dark method." She told Murphy that Cellmark had stretched DNA technology in this case beyond the point of scientific reliability, and that part of what Cellmark did was "bad science." Thompson told Murphy that there were lots of problems with what Cellmark had done, and that Cellmark's statistical analysis in this case was improper. *Tr.* (8/14/06)/58-72; *Tr.* (9/13/06)/69-70. Murphy testified that he was advised that there were "lots of arguments that you could make" against Cellmark's use of an RFU threshold below 100. He believed that "a good argument could be made" that it was scientifically improper for Cellmark to have lowered the RFU threshold for analyzing the key pieces of evidence from 100 to 40. Davis and others told Murphy that it was "highly questionable" to do so.  In a memorandum he sent to  Thompson, Murphy wrote, *inter alia*, that Cellmark's flawed work in this case "**seems to me to be a powerful argument against admitting the results....**" *Tr.* (8/14/06)/58; *Tr.* (9/13/06)/71, 64; Hg. Ex. 15D (*emphasis added*).

 Murphy testified that as of the waiver date, he was familiar with *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *Commonwealth v. Lanigan*, 419 Mass. 15 (1994), and their progeny. He had also read all of the reported decisions respecting DNA evidence decided by

Massachusetts appellate courts. *Tr.* (8/14/06)/77-78. Murphy also testified that he was not aware of any reported decision from any court admitting DNA test results where an analysis threshold as low as 40 RFUs had been employed. *Id.* at 59. He was not aware of any reported appellate decision from any court specifically addressing low RFU or LCN analysis. *Id.* at 148. As of the waiver date, Murphy knew of a single trial in Massachusetts at which the trial judge had admitted Profiler/Cofiler DNA test results, but there had not yet been any appellate decision in that case. *Id.* at 47-48.

### (2)     What defense counsel didn't know.

Murphy had retained both Krane and Taylor, hoping that they could persuade the jury that the presence of DNA alleles matching Greineder on the knife and brown work gloves could be attributed to innocent third-party transfer. *Tr.* (8/14/06)/28-29. Yet Murphy acknowledged that as of the waiver date, he had no idea what either of these individuals could testify to or whether their testimony would help the defense. Murphy found Krane "very hard to reach," and he had no written report from him by the waiver date. *Id.* at 76. While Taylor had been asked to conduct laboratory experiments about DNA transfer, Murphy had not received any test results from him as of that date. *Id.* Murphy thus had no idea whether Taylor's results would be helpful to the defense, let alone admissible. *Id.* at 33, 117.[51]

On March 29, 2001, less than two months before the scheduled start of trial, an Australian court issued a decision (*Karger*), which was harshly critical of Dr. Davis, who had testified in that case as a defense expert.  *Tr.* (8/14/06)/72-73. Once he heard about *Karger*, Murphy had substantial doubts about calling Dr. Davis as a defense witness at trial. *Id.* at 87-88.  Although she was the only forensic DNA scientist the defense had retained, *id.* at 88, Murphy did not know as of the waiver

---

[51]     Murphy did not file any pretrial motion addressing the admissibility of Taylor's experiments. The specific results of those experiments were ultimately excluded by the court at trial.

date whether he could actually put her on the stand.[52]

### d.    Defense counsel's "plan."

Murphy testified that he understood that the prosecution was going to present evidence from Cellmark that Dirk Greineder's DNA was found on the knife and brown work gloves recovered near the scene of Ms. Greineder's body. As of the waiver date, Murphy hoped to present a two-part response to that evidence at trial. First, he would seek to provide the jury with an innocent explanation of how the defendant's DNA could be on those objects. That theory was secondary or tertiary DNA transfer. Murphy hoped that Krane would explain the theory to the jury, and Taylor would testify about his experiments supporting the innocent transfer theory. *Tr.* (8/14/06)/28-32.

The second part of Murphy's planned DNA response was to try to use evidence of "stranger alleles" attributable to neither Dirk nor Mabel Greineder "as a way of trying to create a reasonable doubt." *Tr.* (8/14/06)/130; *Tr.* (9/13/06)/86. Some of those "3rd party peaks" were referred to in Cellmark's own  reports, while others were discernible from Cellmark's raw data. Up until the release of the *Karger* decision, Murphy's plan was to present this aspect of Greineder's defense primarily through the testimony of Dr. Davis. *Id.*

### e.    Defense counsel's decision to waive a motion to exclude Cellmark's inculpatory DNA test results as scientifically unreliable.

Murphy offered five reasons why he decided not to challenge the admissibility of Cellmark's inculpatory DNA test results under *Daubert/Lanigan*:  (1) such a motion would probably fail; (2) even if all allelic calls below 100 RFUs were excluded, substantial inculpatory DNA results on the three key items of evidence (knife and two brown work gloves) would remain; (3) litigating such a motion pretrial would provide the Commonwealth with a preview of Greineder's trial defense; (4)

---

[52]    Dr. Davis ultimately was not called as a defense witness at trial, and no other DNA forensic scientist was retained to replace her.

the exclusion of allelic calls under 100 RFUs would weaken a trial defense that "stranger alleles" not attributable to Dirk or Mabel Greineder were also present; and (5) a successful challenge to Cellmark's statistical analysis would lead only to a modest reduction in the calculated likelihood that Dirk Greineder contributed DNA to the evidentiary items at issue.

> **f.      Defense counsel's response to Cellmark's inculpatory DNA test results at trial.**

Having decided not to challenge the admissibility of Cellmark's inculpatory test results, Murphy proceeded to present a two-part response to those results at trial. Rather than attacking Cellmark's scientifically unreliable results directly or disputing that Greineder's DNA was on the knife and brown work gloves presumably used by the killer, Murphy offered the jury a theory (secondary transfer) as an innocent explanation of how the ostensible presence of the defendant's DNA on those items did not necessarily implicate him in the crime. In addition, the defense offered evidence that there were DNA alleles on those items and others attributable to someone other than Dirk or Mabel Greineder, suggesting the possible presence of some other person at the scene.

Murphy relied upon two witnesses, Krane and Taylor, to present the innocent transfer theory to the jury. Krane testified that it was possible that the presence of Greineder's DNA on certain evidentiary items could have resulted from secondary transfer, rather than from his direct contact with those items. *Tr.*  XXII/58-82. Taylor was permitted to testify that he had conducted some transfer experiments and to respond to hypothetical questions establishing the possibility that innocent transfer could explain the presence of Greineder's DNA on the brown work gloves used by Ms. Greineder's attacker. *Tr.* XXII/218-236. The specific details and results of Taylor's transfer experiments were excluded, and Taylor conceded on cross-examination that none of his transfer studies had been published or subjected to external peer review. *Id.* at 240-241.

Murphy presented evidence respecting the presence of third-party alleles on some of the

items analyzed by Cellmark through cross-examination of Dr. Cotton and the testimony of Professor Krane. Neither electropherograms which Dr. Davis had prepared from Cellmark's raw data nor printouts of the raw data contained on the CD-Rom produced by Cellmark showing low-RFU peaks not attributable to Dirk or Mabel Greineder were admitted into evidence. Rather, the court required Murphy to use hypothetical questions in examining Dr. Cotton about them. *Tr.* XIII/106-111. On cross-examination, Krane conceded that he had only been involved in the case briefly, that he was not a forensic scientist, and that he had never conducted forensic testing. *Id.* at 99-111.

Murphy did not ask Dr. Cotton a single question about Cellmark's lack of validation studies, its inadequate interpretation guidelines, its uniqueness in making allelic calls as low as 40 RFUs, or its flawed statistical analysis. He did not ask Krane or Taylor about those subjects, either. Nevertheless, in closing argument, Murphy belatedly sought to cast doubt upon the scientific validity of Cellmark's testing:

> Are you satisfied with the work that Cellmark did in this case.... Is that the kind of science that you expect to have before you consider whether to convict someone of murder?

*Tr.* XXV/43.

Murphy testified that if the trial had been continued for six months, he would have been able to find a DNA forensic scientist to replace Dr. Davis as a witness, but decided not to seek a continuance. Murphy explained that Greineder was eager to go to trial, Greineder's daughter, Kirsten, was getting married in August 2001, and Murphy was worried that she would be unavailable to attend the trial if it were continued. Yet Kirsten never told him she would be unable to be present at her father's trial if the trial date were postponed. *Tr.* (8/14/06)/900-904.

### g.    The motion judge's decision.

The motion judge stated that he was "not persuaded" that Cellmark's test results were

excludable as scientifically unreliable, and that he would most likely have rejected a *Lanigan* challenge to Cellmark's test results "despite the serious issues raised by Dr. Eisenberg." *Findings of Fact, Rulings of Law, and Order on Defendant's Amended Motion for New Trial, 54* (*2009 R.* 965) Accordingly, defense counsel could reasonably conclude that a *Lanigan* motion would probably fail, and his decision not to file such a motion was not manifestly unreasonable when made on April 17, 2001. The motion judge further concluded that Murphy's decision not to retain an expert in DNA statistics was not manifestly unreasonable "given that the DNA results were only one of numerous pieces of incriminating evidence in the case against the defendant." *Id.* at 57, (*2009 R.* 968).  The judge concluded that Murphy's failure to seek a continuance of trial to retain a new DNA forensic scientist to testify as a defense expert was reasonable given "the likelihood that further delay would result in the loss of support and presence at trial of the defendant's eldest daughter, Kirsten." *Id.*

### h.  The SJC's decision.

The SJC affirmed the motion judge's decision. *Commonwealth v. Greineder*, 458 Mass. 207 (2010), finding that the motion judge's conclusion was supported by the record and was not an abuse of discretion because even though LCN mixtures were at issue, Cellmark's analysts were capable of considering and accounting for issues of stutter and dropout based on their experience and expertise, and the issues raised by the defense expert went to weight rather than admissibility.  "We conclude that the judge did not abuse his discretion or commit other error of law in concluding that the defendant probably would not have prevailed on a pretrial *Lanigan* motion."  As to the handling of the DNA evidence at trial, the SJC found that the third party culprit defense did not "fall flat," the decision not to request a continuance was reasonable in light of the risk of losing Kirsten's presence, and the decision not to retain a statistics expert was not manifestly unreasonable, so the motion judge's findings and conclusions were not an abuse of discretion. *Id.*

### 2.    Summary of Applicable Law.

#### a.    Exclusion of unreliable scientific evidence.

The admission of unreliable evidence against a criminal defendant may violate his constitutional right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article XII of the Massachusetts Declaration of Rights. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 112 (1977); *Commonwealth v. Johnson*, 420 Mass. 458, 461-463 (1995). In Massachusetts, under *Lanigan* and its progeny, the trial judge serves as a "gatekeeper" in making a "preliminary assessment" of whether proffered scientific evidence is sufficiently reliable to be admitted at trial. The gatekeeper role encompasses, not only the underlying scientific principles and methodology, but also whether those principles and methodology were applied in a scientifically-valid fashion. *E.g. Commonwealth v. McNickles*, 434 Mass. 839, 850 (2001). Scientifically unreliable evidence must be excluded "because evidence of this character has too great a potential for affecting a jury's judgment." *Commonwealth v. Curnin*, 409 Mass. 218, 222 n.7 (1991).  The admissibility of DNA test results should be determined on a case-by-case basis, *Commonwealth v. Mathews*, 450 Mass. 858, 871 (2008), and novel applications of an otherwise reliable technique "must be independently tested against the *Lanigan-Daubert* standard." *Commonwealth v. Patterson*, 445 Mass. 626,655 (2005). In this context, a judge must determine as a threshold matter, "whether the testing was properly performed." *Id.* at 647-648.

#### b.    Ineffective assistance of counsel.[53]

Every criminal defendant is guaranteed effective assistance of counsel by the Sixth and Fourteenth Amendment to the United States Constitution. *Strickland*, 466 U.S. 668. Claims of ineffective assistance of counsel are evaluated under a two-pronged test.  The first prong is whether

---

[53]    This summary applies to all of Greineder's ineffective assistance claims.

counsel's performance was seriously and objectively deficient, measured against a objective standard of reasonableness. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 687-691. The second prong requires a showing of prejudice: "The defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonably probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. *See Wiggins*, 539 U.S. at 537 (findings prejudice where there was "a reasonable probability that at least one juror would have struck a different balance").  "'*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced.'" *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (*citation omitted*).

The First Circuit has held that Massachusetts law respecting ineffective assistance of counsel under *Commonwealth v. Saferian*, 366 Mass. 89 (1974), is at last as protective of defendants as the federal standard, and therefore the First Circuit "presume[s] the federal law adjudication to be subsumed within the state law adjudication." *Teti v. Bender,* 507 F.3d 50, 56 (1st Cir. 2007)(internal citation omitted); *Ouber v. Guarino*, 293 F.3d 19, 32 (1st Cir. 2002) ("for habeas purposes, *Saferian* is the functional equivalent of *Strickland*).

Trial counsel has a duty to conduct an adequate, independent investigation of any scientific evidence the Commonwealth seeks to rely upon to prove the defendant's guilt.  *Strickland*, 466 U.S. at 691. Failure to consult with an expert witness may constitute ineffective assistance of counsel. *Dugas*, 428 F.3d at 328. Unless counsel attempts to determine whether the findings and conclusions of the Commonwealth's experts are accurate, he simply has no way of making a reasonable tactical judgment. *See, e.g. Showers v. Beard*, 635 F.3d 625 (3rd Cir. 2011)(counsel ineffective in failing to enlist expert witness to rebut prosecution's expert on key issue and relying instead on ill-informed

cross-examination of prosecution's expert).[54]  The failure of trial counsel to file and litigate a pretrial

motion may constitute ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 385-

386 (1986) (attorney failed to make obvious and meritorious objection to tainted evidence).  Defense

counsel has a clear duty to seek to exclude inadmissible evidence harmful to the defendant's case.

*See, e.g.*, *Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011) (counsel ineffective for failing to file motion

to suppress, which, if it had been made, the trial court would have little choice but to grant).[55]  The

defendant has the burden to demonstrate a likelihood that the motion would have been successful

if filed, and that having prevailed, there is a reasonable likelihood that the verdict would have been

different absent the excludable evidence. *Kimmelman*, 477 U.S. at 375.

### 3.    Application of Law to Facts.

The SJC's determination that defense counsel was not ineffective was an objectively

unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984) for the reasons below.

---

[54]    *See also Bell v. Miller*, 500 F.3d 149 (2nd Cir. 2007)(trial counsel ineffective in failing to consult with a medical expert to ascertain the possible effects of trauma and pharmaceuticals on key prosecution witness); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007)(trial counsel ineffective in relying on defense expert's opinion to forego defense without "consult[ing] with that expert to make an informed decision about whether . . .[the] particular defense . . . was viable"); *Sanders v. Ryder*, 183 Fed. Appx. 666 (9th Cir. 2006)(counsel ineffective in failing to consult or hire a child abuse interview expert regarding proper interview techniques or a DNA expert); *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005)(counsel failed to obtain forensic examination of physical evidence that would have contradicted state's theory of how fatal shooting occurred); *Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004) (counsel failed to consult a ballistics expert); *Pavel v. Hollins*, 261 F.3d 210 (2nd Cir. 2001) (counsel's failure to call expert could not be deemed strategic because counsel failed to consult with expert beforehand and lacked "education [and] experience necessary" to make determination without advice from expert).

[55]    *See also Gentry v. Sevier*, 597 F.3d 838 (7th Cir. 2010) (counsel ineffective in "failing to move to suppress or object to the admission of ...evidence" on 4th Amendment grounds); *Thomas v. Varner*, 428 F.3d 491 (3rd Cir. 2005) (counsel ineffective in failing to file meritorious motion to suppress identification evidence); *Owens v. United States*, 387 F.3d 607 (7th Cir. 2004)(counsel's motion to suppress tangible evidence erroneously forfeited meritorious claim); *A.M. v. Butler*, 360 F.3d 787 (7th Cir. 2004) (counsel ineffective in failing to move for suppression of confession, *inter alia*, as fruit of unlawful arrest); *Joshua v. Dewitt*, 341 F.3d 430 (6th Cir. 2003) (counsel ineffective in failing to litigate 4th Amendment issue, which reasonable trial attorney would have raised, given that "there is nothing in the record to reflect that...trial counsel considered and declined to raise [issue]...for strategic reasons"); *Northrup v. Trippett*, 265 F.3d 372 (6th Cir. 2001)(counsel ineffective in failing to file meritorious motion to suppress evidence; claim of strategic judgment rejected because "it is difficult to imagine what tactical advantage, or cost, could justify [counsel's] decision").

### a. Defense counsel blundered in failing to move to exclude the Commonwealth's scientifically unreliable DNA results.

Cellmark's DNA test results, purporting to link Greineder to the knife and brown work gloves used by Ms. Greineder's killer, provided powerful support for his conviction. Faced with such obviously damaging evidence, it was incumbent upon defense counsel to explore grounds for excluding it at trial and to seek to do so if such grounds existed. Here, counsel had several compelling arguments available to keep Cellmark's inculpatory test results out. His own experts had told him that Cellmark's work in this case was grossly deficient in numerous respects and stretched the technology beyond the point of scientific reliability.  He knew that Cellmark had failed to validate allelic calls below 100 RFUs, that necessary controls were missing, that Cellmark had fiddled with the results, and that its statistical analysis was improper. He knew of no published court decision endorsing the kind of LCN work Cellmark had performed. Indeed, in a file memorandum he wrote shortly before electing not to file a *Lanigan* motion, Greineder's counsel wrote that Cellmark's flawed work **"seems to me to be a powerful argument against admitting the results**...." Tr. (8/14/06)/58, *Tr.* (9/13/06)/71, Hg. Ex. 15D. (*emphasis added*)

The exhaustive post-conviction analysis of Cellmark's work in this case carried out by Dr. Eisenberg and Dr. Brenner conclusively established the scientific invalidity of that work and the unreliability of Cellmark's test results.  Dr. Eisenberg demonstrated that Cellmark's interpretation of LCN DNA mixtures  at an RFU peak detection threshold below 100 was unreliable, unscientific, improperly validated, and unfairly biased against Greineder. Indeed, Cellmark's approach was "the antithesis of proper scientific practice."*Eisenberg Aff.* 62 (*2009 R.* 434).

The unreliability of Cellmark's test results also permeated the statistical analysis presented to the jury. As Dr. Brenner explained in his uncontroverted affidavit, Cellmark's statistical analysis "violated basic scientific principles" and was "scientifically invalid." According to Dr. Brenner, there

was "no objective way to quantify accurately the random match probability on the right-hand work glove and other pieces of evidence tested by Cellmark." *Brenner Aff.* 12-13 (*2009 R. 269-270*). While Greineder's trial counsel never bothered to retain a statistical expert, he was aware that Cellmark's statistical analysis was improper. *Tr.* 9/13/06, 69-70.

None of the five justifications offered by Murphy for his failure to file a *Lanigan* motion to exclude the DNA results withstands scrutiny. First, Murphy testified that he believed on April 17, 2001 that a motion to exclude Cellmark's results as scientifically unreliable was "unlikely to be successful." *Tr.* 8/14/06, 131. Yet based upon his knowledge of Cellmark's seriously-flawed work in this case, that prediction was utterly baseless. Murphy knew that Cellmark had not validated its testing of mixtures below 100 RFUs, that reducing its RFU threshold from 100 to 40 was both unprecedented and unjustifiable, and that the RFU threshold employed by Cellmark was substantially below that employed by other forensic laboratories or recommended by the manufacturer. Murphy's own experts were sharply critical of Cellmark's work and advised him that Cellmark had engaged in improper analysis and bad science. Moreover, he knew of no reported court decision upholding the admission of DNA test results utilizing such a low RFU threshold in analyzing mixtures.

Under these compelling circumstances, Murphy had ample reason to believe that a motion to exclude Cellmark's test results was meritorious and would thus be allowed by a fair judge. At the very least, all allelic calls by Cellmark based upon peaks below 100 RFUs were ripe for exclusion. Clearly, the filing of a *Lanigan* motion in this case would not have been an exercise in futility, and Murphy's apparent belief to the contrary was manifestly unreasonable.

Second, Murphy testified that even if he had succeeded in excluding all allelic calls under 100 RFUs, the jury still would have heard DNA results that "conclusively linked" the right-hand work glove to Greineder based solely on peaks above 100 RFUs. *Tr.* (9/13/06)/79-80. According to

Dr. Eisenberg, Murphy is wrong. The reality is that virtually all of the peaks relied upon by Cellmark to associate Greineder with the DNA recovered from the key three pieces of evidence were less than 100 RFUs. *Supplemental Affidavit of Arthur J. Eisenberg, Ph.D.* (11/3/06), ¶6; *2009 R.* 685. With respect to the right-hand work glove specifically mentioned by Murphy, Dr. Eisenberg reviewed Cellmark's results locus-by-locus, concluding that "the only scientifically justifiable conclusion that can be reported is that Mabel Greineder must not be excluded as a potential contributor..." and that the results over 100 RFUs do not implicate Dirk Greineder at all. *Id.*, ¶¶8-12, *2009 R.* 686-689.

Murphy's third justification for failing to file a *Lanigan* motion to exclude Cellmark's DNA test results was that such a motion would give the Commonwealth and its witnesses a helpful preview of the defense Murphy was planning to spring at trial. Yet, at trial, defense counsel failed to challenge the scientific reliability of Cellmark's testing before the jury. In cross-examining Dr. Cotton, Murphy did not ask a single question about Cellmark's lack of validation studies for calling allelic peaks and DNA mixtures at less than 100 RFUs, its absence of specific criteria for lowering the RFU threshold from 100 to 40, its lack of substrate controls, or its flawed statistical analysis. Accordingly, filing a *Lanigan* motion challenging the admissibility of Cellmark's DNA test results would not have revealed Murphy's trial strategy since he did not attack those results during trial. In any event, if the effect of filing such a motion would be to render the prosecution's inculpatory DNA test results inadmissible, any clues about how defense counsel was planning to combat the evidence at trial would be rendered academic.

Fourth, Murphy testified that a successful motion to exclude Cellmark's allelic calls under 100 RFUs would have undermined the defense strategy of suggesting that a third person was present at the scene of Ms. Greineder's death. Indeed, Murphy opined that the exclusion of such allelic calls would have "largely eliminated the stranger DNA argument...." *Tr.* (9/13/06)/79. There are several

critical flaws in Murphy's analysis. As Dr. Eisenberg pointed out in his supplemental affidavit, the defense ultimately failed at trial to demonstrate the presence of a significant number of "stranger alleles" on any of the three key items of evidence. Rather, only one such allele was identified on each item. *Supplemental Affidavit of Arthur J. Eisenberg, Ph.D.*, ¶¶13-14; *2009 R*. 689-690. Moreover, as Murphy himself conceded, *Tr.* (9/13/06), p. 87, the defense could have presented its "stranger allele" argument based entirely upon peaks identified by Cellmark and found on Ms. Greineder's blue gloves -- peaks in excess of 100 RFUs.

On any rational assessment of the case, Murphy's planned "stranger allele" argument, relying upon a smattering of unidentified alleles to suggest that a third person may have been present at the scene, paled in significance when compared to the highly incriminating force of the Commonwealth's evidence linking Greineder's DNA to the knife and brown work gloves. Murphy acknowledged that there were "far fewer alleles attributed by the defense to a stranger than there were alleles attributed by the prosecution to Dr. Greineder" on those key items of evidence. *Id*. at 88. Even if the jury could have been persuaded that a third person may have been present, that would not have exculpated Greineder. On the other hand, if the defense had successfully moved to exclude Cellmark's low-RFU, inculpatory results on the knife and brown work gloves, there would have been no provable connection between Greineder and those pieces of evidence, fatally weakening the Commonwealth's case. In sum, anything the defense had to lose by forfeiting its ability to rely on a handful of low-RFU allelic calls was vastly outweighed by what the defense would have gained by eliminating all such calls at trial.

Finally, Murphy testified that he didn't retain an expert in DNA statistics or challenge the admissibility of Cellmark's test results on that basis because he believed that any statistical calculation would still have significantly inculpated Greineder. *Tr.* (8/14/06)/158. Yet by not

bothering to retain a statistical expert to review Cellmark's work, Murphy failed to discover that Cellmark's statistical analysis "violated basic scientific principles" and was "scientifically invalid." *See Brenner Aff*; *2009 R*. 266.  If Brenner is correct (and the Commonwealth presented no evidence controverting his opinion), then Cellmark's inculpatory test results in this case would have been subject to exclusion on that ground as well. Accordingly, Murphy's decision to forego filing a viable *Lanigan* motion under these circumstances was manifestly unreasonable.

In his decision denying Greineder's motion for a new trial, Judge Chernoff concluded that the bulk of Dr. Eisenberg's criticisms went to the weight, not the admissibility, of Cellmark's DNA test results. *Findings of Fact, Rulings of Law, and Order on Defendant's Amended Motion for New Trial, 53* (*2009 R*. 964).  Accordingly, Judge Chernoff stated: "[T]his Court, in its discretion, would most likely have rejected a *Lanigan* challenge to Cellmark's test results in this case, despite the serious issues raised by Dr. Eisenberg." *Id. 54*  (*2009 R*. 965).[56] Based on the record before him, however, Judge Chernoff's conclusion is an unreasonable determination of the facts in light of the state court record. If Dr. Eisenberg is correct in his analysis, Cellmark's application of DNA technology in this case was scientifically invalid and unreliable.[57] Under *Lanigan* and its progeny, a motion to exclude such junk science would properly have been allowed.[58]

---

[56]    Judge Chernoff does not appear to question Dr. Eisenberg's credibility or doubt his conclusions. Since Judge Chernoff denied Greineder's motion to call Dr. Eisenberg as a witness at the evidentiary hearing, this Court is in as good a position as Judge Chernoff to consider the substance of Dr. Eisenberg's affidavits, as well as the affidavit of Dr. Brenner and those proffered by the Commonwealth.

[57]    Th SJC's decision in *Commonwealth v. Gaynor*, 443 Mass. 245, 263-270 (2005) is not to the contrary. In *Gaynor*, "only test results based on a single source of DNA" or results yielding "strong evidence of a primary contributor" were used. *Id.* at 251. In this case, by contrast, Cellmark interpreted LCN mixtures containing extremely weak signals from a putative secondary contributor, stretching DNA technology well beyond validated, reliable limits.

[58]    At least two courts have recently excluded LCN STR-based DNA test results from admission into evidence at trial on the basis of scientific unreliability. *United States v. McCluskey*, 954 F.Supp.2d 1224 (D.N.M. 2013); *People v. Collins*, 2015 WL 4077176 (N.Y. Sup. July 2, 2015).  In *McCluckey*, the court noted, *inter alia*, that "[a] number of leading authorities in the field take the position that LCN testing is not reliable" and that "[m]ost laboratories in the U.. Do not perform LCN testing."  954 F.Supp.2d at 1280, 1277.  The court observed that such testing is carried out by the New York City Office of Chief Medical Examiner ["OCME"], but that the OCME uses special procedures (continued...)

Judge Chernoff's conclusion that Murphy's decision to eschew a motion challenging the admissibility of Cellmark's test results was defensible for tactical reasons is completely beyond the pale. This evidence was devastating to the defense, and none of Murphy's proffered justifications passes muster. Any reasonable lawyer faced with the choice of keeping this highly inculpatory evidence out of the trial or trying to make the best of it would choose the former over the latter. Any other choice, whether viewed in foresight or in hindsight, would be manifestly unreasonable.

> **b.** **Defense counsel blundered in failing to challenge the Commonwealth's DNA evidence or call a DNA forensic scientist and statistical expert to testify at trial.**

Having failed to prevent the Commonwealth from introducing Cellmark's highly inculpatory DNA test results at trial, Murphy compounded that error by failing to challenge or attack that evidence before the jury. The forensic scientist who was supposed to spearhead the defense response to DNA evidence at trial, Dr. Davis, was jettisoned by trial counsel and never replaced. Instead, Murphy chose to rely upon Professor Krane, who was not a forensic scientist and had been retained only just before trial. Krane had never done forensic testing, utilized the software or hardware employed by Cellmark, or reviewed Cellmark's validation studies. He was thus in no position to critique Cellmark's work and didn't even try to do so. To make matters worse, the defense failed to challenge Cellmark's scientifically invalid statistical analysis at trial, either on cross-examination of Dr. Cotton or by presenting an expert in DNA statistics. As in *Leonard v. Michigan*, 256

---

[58](...continued)

for such testing, including the use of 31 amplification cycles rather than the standard 28. *Id.* In the instant case, as in *McCluckey*, Cellmark's own validation studies did not support the reporting of the LCN test results. *See Eisenberg Affidavit* at 51-52, 62.

In *Collins*, the court stated that with the exception of the OCME, "no American laboratory produces high sensitivity [aka LCN] conclusions for use in a criminal case." The court in *Collins* concluded that the special procedures employed by the OCME for such testing were not recognized as sufficiently reliable to warrant admissibility at trial. *But see, e.g., United States v. Morgan*, 53 F.Supp.3d 732 (S.D.N.Y. 2014) (admitting such evidence). The *Collins* court also noted that even the prosecution experts acknowledged that "moving from standard DNA analysis to high sensitivity analysis means crossing a border to a different world." *Slip. Op.* at 8, 14. Yet Greineder's trial counsel never even bothered to challenge the admissibility of such evidence, which would properly have been excluded.

F.Supp.2d 723, 730 (W.D.Mich. 2003), counsel's cross-examination of the Commonwealth's expert "was minimal and failed to address any areas of controversy, such as methodology, lack of expertise, or bias." As a result, Cellmark's biased, scientifically unreliable, yet highly inculpatory test results were essentially unchallenged at trial.

Trial counsel's alternative plan to address Cellmark's DNA test results was utterly lame, hence manifestly unreasonable. Since Dr. Davis wasn't called as a witness, the electropherograms she had prepared to illustrate the "stranger allele defense" were not admitted into evidence. That defense, which relied upon a smattering of low-RFU alleles, fell flat. Taylor's DNA experiments illustrating secondary DNA transfer were also excluded, so that defense theory was significantly weakened as well. Counsel's decision to pin his client's fate on inadmissible exhibits and experiments and to forego a powerful attack upon the Commonwealth's most incriminating evidence cannot be defended under any standard of review.

Judge Chernoff's justifications for Murphy's failure to retain a substitute for Dr. Davis and a statistical expert to testify at trial are not supported by the record and should be rejected. The motion judge says it was reasonable for Murphy to eschew a continuance based upon his fear that Greineder's eldest daughter, Kirsten, would attend trial in May and June, but not after her August wedding. *Findings of Fact, Rulings of Law, and Order on Defendant's Amended Motion for New Trial, 57* (*2009 R.* 968). Yet Murphy admitted that he never asked Kirsten if she would refuse to attend her father's trial if a continuance were necessary, and his fears on that front were entirely speculative, hence unreasonable.

Judge Chernoff concluded that Murphy's decision not to retain a statistical expert was not manifestly unreasonable "given that the DNA results were only one of numerous pieces of incriminating evidence in the case against the defendant." *Id.* 57 (*2009 R.* 968). That is hardly an

excuse for failing to challenge the most incriminating evidence in the case. Murphy's negligence was a clear abdication of his responsibilities to his client.

### c.    Greineder was prejudiced by defense counsel's blunders.

There can be no doubt that the admission of Cellmark's inculpatory DNA test results at trial contributed significantly to Greineder's conviction. The Commonwealth's case was entirely circumstantial and depended largely upon forensic evidence, particularly DNA. Accordingly, Greineder is entitled to constitutional relief if a pretrial motion to exclude at least a substantial portion of those results would have been meritorious. He is also entitled to relief if Murphy's failure to challenge the DNA test results at trial deprived him of a substantial defense.

Assessing the appropriate outcome of a *Lanigan* motion at this juncture requires the Court to consider and weigh the affidavits filed by Dr. Eisenberg (*2009 R.* 472-682) and Dr. Brenner (*2009 R.* 258-276) on one hand and those filed by Dr. Cotton (*2009 R.* 700-720) and Ms. Sgueglia (*2009 R.* 721-735) on the other.  Since the motion judge refused to hear live expert testimony, this Court is in as good a position as the motion judge to make that assessment. Dr. Eisenberg's devastating critique of Cellmark's work remains unrebutted, and Dr. Brenner's critique of Cellmark's statistical analysis hasn't been addressed at all. Accordingly, this Court should conclude that a *Lanigan* motion to exclude all of Cellmark's inculpatory DNA test results (or at least those relying on allelic calls based on peaks under 100 RFUs) would properly have been allowed, as would a motion to exclude Cellmark's statistical analysis of those results.

Moreover, this Court should conclude that Greineder was further prejudiced by Murphy's failure to challenge the scientific validity of Cellmark's inculpatory test results before the jury. Cellmark's testing was highly vulnerable to attack, but such an attack never took place. Greineder was deprived of the effective assistance of counsel, and he is entitled to relief.

### d. This Court should grant *habeas* relief.

The SJC's determination that defense counsel was not ineffective in failing to move to exclude the DNA results and in addressing the DNA at trial was an objectively unreasonable application of *Strickland*, 466 U.S. 668. The process which produced the DNA test results that inculpated Greineder, a cornerstone of the Commonwealth's case, was riddled with serious flaws and such unreliable DNA test results never should have been presented to the jury. Accordingly, it is this Court's duty, upon strict application of the relevant constitutional principles, to grant *habeas* relief.

### B. Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to File a Meritorious Motion to Suppress the Nails Receipt.

#### 1. Statement of Relevant Facts.

##### a. Pretrial and trial proceedings.

On November 12, 1999, Trooper Foley filed an application and affidavit for a search warrant of the Greineder home, seeking, *inter alia*:

> ... a cake pan, containers of lighter fluid, trash and/or plastic bag type containers, **receipts for any of the above**....

*Affidavit in Support of Application for a Search Warrant*, ¶ 2; *2009 R.* 335. (*emphasis added*).

The magistrate issued the requested search warrant, which read, in relevant part:

> YOU ARE THEREFORE COMMANDED within a reasonable time ... to search for the following property:
>
> ... **receipts, and/or other evidence of financial transactions**, zip-lock bags, lighter fluid, cake or loaf pans, latex gloves, the packaging of any of these materials....

*Search Warrant*, *2009 R.* 349. (*emphasis added*). One item seized was a Diehl's Hardware receipt for nails dated September 3, 1999 (hereinafter "nails receipt"). *See Return of Officer*, *2009 R.* 350.

The defendant filed a Motion to Suppress Physical Evidence on July 10, 2000, arguing, *inter alia*, that the lack of specificity in the warrant made it an unlawful general warrant, and that all

evidence seized during the execution of the search warrant should be suppressed.  *See* Defendant's Post-Hearing Memorandum at 3. *2009 R.* 28.

In its October 18, 2000 Memorandum of Decision, the court concluded that the November 12 warrant was a general warrant with respect to certain items. It wrote:

> **[T]he Court concludes that the November 12th search warrant is a general warrant as far as its mandate to search and seize "computers and terminals, receipts and/or other evidence of financial transactions."** It is not a general warrant as to the stated items including "zip-lock bags, lighter fluid, cake or loaf pans, latex gloves, the packaging of any of these materials, checks or cancelled checks, as well as tool mark impressions."

Memorandum of Decision at 39 (*emphasis added*), *2009 R.* 68.  The court observed:

> Given their descriptions in the affidavit, the items listed in the warrant were capable of more specificity. The warrant does not limit the search of the computer(s) and the search of the financial transactions, including the receipts, to the acquisition of stated items (i.e. cake pans, lighter fluid, etc.), but would seem to allow on its face an open-ended search of computers and financial records. To this extent, the warrant is a general warrant.

Id. at 45, *2009 R.* 74.

The court found that the affidavit partially "cured" the unlawful general warrant, so suppression was not warranted for those items that were specified in the affidavit. *See id.* at 47-49, *2009 R.* 76-78. At the same time, the court found that certain enumerated items not listed in the affidavit were outside the scope of the warrant, and that the seizure of these items was not justified by the plain view doctrine as there was no "nexus between these items and the crime of murder or solicitation."  The court therefore suppressed these items. *Id.* at 59, *2009 R.* 88.

The issue of whether the nails receipt was validly within the scope of the warrant was not specifically argued by Greineder prior to trial. *Id.* at 38 n.15, *2009 R.* 67. This was not surprising as neither Greineder nor the Commonwealth then had any reason to ascribe any probative value to the nails receipt. The Court briefly addressed a set of seized items which ostensibly included the nails

receipt in a footnote. It wrote:

> Although not specifically argued by the defendant, this Court would also conclude that that the other items seized, including the loaf pans, the tin foil containers, the Diehl Hardware and Home Depot receipts, the Roche Brothers grocery bags, the plastic bag containing latex gloves, the box containing latex gloves, the boxes of Zip-Lock bags, the packaging for the EZ-Foil loaf pan, and the Roche Brothers receipt would fall under the scope of the warrant.

*Id.* at 49 n.24, *2009 R.* 78. (*emphasis added*)

Mid-trial, on June 4, 2001, the Commonwealth produced to the defense for the first time another receipt from Diehl's showing the purchase of an Estwing hammer on September 3, 1999, the same model as a bloody hammer found in a storm drain at Morse Pond. That receipt indicated that the hammer was bought within minutes of the purchase reflected on the nails receipt and at the same cash register. Defense counsel objected to this late-disclosed evidence, arguing that both receipts should be excluded because of the tardy production. *Tr.* X/5-10. The court refused to exclude the nail receipt, and it was introduced into evidence as Exhibit 236. Id. at 182; *2009 R.* 352.

### b.    Greineder's motion for new trial.

In his motion for new trial, Greineder argued that defense counsel was ineffective in failing to file a meritorious motion to suppress the nail receipt once its evidentiary value to the Commonwealth became clear. Under the logic of the court's prior suppression decision, a motion to suppress would have been successful since the search warrant was a general warrant with respect to the nails receipt, that receipt was not listed in the search warrant affidavit, and its incriminating character was not "immediately apparent" at the time of the seizure. *2009 R.* 204-212.

### c.    Testimony at post-trial hearing.

Murphy testified that, prior to trial, he did not regard the nails receipt as being a "particularly significant piece of evidence." *Tr.* 5/30/06, 68. When the Commonwealth informed him during trial that it had been able to link the nails receipt to the purchase of an Estwing hammer, Murphy

recognized that the nails receipt had become highly significant, and he objected to its admission on grounds of late disclosure. *Id.* at 71. However, he did not move to suppress the receipt on constitutional grounds or ask the Court to reconsider its prior ruling. He acknowledged that he did "not recall thinking about the nails receipt in Fourth Amendment terms after the trial started." *Id.* at 73. He had "no recollection of making a conscious evaluation about whether I ought to renew or seek to...ask the Judge to reconsider or to file a motion for reconsideration." *Tr.* 7/5/06, 22. Murphy stated that based on the court's reasoning, the receipt should have been excluded. *Id.* at 19.

### d.      The motion judge's decision.

In his decision, the motion judge concluded: "[T]his Court cannot say with certainty whether it would have allowed such a [suppression] motion." He reasoned that it might have concluded that the nails receipt was within the scope of the warrant. He noted that, based on its footnote that admittedly "could have been clearer," defense counsel could have concluded that the nails receipt had *already* been ruled admissible, and that the court would not have reconsidered the issue. The judge went on to acknowledge that there is a "serious argument that seizure of the nails receipt was not within the scope of the warrant," and that he "might have" allowed a motion to suppress the receipt. *Findings of Fact, Rulings of Law, and Order on Defendant's Amended Motion for New Trial* at 34-37; *2009 R.* 945-948.

The motion judge rejected the defendant's ineffective assistance argument, holding that even if the nails receipt itself were suppressed, the jury would have nonetheless "learned of its existence and contents." Specifically, he asserted, the Commonwealth could have presented *testimony* regarding the contents of the receipt, even to the extent of using the receipt itself to refresh the witness's recollection of its contents. *Id.* at 37; *2009 R.* 948. Moreover, the judge found that there was no reasonable possibility that the verdict would have been different had the nails receipt been

suppressed since the "nails receipt as evidence of guilt [was] tenuous at best," and it was not a "key piece" of evidence implicating the defendant. *Id.* at 36-38, *2009 R.* 947-949.

### e.        The SJC's decision.

In its decision, the SJC held: "We need not decide the question of the motion to suppress because we agree that regardless of its resolution there was no substantial likelihood of a miscarriage of justice." *Greineder*, 458 Mass. at 253. The SJC noted that the trial judge ruled even if Greineder would have prevailed on a motion to suppress the nails receipt, trial counsel's failure to file such motion would not have created a substantial likelihood of a miscarriage of justice (and therefore did not constitute ineffective assistance of counsel). The SJC noted that the trial judge had found that although the nails receipt created a strong inference that Greineder purchased the Estwing hammer minutes after the nails purchase, Greineder's son testified that he had purchased the nails. More importantly, according to the SJC, the motion judge found that the receipt was not a key piece of evidence because Greineder had purchased other items at the same hardware store, and the judge noted the strength of the Commonwealth's case. *Id.*

### 2.        Summary of applicable law.

### a.        Constitutional prohibition on general warrants.

Under the Fourth Amendment to the United States Constitution and Article XIV of the Massachusetts Declaration of Rights, search warrants must describe the articles to be seized with particularity. *See Commonwealth v. Valerio*, 449 Mass. 562, 566 (2007); *Commonwealth v. Cefalo*, 381 Mass. 319, 327 (1980); *United States v. Ferreras*, 192 F.3d 5, 10 (1st Cir. 1999); *see also* G.L. c. 276, §§1, 2. As the Supreme Court has written: "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n. 5 (1984); *Groh*

*v. Ramirez*, 540 U.S. 551, 558-560 (2007).  If a warrant lacks specificity as to the items to be seized, the fruits of that seizure must be suppressed.  *See, e.g., Commonwealth v. Forish*, 61 Mass. App. Ct. 554, 561 (2004).  For example, a warrant that merely authorized seizure of "[s]tolen handguns, jewelery [*sic*] and coins" was deemed an unlawful general warrant in *Commonwealth v. Rutkowski*, 406 Mass. 673, 674-675 (1990).  The Court noted that the "the generic reference in this case to items generally and lawfully available in our society ... fails to meet the minimum standard of particularity." *Id.* at 676.  A warrant that lacks a specific description of the items to be seized may be saved or cured if accompanied by an affidavit that gives a specific description of those items, if the affidavit is physically attached and is present when the search is executed.  *See Commonwealth v. Sheppard*, 394 Mass. 381, 390 (1985); *Valerio*, 449 Mass. at 567–568; *Forish*, 61 Mass. App. Ct. at 560–561.  In making the determination of whether suppression is required, the Court may consider whether the officers conducting the search believed their authority was limited to the items set forth in the affidavit, and therefore reached the same result as if the warrant had not been defective. *Sheppard*, 394 Mass. at 390. The Court can also consider whether the officers exploited, or attempted to exploit, the illegality of the warrant.  Id.[59]

### b. Standard of review under AEDPA.

While *habeas* relief is generally not available for Fourth Amendment claims, *Stone v. Powell*, 428 U.S. 465, 494 (1976), a petitioner may bring a Sixth Amendment claim arising from a Fourth

---

[59]     Even if a search warrant is invalid, a search or seizure may still be justified if it fits into one of the exceptions to the warrant requirement. One such exception is the plain view doctrine. *See Commonwealth v. Sleich-Brodeur*, 457 Mass. 300, 306 (2010). Under the Fourth Amendment to the U.S. Constitution, the plain view doctrine applies (1) where the police are lawfully in a position to view the object; (2) where the police have a lawful right of access to the object; and (3) in cases concerning (a) contraband, weapons, or other items illegally possessed, where the incriminating character of the object is immediately apparent, *Id., citing Horton v. California*, 496 U.S. 128, 136 (1990); *Commonwealth v. D'Amour*, 428 Mass. 725, 730-731 (1999); or (b) other types of evidence ("mere evidence"), where the particular evidence is plausibly related to criminal activity of which the police are already aware. *Id., citing Commonwealth v. Accaputo*, 380 Mass. 435, 5447 (1980); *Commonwealth v. Bond*, 375 Mass. 201, 206 (1978). Article 14 of the Massachusetts Declaration of Rights adds the requirement that the police come across the object inadvertently. *Id., citing Commonwealth v. Balicki*, 436 Mass. 1, 9-10 (2002) (declining to abandon inadvertence requirement).

Amendment issue if his counsel's failure to litigate the alleged Fourth Amendment violation adequately is the core of the ineffectiveness claim. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). To assert a meritorious claim of ineffective assistance of counsel based upon a failure to file a motion to suppress evidence, the petitioner must first establish that the underlying motion to suppress must itself have merit. *Id.* at 382. Second, the petitioner must establish that the result of the proceeding would have been different but for the excludable evidence. *Barry v. Ficco*, 392 F. Supp. 2d 83, 94 (D. Mass. 2005). On a *habeas* petition, the task before this Court is not to apply the *Strickland* test in the first instance but instead to determine whether the SJC's application of the test was "unreasonable." *Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."). The federal *habeas* court "look[s] to the 'last reasoned opinion' of the state court to discern the grounds for its decision. *Lee v. Corsini*, 777 F.3d 46 (1st Cir. 2015), citing *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).

3.       **Application of law to facts**

a.       **Trial counsel was deficient for failing to file a meritorious motion to suppress.**

The SJC never ruled on the merits of the motion to suppress issue, ruling that "We need not decide the question of the motion to suppress because we agree that regardless of its resolution there was no substantial likelihood of a miscarriage of justice." *Greineder*, 458 Mass. at 253. The SJC thus did not apply federal law or federal constitutional principles to this failure of counsel. In this case, the search warrant was an impermissible general warrant. Through this device, the Commonwealth took a host of materials from Greineder's home, hoping that further investigation might render them useful. This is precisely what the Constitution prohibits. While a general warrant may be cured by an affidavit that provides sufficient specificity, that principle does not apply to the seizure of the nails receipt because **the nails receipt was not mentioned in the affidavit**.

Accordingly, the nails receipt was subject to suppression as the fruit of an unlawful general warrant.

Trial counsel was constitutionally deficient for failing to move to suppress the nails receipt. As counsel testified at the hearing on the motion for new trial, he never even thought about filing a motion to suppress. Such inattention was not the result of a strategic decision based on investigation of all of the facts. *See Gentry*, 597 F.3d at 851-52 (counsel was ineffective in "failing to move to suppress or object to the admission of... evidence" on Fourth Amendment grounds); *Joshua*, 341 F.3d at 440 (counsel was ineffective in failing to litigate Fourth Amendment issues, which "reasonable trial attorney would have raised" based on applicable law and facts of the case, given that "there is nothing in the record to reflect that... trial counsel considered and declined to raise [issue] for strategic reasons.").

### b. The state court's determination that there was no prejudice was an unreasonable determination of the facts.

In denying Greineder's motion for new trial, the motion judge clearly erred in opining that even if the nails receipt were suppressed, the Commonwealth would have been able to present testimony by the seizing officers as to its contents. The essence of the exclusionary rule is that neither the object of an illegal seizure, **nor the fruits thereof**, may be introduced at trial against a defendant. *See Mapp v. Ohio*, 367 U.S. 643, 654-656 (1961); *Commonwealth v. Blood*, 400 Mass. 61, 77 (1987); 6 W.R. LaFave, *Search and Seizure*, §11.4, at 255 n.1 (4th ed. 2004) (evidence to be suppressed includes "not only the physical evidence discovered but also ... testimony about its discovery"). The motion judge's position effectively eviscerates the exclusionary rule. Additionally, the motion judge made a clear error in applying the state law. *See Taylor*, 366 F.3d at 1001 ("Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no presumption of correctness can attach to it."). Contrary to the motion judge's ruling, the officers could not have refreshed their recollection by use of the

receipt, since any use of illegally-obtained evidence, including to refresh recollection for testimony, is prohibited as fruit of the poisonous tree. *Commonwealth v. Woodbine*, 461 Mass. 720, 731 (2012) (before witness is permitted to testify concerning an event after his memory has been refreshed by his review of material that is suppressed due to violations of a defendant's rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, the judge must ensure that the Commonwealth has met its burden of establishing that the witness will not testify from a memory of the suppressed statement, which by definition is not to be placed in evidence, but from an independent memory of the separate event).

Contrary to the SJC's ruling, there is a reasonable likelihood that the verdict would have been different if the nails receipt had been suppressed. In closing argument, the prosecutor argued that the nails evidence was "important." *Tr.* 25/89-90. As the prosecutor stated, the receipt played an important part in the Commonwealth's circumstantial case, seeking to tie Greineder to a hammer which may have been used in the murder. While there was certainly other evidence presented at trial, none of it was overwhelming, and there is no way to determine what tipped the balance towards a guilty verdict. *Cf. United States v. Melvin*, 730 F.3d 29, 40 (1st Cir. 2013) (relying on prosecutor's closing argument to determine whether improperly admitted testimony was sufficiently important to the government's case so as to require vacatur of the defendant's conviction).

### c.    This Court should order *habeas* relief.

The SJC's determination that defense counsel was not ineffective in failing to move to exclude the DNA results and in handling the DNA at trial was an objectively unreasonable application of *Strickland*, 466 U.S. 668. Defense counsel's failure to move to suppress the nails receipt render his assistance constitutionally ineffective. Where defense counsel fails to made an obvious and meritorious objection to tainted evidence important to the state's case, *habeas* relief is warranted. *See Kimmelman*, 477 U.S. at 375 (1986).

**C.      Greineder's Trial Counsel Was Constitutionally Ineffective in Failing to File a Meritorious Motion to Suppress the Fruits of a Search of Greineder's Toyota Avalon.**

**1.      Statement of relevant facts.**

**a.      Search of Toyota Avalon in Greineder's driveway.**

On November 1, 1999, Trooper Foley applied for and obtained a warrant to search Greineder's residence at 56 Cleveland Road in Wellesley and Greineder's van, which was in police custody. The warrant authorized officers to search for various specified items of evidence, such as gloves, receipts for a knife or hammer, and bloody clothing or instruments. *2009 R.* 360.

The search warrant was executed on November 1st. At the beginning of the search, the keys to Greineder's Toyota Avalon (a different vehicle from the van) were seized by law enforcement. Det. McDermott and Det. Vargas spent 15-20 minutes searching the Avalon, which was parked in the driveway located in front of Greineder's garage. *Tr.* VII/107-111, 41-42; *Tr.* IX/116, 160.

**b.      Pretrial testimony.**

At a pretrial hearing, Trooper Foley testified that during the November 1st search, two investigators looked into the Avalon and saw a white towel that appeared to have bloodstains on it, but did not seize that towel. *Pr.Tr.* 7/18/00/94-96.

**c.      Defendant's use of towel at trial.[60]**

Greineder testified that his wife's nose began to bleed while the two stood in the driveway of their house on the morning of October 31, 1999. *Tr.* XX/47. Greineder reached into the Toyota Avalon and got a towel. *Id.* He put the dog into the van while his wife used the towel to clean up from her nosebleed. *Id.* at 52-53. As Greineder was getting the dog into the van, the dog bumped him and his nose began to bleed as well. *Id.* Greineder used the same towel to stanch the blood. *Id.* He gave that towel back to Ms. Greineder, and, when she was done with it, he "threw it [the towel] back

---

[60]      For reasons of clarity, the defense evidence on this issue is addressed first.

in the Toyota." *Id.* Greineder testified that he had brought the towel home from the Atlanta Ritz-Carlton. *Id.* at 48. Greineder turned the towel over to his attorney on November 5, 1999. *Id.* at 132. The towel was subsequently turned over to the Commonwealth pursuant to court order, and was introduced into evidence at trial as Exhibit 440. *Id.* at 48.

The towel provided a crucial link in the defense's DNA transfer theory. Bloodstains on the towel were found to contain DNA material matching both Ms. Greineder's and Greineder's profiles. Id. Defense expert Daniel Krane testified that Greineder's DNA could have been transferred to Ms. Greineder's face when she used that towel on the morning of October 31st. He further testified that Greineder's DNA could then have been transferred from Ms. Greineder's face to the knife found at the crime scene. *Tr.* XXII/98. This DNA transfer theory provided an innocuous explanation for some of the most damaging evidence in the case.

### d.  Commonwealth trial evidence regarding towel.

At trial, Det. McDermott stated that Exhibit 440 was not the towel she had seen in the Avalon on November 1, 1999. *Tr.* VII/42. Chief Cunningham, who was also present at the search, testified that he saw the towel McDermott looked at, and it did not have a Ritz-Carlton emblem on it. *Tr.* IX/160. No photographs were taken during the November 1st search of the Avalon. *Tr.* VII/111.

### e.  Claim of ineffective assistance of counsel respecting towel.

The defense did not move to suppress the fruits of the search of the Toyota Avalon, either prior to or during trial. In his motion for new trial, Greineder contended that his trial counsel was ineffective for failing to move to suppress the Commonwealth's testimony regarding the towel observed during the search, testimony that undermined the DNA transfer theory and cast grave doubt on Greineder's credibility. At the evidentiary hearing on the motion for new trial, Murphy testified that on November 5, 1999, Greineder turned over to him a bloodstained hand towel with a Ritz-Carlton logo on it. *Tr.* 5/30/2006/75. Greineder told him that both he and Ms. Greineder had bled

onto the towel on the morning of October 31, 1999. *Id.* at 76. Murphy put the towel in a paper bag and eventually turned it over to the prosecution in response to a court order. *Id.*

Murphy testified that the towel "was a significant item to the defense." *Id.* at 77. It corroborated Greineder's statements made shortly after Ms. Greineder's death about their simultaneous nosebleeds and shared use of the towel, and it supported the defense's DNA transfer theory which explained how Greineder's DNA could have innocently ended up on the gloves and knife allegedly used by the murderer. *Id.* at 78-79. Based on his conversations with Greineder, Murphy believed that this towel had been in the Toyota Avalon on November 1. *Id.* at 78. He realized that if the Ritz-Carlton towel had not been in the Avalon on November 1, it would "certainly suggest that [Greineder] was lying to a number of people, including a number of members of his close family about an event that was important to the defense." *Id.* at 79.

Murphy testified that prior to trial, he thought the officers' testimony on this subject would "actually [be] a piece of evidence that favored the defendant." *Id.* at 86. However, Murphy never asked McDermott during the suppression hearing to describe the towel that she had seen on November 1. *Id.* at 88. His explanation was that he did not realize that she was one of the two officers who had conducted the search and because he "liked the state of the record the way it was, and ... thought that it was good for the defense, and sometimes if you ask additional questions, you get answers you don't like." *Id.* at 89. Consequently, Murphy did not realize that McDermott was going to testify that the Ritz-Carlton towel was not the towel she had seen in the Avalon on November 1 until she so stated at trial. *Id.* at 11. This testimony surprised him. *Id.* at 28.

Although Murphy did not recall doing any legal research on whether the officers' observations could be suppressed, he understood that observations made during an unlawful search were subject to suppression. *Id.* at 25. He testified that it was unlikely that he researched the issue of whether the police could lawfully search the Avalon, though he thought that "if it [the Avalon]

was not in the garage, I would have suspected the police needed a separate search warrant for it." *Id.* at 25. Once McDermott testified at trial that she had seen a different towel in the Avalon, Murphy realized her testimony "wasn't directly helpful," and contradicted Greineder's subsequent trial testimony. *Id.* at 27, 28. Murphy believed that McDermott's trial testimony did present some opportunities for him to exploit in that the police had failed to take photographs during the November 1 search and McDermott's testimony was inconsistent with Sergeant Foley's. *Id.* at 29. Despite the harmful nature of McDermott's testimony about the towel at trial, Murphy did not consider the possibility of moving to strike it as the fruit of an unconstitutional search. *Id.* at 28.

### f.      The motion judge's decision.

The motion judge adopted the suppression argument made in Greineder's new trial motion, holding that the "driveway was not within the curtilage of 56 Cleveland Road," that the warrant "did not extend to the Toyota Avalon," and that the warrant was not justified under the automobile exception to the warrant requirement. *Findings* at 40; *2009 R.* 951. The judge concluded that "the November 1 search of the Avalon was unlawful and a motion to suppress the officers' observations of the dirty towel would have succeeded." *Id.*

The judge nonetheless found that counsel was not ineffective because "counsel recognized that the fruits of the Avalon search were suppressible," and "deliberately chose not to move to exclude that evidence." *Id.* The judge explained:

> [D]efense counsel wanted the jury to hear the testimony about the simultaneous nosebleeds, which was crucial to the defense's DNA transfer theory. This was a reasonable tactical decision. Once McDermott testified at variance with the pretrial testimony, defense counsel attempted impeachment with the prior testimony and argued that the conduct of the police with respect to the towel demonstrated a sloppy investigation. This strategy was not manifestly unreasonable.

*Id.* at 41; *2009 R.* 952.

-151-

g.      **The SJC's decision.**

The SJC concluded, like the trial judge, that counsel's decision to forego any challenge to the fruits of the search of the Toyota was "a reasonable tactical decision" and was "not manifestly unreasonable." *Greineder*, 458 Mass. at 255.

2.      **Summary of applicable law.**

a.      **Scope of a residential search warrant.**

A search warrant for a residence covers vehicles found within the curtilage of the residence but not those outside. *Commonwealth v. McCarthy*, 428 Mass. 871, 873 (1999). In *Commonwealth v. Simmons*, 392 Mass. 45, 48 (1984), the SJC held that a private driveway adjacent to a home where there was no clearly reasonable expectation of privacy was outside the curtilage.  *See McCarthy*, 428 Mass. at 874; *United States v. Dunn*, 480 U.S. 294, 301 (1987) (listing factors to be applied in determining whether driveway is within curtilage of home for Fourth Amendment purposes);*United States v. Diehl*, 276 F.3d 32, 38 (1st Cir. 2002); *Commonwealth v. Fernandez*, 458 Mass. 137, 145 (2010) ("the driveway in the present case was within the curtilage of the defendant's apartment").

b.      **Limited exception to warrant requirement for automobile searches.**

Under both the Fourth Amendment and Article XIV, police may not search an automobile without a warrant unless they can make a showing of probable cause and exigent circumstances. The Commonwealth must show that there is probable cause that the automobile contains contraband or evidence of a crime. *See Carroll v. United States*, 267 U.S. 132, 149 (1925); *Commonwealth v. Ortiz*, 376 Mass. 349, 353 (1978). The exigent circumstances requirement is met only when it is "impracticable" to obtain a warrant. *Commonwealth v. Alvarado*, 420 Mass. 542, 554 (1995).

c.      **Filing of motion to suppress during trial.**

While motions to suppress are generally required to be filed prior to trial, there is an

exception for a motion to suppress evidence that counsel could not anticipate would be introduced at trial. *See, e.g., Commonwealth v. Carter*, 39 Mass. App. Ct. 439, 440-441 (1995); *Commonwealth v. Watkins*, 33 Mass. App. Ct. 7, 13 n.6 (1992); Blumenson, Fisher, & Kanstroom, 2 *Massachusetts Criminal Practice* § 15.2D (1998 & Supp. 2001).

### 3.    Application of law to facts.

#### a.    Trial counsel was deficient in failing to file a meritorious motion to suppress.

Greineder's car was parked in his driveway, which was not within the curtilage of the house. As in *Simmons*, the driveway was openly visible from the public road and was the normal means of access to the house. There was no gate separating the driveway from the public road; there were no trees, fence or shrubbery shielding the driveway from the public road; and there were no "No Trespassing" signs posted. *See Simmons*, 392 Mass. at 47. Accordingly, the search warrant for the house did not authorize a search of the car. As the motion judge correctly concluded, *A.* 951, a motion to suppress the evidence obtained as a result of the car search would have been meritorious.

Once Detective McDermott testified that the towel she saw in the Avalon was not the Ritz-Carlton towel, defense counsel should have moved to suppress the fruits of the search of the Avalon and to strike her testimony. Counsel claims he had hoped McDermott's testimony would be helpful in corroborating Greineder's story. But once it was clear that McDermott's testimony about the search was harmful to the defense, counsel's failure to move to suppress and strike was grossly negligent. Under the circumstances, the court could properly have entertained a motion to suppress during trial.[61] There was no strategic reason not to file such a motion. By his own admission, counsel simply failed to consider doing so. As in *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), this failure "was the

---

[61]    While motions to suppress are generally required to be filed prior to trial, there is an exception for a motion to suppress evidence that counsel could not anticipate would be introduced at trial. *See, e.g., Carter*, 39 Mass. App. Ct. at 440-441; *Watkins*, 33 Mass. App. Ct. at 13 n.6; Blumenson, Fisher, & Kanstroom, 2 *Massachusetts Criminal Practice* §15.2D (1998 & 2001 Supp.). In this instance, defense counsel was surprised by McDermott's trial testimony.

result of inattention, not reasoned strategic judgment."

        **c.     The motion judge's reasoning and the SJC's affirmance were unreasonable.**

The motion judge's decision rejecting this claim rested on a faulty premise – that defense counsel's failure to move to suppress the evidence was a "deliberate" decision. A. 951. Similarly, the SJC ruled: "We conclude, as did the judge, that counsel's decision to forego any challenge to the fruits of the search of the Toyota was a reasonable tactical decision and was not manifestly unreasonable." *Greineder*, 458 Mass. at 255. However, counsel testified that he did **not** consider moving to suppress and strike the testimony in the middle of trial. Tr. (5/30/06)/28. Therefore, the motion court's conclusion and the SJC's affirmance of his conclusion that this was a strategic decision was unreasonable. *See, e.g., United States v. Mercedes-De La Cruz*, 787 F.3d 61, 67-69 (1st Cir. 2015) ("That a timely motion to suppress would likely have been meritorious and without repercussion to other defense strategies confutes any argument that counsel's failure to file such a motion was professionally reasonable"). In any event, any such decision would have been manifestly unreasonable once the damaging nature of Detective McDermott's testimony became clear.

        **d.     Counsel's failure to move to suppress was prejudicial.**

There is a reasonable likelihood that the verdict would have been different had the evidence regarding the towel been suppressed. The Commonwealth's case was based entirely on circumstantial evidence, and Greineder's testimony about the towel was the linchpin of the DNA transfer theory presented by the defense at trial. Testimony by Detective McDermott that the towel produced by Greineder was not the one observed in Greineder's vehicle during the search devastated Greineder's credibility by making him appear dishonest. Further, it completely undermined the defense's DNA transfer theory, making it look more like a concoction supported by fabricated evidence than a reasonable explanation of the otherwise-damning DNA test results. Greineder suffered substantial

prejudice and is entitled to relief.

### e.    This Court should order *habeas* relief.

The SJC's determination that defense counsel was not ineffective in failing to move to exclude the DNA results and in handling the DNA at trial was an objectively unreasonable application of *Strickland*, 466 U.S. 668.  In light of the DNA evidence, as discussed above, defense counsel's failure to move to suppress the towel was "a blunder in the first magnitude." *Owens*, 387 F.3d at 608. Nor was defense counsel's failure to file a motion to suppress a reasonable tactical decision because he never even thought to file one and, as discussed above, the defendant was prejudice thereby. As Judge Ponser has stated:

> The "prejudice" essential to a violation of the Sixth Amendment right to the effective assistance of counsel is not being convicted though one is innocent, although that is the worst kind; it is being convicted when one would have been acquitted, or at least would have had a good shot at acquittal, had one been competently represented.

*Owens*, 387 F.3d at 610. Because defense counsel failed to raise, let alone adequately litigate, a meritorious suppression motion, which resulted in the admission of seriously inculpatory evidence, *habeas* relief is warranted.

### D.    The Cumulative Effect of Counsel's Failures Amounted to Ineffective Assistance of Counsel Entitling Greineder to *Habeas* Relief.

If a court finds numerous deficiencies in a counsel's performance, it need not rely on the prejudicial effect of a single deficiency if the combined effect of all of counsel's deficiencies establishes prejudice.  *See Dugas*, 428 F3d. at 335 ("*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced," citing *Kubat v. Thierat*, 867 F.2d 351, 370 (7th Cir. 1989); *Gonzales v. McKune*, 247 F.3d 1066, 1078 n.4 (10th Cir. 2001)( "*Strickland* . . . makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong."); *Washington v. Smith*, 219 F.3d 620, 634-635 (7th Cir. 2000)("Evaluated individually, these errors may or may not have been prejudicial to [the

defendant], but we must assess the 'totality of the omitted evidence' under *Strickland*, rather than the individual errors"); *DeShields v. Shannon*, 338 Fed. Appx. 120, 2009 (3rd Cir. July 10, 2009)("cumulative effect of counsel's failures" amounted to ineffective assistance even if failures, "taken individually," would be insufficient).

Due to the combined effect of myriad mistakes by his lawyer, Greineder was deprived of effective assistance of counsel under the federal constitution, and his resulting murder conviction cannot be deemed fair or just.  Having failed to exclude the unreliable, inadmissible, inculpatory DNA test results, trial counsel also failed to effectively address those DNA results at trial.  He further failed to file a meritorious motion to suppress the directly inculpatory nails receipt, as well as failing to move to suppress the fruits of the search of Greineder's Toyota, consisting of testimony about a towel that severely undermined the defense transfer theory.  Without trial counsel's inexcusable failures, Greineder would have had a strong chance of acquittal.  The SJC's determination that defense counsel was not ineffective on the basis of these cumulative failings was an objectively unreasonable application of *Strickland*, 466 U.S. 668.  On the basis of the cumulative effect of trial counsel's failings, relief is warranted.

IV. **GREINEDER'S CONSTITUTIONAL RIGHT TO DISCLOSURE OF EXCULPATORY INFORMATION AND HIS RIGHT TO A FAIR TRIAL BASED ON RELIABLE EVIDENCE WERE DENIED BASED ON THE RECANTATION OF THE PROSECUTION'S FOOTWEAR EXPERT.**

A. **Statement of Relevant Facts.**

The Commonwealth's theory at trial was that after attacking his wife in the middle of a dirt path at Morse Pond, Greineder dragged her body backwards to the edge of the path. The Commonwealth's evidence to support its theory consisted primarily of a drag mark found in the path, along with expert testimony about a heel mark next to the drag mark. If believed, the testimony about Greineder's heel mark strongly supported the Commonwealth's case against him.

### 1.     Prosecutor's opening statement.

In his opening statement, the prosecutor outlined his theory.  He argued:

> You will hear, ladies and gentlemen, that that sandy area where May Greineder's body was was examined for the footprints that were in it and that everybody that went there into that area had photographs of their footwear taken so that Sergeant Deborah Rebeiro could look at that footwear, compare it to those footprints, and try and reconstruct where people were.
>
> **May Greineder's body was moved.**  She was struck in the back of the head. She fell face forward, and as she lay in the middle of the pathway her neck was cut open, and she was stabbed in the head and chest.  There was a large pool of blood in the center of the path.
>
> **The body was off to the side, and there was a drag mark with blood off to the side of the heel, led right to her left heel.**  As Sergeant Rebeiro tried to eliminate different footwear she also got **the defendant's footwear**, and you will hear **in a position that would be backwards to the victim's body that there are heel marks which had the same size as the defendant's heels and had some of the manufacturing characteristics**.

*Tr.* 5/24/2001 at 50-51 (*emphasis added*).

### 2.     Testimony of Deborah Rebeiro.

State Police Sergeant Deborah Rebeiro testified that she went to Morse Pond on October 31, 1999, where she observed a drag mark inside a bloodstain on a dirt path.  *Tr.* VII/243-244. Rebeiro testified in detail about Footprint #7, which overlapped some of the bloodstains. She noted a connection between Footprint #7 and the drag mark, which "starts in the area of footwear track no. 7 and leads back toward the area of the final resting place of the victim." *Tr.* VIII/30. She opined: "[T]he left footwear of Dirk Greineder could have made impression no. 7." *Id.* at 36. The direct examination continued:

> Q:     And how would a person be situated or standing? Which way would they be facing in order to make that impression?
> A:     **Their back, or the heel area of their footwear, would be in front of, or the heel would be towards the back of the victim as she was in her final resting position**. (*emphasis added*)

*Id.* At the prosecutor's request, Rebeiro marked one photograph (Exhibit 123) with an arrow

indicating "the way the foot would be directed," and an "X" showing the course of the drag mark. *Id.* at 37. She explained: "**The drag mark appears to be starting in the general vicinity of the heel area going back towards the victim**." *(emphasis added) Id.*

Defense counsel did not cross-examine Rebeiro about Footprint #7. On redirect examination, the Commonwealth introduced side-by-side photographs of the overlay of Greineder's left sneaker and the dental stone cast of Footprint #7. Rebeiro reiterated that, in her opinion, the overlay of the shoe corresponded with that impression. *Id.* at 98-100.

### 3.    Testimony of Greineder.

In his testimony, Greineder described his actions at the scene where he discovered his wife's body. His dog, Zephyr, had run ahead of him. Greineder followed, and the dog led him to his wife lying on the edge of the path. He ran over to her, and pushed the dog aside. He leaned over to take her pulse on the left side, but observed a lot of blood there, so he attempted to take her pulse on the right side. He could not feel a pulse. He shook her, and then leaned down to check for respiration. He then tried to pick her up, but could not. He first attempted to pick her up while kneeling at her right side, and then stepped over her and tried again. When that did not work, he went to the other side of her body, squatted down, and again tried to lift her, unsuccessfully. *Tr.* 6/19/01 at 78-82.

Greineder then left to get help. After attempting unsuccessfully to find someone who had a telephone, he returned to his car and called the police. After speaking to the police, he started running back to the scene, and was picked up by a police car. When the car arrived at the scene, Greineder went back to Ms. Greineder's body. He tried to take her pulse again and tried to listen for a heartbeat. The police then asked him to back away from her body, and he backed away on his knees. Someone then grabbed his elbow and escorted him out of the area. *Id*. at 82-94.

The prosecutor relied repeatedly on Rebeiro's testimony about Footprint #7 in attacking Greineder's credibility on cross-examination and implying that Greineder was tailoring his testimony

to the evidence presented at trial: "[Y]ou never said that before you heard Deborah Rebeiro talk about your heelmark, did you?"  *Tr.* XX/150; *see also Tr.* XXI/103.

### 4.     The prosecutor's closing argument.

In closing argument, the prosecutor focused on Greineder's supposed heelmark as an important part of the Commonwealth's case. He argued, in pertinent part:

> Remember Sergeant Rebeiro – Deborah Rebeiro.  She was the tall one.  OK, you do remember.  That's important evidence, ladies and gentlemen.... Is it probable that this person dragged another body without leaving any footwear impressions? Is that probable? I suggest to you it's not, ladies and gentlemen.  And I suggest to you it's not, because we have that footwear. **It's the defendant's heel mark, right where he would have picked her up, with bloody arms under the jacket, he dragged her backwards.... That, ladies and gentlemen, is evidence, strong, powerful evidence, that the wearer of those shoes dragged May Greineder to right where that heel sits, and that that heel stayed there until the police were there.**

*Tr.* XXV/74-76 (*emphasis added*).

### 5.     Greineder's motion for new trial.

In his motion for new trial, Greineder argued, *inter alia*, that his trial counsel had been constitutionally ineffective in failing to rebut Rebeiro's inculpatory testimony about Footprint #7. In support of his claim, Greineder filed an affidavit by William J. Bodziak, a former forensic examiner for the FBI and the author of a leading treatise in the field. Based on his independent review of the evidence, Bodziak opined that Footprint #7 was not **the heel** of Greineder's left shoe, but rather **the toe** of Greineder's right shoe. He concluded:

> In sum, in my opinion to a reasonable degree of scientific certainty, Sergeant Rebeiro was incorrect when she testified that the footprint evidence was consistent with Dirk Greineder having dragged May Greineder to the location where May's body was found.

Exhibit 5 to *Memorandum of Law in Support of Greineder's Motion for New Trial*; *2009 R.*  280.

### 6.     Rebeiro's post-trial affidavit.

On May 9, 2007, the Commonwealth filed an *Affidavit of Deborah A. Rebeiro. 2009 R.* 889-

890. Rebeiro stated that she had reviewed both Bodziak's affidavit and the dental casts of Footprint #7. She continued:

> [A]fter examining the photographs and the dental casts of impression #7, I concur with Mr. Bodziak that impression #7 represents two areas of the defendant's right sneaker, one impression being from the toe area, not the heel area, as I previously reported....

*Id.* at ¶ 5. In short, Rebeiro admitted that her trial testimony about Footprint #7 was erroneous.

### 7.      Defendant's amended motion for new trial.

Shortly after Rebeiro's affidavit appeared, Greineder filed an amended motion for new trial adding a claim based upon Rebeiro's admission that her inculpatory trial testimony about Footprint #7 was false. Greineder argued that Rebeiro's false testimony probably affected the jury's deliberations, so relief was required.

### 8.      The motion judge's decision.

In his ruling, the motion judge rejected the Commonwealth's argument that the change in Rebeiro's testimony was "immaterial," and concurred with Greineder that the change was "significant." *Ruling* at 63, 68; *2009 R.* 974, 979. As Judge Chernoff recognized:

> The elimination of the heel print negates a facet of the Commonwealth's theory that the defendant must have been the murderer because his heel print demonstrates that he dragged the victim's body out of the center of the path, where the fatal assault commenced....

*Id.* Judge Chernoff also noted:

> The trial transcript, the video of the closing argument, and the judge's recollection of the trial all showed that the Commonwealth pervasively drove home to the jury its theory that the heel print was strongly probative of the defendant's identity as the dragger of the victim and thus the murderer.

*Id.* at 54-55; *2009 R.* 965-966.

Nevertheless, Judge Chernoff concluded that, in light of the other evidence presented by the Commonwealth at trial, "the change in Rebeiro's testimony, although significant, does not cast real

doubt on the justice of the defendant's conviction." *Id.* at 65-68; *2009 R.* 976-979.  In footnote 11, the motion judge stated: "Because there is neither a hint of wrongdoing nor of bad faith, the Court does not feel compelled to impose a strict due process standard of review, application of which might well result in an order for a new trial." *Id.* at 61; *2009 R* 972.

### 9.    The SJC's decision.

On appeal, the SJC ruled that the motion judge applied the correct standard under Massachusetts newly-discovered evidence law (citing *Commonwealth v. Grace*, 397 Mass. 303, 307 (1986)), that he considered this "newly-discovered" evidence in light of specific strengths of the Commonwealth's case, and that his conclusion that the evidence "does not cast real doubt on the justice of the defendant's conviction" was not an abuse of discretion.  The SJC decision made no discussion of federal constitutional law whatsoever.  *Greineder*, 458 Mass. at 244-246.

### B.    Summary of Applicable Law.

### 1.    Constitutional right to disclosure of exculpatory information.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, a defendant is denied due process when the prosecution fails to disclose material, exculpatory information prior to trial. Two important features of the *Brady* rule expand its scope beyond intentional nondisclosure by a malicious prosecutor. First, a prosecutor need not act in bad faith in order for there to be a due process violation. *United States v. Agurs*, 427 U.S. 97, 110 (1976) ("nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor"); *Brady*, 373 U.S. at 87-88 (non-disclosure of material exculpatory evidence is a violation "irrespective of the good faith or bad faith of the prosecution," violation does not turn on whether nondisclosure was product "of guile"); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Second, knowledge by any member of the prosecutorial team is imputed to the prosecutor. *See, e.g., Kyles v. Whitley,* 419 U.S. 419, 437 (1995). Indeed, under *Kyles*, the prosecutor "has a duty

to learn of favorable evidence" in the possession of all others who are "acting on the government's behalf in the case, including the police." *Id. See also Mastrocchio v. Vose*, 274 F.3d 590 (1st Cir. 2001) (imputing the witness protection team's knowledge of benefits given to a material witness to the prosecutor). Taking these two rules together, a member of the prosecution team who has exculpatory evidence in their possession need not act in bad faith in order for the non-disclosure to amount to a *Brady* violation.

However, even where there has been a non-disclosure of exculpatory information, there is no *Brady* violation unless the non-disclosed evidence can be said to be "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Evidence is considered to be material only when there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. In determining whether such a probability exists, "the question is not whether the defendant would more likely than not have received a different verdict from the evidence, but whether in its absence he received a fair trial." *Kyles*, 419 U.S. at 434. The trial cannot be said to have been fair if the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). *Brady* violations have been found as a result of the recantation of a prosecution witness's testimony. *See, e.g., Wolfe v. Clarke*, 691 F.3d 410, 417, 426 (4th Cir. 2012); *Douglas v. Workman*, 560 F.3d 1156, 1166, 1175 (10th Cir. 2009); *State v. Ziegler*, 159 So.3d 96 (Ala. 2014).

## 2.  Constitutional right to fair trial based on reliable evidence.

A defendant's right to due process under the Fifth and Fourteenth Amendments protects him from conviction based on unreliable evidence. *California v. Green*, 399 U.S. 149, 188 n.20 (1970) (Harlan, J., concurring) ("Due process does not permit a conviction based on no evidence, or on evidence [that is] unreliable and untrustworthy..."). A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness, for due

process purposes. To permit a conviction based on uncorrected false material evidence to stand is

a violation of a defendant's due process rights under the Fourteenth Amendment. *Maxwell v. Roe*,

628 F.3d 486 (9th Cir. 2010) (*habeas* relief granted where defendant convicted based on false

testimony of jailhouse informant); *Hall v. Director of Corr.*, 343 F.3d 976 (9th Cir. 2003)(*per

curiam*) ("false and material evidence was admitted at Hall's trial in violation of his due process

rights"); *Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002) (*habeas* relief granted where prosecution's

star witness testified falsely). The due process guarantee may require a new trial when newly-

discovered evidence, including a witness recantation, reveals that the conviction was obtained

through the use of unreliable evidence. In *Coogan v. McCaughtry*, the court wrote:

> In some situations newly-discovered evidence is so compelling that it would be a
> violation of the fundamental fairness embodied in the Due Process Clause not to
> afford a defendant a new trial at which the evidence could be considered.

958 F.2d 793, 801 (7th Cir. 1991).

In the recantation context, fundamental fairness may require a new trial, even in the absence

of bad faith. *United States v. Young*, 17 F.3d 1201,1203 (9th Cir. 1994)(The "government's

assurances that false evidence was presented in good faith are little comfort to a criminal defendant

wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even

false evidence presented in good faith, hardly comports with fundamental fairness."). *See also

Sanders v. Sullivan*, 853 F.2d 218, 224 (2nd Cir. 1988)(reversing the denial of *habeas* relief, holding

that petitioner's due process rights were violated when the petitioner was convicted based on

material testimony of a witness who recanted); *United States v. Wallach*, 935 F.2d 445, 473 (2nd Cir.

1991)(perjury of a key government witness, irrespective of whether the government knew of the

perjury at the time of the trial, "infected the trial proceedings" and required reversal).

### 3.      Standard of review under AEDPA.

The failure of the state court to address a petitioner's federal constitutional claims may

constitute a lack of adjudication on the merits, rendering his claim eligible for *de novo* review. *See, e.g., Cone*, 556 U.S. at 472 ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim...the claim is reviewed *de novo*."); *Johnson*, 133 S.Ct. at 1090. *Harrington*, 562 U.S. at 99, set up a rebuttable presumption that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." However, the presumption is rebuttable. *Williams*, 133 S.Ct. at 1091. *See, e.g., McLellan*, 703 F.3d at 348-351 (presumption rebutted); *Wooley*, 702 F.3d at 421-422 (same); *Harris*, 698 F.3d at 623-25 (same); *Balsavage*, 936 F.Supp.2d at 505 (same); *Funches*, 2014 WL 4446670 at *4 (same); *Pacheco*, 2013 WL 6799036, at *6 (same).

### C.     Application of Law to Facts.

#### 1.     Greineder's *Brady* and Due Process claims must be reviewed *de novo*.

Greineder's claim respecting the false footwear evidence must be viewed by this court *de novo*. The state court here completely ignored Greineder's constitutional argument. As in *Balsavage*, the SJC cited no federal cases and only reviewed the claim as to whether or not the motion judge applied the correct standard governing motions for new trial on the basis of state newly-discovered evidence law. The SJC did not mention due process or *Brady*, and instead relied on, and indeed adopted the trial judge's ruling on the motion for new trial by holding that there was no abuse of discretion or other error of law.[62] In so concluding, the SJC necessarily adopted the motion judge's explicit decision not to review the Due Process or *Brady* claims. *See Commonwealth v. Greineder*, 2007 WL 7008820 at n. 11 (2007) ("Because there is neither a hint of wrongdoing nor of bad faith,

---

[62]     Moreover, it should be noted that Massachusetts state law procedural principles as articulated by the SJC include a policy to avoid reaching constitutional questions where possible. *See Commonwealth v. Paasche*, 391 Mass. 18, 21 (1984) ("We do not decide constitutional questions unless they must necessarily be reached."); *Neff v. Commissioner of Dep't. of Indus. Accidents*, 421 Mass. 70, 72-73, 76-77 (1995) (same); *John Doe # 89230 v. Sex Offender Registry Board*, 452 Mass. 764, 77 (2008) (same).

the Court does not feel compelled to impose a strict due process standard of review, application of which might well result in an order for a new trial").  Notwithstanding the fact that it was contrary to clearly established federal law to impose a requirement of bad faith before proceeding to a review of a due process claim, this footnote and the SJC's implicit adoption of it, clearly establish that the state court below did not adjudicate the *Brady* and due process claims on the merits.  Accordingly, Greineder is entitled to *de novo* review of these claims.

### 2.    Rebeiro's trial testimony was false, and her recantation was credible.

There can be no doubt that Rebeiro's recantation was honest and reliable. She would not have volunteered her affidavit, exposing herself to professional embarrassment and potentially imperiling the conviction, unless it were true. Moreover, Rebeiro's recantation is strongly corroborated by Bodziak's affidavit, the catalyst prompting Rebeiro to change her tune. Indeed, the Commonwealth did not contest the credibility of the recantation, and the motion judge credited it as reliable. *Greineder*, 2007 WL 7008820 ("This court credits Roberio's affidavit...") Given the SJC's implicit adoption of the motion judge's opinion, the SJC similarly credited this recantation.  In sum, this Court should credit Rebeiro's recantation and conclude that her trial testimony that Greineder's heel mark was adjacent to a drag mark leading to Ms. Greineder's body was false.

### 3.    Rebeiro's erroneous trial testimony seriously prejudiced the defense.

The connection between Greineder's alleged heel mark and the drag mark found near Ms. Greineder's body was a key part of the Commonwealth's case. The "heel mark" was discussed by the prosecutor in his opening, addressed at length by Rebeiro, and emphasized in the prosecutor's closing argument. The significance of this evidence was clear – if the jury believed Rebeiro's uncontradicted testimony about Footprint #7, it would undoubtedly conclude that Greineder had dragged Ms. Greinder's body to its final resting place and thus, almost certainly, was her killer. Indeed, this evidence alone may well have caused some jurors to convict, and there is a reasonable

probability that without it, the jury would have acquitted him.

The prosecutor was well aware of the extraordinary significance of this testimony, as shown by his reliance on it in closing, referring specifically to Rebeiro's testimony as showing that "it's the defendant's heel mark, right where he would have picked her up, with bloody arms under the jacket, he dragged her backwards.... That, ladies and gentlemen, is evidence, strong, powerful evidence, that the wearer of those shoes dragged May Greineder to right where that heel sits, and that that heel stayed there until the police were there."*Tr.* XXV/74-76 (*emphasis added*).  Further, the prosecution was able to use this erroneous evidence to impeach Greineder's version of events asserting his innocence by claiming that Greineder had concocted his testimony to fit the evidence. Had Robeiro's testimony been accurate – or her recantation available to the defense prior to trial – it would have supported Greineder's testimony that he approached Ms. Greineder to check her pulse and not that he had dragged her body to her final resting place.  Given the extreme importance of Greineder's testimony to his chances of acquittal, it was of the utmost importance for the prosecution to discredit him.  The fact that the prosecutor was able to do so through the use of indisputably erroneous, yet highly inculpatory, testimony rendered the trial fundamentally unfair in violation of due process.

The defense did not offer any explanation of the "heel mark," cross-examine Rebeiro about Footprint #7, or give the jury any reason to disbelieve her testimony. Defense counsel said nothing about Footprint #7 in closing argument, presumably because he had nothing to say. That evidence thus stood as an important, unrebutted piece of the Commonwealth's case. As the motion judge noted, this evidence was "significant" in light of the Commonwealth's contention, "persuasively dr[iven] home to the jury," that it was "strongly probative" of Greineder's guilt. A. 975-976, 979. Rebeiro's recantation, if available at trial, would have completely eviscerated the inculpatory quality of this unrebutted testimony.

The recantation evidence would have been important for another reason as well. Much of the

Commonwealth's case was based on the credibility of its coterie of experts who testified, inter alia, about blood spatter, footprint, fiber, and DNA evidence. If the defense had been able to present Rebeiro's recantation to the jury, it would have had the probable effect of casting doubt on the Commonwealth's entire phalanx of experts.

Accordingly, there is a reasonable probability that, had the recantation been available to the defense prior to trial, the result of the proceeding might have been different. *Bagley*, 473 U.S. at 682. In its absence, Greineder did not receive a fair trial, and the recantation seriously undermines confidence in the verdict. Thus, the evidence was material under *Bagley* and *Kyles*.

### 4. Greineder is entitled to relief under federal constitutional law.

#### a. *Brady* violation.

The significance that the recanting witness was a government agent cannot be overstated. Under such circumstances, this Court should apply a *Brady*-type analysis. That line of cases is specifically designed to deal with mistakes by a member of the prosecution team that affect the accuracy of the information presented to the jury at trial. Here, it was the malfeasance of the prosecution team itself that tainted the presentation of evidence to the jury, violating the defendant's right to a fair trial.[63] Under such circumstances, this Court should apply a "reasonable probability" test in determining whether the prejudice flowing from the erroneous testimony requires a new trial. Under that test, Greineder is clearly entitled to relief.[64]

As discussed above, there can be no doubt that this exculpatory evidence is material to guilt. In addition, Greineder's pre-trial motion for all scientific test results – which was allowed by

---

[63] Consider the following two scenarios: In the first, Rebeiro testifies that the footprint was that of a heel, while (unbeknownst to the prosecutor) there is a prior affidavit authored by Rebeiro which indicates that the print was that of a toe, a document never turned over to the defendant in violation of <u>Brady</u>. In the second, as here, the conflicting affidavit is produced after trial. It would be truly anomalous if a defendant in the first scenario were entitled to a new trial, while the defendant in the second were denied any relief.

[64] In his *Findings*, the motion judge noted that if "a strict due process standard of review" were applied, it "might well result in an order for a new trial." *Findings* at 61 n.11, *2009 R*. 972.

agreement (Docket #14, Tr. 4/10/00 at 5; A. 24) – was sufficiently specific to encompass Rebeiro's **accurate** opinion, as revealed in her post-trial affidavit. It is of no matter that Robeiro may have truly believed that her testimony was accurate at the time she gave it, because had she exercised due diligence, she would have formed the correct opinion, which constituted material exculpatory evidence that was not disclosed to the defense.   The Commonwealth's failure to produce this exculpatory evidence upon request amounts to a *Brady* violation, resulting in a trial tainted by the presentation of false, unreliable expert testimony.   Relief is required.

### b.      Due process violation.

The due process principle of fundamental fairness similarly entitles Greineder to relief. Given the centrality of the footwear testimony to the Commonwealth's case, it cannot fairly be said that the erroneous evidence was not a real factor in the jury's deliberations.   Indeed, there is a strong possibility that the outcome of the trial would have been different if Robeiro's accurate opinion had been presented to the jury.   As another court wrote in a similar context:

> The ... expert's testimony was damning – and it was false.... [the defendant] has the right to be tried, insofar as possible, on the basis of true and correct evidence; to deny him this right is to deny him a fair trial.... [T]o allow a conviction to be based even in part on such manifestly inaccurate and prejudicial testimony ... would be a serious injustice.

*State v. Caldwell*, 322 N.W.2d 574, 586 (Minn. 1982).   The presentation of Robeiro's erroneous expert testimony rendered Greineder's trial fundamentally unfair.   He is entitled to relief.

### 5.      Greineder is entitled to *habeas* relief.

Since the state court below did not adjudicate Greineder's *Brady* and due process claims on the merits, he is entitled to *de novo* review and to relief for the reasons set forth above.   In the event that this Court concludes that these claims were adjudicated on the merits, Greineder is nonetheless entitled to *habeas* relief, as the state court's denial was contrary to, and constitutes an unreasonable

application of, clearly established federal law.

The unreasonableness of the state court's denial of relief is exemplified by the trial judge's erroneous determination – and the SJC's subsequent agreement –  not to apply a due process standard of review because there was "neither a hint of wrongdoing nor of bad faith."  As discussed above, *Brady* explicitly held that there was no requirement of bad faith by the prosecution. The presentation of false evidence may amount to a due process violation "even if the government unwittingly presents false evidence." *See, e.g., Young*, 17 F.3d at 1204. Accordingly, the state court's decision not to consider these claims due to lack of bad faith was unreasonable.

Significantly, the SJC explicitly denied relief on the sole ground that the motion judge did not abuse his discretion in concluding that there was not a "substantial likelihood" that the jury would have reached a different result.  However, this standard is significantly different than the due process standard, which considers whether there was a "reasonable probability" that the result would have been different. The SJC's application of the wrong legal standard is contrary to clearly established federal law.  Pursuant to the analysis above, Greineder is entitled to relief under the due process "reasonable probability" test, even if he is not entitled to relief under the Massachusetts "substantial likelihood" test.

**V.   GREINEDER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL WAS VIOLATED BASED ON THE ERRONEOUS ADMISSION OF AND PROSECUTORIAL MISUSE OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE ABOUT GREINEDER'S EXTRAMARITAL SEXUAL ACTIVITIES.**

   **A.  Statement of Relevant Facts.**

      **1.      Pretrial proceedings.**

Greineder moved prior to trial to exclude evidence of his extramarital sexual activities.  *See Motion to Exclude Evidence of "Other Bad Acts"*, *2009 R.* 320. In opposition, the Commonwealth argued that such evidence demonstrated "hostility" toward his wife and, therefore, his motive to kill

her. *Pr. Tr.* 1/25/01 at 29-31. Deeming some of the proffered evidence to be probative of "hostility," "discord," and "deterioration" of the marriage and hence providing a motive to "be rid of his wife," the court admitted evidence of Greineder's extramarital sexual activity during the seven days immediately preceding his wife's death, as well as his use of an alias to facilitate that activity. *Memorandum of Decision and Order on the Defendant's Motion In Limine To Exclude Prior Bad Acts Evidence* at 7-8, *2009 R.* 328-329. The court excluded evidence regarding Greineder's sexual conduct prior to that seven-day window. *Id.* at 9-10.  Judge Chernoff stated that the defendant's rights were saved with respect to all issues on which he had rendered a written ruling, and that there was no need for defense counsel to object. *Tr.* VII/56. Accordingly, this issue was fully preserved.

### 2.     The Commonwealth's presentation of extramarital sex evidence at trial.

The prosecutor referred to the extramarital sex evidence in his opening statement, describing Greineder as "a man of secrets, deeply and closely held secrets." *Tr.* II/41. During trial, the Commonwealth presented three days of testimony and numerous exhibits regarding Greineder's extramarital sex life. The prosecution presented evidence that on October 22-23, 1999, while attending a conference in New Jersey, Greineder called an escort service, which sent a woman to the hotel where she engaged in sexual intercourse with him for payment. *Tr.* XV/133-146, 150-163; XVI/65-70. Deborah Doolio, a Boston escort, testified that she met Greineder at a hotel in the spring of 1999, and he subsequently called her several times. In September, he called her and told her not to call him again. On October 30 and November 1, he called her, but she did not speak to him. *Tr.* XVI/72-79. The Commonwealth presented extensive evidence about Greineder's extramarital sexual activities using the Internet. Between October 24 and 29, 1999, Greineder joined an online dating service, "people2people," and communicated with four other members of the site about potential sexual encounters. The individuals he contacted were called as trial witnesses, and the emails sent

to them were read to the jury.[65] *Tr.* XVI/120-164 (am); XVI/1-42. Using an American Express card he obtained using the name of a college roommate, Greineder registered with "ultimate live.com," a website which provides interactive chat and streaming pornographic video, in September 1999. The membership was cancelled on November 10, 1999. *Tr.* XVI/131-137.

### 3.    Limiting instruction.

The court gave a limiting instruction on the evidence regarding Greineder's extramarital sexual activities following Doolio's testimony and again during the final charge, specifying that such evidence could be considered by the jury solely on the issue of motive. *Tr.* XVI/85-86; *Tr.* XXIV/32.

### 4.    The defendant's response at trial.

Greineder testified that he and his wife ended their sexual relationship in the mid-1990s by her choice, when she developed discomfort and pain during sex. *Tr.* XIX/248. Thereafter, he began experimenting with phone sex and Internet sex sites. *Id.* at 248-251. He had sex with a prostitute on about eight occasions between February 1998 and October 1999.  *Tr.* XX/8-10. He also had sex with two people he met on the Internet during that same period. *Id.* at 12.

 Greineder testified that he never thought about asking his wife for a divorce. *Id.* at 18. Contrasting his extramarital sexual activities with his marriage, Greineder explained:

> What the family meant to me and means to me is so much more, and you know, my wife was the most wonderful person I have ever met. She made me a better person. She helped my family become what we became. I was a better doctor because of her, and I was a much better father because of her. And in hindsight, it seems so silly, I guess immature, but it just didn't seem central.

---

[65]        One of several such emails read to the jury, sent by Greineder to a married couple named Page on "people2people" is as follows: "I am white, married, but she does not play, so I'm looking for a very discrete couple with whom to play.  I also am very oral, both give and receive, and would love to exchange emails to see if we can fit. I'm a few pounds over weight, really, only a few, love big breasts to suck and love group activities. I'm basically straight but could be flexible in group situations. I cannot host but would be willing to arrange for hotel accommodations if we got along. I am 49, clean, disease and drug free, college grad, managerial type. Please email me." *Tr.* 16/29. A series of email exchanges with this couple were introduced, including references to emailed nude photographs and a discussion of "bondage and discipline," although there was no evidence that Greineder ever actually met with them. The husband testified as a trial witness. *Tr.* 16/1-42.

*Tr.* XIX/259.

Greineder testified that he was not sure if his wife knew about his sexual activities. *Tr.* XX/17. She discovered Viagra in his shaving kit in the summer of 1998. *Id.* He told her that he bought it as an experiment, and they never talked about the subject again. *Id.* at 18. The prosecutor cross-examined Greineder at length about the details of his extramarital sexual activities. *Tr.* XX/165-171; *Tr.* XXI/159-164, 174-189.

The Greineders' son, Colin, testified that he asked his mother whether she was happy in her marriage. *Tr.* XXIV/54. She said she was, adding "our sex life could be better." *Id.* at 55. Colin testified that his mother told him that she and her husband had talked about the problems in their sex life, adding: "I think your dad has his own way of dealing with that now." *Id.*

### 5.      The prosecutor's closing.

In his closing argument, the prosecutor did not claim that the evidence about Greineder's extramarital sexual activities was probative of motive. Instead, he characterized this evidence as "a window to the relationship that was going on between May and Dirk at that time period." *Tr.* XXV/62. He specifically referred to:

> prostitutes whom he told he was getting divorced, that he was separated, and that his wife was old and soft, that he was seeking out Elizabeth, who he had a long term standing relationship with, that he was seeking out alternative sexual styles, that he had at the ready naked pictures of himself to send out to try and bring about further meetings, that he's sending out his cell phone number to these people.

*Id.* at 60-61.

### 6.      The SJC's decision.

The SJC ruled: "The evidence of the defendant's extramarital sexual activity was highly probative of a motive to kill." *Greineder*, 458 Mass. at 240.  The Court found that "The evidence supported a reasonable inference that the victim's presence had become an inconvenience to him, and an obstacle to a lifestyle he pursued and kept secret from his entire family and the public.  The

jury could have inferred that when he contacted the prostitute just before and after the murder, the time had come to kill his wife..  In the words he expressed to the prostitute, the time was now 'right.'" *Id.*  The SJC ruled that the trial judge did not abuse his discretion by admitting this evidence, noting that the inference of motive need not be inescapable or necessary, but merely "reasonable and possible." *Id.*  The SJC found the probative value of the evidence was very high, and ruled that the prosecutor did not go too far in closing, did not abandon the motive theory, and that the prosecutor's reference to certain statements about extramarital activity had record support and were not unfair.  *Id.*  The SJC decision made no mention of federal constitutional law.

### B.      Summary of Applicable Law.

#### 1.      Mistaken evidentiary rulings may violate due process.

Typically, federal *habeas* relief cannot be granted merely because a state court errs in its application of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Pulley v. Harris*, 465 U.S. 37, 41(1984).  However, "a state court's error in applying a state rule sometimes can have constitutional implications...[and] [t]hat, in turn, may afford a basis for federal habeas relief."  *Sanna*, 265 F.3d at 12. Mistaken state court evidentiary rulings may violate a defendant's right to due process if they render the trial fundamentally unfair. *Dowling v. United States*, 493 U.S. 342, 352 (1990). *Accord Lyons v. Brady*, 666 F.3d 51, 55 (1st Cir. 2012); *Coningford v. Rhode Island*, 640 F.3d 478, 484 (1st Cir. 2011). In order for the erroneous admission of evidence to amount to a constitutional violation, it "must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible." *Lyons*, 666 F.3d at 56 (1st Cir. 2012). Where a trial court commits an evidentiary error, the error is not necessarily rendered harmless by the fact that there was other, cumulative evidence properly admitted.  *See Krulewitch v. United States*, 336 U.S. 440,  444-45 (1949) (holding that, in a close case, erroneously admitted evidence – even if cumulative of other evidence – can "tip[] the scales" against the defendant); *Hawkins v. United States*, 358 U.S. 74, 80 (1958) (concluding that

erroneously admitted evidence, "though in part cumulative," may have "tip[ped] the scales against petitioner on the close and vital issue of his [state of mind]").

## 2.   Prosecutorial misconduct may violate due process.

A prosecutor "is representative not of an ordinary party to a controversy, but of a sovereignty whose obligation...in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Id.*  The Supreme Court has stated:

> [T]he State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probably perpetrator of the crime.  The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Michelson v. United States*, 335 U.S. 469, 476 (1948). It is thus well-recognized that a fundamental rule of evidence is that a defendant's "bad character" cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime. *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000). It is serious misconduct to engage in a persistent *ad hominem* attack on the accused's character. *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979). "A prosecutor may not urge the jury to 'consider [a defendant's] bad character as a thumb on the scale in favor of a finding of guilt.'"  *Simpson v. Warren*, 475 Fed. Appx. 51 (6th Cir. 2012) (citing *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005).

Prosecutorial misconduct may "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). *Accord Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  *See e.g. Martin v. Parker*, 11 F.3d 613, 615-617 (6th Cir. 1993)(prosecutor's improper comments, in which he compared defendant to Adolf Hitler, and his repeated references to defendant's prior bad acts, combined to deny defendant his right to

a fair trial in sexual abuse prosecution in violation of due process). The Supreme Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trail as to amount to a violation of due process: (1) whether the comments were isolated or pervasive *see Donnelly*, 416 U.S. at 646; (2) whether they were deliberately or accidentally placed before the jury, *see Id.* at 647; (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, *see Darden*, 477 U.S. at 182; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden*, 477 U.S. at 182; *Berger*, 295 U.S. at 84-85; (5) the strength of the overall proof establishing guilt, *see Darden*, 477 U.S. at 182; (6) whether the remarks were objected to by counsel, *Darden*, 477 U.S. at 182-83 & n. 14; and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182.

A prosecutor commits misconduct during closing argument when he misstates the evidence presented at trial. *Darden*, 477 U.S. at 181-82. The prosecution's misuse of evidence introduced for a limited purpose is error and may create a substantial risk of unfair prejudice. *See Washington*, 228 F.3d at 699 (improper for prosecutor to misuse character evidence admitted for limited purpose); *Simpson*, 475 F. App'x at 63. A prosecutor may not make intentional misrepresentations to the jury. *Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994). "[A] prosecutor's act of misrepresenting facts in evidence is improper, since doing so may profoundly impress a jury and may have a significant impact on the jury's deliberations." *Walker v. Morrow*, 458 Fed. Appx. 475, 490 (6th Cir. 2012).

### 3.      Combined effect of trial errors may violate due process.

Moreover, the combined effect of multiple trial court errors may violate due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 298, 302-303 (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a

constitutional violation or would independently warrant reversal. *Id.* at 290 n. 3.  Cumulative error

warrants *habeas* relief where the errors have "so infected the trial with unfairness as to make the

resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.  Such "infection" occurs

where the combined effect of the errors had a "substantial and injurious effect or influence on the

jury's verdict." *Brecht*, 507 U.S. at 637 (*internal quotation omitted*).  *See, e.g., Parle v. Runnels*, 505

F.3d 922 (9th Cir. 2007)(state court's conclusion that cumulative effect of multiple evidentiary errors

during homicide trial did not violate defendant's due process rights was objectively unreasonable

application of clearly established federal law, and thus warranted federal *habeas* relief, in light of

starkly one-sided impact of errors, in that all of improperly excluded evidence supported defense,

while all of the erroneously admitted evidence undermined the defense and bolstered state's case).

    **C.**    **Application of Law to Facts.**

        **1.**    **The repeated admission of extensive, lurid, prejudicial sex evidence at the trial of this case and the prosecutor's misuse of this evidence during closing argument deprived Greineder of his right to due process.**

Before Greineder's trial, the SJC had previously held that "[e]vidence of a hostile relationship

between a defendant and his spouse may be admitted as relevant to the defendant's motive to kill the

victim spouse." *Commonwealth v. Rosenthal*, 432 Mass. 124, 127 (2000). However, sexual infidelity

alone had never been equated with a "hostile relationship." In every case where the SJC previously

treated extramarital sexual activity as relevant evidence of hostility, the defendant also engaged in

physical abuse or expressed disdain towards the victim. *See, e.g., Commonwealth v. Magraw*, 426

Mass. 589, 596 n.9 (1998); *Commonwealth v. Bonomi*, 335 Mass. 327, 340 (1957); *Commonwealth

v. Howard*, 205 Mass. 128, 133 (1910). As other jurisdictions have recognized, evidence of

extramarital sexual activity is not, without more, probative of a motive to commit uxoricide.  In

*Casterline v. State*, 736 S.W.2d 207, 211-212 (Tex. Ct. App. 1987), the Texas Court of Criminal

Appeals held: "Evidence of a troubled marriage alone does not establish a motive to kill. Spouses

in a troubled marriage may be neither jealous nor emotional, and even if they are, that jealousy or emotion need not necessarily create a homicidal motive. It would be highly speculative to infer that marital infidelity, standing alone, created a homicidal motive." *See People v. Hendricks*, 137 Ill.2d 31, 54-55, 560 N.E.2d 661 (1990).

Nonetheless, prior to trial, the Commonwealth managed to convince the court to admit explosive evidence sullying the defendant's character on a false premise. Desperately seeking admission of such evidence, the prosecutor characterized it as demonstrating a "hostile relationship" probative of motive. *Tr.* (1/25/01)/39-40. Yet the plethora of evidence regarding Greineder's extramarital sexual activities admitted at trial did not provide any link in a chain of evidence proving that the defendant had a motive to murder his wife. There was no evidence introduced to suggest that Ms. Greineder intended to leave Greineder, nor was there any evidence of hostility between the two. Hence, the sex evidence was simply not relevant and should have been excluded.

Even if Greineder's extramarital sexual activity had some conceivable relevance on the issue of motive, any probative value was far outweighed by the resulting unfair prejudice. Evidence that Greineder was involved in extramarital sexual activity, including the use of prostitutes, group sex, and sadomasochism, was a transparent attack on his character. If Greineder could lead this secret, repulsive double life, couldn't he also have secret, repulsive plans to murder his wife? That implicit suggestion permeated the Commonwealth's case, then was hammered home in closing argument. It was patently improper, but it worked!

In ruling on Greineder's motion *in limine*, the trial court allowed the Commonwealth to present evidence about his sexual activities during the seven days prior to Ms. Greineder's death. This putative compromise was wholly ineffectual. The practical result of the ruling was to make it appear that in the week prior to his wife's murder, Greineder had suddenly engaged in a wild burst of extramarital sexual activity. The jury would undoubtedly have been tempted to infer some

connection between this unprecedented behavior and the murder. To negate that unfair and erroneous inference, Greineder was forced to introduce evidence of a longer history of extramarital sexual activity himself. In the end, the court's ruling did nothing to protect Greineder from an unfair trial.

Having hoodwinked the court into believing the sex evidence was tied to motive, the Commonwealth abandoned that bogus theory entirely in closing argument. The prosecutor's inability to connect the sexual evidence to Ms. Greineder's murder did not deter him from bringing up the sordid details one more time, improperly connecting Greineder's sexual activities with the murder:

> I wish I could tell you exactly how a person gets to that point [i.e., to commit murder] in their own life. I can't. I can't tell you how a person gets to the point where he's doing many things that this Defendant was doing.

*Tr.* 25/95.[66]

To make matters worse, the prosecutor referred to several "facts" which were unsupported by the evidence. He told the jury that Greineder had described his wife as "old and soft," and that Greineder had been seeking out a woman named "Elizabeth" with whom he had "a long term standing relationship." *Tr.* 25/61. Neither of these "facts" was in evidence.[67] The unfair prejudice resulting from these fabrications was substantial.

### 3.      This Court should grant *habeas* relief.

In *Gumm v. Mitchell*, 775 F.3d 345, 379-385 (6th Cir. 2014), the Sixth Circuit held that a prosecutor's misconduct in eliciting testimony of witnesses regarding defendant's alleged bizarre sexual habits, including bestiality, together with the prosecutor's extensive closing arguments regarding those statements, was flagrant and severe, warranting *habeas* relief.  The same result is warranted here.  Prior to trial, the Commonwealth managed to convince the Court to admit explosive

---

[66]      The phrase "many things that this Defendant was doing" cannot have referred to anything but the extramarital sexual activities highlighted so many times during trial.

[67]      On cross-examination, Greineder specifically  denied that he had made either statement. *Tr.* 20/169-170. There was no evidence to the contrary presented at trial.

evidence sullying Greineder's character on an untenable, invalid premise.   Desperately seeking admission of such evidence, the prosecutor characterized it as demonstrating a "hostile relationship" probative of motive. *Tr.* 1/25/01, pp. 39-40. Yet the plethora of evidence regarding Greineder's extramarital sexual activities admitted at trial did not provide any link in a chain of evidence proving that he had a motive to murder his wife.   It should have been excluded.

There was no evidence introduced to suggest that Ms. Greineder intended to leave her husband. The Commonwealth's evidence demonstrated none of the hostility or abusiveness of prior Massachusetts cases where palpable evidence of the defendant's anger, hatred, or disdain toward the victim was presented through prior bad acts.   No evidence of any hostility Greineder manifested towards his wife was presented by the Commonwealth. To the contrary, Doolio testified that Greineder was conflicted about using an escort, and she responded that, perhaps, an escort was not for him.  The Commonwealth read e-mails into evidence in which Greineder explicitly told potential partners that he was "not ready for a long term relationship" and that he was "married but she does not play." After exposing the jury to evidence of Greineder's extramarital affairs with prostitutes, reading and then rereading his explicit e-mails soliciting casual sex, and presenting evidence that he sent a naked picture of himself to a married couple with whom he hoped to engage in sadomasochistic activity, the Commonwealth argued in closing that this evidence might somehow assist the jury in determining whether Greineder was the kind of husband who might be willing to kill his wife. *Tr.* XXV/60-62.   Yet the evidence did no more than besmirch Greineder's character. It did not constitute any probative evidence that he had a motive to kill his wife.   The SJC's decision ruling that the evidence of the defendant's extramarital sexual activity "was highly probative of a motive to kill," *Greineder*, 458 Mass. at 240, was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 2254(d)(2), because the SJC blatantly misstated material evidence in the trial transcript and used that misstatement to form

an erroneous adverse legal conclusion.

Even if evidence of Greineder's extramarital sexual acts had some conceivable relevance on the issue of motive, any probative value was far outweighed by the resulting unfair prejudice. Thus even if some portion of the evidence were admissible, the SJC completely ignored Greineder's constitutional claim that the over-the-top admission, repetition, and misuse of this explosive evidence was a denial of his right to due process. The evidence that Greineder was involved in extramarital sexual activity, including the use of prostitutes, group sex, and sadomasochism, was a transparent attack on his character. If Greineder could lead this secret, repulsive, and complicated double life, couldn't he also have secret, repulsive and complicated plans to murder his wife? That implicit and wholly impermissible suggestion permeated the Commonwealth's case at trial. As in *Hendricks*, 560 N.E.2d 661 (evidence of defendants attempts to grope and kiss models could not explain the murder of his wife and children) and *Gumm,* 775 F.3d at 379-385 (evidence of defendant's alleged bizarre sexual activities improperly injected to inflame jury), the admission of this evidence dramatically shifted the focus of this trial from Ms. Greineder's death to Greineder's sexual proclivities. Ironically, it also compelled the defense to present even more evidence of Greineder's extramarital sexual acties in order to rebut the implicit inference that he became involved in such activities for the first time right before his wife's death.

Evidence regarding Greineder's extramarital sexual activities had no proper place at trial. The Commonwealth broke its promise to use such evidence solely to establish Greineder's motive to murder his wife. Nevertheless, the evidence came in, through witness after witness, until the Commonwealth had achieved its real objective of destroying the defendant's character. *See Gumm*, 775 F.3d at 379-385. The lurid evidence and remarks regarding Greineder's extra-marital sexual activities were pervasive, deliberately placed before the jury, explosively prejudicial to the defendant, and misstated by the prosecutor. *See Donnelly*, 416 U.S. at 646-647; *Berger*, 295 U.S. at 84-85.

The erroneous admission and misuse of this toxic bad acts evidence contributed significantly to the jury's verdict and violated Greineder's constitutional right to a fair trial.  Relief is warranted.

## VI.   GREINEDER'S FUNDAMENTAL RIGHT TO TRIAL BY JURY WAS DENIED BASED ON THE DELIBERATING JURY'S EXPOSURE TO EXTRANEOUS INFORMATION THROUGH THE JURY'S UNAUTHORIZED BANANA EXPERIMENT.

### A.   Statement of Relevant Facts.

An important component of the Commonwealth's case was its effort to tie Greineder to a pair of bloodstained, dimpled work gloves found at Morse Pond.  The Commonwealth claimed that one key link between Greineder and the gloves was the similarity between a smear on the jacket Greineder was wearing that day and the pattern of dimples on the gloves.  The Commonwealth presented testimony from a blood spatter expert who opined that a streak on the jacket and the pattern on the gloves were similar. The defense cross-examined the Commonwealth's expert and produced its own expert in response, asserting that the Commonwealth's proof on this key point was unscientific and inadequate.  This dispute was highlighted in both closing arguments.

Evidence adduced at a post-verdict hearing established that the deliberating jury conducted its own experiment on this very issue. A member of the jury intentionally rubbed one of the work gloves against an unpeeled banana. The resulting bruise on the banana was seen by every juror and then compared to the streak on Greineder's jacket. It was noted that the bruise indeed looked like the streak on the jacket, supporting the Commonwealth's contention that the work gloves had come into contact with Greineder and making it seem more likely that he had committed the crime.

### 1.   Trial testimony.

The Commonwealth's expert, Rod Englert, opined that the pattern of dots on the work gloves matched the streak on Greineder's jacket. *Tr.* XVIII/182-183, 270. Both the gloves and the jacket were introduced into evidence.  On cross-examination, defense counsel established that Englert had

neither made any quantitative measurements nor produced overlays to compare the pattern of dimples on the gloves with the swipe pattern on the jacket. *Id.* at 253, 263-264, 270, 283.

Stuart James, the defense blood spatter expert, testified that he could not make a positive comparison between the dimples on the gloves and the streak on the jacket, calling such a comparison "speculation." *Tr.* XXII/87. James emphasized the absence of overlays comparing the jacket to the gloves as a significant omission in Englert's work which precluded a meaningful comparison. *Id.* at 86-90.

## 2.  Closing arguments.

In closing argument, defense counsel stressed the failure of Englert to make measurements or prepare overlays to support his opinion comparing the pattern on the gloves with the streak on Greineder's jacket, describing Englert's testimony as "guesswork and conjecture, not the kind of evidence that's required to prove someone guilty beyond a reasonable doubt." *Tr.* XXV/42-43. Defense counsel warned the jury: "You can't fill in the holes in the case. You can't fill in the gaps. You can't even connect the dots." *Id.* at 14-15.

In his closing argument, the prosecutor emphasized the importance of the swipe pattern on Greineder's jacket. He urged the jury to pay special attention to that streak and invited the jury to make its own comparison:

> I'll ask you one favor. Each and every morning you find the brightest light in that deliberation room. You look at the inner left lapel area here. See those dots. If they mean anything to you, you give them the weight that they deserve. If you don't, you think they're junk, you don't give them the weight. That's your option. That's your job as jurors. And again, ladies and gentlemen, right in this light. Again, with the patterns, ladies and gentlemen, on the plastic bags, on the hammer, across the plastic bag.

*Id.* at 89.

## 3.  Jury's request for a millimeter ruler.

On its third day of deliberations, the jury submitted a note to the court, which read:

"REQUEST MILLIMETER RULER." *2009 R.* 363. Defense counsel opposed the request, arguing

that it would encourage the jury to perform impermissible tests. He stressed that part of the defense

strategy was to emphasize Englert's failure to make measurements or create overlays and noted that

the defense expert had testified that such measurements were necessary to an accurate determination.

*Tr.* XXVII/7.  He added:

> I would suggest to the Court that it's beyond the expertise of the jury and requires the
> special expertise of an expert witness. I think, Your Honor, in addition, that ... **the
> jury should not be encouraged to perform its own tests....**

*Id.* at 12-13 (*emphasis added*). The court responded to the jurors in writing: "I am sorry that I cannot

grant your request for a millimeter ruler." *2009 R.* 364.

### 4.    Post-verdict inquiry.

In his motion for a new trial, Greineder presented an excerpt from a published book about

the case describing an experiment conducted by the jury during its deliberations. Based upon that

showing, the trial court took testimony from the book's author and admitted a recording of her

interview with one of the deliberating jurors. Thereafter, the court heard sworn testimony from six

deliberating jurors: W. Giesecke, S. Smith, E. Miller, C. Salvi, S. Vitzthum, and S. Barbera.

Juror Salvi described the jury's banana experiment. He explained that the jury was "trying

to make the glove print fit certain things on the jacket on the sleeve and glasses." *Tr.* (2/24/06) at

28. He noted that after the jury's request for a millimeter ruler had been denied, he performed an

experiment that enabled the jurors to "see what would have happened if this glove had run across

the slicker." *Id.* at 39. Salvi testified that while wearing one of the brown work gloves and holding

an unpeeled banana, he made a "little smear" on the banana. He recalled that the "smear looked like

one of the smears on the sleeve." *Id.* at 31-32. He stated that the smear "was a pretty good size. And

it was very obvious." *Id.* at 32. Salvi testified that "just about everybody saw it.... It wasn't exclusive

to me or one or two people." *Id.* at 33. He added: "We marveled at the fact that the print on the

banana looked just like the print on the sleeve, the streak." *Id.* He addressed the other jurors about the banana experiment, saying: "Look, we don't really need a ruler. We have got this." *Id.* at 38.

Several other jurors who testified during the post-verdict inquiry also remembered the banana experiment.  Juror Vitzthum testified: "[W]e asked for a ruler, and we were denied the ruler. And that's when we used the banana." She explained that one juror made a swipe on an unpeeled banana, and about ten minutes later, there was a mark on the banana that looked like a mark on the jacket. *Tr.* (3/3/06) at 9-10. She stated that the jurors discussed the mark on the banana after they observed it. *Id.* at 16. Juror Barbera remembered that someone rubbed a work glove on the outer skin of a banana, and the resulting bruise was then compared with Greineder's jacket. *Id.* at 19-21.

> ### 5.    The motion judge's decision.

The motion judge found that the experiment described by Salvi occurred on the fourth day of deliberations, that "strong similarities" between the smear on the banana and the streak on Greineder's jacket were noted by some jurors, and that there was communication among some jurors regarding those similarities. *Findings of Fact, Rulings of Law, and Order on Defendant's Motion for New Trial Based on Jury's Exposure to Extraneous Information* at 3, *2009 R.* 775. The judge further found that the banana experiment was not discussed by the jury thereafter and that the experiment "had no impact on the resumed deliberations on Day 4 and the deliberations on Day 5 to verdict." *Id.* at 4, *2009 R.* 776.

The motion judge characterized the banana experiment as "an experiment within the lines of the evidence offered at trial," adding that "the use of the banana, an outside object not part of the trial evidence, did not make the experiment an improper consideration of extrinsic evidence." *Id.* at 7, 9, *2009 R.* 779, 781. The judge concluded that the experiment did not constitute extraneous information. In any event, the judge determined, the experiment would not have influenced a hypothetical average jury and did not influence this jury. *Id.* at 10-14, *2009 R.* 782-786.

### 6.     The SJC's decision.

On appeal of the motion judge's decision, the SJC ruled that the experiment was within the scope of the evidence presented at trial and cumulative of expert testimony, as it was an evaluation of the testimony of experts who opined on the consistency between the dots on the gloves and "various pieces of evidence."   The SJC found no abuse of discretion in the motion judge's determination that the jury experiment did not constitute extraneous matter. *Commonwealth v. Greineder*, 458 Mass. 207, 246-248 (2010).

### B.     Summary of Applicable Law.

### 1.     Jury experiment as extraneous information.

The requirement that a jury's verdict be based solely upon evidence presented in the courtroom is guaranteed by the Sixth and Fourteenth Amendments. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965).  *Accord, Parker v. Gladden*, 385 U.S. 363, 364 (1966). The exposure of a deliberating jury to extrinsic evidence, including that derived from an improper jury experiement, deprives the defendant of these rights.  *See, .e.g., Lacy v. Gardino*, 791 F.2d 980, 983 (1st Cir. 1986) (*citing Gibson v. Clanon*, 633 F.2d 851, 853 (9th Cir. 1980), *cert denied* 450 U.S. 1035 (1981).  *See also Annotation*, *Propriety of Juror's Tests or Experiments in Jury Room*, 31 A.L.R.4th 566, 593-597 (1984) (collecting cases).  "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 464 (1907) (Holmes, J.) The jury's exposure to information "raises a presumption of prejudice"  and thus "the government bears the burden of showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction." *United States v. Santana*, 175 F.3d 57, 65-66 (1st Cir. 1999).

While it is true that jurors may examine and scrutinize the evidence, they may not experiment with the evidence in a way that has "the effect of putting them in possession of evidence not offered

at trial." *United States v. Beach*, 296 F.2d 153, 158 (4th Cir. 1961).  For example, jurors are free to manipulate evidence, even taking an exhibit apart and putting it back together, in order to take a "closer look" at it.  *See, e.g., Bogle v. Galaza*, 38 Fed. Appx. 437, 438 (9th Cir. 2002) (not improper for the jury to use a key to unlock a safe, where both items were in evidence).   In addition, jurors may use objects, even those not in evidence, to demonstrate a common sense principle or to illustrate an argument.  *See, e.g., Gentry v. State*, 236 Ga. App. 820, 823 (1999) (proper for a juror to use a toy car and a cofee cup to replicate collision at issue, because it was used "as a model to illustrate trial evidence").   However, when jurors go beyond these acceptable means of evaluating evidence admitted at trial and conduct experiments that have the effect of producing new evidence, their actions are improper because the new evidence is not subject to screening by the trial judge nor testing via cross-examination, thereby exposing the jurors to extraneous information.[68]

## 2.      Prejudice.

Such exposure to extrinsic evidence "raises a presumption of prejudice," *Santana*, 175 F.3d at 65-66, and thus the burden is on the "beneficiary of the error" to prove that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *Santana*, 175 F.3d at 66 ("the

---

[68]      *See, e.g., Marino v. Vasquez*, 812 F.2d 499, 502 (9th Cir. 1987)(relief granted where juror conducted experiment testing the accuracy of a defense witness's claim that it would be impossible for an individual to fire a handgun while it was held in a certain position); *Jennings v. Oku*, 677 F.Supp. 1061, 1062 (D. Haw. 1988) (relief required where entire jury conducted experiment aimed at discerning which party's version of how the defendant's fingerprints were placed on victim's car door was the correct version); *Miller v. Harvey*, 566 F.2d 879, 881 (4th Cir. 1977) (juror bit another juror on the arm so jury could resulting bruises and compare them to alleged human teeth marks identified in a photograph by a trial witness); *United States v. Castello*, 526 F. Supp. 847, 848 (W.D.Tex. 1981) (reversal where one of the jurors conducted a ballistics experiment to test whether the victim was shot in the back or from the front); *United States v. Navarro-Garcia*, 926 F.2d 818 (9th Cir. 1991) (improper for a juror to test whether the defendant should have known that there was marijuana in his trunk by placing roughly 300 pounds in the trunk of her car and observing the impact on the vehicle's driving); *Beach*, 296 F.2d at 158 (improper for the jury to test the amount of noise emitted by adding machines in evidence, because the conditions were not exactly as they were when the machines were in the home); *United States v. Welch*, 377 F.Supp. 367, 369 (D.S.C. 1971) (*aff'd p.c.*, 496 F.2d 861 (4th Cir. 1973) (use of adhesive tape by juror to test whether residuewould be left on skin once it was applied and removed as argued by defendant); *United States v. Nevell*, 28 F.3d 109 (9th Cir. 1994) (improper for jury to conduct an experiment with M & M's to test prosecution's theory of the case); *Carter v. State*, 753 S.W.2d 432 (Tex. App. 1988) (improper for jury to conduct experiment to determine whether defendant's account of how liquid splashed when he fell was credible); *Ex Parte Thomas*, 666 So. 2d 855 (Ala. 1995) (improper for jurors to use rope to tie a juror's hands and conduct an experiment to resolve a disputed issue).

government bears the burden of showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction"). If "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," then the error cannot be considered harmless. *Chapman*, 386 U.S. at 23.

In conducting harmless error review, the court must consider the "connection between the extrinsic information ... and an issue material to and disputed throughout the trial." *Santana*, 175 F.3d at 67. The greater that connection, the greater the prejudice arising from the jury's exposure to extrinsic evidence. *Id.* In addition, the court must consider the "record as a whole to detrmine the impact of the improper evidence upon the jury....The prejudicial effect of the improper evidence must be weighed against the weight of the properly admitted evidence." *Lacy*, 791 F.2d at 986 (*quoting Morgan v. Hall*, 569 F.2d 1161, 1166 (1st Cir. 1978)). *See also Santana*, 175 F.3d at 66. However, even where the independent evidence against the defendant is strongly indicative of guilty, "the presence of highly prejudicial extra-record evidence can cast doubt" on the verdict. *Lacy*, 791 F.2d at 986. *See also Gibson*, 633 F.2d 851 (despite strong case against the defendant, evidence was so prejudicial that it could not be considered harmless error). The prejudice arising from extraneous evidence is more easily recognized when that evidence would not have been admissible at trial. *See, e.g. Marshall v. United States*, 360 U.S. 310, 312-313 (1959) ("We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence.")

### C.    Application of Law to Facts.

#### 1.    The banana experiment exposed the jury to extraneous information.

As pointed out by defense counsel in closing, there was a major hole in the prosecution's case: the failure to establish a link between the murderer's gloves and Greineder. The jury was well

aware of this hole, and attempted to fill that gap themselves.  First they requested a millimeter ruler, which was denied because of the risk that they would use it to attempt to make measurements to determine whether or not the streaks on Greineder's jacket were made by the gloves. The importance of the trial judge's ruling barring use of the millimeter ruler cannot be overstated: if the use to which the jury would put the ruler was improper, than an experiment aimed at the same end was equally – if not more – improper.

Because the jury was denied the use of the millimeter ruler, they devised an experiment that would accomplish the same result -- the banana experiment.  After performing the experiment, the jury concluded, based on wholly unreliable and unscientific observations, that the streaks made on the banana closely resembled the streaks on Greineder's jacket. The jury's experiment enabled them to gain additional evidence that was not presented at trial -- an affirmative match between Greineder's jacket and the gloves worn by the murderer. As the motion judge stated, the jury effectively created its own "transfer exemplars." *2009 R*.779.  The fact that there was testimony at trial that the streaks on the jacket could *possibly* have been made by the gloves is totally inapposite because that testimony did not provide the jurors with a first-hand observation that the streaks looked exactly the same.  Indeed, the fact that the jurors were able to observe the results of this experiment by themselves made the evidence even more damning, since the jurors did not need to question their own methods and credibility, as they would for an expert's experiment.

The SJC's determination that this experiment did not expose the jury to extraneous evidence was an unreasonable application of clearly established federal law.  Supreme Court precedent clearly establishes that a verdict must be based solely on evidence presented in the courtroom, and not on evidence considered for the first time in the jury room. *Turner*, 379 U.S. at 472-73.  The jury's experiment essentially created an overlay of the streak from the gloves – a piece of critical evidence that defense counsel pointed out was missing from the prosecution's case.  The jury-created overlay

and the jury's conclusion that it looked similar to the streak on Greineder's jacket were considered

for the first time in the jury room without being subject to cross-examination.  The only reasonable

conclusion that could have been drawn from a review of the record was that the experiment had the

"effect of putting [the jury] in possession of evidence not offered at the trial," *Beach*, 296 F.2d at

158, and any conclusion to the contrary must be rejected as wholly unreasonable.

### 2.     The Commonwealth did not prove the absence of prejudice.

The Commonwealth did not meet its burden of proving beyond a reasonable doubt that the

jury's exposure to this extraneous evidence was harmless.  Indeed, there is no way that it could.

Defense counsel and the defense expert had stressed the absence of quantitative proof or overlays

linking the work gloves to Greineder's jacket.  Having been denied access to a ruler with which to

make its own quantitative assessment, the jury resorted to fabricating the equivalent of an overlay

using a banana and compared its creation to the streaks on the jacket. Armed with the results of its

comparison, the jury was significantly more likely to accept the Commonwealth's contention that

the murderer's gloves had created the streaks on Greineder's jacket, pointing to him as the

perpetrator. The precise evidentiary gap which the defense emphasized in the Commonwealth's

proof at trial was neatly filled in by the jury itself!  The prejudice is palpable.

The conclusion that an average jury was most likely to have been affected by this experiment

is reinforced by consideration of the factors discussed in *Santana*. The experiment exposed the jury

to evidence highly related to a material issue at trial -- whether there was any connection between

the murderer's gloves and Greineder. *See Marino*, 812 F.2d at 506 ("reversible error commonly

occurs where there is direct and rational connection between the extrinsic material and prejudicial

jury conclusion, and where the misconduct relates directly to a material aspect of the case.") This

experiment introduced evidence highly probative of this issue, evidence that was highly unreliable,

unscientific, and extraneous.  The prejudicial nature of this evidence was reinforced by the trial

judge's prior rulings prohibiting the introduction of expert experiments that were certainly significantly more reliable than the one performed by the jury.   As in *Marshall*, 360 U.S. at 312-313, "the prejudice to the defendant is almost certain to be as great when the evidence reaches the jury [by way of a jury experiment] as when it is a part of the prosecution's evidence." Indeed, the jury's use of a millimeter ruler would have been significantly more reliable than the experiment they performed – since it would have allowed them to make objective measurements in lieu of lay observations, but yet the judge ruled that use of the millimeter ruler would have been improper! Presumably, the trial judge similarly would have ruled the banana experiment to be improper had the jury asked permission to perform it. There was no immediate reprimand from another juror after the extraneous material was presented. On the contrary, many, if not all, of the jurors, looked at the mark on the banana, noted its similarity to the pattern on the gloves, and talked about it.

Moreover, there was far from overwhelming evidence of guilt.   There were no eyewitnesses to the crime nor inculpatory admissions. The jury deliberated for five days before reaching a verdict. There is simply no way of knowing what led each of the 12 jurors to vote to convict. Indeed, it was on the morning following this improper jury experiment that they delivered their guilty verdict!  The Commonwealth cannot meet its burden of proving beyond a reasonable doubt that there was not a "reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman*, 386 U.S. at 23.  This inculpatory, extraneous information which filled an important gap in the Commonwealth's case and which Greineder had no opportunity to rebut or challenge was clearly prejudicial.  Under *de novo* review, this Court should so find, but even if this Court concludes that the prejudice element was adjudicated on the merits, it is clear that the SJC's decision was an unreasonable application of clearly established federal law.   The motion judge was correct in observing that "although tying the gloves to Greineder was a significant part of the government's case, it was not so crucial that the jury could not have convicted the defendant without it." A. 784.

That, however, is not the applicable legal test!

The motion judge went beyond the hypothetical jury test under Massachusetts law and sought to make findings regarding the **actual** impact of the banana experiment on the jury. Both that endeavor and the conclusions he reached were flawed. The tainting of even a single juror is sufficient to invalidate a verdict. *Parker*, 385 U.S. at 366. Here, there was no evidence about the impact of the banana experiment on eight of the 12 deliberating jurors.[69] Absent blind speculation, the court could not properly conclude that any or all of those eight jurors was actually unaffected. However, among the jurors who did testify, there is ample evidence that it had an effect. Juror Salvi stated that the jurors "marveled" at the similarity between the bruise on the banana and the streak on the jacket. *Tr.* (2/24/06)/33. Juror Vitzthum confirmed that all of the jurors saw the bruise on the banana and compared it to the jacket, that the bruise on the banana looked like the streak on the jacket, and that they discussed the bruise. *Tr.* (3/3/06)/10-16. Juror Barbera testified to the same effect, adding that there was discussion of the comparison among the jurors. *Id.* at 21-22. During his recorded interview, conducted far closer to the time of trial than the evidentiary hearing, Juror Giesiecke stated that the banana experiment was "one of those moments" of insight, which "helped" the jury resolve the case. <u>A</u>. 750. Accordingly, the motion judge's determination that "the banana experiment did not influence the jury's deliberations or impact their verdict," *A*. 786, must be rejected. Indeed, since there is direct evidence that the experiment *actually* impacted at least one juror, and since Greineder "was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors," *Parker*, 385 U.S. at 366, he is entitled to *habeas* relief.

---

[69]     Those eight jurors included the six jurors who did not testify and jurors Smith and Miller, who did not recall the banana experiment and gave no testimony regarding its effect.

**VII.   GREINEDER'S FUNDAMENTAL RIGHT TO TRIAL BY JURY WAS DENIED BASED ON THE DELIBERATING JURY'S EXPOSURE TO EXTRANEOUS INFORMATION (STAINS ON THE BACK OF GREINEDER'S JACKET) WHICH HAD BEEN EXCLUDED FROM THE EVIDENCE AT TRIAL.**

**A.    Statement of Relevant Facts.**

**1.    Pre-trial proceedings.**

Part of Greineder's defense was that his jacket became stained with blood during his initial discovery of his wife, as he attempted to assess her injuries and help her, before summoning police and medical assistance. Despite extensive examinations by prosecution experts, no blood stains were observed on the back of the jacket.  No tests were conducted to assess the presence of any blood on this area by either chemical, serological, or DNA testing.  However, two months prior to trial, the jacket was treated with a chemical, amido black, which is a nonspecific stain that is used to detect the presence of protein, which is found in blood, but also in many other substances of animal and plant origin. After the amido black treatment, prosecution expert Rod Englert professed to find some stains on the back of the jacket which he characterized as "cast-off," stains resulting from blood flying off a bloody weapon repeatedly swung overhead while striking the victim.

The defense, in a pre-trial hearing on a motion *in limine*, argued that the absence of any scientific testing establishing that these stains actually were bloodstains, and the fact that amido black is unreliable to establish the presence of blood, precluded admission of the stains into evidence. No final ruling was made on this motion prior to trial. *Tr.* 5/17/01 at 14-17.

**2.    Trial proceedings.**

The jacket was introduced into evidence on June 5.  *Tr.* X/189; Exhibit 1B to *Memorandum* at 9.  As the trial progressed, the Court continued to hear argument about the admissibility of the stains on the back of the jacket. On June 13,  Englert was questioned outside the presence of the jury. He testified regarding the concept of "cast-off" (i.e. centrifugal force projecting blood off a weapon).

*Tr.* XVI/65.   On cross-examination, he admitted that he did not see any stains on the back of the jacket, despite using four high-intensity lights. "I could testify that it's cast-off, but I cannot say it's blood."   He noted that the stains had not been tested. *Tr.* XVI/101-103.

After the *voir dire* of Englert on June 13th, the Court acknowledged that there was not enough evidence to conclude that the stains were blood.   *Tr.* XVI/218-219.   The prosecutor argued that the evidence that the stains were cast-off of a protein was admissible even in the absence of direct proof that the stain was caused by blood. *Tr.* XVI/236. The following morning, June 14, the trial judge again discussed his thinking regarding the back of the jacket, questioning how the jury could permissibly infer that cast-off protein stains were, in fact, blood, when the Commonwealth's experts would not "bridge the gap and say its blood." *Tr.* XVII/14-16.

As the trial progressed, Michael French, a fingerprint examiner, testified to the jury on June 14th about amido black and how it can be used to enhance bloodstains by staining protein a dark blue or black color so that it can be better visualized. *Tr.* XVII/21-22.   He introduced  photographs of stains from the front of the jacket. With the issues relating to the back of the jacket still unresolved, Lt. Kenneth Martin testified before the jury regarding bloodstain pattern analysis.   He explained the concept of "cast-off." *Tr.* XVII/47-48, 61-62. Lt. Martin then testified on *voir dire* outside the jury's presence about the stains on the back of the jacket, pointing to stains on the back of the jacket and stating: "these are very, very good, well defined cast-off type of spatters." *Tr.* XVII/169-170. He stated that he could testify to a reasonable degree of scientific certainty that it was cast-off, but could not say to a "reasonable degree of scientific or forensic certainty that it's blood." *Id.* at 175.   After court concluded that day, Judge Chernoff issued a written ruling admitting evidence regarding the stains on the back of the jacket. S*ee Ruling dated June 14, 2001*.   Within a few hours, however, Judge Chernoff reconsidered and issued a different Order on Reconsideration, in which he ruled that evidence of the stains was excluded because although the Commonwealth could establish that the

jacket was positive for protein and the stains were consistent with a "cast-off" pattern, none of the

Commonwealth's experts would testify that the cast-off stains were bloodstains. He stated:

> **The stains on the back of the jacket are not relevant to the case unless the fact finder can draw the inference that they are cast-off blood stains.** The Commonwealth argues that the jury can make that finding inferentially on facts which are not found beyond a reasonable doubt nor even with the standard that governs the experts. In other words that, on the same evidence, the jury can reach conclusions that the experts cannot.

(*Emphasis added*.) Judge Chernoff also noted that, although the stain had been "indelibly dyed" by

the amido black reagent, it could still have been further tested for DNA. He concluded:

> As it now stands, the evidence is barely relevant and its prejudicial effect would greatly outweigh its probative value. **Hence, evidence of the presence of protein on the back of the jacket and its cast-off configuration will be <u>excluded</u>**.

*Id.* at 2 (*emphasis added*).

Early the next morning, before the jury came in, Judge Chernoff brought up the jacket issue

with counsel again, mentioning his two orders. The possibility of removing the stained area from

the back of the jacket was immediately raised by the prosecutor:

> THE COURT: All right. I sincerely apologize to all of you for changing an order that I did last night. It didn't set right with me, so, I made the change. Okay. Thank you.
> MR. GRUNDY: I'm going to ask one consideration that, if we could take a short break between this witness and the next and it may fall in an appropriate area for a break, but **I would just like to get that off of that jacket** so that the next witness can testify to --
> THE COURT: To get what off the jacket?
> MR. GRUNDY: **Cut that out of the jacket**.
> THE COURT: Well, I could just simply tell the jury that **what's on the back of the jacket** -- there's no proof that it's blood and so it's irrelevant to this case. Then they don't think there's something being kept from them. I could simply say **it's irrelevant. It's not evidence in this case**. If you people have an agreement I'll go along with it. **If not, I'll make a decision on it.**

*Tr.* XVIII/4-5; Exhibit 1E to *Memorandum* at 53-54. Later that day, prior to the testimony of Rod

Englert, the parties discussed at sidebar the planned use of the jacket with a mannequin. Both

attorneys appeared willing to have the jacket redacted, but the court again delayed taking any action:

MR. MURPHY: I would just -- would like to give -- have an opportunity to look at the dummy dressed up before the jury sees the dummy dressed up. I noticed that on that area in the back there's a big piece of measuring tape.

MR. GRUNDY: I can take that off.

MR. MURPHY: **I would prefer to cut that out of it, the whole area out of the jacket.** Because if Mr. Englert says anything about cast-off, they're going to draw conclusions.

THE COURT: Well, does he know that the only cast-off he can talk about is something that he referred to in the front?

MR. MURPHY: But I think that they'd be able to jump to their own conclusions about the back, if when he starts talking about cast-off, he puts his arm back and when --

THE COURT: Well then why don't we move the dummy over here so the jury won't see it and you can take a look at it before you use it.

*Tr.* XVIII/69; Exhibit 1E to *Memorandum* at 56. Englert then testified before the jury regarding cast-off, but made no mention of any possible cast-off on the back of the jacket. *Tr.* XVIII/83-84.

### 3.    Post-conviction developments.

In 2012, a book entitled *A Murder in Wellesley* was published regarding the investigation and trial in this case. Tom Farmer, Marty Foley, *A Murder in Wellesley: The Inside Story of an Ivy-League Doctor's Double Life, His Slain Wife, and the Trial That Gripped the Nation* (Northeastern University Press, 2012). The book was authored by the lead criminal investigator (Foley), together with the lead reporter (Farmer) covering the trial for the Boston Herald. In chapter 25, the authors elaborate in detail upon the jurors' activities during deliberations, including what appear to be direct quotations from at least eight jurors. It also includes the following paragraph:

Poring over every inch of the bloodstained evidence, the jurors made another startling discovery on the back of the nylon windbreaker that they had heard no testimony about. Discussing what could have caused the small, circular stains highlighted by amido black, **they could come to only one conclusion. It had to be blood cast from an upraised weapon**. Not knowing Marty Murphy had convinced the judge to keep the incriminating pattern out of evidence because Grundy could not prove it was May's blood after deciding not to remove the stain and have it tested, the astute jurors had found it anyway.

*A Murder in Wellesley*, pp. 292-293 (emphasis added); *Affidavit of Counsel in Support of Application for Leave to Appeal from Denial of His Motion for New Trial* (8/21/14), Exhibit 3, *2014 R.* 65-69.

### 4.    Motion judge's ruling in denying relief.

*Defendant's Motion for Post-Verdict Jury Inquiry and New Trial* based on these facts was filed on March 8, 2014.   On July 24, 2014, the trial court (Brassard, J.) denied relief in a *Memorandum of Decision and Order on Defendant's Motion for Post-Verdict Jury Inquiry and New Trial*, 2014 WL 3715033.  Judge Brassard initially examined whether there was a waiver of the issue based on defense counsel's failure to object or to seek to conceal the back of the jacket or request a limiting instruction. He concluded, contrary to the Commonwealth's arguments, that "given the seriousness of the defendant's claim, it is better to address the merits than to rest on waiver." *Id.* at 11, *citing Santana*, 175 F.3d at 65. Judge Brassard also rejected the Commonwealth's argument that Greineder had waived the issue by failing to raise it in the first motion for new trial. He wrote: "[T]he defendant was unaware of the jury's examination of the back of the jacket and discussion of the cast-off stains at the time he filed and litigated his new trial motion and direct appeal." *Id.* at 12.

Addressing the merits of the issue, Judge Brassard found that the consideration of the stains did not constitute improper extraneous evidence.   In doing so, he relied on two separate considerations.  First, he reasoned that the real focus of the dispute was not the stains themselves, but potential expert testimony based thereon.  He stated:

> The Commonwealth argues that this ruling excluded only expert testimony concerning the stains, not the stains themselves....  There is much force to the Commonwealth's argument.  Judge Chernoff's principal concern was admitting *expert* testimony about the significance of the stains based on the *assumption* that the protein stains were attributable to human blood and in particular, to the blood of the victim....  In addition, the Commonwealth's interpretation arguably is supported by the fact that the court sent the jacket to the jury during deliberations without concealing the stains on the back.

*Id.* at 18-19 (*italics in original*). Second, he reasoned that there had been some discussion of the stains during trial due to questioning by defense counsel.  He said:

> Defense counsel himself drew attention to the back of the jacket in cross-examining Englert on June 15, 2001, asking whether he took notes and made diagrams about the

significant stains he observed on the front and the back of the jacket. The stains on the back of the jacket thus were mentioned at trial despite the ruling excluding expert testimony on the subject.

*Id*. at 20-21.  Based on these two points, Judge Brassard ruled that "even assuming the accuracy of the events described in the book, Greineder has not demonstrated by a preponderance of the evidence that the jury was exposed to extraneous evidence in violation of the Sixth Amendment."*Id.* at 21.

Further, Judge Brassard determined that there was no "reasonable possibility of prejudice." *Id*. at 21.  He rejected Greineder's argument that, as the jury took an active role in generating new evidence against the defendant, prejudice should be presumed.  Here, he reasoned, "the jurors did not actively gather outside information for use in reaching a verdict; rather, they examined evidence on the back of a jacket which had been admitted as a trial exhibit and sent to [*sic*] into the jury room for use in their deliberations." *Id.* at 23. He concluded that the evidence of the stains was cumulative of other similar evidence, and did not "uniquely undermine the defense."  *Id.* at 25. He rejected the claims of ineffective assistance of counsel for the same reasons.  *Id.* at 26 n.3.

### 5.      The SJC's denial of Greineder's gatekeeper application.

Justice Spina of the SJC denied Greineder's application under M.G.L. c. 278, §33E for leave to appeal Judge Brassard's decision.  Justice Spina ruled that Greineder's argument was neither "new" nor "substantial," thus it did not need to be considered by the full court.  He ruled that the act the defendant challenges is not the use of the jacket during deliberations, but rather its unadulterated submission to the jury.  He found that the defendant was aware, or on notice, at the time, that the jacket was submitted to the jury with the back panel intact, thus his failure to address this oversight on direct appeal does not render the issue "new" for purposes of G.L. c. 278, § 33E gatekeeper review.  He ruled that the book publication is "immaterial" as its effect was merely to draw the defendant's attention belatedly to an issue he could have addressed earlier. Moreover, Justice Spina ruled that the issue was not "substantial," finding that (1) the motion judge found that the back panel

of the jacket was not extraneous information since the jury had before it information, knowledge, or specific facts that came from the evidence at trial, and did not actively seek out extraneous information, and (2) the prejudicial effect was minimal, if not non-existent, and was extremely unlikely to tip the scales.  *Memorandum of Decision*, No. SJ-2014-0352, dated 12/30/14.

### B.    Summary of Applicable Law.

#### 1.    Constitutional right to jury trial based on the evidence.

The requirement that a jury's verdict be based solely upon evidence presented in the courtroom, "where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," is guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution. *Turner*, 379 U.S. at 472-473.  *Accord Parker*, 385 U.S. at 364; *Santana*, 175 F.3d at 65. This is because "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson*, 205 U.S. at 464.  *See also United States v. McKinney*, 429 F.2d 1019, 1023 (5th Cir. 1970)("Our adversary system presupposes courtroom testimony only and must reject the transfusion of testimony adduced beyond the judicial aegis. To the greatest extent possible, all factual testimony must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime."); *United States v. Ofray-Campos*, 534 F.3d 1 (1st Cir. 2008).

#### 2.    Extraneous Information.

"The jury's exposure during its deliberations to extrinsic information, whatever its source, is an error of constitutional proportions." *Santana*, 175 F.3d at 65.  "If prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial." *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984). The fact that extrinsic information is brought to the jury's attention through inadvertence rather than purposefully is irrelevant to the consideration of

whether the defendant is entitled to a new trial. *Id.* ("Even if inadvertent, sending the unauthorized exhibits [] to the jury during their deliberation was error" ). *See also United States v. Lenz*, 383 F.3d 191, 219 (4th Cir. 2004) ("It is not necessary that the defendant prove that the prejudicial evidence was intentionally placed before the jury to obtain a new trial; accidental or inadvertent submission of the materials will suffice."); *United States v. Contreras-Matos*, 5 F.3d 541 (9th Cir. 1993) (error, albeit harmless under the facts of the case, when a "packet of extrinsic information was inadvertently attached to a government exhibit."); *United States v. Greene*, 834 F.2d 86, 88 (4th Cir. 1987) (error even though the extrinsic evidence was "sent to the jury room through inadvertence.")

In addition, the fact that the extrinsic information was attached to a properly admitted exhibit is irrelevant; what matters is the fact that the jury was exposed to the information. *See Lacy*, 791 F.2d at 986 (Sixth Amendment violation when juror peeled tape off exhibits to unmask information about defendant's prior criminal record); *United States v. Lee*, 573 F.3d 155, 162 (3d Cir. 2009) ("This rule equally applies to material submitted to the jury through inadvertent attachment to properly admitted evidence"); *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970) (reversible error when jury found previously undetected $750 in cash located in a shirt inside an attache case that was admitted into evidence). *See also Bates v. Preble*, 151 U.S. 149 (1893) (reversible error when trial judge allowed entire book to go to jury without sealing off inadmissible pages).

This doctrine covers not just information unrelated to trial testimony and exhibits, but also objects or information submitted with the exhibits or attached thereto. In one particularly illuminating case, *Benjamin v. Fischer*, 248 F.Supp.2d 251 (S.D.N.Y. 2002), *aff'd*, 87 Fed. Appx. 761 (2d Cir. 2004), the trial court ruled that the defendant's prior convictions were inadmissible. During trial, defense counsel introduced into evidence a report that included information regarding the defendant's prior convictions. There was no objection and indeed no mention at the time that

the report included that information.  At some point defense counsel -- without informing the court -- used an ink marker to black out the portions of the report referencing the prior charges.  After a guilty verdict, one of the jurors contacted the court and defense counsel and indicated that, during deliberations, the jurors had held the report up to the light and read through the black ink, thereby discovering the prior charges.  On *habeas* review, the prosecution argued that the arrest portion of the police report was not "extrinsic evidence because the report "was admitted as a defense exhibit without restrictions."  *Id.* at 260-261.  It noted that it had been defense counsel who offered the exhibit, and claimed that "the exhibit in its entirety was duly admitted evidence because the record did not indicate that the report was to be redacted before being presented to the jury."*Id.* In the course of finding a Sixth Amendment violation, the *habeas* court rejected these arguments.  It stated first:

> **[E]xtrinsic information does not transform itself into admissible evidence simply because it is hidden within a properly admitted exhibit introduced into evidence without restrictions**....Here, in a pretrial hearing, Benjamin's prior criminal convictions—a felony conviction for robbery and a misdemeanor conviction for assault—were explicitly held inadmissible except for purposes of impeachment by the government if Benjamin chose to testify....  The mere fact that defense counsel approved of the police report in the form it was admitted does not deprive petitioner of his constitutional right not to have extrinsic information considered by the jury.

*Id.* at 261 (*emphasis added*).  It then noted that the fact that it was defense counsel's ineffective redaction was not determinative.  It wrote:

> Moreover, the extraneous nature of the redacted portion does not change simply because the admitted evidence was a defense exhibit, or the redaction was performed by defense counsel. The settled law in this circuit is that it is the "'*nature* of the matter [discovered by the jury] and its probable effect on a hypothetical average jury,' not the *source* of the information ... which determines whether [a] defendant has been prejudiced."...  Whether the inadequately redacted document at issue here was a prosecution or defense exhibit is of no significance. In either case, the hidden and inadmissible information is contained in a duly admitted exhibit that both parties approved for receipt into evidence.

*Id.* at 261-262 (*italics in original*).  Having found that extraneous information had come before the jury, the court then considered the issue of prejudice.  It found that the error was not harmless, under

the *Chapman* test (as discussed below), and that the state court's decision had been contrary to well-established federal law. *See also Eslaminia v. White*, 136 F.3d 1234 (9th Cir. 1998) (tape introduced into evidence as it contained interview with defendant; jury also listened to reverse side, which had a separate interview with a non-testifying witness that had not been referred to at trial).

### 3.    Evaluation of prejudice.

Exposure to extrinsic evidence "raises a presumption of prejudice." *Santana*, 175 F.3d at 65-66 (citing *Remmer v. United States*, 347 U.S. 227, 299 (1954)). The burden is on the "beneficiary of the error" to prove that it was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24; *Santana*, 175 F.3d at 66 ("the government bears the burden of showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction"). If "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," then the error cannot be considered harmless. *Chapman*, 386 U.S. at 23. *See also Braswell v. United States*, 200 F.2d 597, 602 (5th Cir. 1952); *United States v. Bradshaw*, 281 F.3d 278, 293 n.8 (1st Cir. 2002).

In conducting harmless error review, the court must consider the "connection between extrinsic information...and an issue material to and disputed throughout the trial." *Santana*, 175 F.3d at 67.   The greater that connection, the greater the prejudice arising from the jury;s exposure to extrinsic evidence. *Id.* in addition, the court must consider the "record as a whole to determine the impact of the improper evidence upon the jury...The prejudicial effect of the improper evidence must be weighed against the weight of the properly admitted evidence." *Lacy*, 791 F.2d at 986. *See Santana*, 175 F.3d at 66.   However, even where the independent evidence against the defendant is strongly indicative of guilt, "the presence of highly prejudicial extra-record evidence can cast doubt" on the verdict. *Lacy*, 791 F.2d at 986.  *See also Gibson v Clannon*, 633 F.2d 851 (9th Cir. 2011) (despite strong case against the defendant, the evidence was so prejudicial that it could not be

considered harmless error).   The prejudice arising from extraneous evidence is more easily

recognized when that evidence was already deemed inadmissible at trial.   *See, e.g. Marshall*, 360

U.S. at 312-313 ("We have here the exposure of jurors to information of a character which the trial

judge ruled was so prejudicial it could not be directly offered as evidence.   The prejudice to the

defendant is almost certain to be as great when that evidence reaches the jury through news accounts

as when it is part of the prosecution's evidence.").

      **C.**     **Application of Law to Facts.**

      **1.**     **The jury was exposed to extraneous material.**

Greineder clearly made a sufficient showing to require a post-verdict inquiry to determine

whether members of the jury inspected and discussed the stains on the back of jacket during

deliberations.   The trial judge had specifically ruled that the *stains*, not just the expert testimony

regarding them,  were not relevant and any mention of them during the trial was excluded.   Despite

that ruling, the jury discovered those stains, and formed their own unreliable and unscientific

conclusions about what caused them. Because this information was not presented from the witness

stand, the defendant was denied any opportunity to confront or respond to it.  He had no opportunity

to emphasize that the stains could have come from a non-blood source, no opportunity to present an

alternative explanation for the protein on the back of the jacket, and no opportunity to even contest

the conclusion that the stains were consistent with cast-off from an upraised weapon. Because there

was no testimony regarding the back of the jacket, the jury was not aware that the stains had not been

visible at all prior to the use of the amido black.  Even more importantly, the jury was not aware that,

unlike other stains on the jacket (which were seen to be the color of blood initially or were subjected

to further confirmatory testing), there was no reason to believe that the stains on the back were blood,

rather than some other protein.  The jury's evaluation of this evidence was therefore not only beyond

the scope of the evidence properly before it, but also likely based on a fundamentally-flawed and untested assumption by the jury that the stains were bloodstains. This information did not pass through the "judicial sieve."  Indeed, unlike most reported cases on the subject of extraneous information, this information was deliberately filtered out by that sieve!

This case is on all fours with *Benjamin v. Fischer*. Here, as there, the evidence was explicitly held inadmissible, was not rendered admissible simply because it was "hidden within" or attached to a proper piece of evidence, and the "mere fact" that somehow this information was allowed by defense counsel -- as well as the prosecutor and the Court -- to make its way into the jury room does not "deprive [Greineder] of his constitutional right not to have extrinsic information considered by the jury." 248 F.Supp.2d at 261.  Additionally, as in *Santana*, 175 F.3d at 65, here the judge's delay and indecision contributed significantly to the reasons that the offending items were not excised from the jacket as specifically requested by both the prosecutor and defense counsel.

## 2.    The defendant was prejudiced.

Once it is established that the jury was exposed to extraneous information, the burden shifts to the Commonwealth to prove a lack of prejudice beyond a reasonable doubt.  The Commonwealth has utterly failed to satisfy its burden. Since the "connection between the extrinsic information...and an issue material to and disputed throughout the trial" is extraordinarily high, the prejudice resulting from this exposure is obvious. *Santana*, 175 F.3d at 67. The extraneous information fit exactly into the prosecution's theory of the case -- that Greineder's use of a weapon had resulted in cast-off stains on the back of his jacket -- which is, obviously, why the prosecution fought so hard to have it admitted, why the defense objected so strenuously, and why the Court properly devoted so much attention (including two written opinions on the same day during trial) to deciding this precise issue. The Commonwealth should hardly be heard to contend now that it devoted so much effort to

introducing evidence that would have had no effect on the trial.  This information was not harmless, much less harmless beyond a reasonable doubt.

Having listened to weeks of testimony from lay witnesses and dueling experts, this jury chose to resolve the case (at least in part) based on its own bloodstain "analysis" of stains that no expert had discussed.  It is mind-boggling that in a case tried with such obvious care on both sides and with such a wealth of evidence for the jury to properly evaluate, the jury chose to rely on its own untutored bloodstain analysis, which the defendant had no opportunity to address.  Prejudice must be presumed. There was not overwhelming evidence of guilt in this case; the jury deliberated over four days before reaching its conclusion. While it may be true that there was a fair amount of evidence against petitioner, "the presence of highly prejudicial extra-record evidence" such as this nonetheless casts doubt on the verdict, and relief is required.  *Lacy*, 791 F.2d at 986.  The highly prejudicial nature of this extraneous material is exemplified by the trial judge's ruling that its prejudicial value substantially outweighed its probative value.

The motion judge was wrong that Judge Chernoff only excluded expert opinion regarding the stains, and did not intend to exclude the stains themselves.  First, it is clear that Judge Chernoff did in fact exclude the stains on the back of the jacket. He explained, at one point: "[W]hat's on the back of the jacket -- there's no proof that it's blood and so it's irrelevant to this case. Then they don't think there's something being kept from them. I could simply say it's irrelevant. It's not evidence in this case." *Tr.* XVIII/4-5.  This paralleled what he wrote in his ruling, where he stated: "The stains on the back of the jacket are not relevant to the case [unless the jury could conclude that they were cast-off, which Judge Chernoff decided that they could not]." Exhibit 2A to *Memorandum*.  In short, there is no way to read the record as supporting any conclusion other than that the stains themselves were excluded from evidence.  He wrote directly regarding "what's on the back of the jacket," that

is, the stains (not the opinions).   Judge Brassard's interpretation of Judge Chernoff's ruling is

contrary to Judge Chernoff's plain language.  It is also contrary to the obvious interpretation of the

parties (and the court) at the time.  There would have been no discussion of cutting parts of the jacket

off had the only issue been the expert opinion testimony.

Judge Brassard's further conclusion, adopted by Justice Spina, that this evidence was

cumulative of trial testimony because defense counsel mentioned the notion of stains on the back of

the jacket while cross-examining Englert must be rejected.   The question referred to by Judge

Brassard related to notes taken by Englert regarding what he saw on the rear of the jacket prior to

staining it with amido black – which was nothing!   *See Tr.* Vol. XVIII/240-241.[70] **There was no**

**discussion whatsoever in front of the jury regarding any cast-off stains on the rear of the**

**jacket.**  Judge Brassard's and Justice Spina's reliance on this portion of the trial transcript to reject

Greineder's claim was an unreasonable determination of the facts in light of the record. Moreover,

"to be considered truly cumulative, there must be an extremely close relationship between the

extrinsic evidence and the evidence actually admitted." *Eslamania*, 136 F.3d at 1239.  A question

about whether any notes were taken about any staining on the back of the jacket can hardly be

---

[70]     Murphy questioned Englert, in pertinent part:

Q:     And you also noted a number of other stains, again, before this jacket was treated with amido
       black; is that correct?
A:     That's correct....
Q:     And you made some notes and some little diagrams about the stains that you saw on the front
       and on the back that were the most significant; isn't that right?  When you first examined the
       items back on?
A:     I documented everything that I could, yes, sir.

*Tr.* Vol. XVIII/237-241; *attached hereto as Exhibit 3.*  Murphy then introduced the diagram that Englert had made "of
the stains that you thought were significant on the backside of the jacket."  *Id.* at 241. It was clear that, during this pre-
amido black examination, Englert did not see the stains that are now in question.  During *voir dire*, Englert had testified,
as to his examination at the time: "I didn't see any blood-stain, sir.  I missed it if it was there I didn't see it."  *Tr.* Vol.
XVI/100; Exhibit 1C to *Memorandum*.  He wrote the word "void" in his notes with respect to the back of the jacket.
*Id.* at 100-101. In short, what happened during cross-examination is merely that Murphy brought out the fact that, in his
examination of the relevant portion of the back of the jacket prior to the application of amido black, Englert did not note
any blood-stains in that area.  There is no way that this sequence of questions can be used to support Judge Brassard's
conclusion that the stains on the back of the jacket that appeared only after the treatment of amido black were discussed
in any way in front of the jury at trial.

considered extremely closely related to the actual stains, which enabled the jury to improperly and erroneously infer that they were caused by blood cast-off.   And further, just because "some evidence... was properly introduced at trial does not mean that the specific, novel details provided" by viewing the stains and coming to unscientific conclusions should be considered harmless.   *Id.*

Finally, Judge Brassard's conclusion, also adopted by Justice Spina, that the jury's consideration of the stains on the back of the jacket was not prejudicial because the stains were cumulative of other information in the trial, is unreasonable.  First, it ignores that the jury apparently was, in fact, influenced by its consideration of the extraneous evidence.  As is stated in *A Murder in Wellesley*, the jurors did not merely notice the stains, but rather "discuss[ed]" them and "c[a]me to [a] conclusion" regarding them.   That alone -- reliance upon the extraneous evidence to *reach a conclusion* directly implicating Greineder -- is enough to establish prejudice.  Evidence that even one juror was *actually* effected by the extraneous information is sufficient to invalidate a verdict.  As the Supreme Court has observed, a criminal defendant is "entitled to be tried by twelve, not nine or even ten, impartial and unprejudiced jurors." *Parker*, 385 U.S. at 366.  This was not idle chitchat, but rather focused discussion that led to an incriminating conclusion. Second, the motion judge failed to grasp that while there were many pieces of circumstantial evidence against the defendant, the defendant had responded to and addressed all of them, either by attacking them in terms of weight or credibility or by arguing that they were not actually incriminating.  The evidence of the stains on the back of the jacket, however, was not rebutted or attacked by the defense -- because the defense was not aware that the jury was considering this extraneous material to establish his guilt.  Such unknown and thus unrebutted evidence can hardly be considered cumulative of other pieces of evidence that were vigorously opposed.  Perhaps the best measure of the importance of the excluded "cast off" evidence is not Judge Brassard's evaluation, but rather that of the parties at the time.  As

quoted in detail above, the trial court and the parties spent extensive time discussing the admissibility of this evidence, and the Commonwealth sought vigorously (though, at the time, unsuccessfully) to introduce it precisely because it believed that this was significant evidence that would substantially buttress its case. It would not have devoted this effort to meaningless evidence. The jury's exposure to this extraneous evidence was not harmless.

> **3.    In the alternative, Greineder's right to the effective assistance of counsel was violated.**

In the alternative, defense counsel provided ineffective assistance in allowing the jacket to go to the jury without any objection or attempt to redact or conceal the stains on the back of the jacket. "[A]s a general proposition, 'defense counsel [is] as responsible as the prosecutor for seeing to it that only proper exhibits [are] sent to the jury room." *Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994). *Cf. Bustamante v. Quarterman*, 284 Fed. Appx. 183, 188 (5th Cir. 2008) (assuming counsel's failure to ensure only admitted exhibits sent to jury constituted deficient performance). Once the trial judge ruled that testimony regarding the back of the jacket would be precluded because of the amido black staining, defense counsel should have ensured that the back of the jacket was either covered or removed.  Indeed, both defense counsel and the prosecutor realized that the back of the jacket had no place in the case, and the judge specifically requested that they propose a solution to the problem.  Yet this was apparently never done.  Trial counsel does not recall at this point what his thinking was at the time respecting this subject.  *Affidavit of James L. Sultan*, Exhibit 4 to *Memorandum*, ¶3. In any event, there was no reasonable tactical reason for such omission.  Indeed, defense counsel accurately realized at the time that, if nothing was done, the jury would likely reach its own conclusion regarding the back of the jacket, to the defendant's detriment. *Tr.* XVIII/69; Exhibit 1E at 56. As he stated, the jury could apply Englert's testimony "to jump to their own conclusions about the back." *Id.*  Under the circumstances, any strategic decision to allow

the jury to consider the stains on the back of the jacket during deliberations would have been manifestly unreasonable, as no conceivable purpose for the defense would have been served thereby.

Further, to the extent that this Court were to find that counsel's actions and omissions with respect to the jacket did not, standing alone, rise to the level of a constitutional violation, then in the alternative the defendant argues that the cumulative effect of all counsel's errors, including those previously raised in the motion for new trial and this additional error relating to the back of the jacket, violated his constitutional right to the effective assistance of counsel.

### 5.    This Court should order *habeas* relief.

Supreme Court precedent clearly establishes that a verdict must be based solely on evidence presented in the courtroom, and not on evidence considered for the first time in the jury room. *Turner*, 379 U.S. at 472-73; *Parker*, 385 U.S. at 364; *Patterson*, 205 U.S. at 464. This is a case where evidence specifically deemed too prejudicial to be admissible was seen and evaluated by the jury in a manner that influenced their decision.  This occurred due to the combined inattention of the judge (who failed to make a decision) and both prosecuting and defense attorneys. The impermissible influence of inadmissible evidence upon the jury is an exceptional circumstance that violates due process and clearly established Supreme Court precedents. *Cf. Bouret-Echevarria v. Caribbean Aviation Maintenance*, 784 F.3d 37 (1st Cir. 2015)(juror awareness of external influence is "extraordinary circumstance" that might justify extraordinary relief of vacating civil judgment under Fed. R. Civ. P. 60(b)(6), *citing Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.")). The state court decision that the jury was not exposed to extraneous evidence and that any exposure was harmless must be rejected as an unreasonable determination of the facts and

an unreasonable application of clearly established federal law.  Greineder is entitled to *habeas* relief.

## CONCLUSION

Any criminal defendant disappointed in the outcome of state court proceedings may file a petition for writ of *habeas corpus* in federal court. Such petitions, which are commonplace, often deserve short shrift.  The recent trend, both in legislation and in the decisions of the United States Supreme Court, has been to narrow the availability of *habeas corpus* relief and to defer to the decisions of state courts.  In some cases, however, constitutional violations of great magnitude occur which deprive a criminal defendant of a meaningful opportunity to defend himself against the most serious of criminal charges.  In such cases, the fundamental fairness of the criminal justice system and the reliability of the result rendered by that system are cast into grave doubt.  In the most extreme cases, an innocent person may be wrongfully convicted and sentenced to life imprisonment.

This is one of those rare cases which cries out for relief.   This first degree murder trial was beset by serious errors by both trial counsel and the trial judge from start to finish.  Due to the combined effect of myriad mistakes by the trial court, defense counsel, the prosecutor, the Commonwealth's witnesses, and even the jury, Greineder was deprived of constitutional due process, and his resulting murder conviction cannot be deemed just or fair.  The petition for writ of *habeas corpus* should be granted and the state ordered to either release the petitioner from custody or retry him within a reasonable period of time.

Respectfully submitted,
**DIRK GREINEDER**
By his attorney,
/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
Rankin & Sultan
151 Merrimac Street
Boston, MA 02114
(617) 720-0011

Dated: July 17, 2015