# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
**DIRK GREINEDER**                                              )
                                                                )
              **Petitioner,**                                   )
                                                                )
**v.**                                                          )          **Civil Action No. 15-12978-DJC**
                                                                )
**SEAN MEDEIROS**                                               )
                                                                )
              **Respondent**                                    )
_____ )


## RESPONDENT'S MEMORANDUM IN OPPOSITION TO
## <u>THE PETITION FOR HABEAS CORPUS</u>


Respectfully submitted,
MAURA HEALEY
Attorney General

<u>/s/ Susanne G. Reardon</u>
Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2832
Dated: March 8, 2016              BBO # 561669

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 4

PRIOR PROCEEDINGS ................................................................................................ 4

STATEMENT OF FACTS ............................................................................................. 5

ARGUMENT .................................................................................................................. 10

I.    UNDER AEDPA, THIS COURT'S REVIEW OF PETITIONER'S CLAIMS IS
      LIMITED AND HIGHLY DEFERENTIAL. .................................................. 10

II.   THE SJC'S DENIAL OFPETITIONER'S PUBLIC TRIAL CLAIM WAS NOT
      OBJECTIVELY UNREASONABLE, AND PETITIONER IS NOT ENTITLED TO A
      NEW EVIDENTIARY HEARING IN FEDERAL COURT ........................................... 12

      A.    The State Courts Found That the Courtroom Was Not Closed. ........................... 13

      B.    The SJC's Finding that the Courtroom was not Closed Was Not Objectively
            Unreasonable, and Petitioner Cannot Overcomethe Presumption of Correctness.15

      C.    De Novo Review of this Claim is not Appropriate Where the SJC Properly Found
            No Closure and Therefore the *Waller* Factors Were Not Required. ..................... 16

      D.    The SJC's Decision to Affirm the Denial of the Motion to Recuse Was Not
            Contrary to or an Unreasonable Application of Federal Due Process Principles as
            Established by the Supreme Court. ....................................................................... 17

      E..   Petitioner's request for an evidentiary hearing should be denied. ........................ 18

III.  THE SJC REASONABLY CONCLUDED THAT THE COMMONWEALTH'S DNA
      EXPERT'S TESTIMONY DID NOT VIOLATE PETITIONER'S RIGHT TO
      CONFRONTATION ................................................................................................ 20

      A.    The *Williams* Decision. ......................................................................................20

      B.    Petitioner's Claim Regarding the Expert Witness's Opinion Testimony is
            Procedurally Defaulted. ....................................................................................... 22

      C.    The SJC's Reasonably Determined that Dr. Cotton's Testimony as to the Test
            Results of a Non-Testifying Analyst, Although improperly Admitted, Was not
            Unduly Prejudicial. .............................................................................................. 26

            1.    The SJC's Decision Was Reasonable Determination of the Facts.      26
            2.    Because Dr. Cotton Properly Testified to Her Independent Opinion, the
                  SJC Properly Based its Decision on *Williams.*      28
            3.    The SJC Reasonably Determined that the Improper Admission of the
                  Underlying Test Results was not Prejudicial ......................................... 28

IV.   THE SJC REASONABLY REJECTED PETITIONER'S INEFFECTIVE ASSISTANCE
      CLAIMS ............................................................................................................... 30

      A.    Failing to Exclude or Challenge Scientifically Unreliable DNA results. ............... 31

            1.    Failure to Move to Exclude DNA Evidence. ............................................ 32

            2.    Failure to Challenge DNA evidence at trial. ............................................ 33

      B.      Failure to move to suppress nails receipt. ............................................................... 34

      C.      Failure to move to suppress search of Petitioner's car. ........................................ 36

V.      THE SJC'S DECISION ABOUT THE RECANTATION OF THE COMMONWEALTH'S FOOTPRINT EXPERT WAS A REASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW ............... 38

      A.      Deferential Review under AEDPA is Appropriate. ............................................. 38

      B.      The SJC's Decision was a Reasonable Application of *Brady* and *Green* ............. 40

          1.      The *Brady* Claim ...................................................................................... 40

          2.      The Due Process Claim                         41

VI.      PETITIONER'S CLAIM REGARDING THE ADMISSION OF EVIDENCE OF EXTRAMARITAL ACTIVITY IS AN ISSUE OF STATE EVIDENTIARY LAW AND IS NOT COGNIZABLE ON HABEAS REVIEW. ......................................................... 42

      A.      Evidentiary issues are generally issues of state law and are not cognizable on habeas review. ...................................................................................................... 42

      B.      Alternatively, the SJC's decision is neither contrary to or an unreasonable application of clearly established Supreme Court law ........................................ 43

VII.      THE STATE COURTS REASONABLY DETERMINED THAT THE JURY'S EXPERIMENT WITH A BANANA DURING DELIBERATIONS DID NOT CONSTITUTE EXTRANEOUS EVIDENCE. ............................................................... 45

      A.      Facts Regarding the Banana Incident During Deliberations ................................ 45

      B.      The State Courts' Findings of Fact Are Entitled to a Presumption of Correctness. ................................................................................................................................ 46

      C.      The SJC's Decision Was not Contrary to or an Unreasonable Application of Clearly Established Supreme Court Law. .............................................................. 46

VIII.      PETITIONER'S CLAIM REGARDING THE JURY'S EXPOSURE TO STAINS ON THE BACK OF PETITIONER'S JACKET IS PROCEDURALLY DEFAULTED. ....... 48

      A.      The Gatekeeper's Decision Constituted a Procedural Default. ........................... 48

      B.      Petitioner Failed to Demonstrate "Cause and Prejudice" to Excuse the Procedural Default ................................................................................................................... 49

      C.      In the Alternative, the State Court's Decision was not Contrary to or an Unreasonable Application of Clearly Established Supreme Court caselaw. ........ 49

CONCLUSION…… ……………………………………………………………………      51

## INTRODUCTION

Respondent Sean Medeiros, Superintendent of MCI Norfolk, hereby opposes Petitioner Dirk Greineder's ("Petitioner") petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.[1]  Petitioner challenges his conviction for first degree murder raising seven claims: 1) denial of his constitutional right to a public trial; 2) violation of right to confrontation by the admission of test results of a non-testifying DNA expert; 3) ineffective assistance of counsel; 4) denial of his constitutional right to disclosure of exculpatory evidence and a fair trial based on the recantation of the prosecution's footprint expert; 5) violation of his constitutional right to a fair trial based on the admission of evidence of his extramarital sexual activities; 6) denial of his right to trial by jury based on jury's exposure to extraneous evidence (the banana experiment) during deliberation; and 7) denial of right to trial by jury based on jury's exposure to extraneous information (stains on the back of his jacket) during deliberation.  For the reasons set forth below, habeas relief should be denied.

## PRIOR PROCEEDINGS

On February 29, 2000, a Norfolk County grand jury indicted Petitioner for the murder of his wife, May Greineder, on October 31, 1999, in violation of G.L. c. 265, § 1 (S.A. 4).  A jury trial commenced on May 21, 2001, Chernoff, J., presiding (S.A. 8).  The jury found Petitioner guilty of first degree murder based on deliberate premeditation on June 29, 2001 (S.A. 9).  He was sentenced to life imprisonment  (S.A. 9).

Petitioner filed a motion for new trial on August 1, 2005 (S.A. 11; F.S.A. 495).  In orders dated May 5, 2006 and October 31, 2007, Judge Chernoff denied the motion (S.A. 13, 16; F.S.A 1246-1313).  The direct appeal and the appeal from the denial of the motion were consolidated.

---

[1] References to Petitioner's Memo will be cited as (Pet. M. at __), to Petitioner's Addendum as (Pet. Add. --), to the Respondent's Supplemental Answer as (S.A. __) and to Respondent's Further Supplemental Answer as (F.S.A. --).

Following oral argument, the SJC remanded the case to the trial judge to make written findings on the public trial claim.  Following an evidentiary hearing, Judge Chernoff filed a response to the SJC's order (F.S.A. 1499-1514).  The SJC affirmed the conviction and the denial of the motion on November 4, 2010.  *Commonwealth v. Greineder* , 458 Mass. 207, 936 N.E.d 372 (2010)(S.A. 314).

On June 29, 2012, the Supreme Court granted certiorari, vacated the judgment and remanded the case for further consideration in light of *Williams v. Illinois*, 132 S. Ct. 2221 (2012) (S.A. 29).  Following further briefing, the SJC affirmed Petitioner's conviction on March 14, 2013.  *Commonwealth v. Greineder*, 464 Mass. 580, 984 N.E.2d 804 (2013)(S.A. 468).  The Supreme Court denied certiorari on October 7, 2013 (S.A 30).

Petitioner filed a second motion for new trial on March 18, 2014 (S.A. 21; 2843-2943).  This motion was denied on July 24, 2014, Brassard, J. (S.A. 482-507).  Justice Spina, sitting as the SJC single justice "gatekeeper," denied Petitioner's application for leave to appeal the denial of the motion on December 30, 2014 (S.A. 589).

Petitioner filed this Petition for Habeas Corpus on July 17, 2105.  Respondent filed an answer and supplemental answer on September 18, 2015.

## STATEMENT OF FACTS

The Supreme Judicial Court's recitation of the facts of Petitioner's crime is entitled to the presumption of correctness under 28 U.S.C. §2254(e)(1).  *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). The AEDPA presumption of correctness applies to all "basic, primary, or historical facts" underlying the state court's conclusion. *Gunter*, 291 F.3d at 76; *Sanna*, 265 F.3d at 7. In addition, the presumption of correctness extends to factual determinations made by both state trial and appellate courts, *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002), and to any

factual findings implicit in the state court's ruling. *LaVallee v. Delle Rose*, 410 U.S. 690, 692 (1972) (applying prior version of statute); *Weeks v. Snyder*, 219 F.3d 245, 258 (3d Cir. 2000). The Court can supplement with other record facts consistent with the SJC's findings. *See Yeboah-Sefah v. Ficco*, 556 F.3d 53, 62 (1st Cir.), *cert. denied*, 130 S. Ct. 639 (2009); *Healy v. Spencer*, 453 F.3d 21, 22 (1st Cir. 2006).

As the First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings." *Mastracchio v. Vose*, 274 F.3d 590, 598 (1st Cir. 2001). The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1).

The SJC made the following findings of fact:

On the morning of October 31, 1999, the defendant and his wife of thirty-one years parked their van at the entrance to the access road to Morses Pond (pond) in Wellesley, just outside the gate that blocks vehicular access, and walked their German shepherd dog around the park at the pond. William Kear was walking his small dog that morning on the pond access road, a two-lane paved road leading to a parking lot and a beach at the pond, when the defendant crossed in front of him from right to left (east to west). This occurred when Kear was at the first (south) entrance to the parking lot off the pond access road. The defendant was just beyond the second (north) entrance to the parking lot, where the lanes separate to form a circle. The defendant had emerged from the woods on a dirt path, crossed the pond access road just beyond the circle, then continued westerly down an unnamed road and out of sight. The defendant had a backpack, and he was walking rapidly with a dog on a leash. He made no noise.

About forty-five to ninety seconds later Kear entered the circle and the defendant reemerged from the road where Kear had last seen him. The defendant approached Kear and asked if he had a cellular telephone. Kear did not have one. The defendant asked Kear to go and make a telephone call for him. Kear declined, then asked the defendant what happened. He said his wife had been attacked, and pointed up the path beginning where Kear first saw him. The defendant said he had a cellular telephone in his van and he would make the call. On the way to his van the defendant passed Rick Magnan. He yelled to Magnan and asked if he had a cellular telephone. Magnan said he did not. The defendant walked to the start of the access road and telephoned Wellesley police from his van. In the meantime, Kear had walked up the path in the direction the defendant said his wife had been attacked to see if he could be of help.

Officer Paul Fitzpatrick was the first Wellesley police officer to arrive. He opened the gate to the access road and proceeded driving when the defendant, who was walking back toward his wife, yelled to him and said his wife had been attacked. The defendant entered Fitzpatrick's cruiser and directed him to the circle in the road. Fitzpatrick parked his cruiser, then followed the defendant up the dirt path to the area where his wife lay. Paramedics were right behind them. There was a significant area of bloodstain on the path, with a drag mark through the bloodstain. The drag mark led to the victim's body. The victim later was pronounced dead at the scene.

The cause of death was a horizontal stab wound into the left side of the neck. The wound was large, five and one-half inches long and two and one-half inches wide, caused either by two thrusts with a knife, or movement by the victim during a single thrust. Every muscle on the left side of her neck was damaged, as were the jugular veins, causing rapid exsanguination. A second and potentially fatal stab wound was inflicted horizontally into the left side of her chest, penetrating the pulmonary artery and left lung. However, so little blood was found in the left chest cavity that the wound must have been inflicted either after death or around the time the victim's body had ceased to function. Other stab wounds, all nonfatal, included one to the victim's lower left chest, two to the back of her head, and three to her forehead.

The victim sustained two other nonfatal wounds. One was a laceration on the back of her head that tore the skin and pushed it, consistent with an impact by a metal object with heft, such as a hammer. The other was a contusion on the left side of her face aligned with a fracture at the base of the skull, consistent with an impact by a padded, blunt object, such as a hand, knee, or foot. Neither of these wounds would have rendered her unconscious.

The victim had an abrasion on her lower back, at the base of the spine. The skin in that area displayed a piling up, as if the victim had been dragged by her shoulders. Her shirt had been pulled up and her pants opened, and blood spatter appeared on her abdomen and lower chest.[1] She also had blood spatter on her hands, but she had no defensive wounds. Seminal fluid was not detected on any swabs prepared at the autopsy.

(a) *The defendant's statements.* The defendant made several statements on October 31, 1999, the details of which were not consistent. He told a paramedic at the scene that his wife twisted her back throwing a ball to their dog. She stopped walking and the defendant went ahead to retrieve the dog. After putting the dog in the van he returned and found his wife lying in the path.

Officer Fitzpatrick escorted the defendant away from the scene to the circle in the road while police processed the crime scene. The defendant told Fitzpatrick that he and his wife went for a walk and she tripped on something, injuring her back.

7

She told him to go on without him and she would meet him at the entrance to the parking area. When he and the dog reached the gate to the beach, the dog started "acting funny" and it turned back. The defendant followed, and discovered his wife lying in the path. He checked her and found a weak carotid pulse, so he ran to the van to telephone police. About twenty minutes after talking to Fitzpatrick the defendant asked if his wife was dead. Fitzpatrick said she was. Five minutes later the defendant asked whether Fitzpatrick was going to arrest him. Fitzpatrick said it was not his decision to make.

Sergeant Peter Nahass of the Wellesley police department went to the circle where the defendant and Officer Fitzpatrick were waiting. He observed a reddish stain on the sleeve of the defendant's windbreaker jacket (jacket), all the way down to the wrist, and also on his running shoes. The defendant's hands were clean. He had two scratches on his neck. Nahass asked him what happened. The defendant said he and his wife were walking their dog when she hurt her back throwing a ball to the dog. He told her to wait there while he went ahead with the dog. He turned back at the gate to the pond, which was locked, and the dog ran ahead. When he caught up to the dog, it was licking his wife's face. She was lying in the path. The defendant, who is a doctor, said he tried to take his wife's pulse at the carotid artery. The dog's leash was secured around his wife's waist. He removed the leash, attached it to the dog, then returned to their van and telephoned police. He gave a similar account to Detective Jill McDermott of the Wellesley police, but added that as he first approached his wife lying in the path he realized something was wrong because her pants were open and she had blood on her neck. She had no pulse; but she was warm, so he tried to rouse her.

At the Wellesley police station the defendant told Detective McDermott he had told her everything and was not hiding anything. He then stated, "You asked me for my clothing, and it suddenly scares me." Ten minutes later the defendant said his wife had given him a back rub the night before and would have his skin under her fingernails.

Trooper Martin Foley of the State police noticed at the scene that the defendant's jacket had reddish-brown stains on the chest area, both upper arms and elbows, and that there was a large stain on the left cuff that ended abruptly about two and one-half inches from the end of the sleeve. He also observed a reddish-brown stain on the defendant's sneakers, and a reddish-brown "swipe" on the left lens of his glasses. He observed that the victim's pants were open at the waist and her shirt was pulled up. Detective McDermott had told him of her conversation with the defendant. Foley asked the defendant what he had done the night before. The defendant said he helped his wife with a slide presentation she was working on for a course she was taking to become a nurse practitioner. The defendant said his wife went to bed around 11 p.m., and he retired at 12:30 a.m. Foley asked if they slept in the same bedroom. The defendant said they did. Because of the possibility this might be a sexual assault, Foley asked the defendant if he and his wife had intercourse that morning, the night before, or during the previous week, in the

event police found semen. The defendant said he did not, and offered that they had not been sexually active for a few years because his wife had neck problems.

The defendant described for Foley the course of his walk that morning with his wife, which was similar to the description he gave Officer Fitzpatrick and Detective McDermott. However, the only wound he mentioned seeing was a wound on her forehead, and he made no mention of her neck wound. The defendant said he checked the carotid artery on the right side of her neck. He also said he tried to move her, but he was unable to do so. He said she weighed 120 pounds, and at one time he could lift more than twice that, but she was like dead weight. He then tried to find a jogger with a cellular telephone. He said he thought he saw one, and pointed toward the road that William Kear saw him walk down after crossing the pond's access road at the circle. The defendant said he ran as fast as he could, to the point he felt he would vomit. He then met Kear and asked if he had a cellular telephone. He told Foley that he checked the carotid artery on the left side of his wife's neck when he returned after he telephoned police from their van. He said that was the first time he noticed the wound in her neck. Foley asked the defendant if he had washed his hands, which were clean, and the defendant replied he had not. Foley asked him why he had no blood on his hands, and the defendant was unable to give an explanation.

The defendant told Ilse Stark, his wife's sister, that he and his wife had simultaneous nosebleeds as they were getting ready to go to the pond. He removed a towel from his car, which was in the driveway, and they both used it to stop their nose bleeds. He explained that it was possible that his DNA could have been transferred from the towel to her gloves. He told Stark that his wife twisted her back while they were walking in the park, and she did not want to continue. She insisted that he go ahead without her and exercise the dog. About ten minutes later he returned and discovered his wife lying in the path; he saw a lot of blood. He said he took her pulse and saw that someone had "slit" her neck. He jumped up, saw a jogger, and gave chase. While chasing the jogger he saw a man with a small dog (Kear). He went back and asked the man if he had a cellular telephone.

On November 1, 1999, the defendant told Belinda Markel, Stark's daughter, that he and his wife had intercourse the morning she died. He gave a similar description of events that he had given to Stark. He told her he was concerned that police had searched his house for a glove and took his pants, and they might have fibers from gloves he had once worn. He also told her he was concerned that police photographed him and he had red marks on his neck from shaving. He said his wife's throat had been cut, and she had been hit in the head multiple times.

*Commonwealth v. Greineder*, 458 Mass. 207, 209-14, 936 N.E.2d 372, 377-80 (2010) (S.A.

314).

## ARGUMENT

**I.    UNDER AEDPA, THIS COURT'S REVIEW OF PETITIONER'S CLAIMS IS LIMITED AND HIGHLY DEFERENTIAL.**

Habeas corpus review of a claim previously adjudicated by state courts is both limited and highly deferential. Under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This "highly deferential standard for evaluating state-court rulings" reflects the overarching structure of the federal habeas corpus scheme, which simultaneously vests the state courts with the "primary responsibility" for evaluating federal law claims raised in a criminal trial and requires habeas corpus courts to presume that state courts know and follow the law. *See Woodford v. Visciotti,* 537 U.S. 19, 26-27 (2002) (per curiam). Thus, as the Supreme Court has repeatedly emphasized, it is not sufficient to warrant habeas corpus relief when the state court's decision was merely erroneous or incorrect. *See id.* at 27; *Williams v. Taylor*, 529 U.S. 362, 412 (2000). It is not even sufficient that the state court "failed to apply" federal law clearly established by the Supreme Court, *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam), or that the state court committed "clear error," or that the reviewing court is of the "firm conviction" that the state court's ruling was erroneous, *see Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

Rather, federal courts must decline to disturb state-court judgments unless the Petitioner demonstrates that his claim falls into one of the narrowly drawn categories set forth in § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. Under the "unreasonable application" clause, the Petitioner may prevail only if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. To be entitled to relief under this clause, the Petitioner bears the burden of showing that the state court decision applied the clearly established law in an "objectively unreasonable manner." *Id.* at 409-410. Furthermore, because "[a]pplying a general standard to a specific case can demand a substantial element of judgment, . . . [t]he more general rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The clearly established law that is relevant to the analysis under § 2254(d)(1) is limited to the holdings of United States Supreme Court cases existing at the time of the state court decision, and does not include the dicta of such cases. *See id.* at 660; *Williams*, 529 U.S. at 412. However, "factually similar cases from the lower federal courts may inform such a determination, providing a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002) (en banc), *citing Ouber v. Guarino,* 293 F.3d 19, 26 (1st Cir. 2002); *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir. 1998). The "prisoner must show that the state courts ruling on the claim being presented in federal court was so lacking in justification

that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

Factual determinations of state courts warrant similar deference. To satisfy § 2254(d)(2), a petitioner must show that the state's factual determination was objectively unreasonable. *See Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003), citing *Williams*, 529 U.S. at 399. Again, objective unreasonableness does not refer to a merely incorrect or erroneous decision. *See Williams*, 529 U.S. at 410; *see also Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003) ("[P]etitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error."); *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003) ("[A] federal habeas court may not grant habeas relief under § 2254(d)(2) merely because it disagrees with a state trial court's factual determination.").

## II.   THE SJC'S DENIAL OF PETITIONER'S PUBLIC TRIAL CLAIM WAS NOT OBJECTIVELY UNREASONABLE, AND PETITIONER IS NOT ENTITLED TO A NEW EVIDENTIARY HEARING IN FEDERAL COURT.

As discussed below, the SJC's determination that there was no closure of the courtroom during the jury empanelment in this case was a reasonable determination of the facts as presented during an evidentiary hearing and as recalled by the trial judge, and petitioner has not overcome the presumption of correctness of these findings with clear and convincing evidence.  In addition, the SJC's decision was not contrary to or an unreasonable application of clearly established Supreme Court caselaw because the SJC was not required to apply the *Waller* factors where there was no closure of the courtroom as a factual matter.  Finally, AEDPA bars petitioner's request for an evidentiary hearing.

A.      The State Courts Found That the Courtroom Was Not Closed.

Petitioner first raised this claim in his direct appeal based on Judge Chernoff's statement

to the perspective jurors that individual voir dire would be "non-public" (F.S.A. 493).  Following

oral argument the SJC remanded the case back to the Superior Court to make findings on the

manner in which the individual voir dire was conducted (S.A. 26).  The SJC requested the judge

to answer nine questions and instructed that the judge could hold an evidentiary hearing, but was

not required to do so.  *Id*.  Judge Chernoff filed a written response five days after the SJC's order

setting forth his memory of whether the courtroom had been closed to the public.  (S.A. 26;

F.S.A. 1400-1405).  On the same day, Judge Chernoff received a faxed letter from a reporter

who had covered the trial and who appeared to have a different memory of events.  Thereafter,

Petitioner filed a motion for an evidentiary hearing and a motion to recuse (S.A. 18; F.S.A. 1409-

1491).  Judge Chernoff allowed the motion for an evidentiary hearing and denied the motion to

recuse (F.S.A. 1493-1496).  Following a three day hearing with testimony from 21 witnesses,

Judge Chernoff issued a Second Response to the Order of the Supreme Judicial Court (F.S.A.

1499-1512).  His core findings were as follows:

> 1) there were no press members inside Courtroom 8 during the individual voir
> dire.  Although there was no judicial order, staff person, or sign that barred their
> entry, some media members heard from a non-court source that the proceedings
> were closed.  2) Some of the Greineder family members heard from a non-court
> source over the weekend preceding the voir dire that they could not or should not
> attend the individual voir dire.  3) Although there was no judicial order, staff
> person or sign that barred entry, only a few members of the public attended the
> individual voir dire. 4) Neither one of the attorneys complained of the process.

(F.S.A. 1506).

The SJC summarized the judge's findings and applied the standard of review used for

appeals from the denial or grant of a motion for new trial, reviewing the trial judge's subsidiary

findings of fact for a clear abuse of discretion or whether they were clearly erroneous.  The court

extended special deference to motion judge, who was also the trial judge.  (Pet. Add. 39-42).

The SJC rejected Petitioner's arguments that the evidence should have been interpreted

differently, specifically finding that evidence of a long-standing practice at the Norfolk Superior

Court of excluding the public from jury selection "was used here solely to impeach the acting

chief court officer, and not for substantive purposes.  Even if it had been used substantively, the

evidence, consisting of her prior recorded testimony from the *Cohen*[2] case, was significantly

undermined by evidence that the policy was not followed in this case." (Pet. Add. 43).  The court

also declined to resolve the conflict in testimony as to the presence of Petitioner's daughter,

Britt, in the courtroom during jury voir dire because that is the function of the trial judge.  (Pet.

Add. 43).  The court did not adopt Petitioner's view of the judge's use of the word "non-public"

to mean that the public had been excluded from the voir dire:

> Our order of remand specifically stated that the record was not sufficient to allow
> meaningful consideration of the defendant's claim. The judge has now explained
> his use of the word "non-public," stating he never intended to exclude the public
> and he did not order room 8 closed. He used the word "non-public" to describe
> the measures taken to ensure that jurors would be encouraged to give candid
> answers to questions on voir dire without fear of criticism, ridicule, or reprisal,
> and to describe his exclusion of cameras from the court room during individual
> voir dire of prospective jurors. (Pet. Add. 42).

The SJC ultimately upheld the trial judge's findings of fact:

> The judge found, based on the hearing evidence, that there was no oral or written
> order barring the media or any other segment of the public from the individual
> voir dire.  He also found that, based on all the evidence, Britt and members of the
> public attended portions of the voir dire; that no one was prevented from entering
> room 8, and no one was asked to leave room 8.   There was no evidence that
> anyone had stayed outside room 8, during the voir dire because of knowledge of a
> court house policy that excluded spectators from jury selection proceedings.
> Spectators who did not attend were noticed and they were not asked to leave,
> which in the circumstances of this case, strongly suggests that there was no
> closure of the court room in the constitutional sense. . .  We have exercised out
> own independent judgment, and we are satisfied that [Petitioner] has failed to

---

[2]   *Commonwealth v. Cohen*, 456 Mass. 94, 921 N.E.2d 906 (2010).

show that the public, including Britt, was excluded from the voir dire in the constitutional sense. (Pet. Add. 45)

The SJC similarly found that the courtroom was not closed to the media in the constitutional sense during the individual voir dire of prospective jurors.  (Pet. Add. 46).

    **B.**    **The SJC's Finding that the Courtroom was not Closed Was Not Objectively Unreasonable, and Petitioner Cannot Overcome the Presumption of Correctness.**

In federal habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  *See Gaskins v. Duval*, 640 F.3d 443, 452 (1st Cir. 2011); *Brown v. Ruane*, 630 F.3d 62, 64 n.1 (1st Cir. 2011); *Torres v. Dennehy*, 615 F.3d 1, 4 (1st Cir. 2010).   This presumption applies to both state trial and appellate courts. *Gaskins v. Duval*, 640 F.3d at 452.  A petitioner may overcome this presumption with clear and convincing evidence.  *See* § 2254(e)(1); *Companonio v O'Brien*, 672 F.3d 101, 109 (1st Cir. 2012); *O'Laughlin v. O'Brien*, 568 F.3d 287,  290, 298 (1st Cir. 2009); *Foxworth v. St. Amand*, 570 F.3d 414,  424 (1st Cir. 2009).  A petitioner may not overcome the presumption merely by relying on the same documents already considered by the state courts to describe a different version of events, since the state court has already made credibility determinations that the habeas court must defer to absent some indication of serious error.  *See Teti v. Bender*, 507 F.3d 50, 58 (1st Cir. 2007); *Gaskins v. Duval*, 640 F.3d 443, 453 (1st Cir. 2011) (same).  Petitioner's argument is essentially an invitation to this court to interpret the testimony given at the evidentiary hearing differently than the trial judge did. This is simply not enough to overcome the presumption of correctness. S*ee Torres v. Dennehy*, 615 F.3d 1, 5 (1st Cir. 2010) (concluding that although petitioner presents an arguable interpretation of the facts, where SJC found otherwise and provided adequate support for its position, petitioner is not entitled to habeas relief) (citing *Wood v. Allen*, 130 S. Ct. 841, 849 (2010)).

This case can be distinguished from the recent decision in *U.S. v. Negron-Sostre*, 790 F.3d 295 (2015) upon which Petitioner relies.  *Negron* involved a direct appeal from federal narcotics and conspiracy convictions in which the defendants claimed that their Sixth Amendment right to a public trial was violated.  The district court held an evidentiary hearing and determined that there was no evidence that a long standing district court policy of not allowing the public into the courtroom during voir dire was followed in this case.  *Id*. at *300. The court reviewed the claim for clear error because the defendants did not object. *Id*. at *301. In contrast to this case, the trial judge did not specifically determine that the courtroom was not closed and then blamed the defense attorneys for informing their clients' families that they could not enter.  *Id*. at *304. The district court also failed to acknowledge the testimony of a court officer that the general practice was to exclude members of the public unless an attorney requested that it be open prior to trial.  *Id*.  The Court concluded that the district court erred in not finding that a complete closure occurred during jury selection and the closure was at least partially attributable to court personnel.  *Id.* at *305.

In this case, three members of the prosecution team and the judge's law clerk testified that they observed members of the public in the courtroom during jury voir dire.  Four court officers that worked on the trial testified that there were no signs on the courtroom door prohibiting entry and the lobby officer stated that he did not deny admission to anybody.  (F.S.A. 1501-1503).

### C.       De Novo Review of this Claim is not Appropriate Where the SJC Properly Found No Closure and Therefore the *Waller* Factors Were Not Required.

Petitioner claims that this Court should consider the public trial claim under a de novo standard of review because the trial judge failed to consider compliance with the factors listed in *Waller v. Georgia*, 467 U.S. 39, 46 (1984).  This argument relies on the prior argument that the

SJC's affirmance of the no closure finding was an unreasonable factual finding.  The first inquiry

in a public trial claim is whether there actually was an unconstitutional closure. If the court finds

that there was no such closure, the inquiry ends there.   Where the SJC's finding that the

courtroom was not closed was a reasonable determination of the facts, see argument IIB, *supra*,

the court's resolution of the claim on that basis, without further consideration of the *Waller*

factors, was not contrary to or an unreasonable application of Supreme Court precedent.[3]

### D.    The SJC's Decision to Affirm the Denial of the Motion to Recuse Was Not Contrary to or an Unreasonable Application of Federal Due Process Principles as Established by the Supreme Court.

Petitioner filed a motion to recuse prior to the evidentiary hearing alleging that the trial

judge made his initial findings relying only on his own memory without consulting the parties or

considering any other evidence.  As a result, Petitioner claims that the judge had prejudged the

facts and could not be impartial in adjudicating this issue and thereby violated his right to a fair

and impartial tribunal.  The trial judge denied the motion, finding that he could be an objective

decision maker after examining his conscience (F.S.A. 1496).

The SJC affirmed the denial of the motion because the trial judge used the correct

standard and did not abuse his discretion (Pet. Add. 46):

> He first examined his own conscience (with penetrating self-awareness) and
> concluded that he could be fair and impartial. He then applied the second prong of

---

[3]   In any event, the *Waller* court held that a courtroom should not be closed to the public *over the objection of the defendant* without violating the Sixth Amendment right to a public trial. Waller, 457 U.S. at 41, 47.  Petitioner did not object to the individual voir dire process in this case.

Further, even under a *de novo* standard of review, Petitioner must demonstrate "that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court."  *Aspen v. Bissonnette*, 480 F.3d 571, 576 (1st Cir. 2007); *accord Kater v. Maloney*, 459 F.3d 56, 63-64 (1st Cir. 2006) ("Whether habeas review is under the deferential standard provided in § 2254(d)(1) or under the *de novo* standard . . . , state habeas petitioners may not seek release on federal law grounds which have yet to be clearly established.").

the test, stating what is objectively obvious in the circumstances: judges are often called on to review, reexamine, or reconsider findings and rulings, and often modify or even completely revise prior determinations, and thus the issuance of his first response did not disqualify him from further consideration of the matter. The defendant has offered no evidence to show that the judge was not fair and impartial, or that his impartiality in further considering the matter might reasonably be questioned based on the fact he issued his first response. There was no evidence of bias or prejudice from an extrajudicial source. We are satisfied that the judge did not abuse his discretion in denying the motion to recuse himself.

(Pet. Add. 46)

The judge's memory as to what occurred added to these findings and he was careful to segregate those portions of his findings that came from his own memory and those that came from the witness stand.  *See Likely v. United States*, 510 U.S. 540, 551 (1994) ("[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings.  It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant").  *See also Commonwealth v. Adkinson*, 442 Mass. 410, 415, 813 N.E.2d 506 (2004) (in order to require disqualification, bias or prejudice must spring from extrajudicial source not matters learned from participation in the case).

The Supreme Court has held that although a fair trial in a fair tribunal is a basic requirement of due process, "most matters relating to judicial disqualification [do] not rise to a constitutional level.  *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948).  Petitioner has failed to show that the SJC's decision affirming the denial of the recusal motion was an unreasonable application of clearly established Supreme Court law.

### E.    Petitioner's request for an evidentiary hearing should be denied.

Petitioner claims that he is entitled to an evidentiary hearing in this court because he did not receive a full and fair evidentiary hearing in state court.  Pet. M. at 50-52 (citing *Townsend v.*

*Sain*, 372 U.S. 293, 313 (1992).  Petitioner ignores AEDPA's limitations on evidentiary hearings in federal habeas proceedings.  In *Cullen v. Pinholster*, 563 U.S.170, 181-182 (2011), the Supreme Court held that "[r]eview under [28 U.S.C. § 2254(d)(1), as added by the Antiterrorism and Effective Death Penalty Act ("AEDPA"),] is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.* at 1398; *see also Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011) (holding that, under *Cullen*, habeas petitioner was not entitled to an evidentiary hearing on his ineffective assistance claim).  *Cullen* sets forth the following:

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

*Id.*  The First Circuit later held that this evidentiary hearing bar applies to review under both prongs of § 2254(d).  *See Garuti v. Roden*, 733 F.3d 18, 23 (1st Cir. 2013) ; *Brown v. O'Brien*, 666 F.3d 818, 822 n.3 (1st Cir. 2012). Petitioner's public trial claim was already subject to an evidentiary hearing in state court and the SJC adjudicated the claim based on the facts found at that hearing.  This Court is limited to the state court record.  Petitioner's request must be denied.

Even in cases where the state court has failed to decide a claim on its merits, a federal habeas court generally should not conduct an evidentiary hearing to aid in deciding that claim unless a petitioner satisfies the standards set forth in 28 U.S.C. § 2254(e)(2).  *Pinholster*, 131 S. Ct. at 1401.  Under Section 2254(e)(2), "an evidentiary hearing is prohibited if 'the applicant has failed to develop the factual basis of a claim in State court proceedings' unless certain stringent exceptions apply." *Teti*, 507 F.3d at 62 (quoting 28 U.S.C. § 2254(e)(2), and describing statutory exceptions as "narrow").  Those exceptions are as follows:

(A) the claim relies on—
>    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or
>    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2); *see Teti*, 507 F.3d at 62 (noting that even if Section 2254(e)(2) is satisfied, "a habeas judge, before granting an evidentiary hearing, must first consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief"; and further noting that such circumstances may be present only if the petition alleges facts "sufficient to overcome AEDPA deference to the state court's factfindings and legal conclusion to the contrary"). Petitioner cannot meet this standard, and his request for an evidentiary hearing should be denied.

## III. THE SJC REASONABLY CONCLUDED THAT THE COMMONWEALTH'S DNA EXPERT'S TESTIMONY DID NOT VIOLATE PETITIONER'S RIGHT TO CONFRONTATION.

### A. The *Williams* Decision

The Confrontation Clause of the Sixth Amendment gives criminal defendants the right to be confronted with the witnesses against them. U.S. Const. amend. VI. For many years, the Supreme Court held the view that the Confrontation Clause permitted the admission of out-of-court statements that fall within a firmly rooted hearsay exception or that bear sufficient "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). In 2004, the Supreme Court overruled the *Ohio v. Roberts* reliability test and thereby changed the decades-old application of the Confrontation Clause. Under the new analysis set forth in *Crawford v. Washington*, 541 U.S. 36 (2004), a testimonial hearsay statement by a person who does not testify at trial is inadmissible unless the prosecution established unavailability and a prior opportunity to cross-examine. *Id*. at

54.  A testimonial statement is a statement that a reasonable person in the position of the

declarant would objectively foresee might be used in the investigation or prosecution of a crime.

*Id*. at 51-52.

Since *Crawford*, the Court has continued to narrow and define how the term

"testimonial" applies in different situations.  In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305

(2009), the Court held that forensic reports that certify incriminating test results are testimonial,

and in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), the Court reaffirmed *Melendez-Diaz*

and made it clear that the prosecution may not call a supervisor or other "surrogate" witness to

the stand in place of the actual author of the report.

In *Williams*, the Supreme Court considered a question left open in it prior confrontation

clause decisions, namely whether *Crawford v. Washington*, 541 U.S. 36 (2004) precludes an

expert witness from expressing an opinion based on facts about a case that have been made

known to the expert but about which the expert is not permitted to testify.  *Williams, supra*, at

2227.  Although the justices in *Williams* disagreed on whether and to what extent a witness can

testify about another analyst's test results, all nine agreed that a witness can formulate his own

opinion – and then testify to that opinion – using those test results.  *Id*. at 2223 (plurality opinion)

("It has long been accepted that an expert witness may voice an opinion based on facts

concerning the events at issue in a particular case even if the expert lacks first-hand knowledge

of those facts."); *id*. at 2246 (Breyer, J., concurring) ("Under well-established principles of

evidence, experts may rely on otherwise inadmissible out-of-court statements as a basis for

forming an expert opinion if they are of a kind that experts in the field normally rely upon."); *id*.

at 2256 (Thomas, J., concurring) (threshold question was whether the Cellmark report was

testimonial; issue was not whether expert could rely on the report to formulate her opinion); *id*.

at 2270 (Kagan, J., dissenting) (approving expert testifying that DNA profile produced by the lab matched the DNA profile identified as belonging to the defendant).

The *Williams* Court also held that the admission of statements that disclosed information about underlying DNA testing performed by a non-tesifying analyst that formed the basis of the expert opinion did not violate the Sixth Amendment. *Id*. at 2228, 2240, 2244. Five justices concluded, albeit for different reasons, that such basis evidence is admissible without violating a defendant's confrontation right. *Id*. at 2244 (plurality opinion), 2245, 2248 (Breyer, J., concurring), 2255 (Thomas, J., concurring in the judgment).

In its decision on remand, the SJC affirmed its bifurcated approach to expert witness testimony. This approach distinguishes between an expert's opinion itself and the hearsay information that formed the basis of the opinion. *Id*. at 584, 984 N.E.2d at 808 (Pet. Add. 61). Massachusetts jurisprudence allows an expert to testify to his or her independent opinion even if based on data not in evidence, but does not allow an expert witnesses to testify to the specifics of hearsay information underlying the opinion on direct examination. *Id*. at 592, 984 N.E.2d at 813 (Pet. Addd. 64). Therefore, Massachusetts rules offer a defendant more protection than the Sixth Amendment does. *Id*. at 593, 984 N.E.2d at 814 (Pet. Add. at 64).

**B.     Petitioner's Claim Regarding the Expert Witness's Opinion Testimony is Procedurally Defaulted.**

In considering this Confrontation Clause claim, the SJC divided its opinion into two inquiries, first considering the opinion testimony of Dr. Robin Cotton and second, her testimony regarding the details and results of DNA testing done by another analyst (Wendy Magee) who did not testify. As to the opinion testimony, the SJC specifically found that Petitioner had not objected and reviewed the matter under the substantial likelihood of a miscarriage of justice

standard (Pet. Add. 46). This constituted a procedural default barring review by this court unless Petitioner can show cause for and prejudice from the default.

Pursuant to the doctrine of procedural default a federal court generally will not review the merits of claims, including constitutional claims that a state court declined to hear because the petitioner failed to follow a state procedural rule. *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012), *citing Coleman v. Thompson*, 501 U.S. 722, 747-748, (1991); *also citing Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977). Federal review will be barred if, among other conditions, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *Martinez v. Ryan*, 132 S. Ct. at 1316, *citing Walker v. Martin*, 131 S. Ct. 1120, 1127-1128 (2011); *Beard v. Kindler*, 130 S. Ct. 612, 617-618 (2009). In *Coleman*, the Supreme Court held that where

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

501 U.S. at 750. *See Lynch v. Ficco*, 438 F.3d 35, 45 (1st Cir. 2006); *Horton v. Allen,* 370 F.3d 75, 80 (1st Cir. 2004). On habeas review, the "independent and adequate state ground" doctrine is applied for reasons of comity and federalism to avoid having federal habeas courts review issues that the United States Supreme Court would lack jurisdiction to consider on direct review. *Lambrix v. Singletary*, 520 U.S. 518, 523-24 (1997). Accordingly, it should be addressed at the outset of a case. *Id.*

A state decision based on the failure to properly raise an issue at the earliest possible time constitutes an adequate and independent state ground, as does the failure to lodge a contemporaneous objection at trial. *See, e.g., Coleman,* 501 U.S. at 729-730 (untimely filing of

notice of appeal); *Wainwright,* 433 U.S. at 86-87 (contemporaneous objection).   For habeas purposes, the federal courts do not infer waiver of a procedural bar "unless the state appellate court has made it 'reasonably clear that its reasons for affirming a conviction rest upon its view of federal law.'"   *Tart v. Com. of Massachusetts,* 949 F.2d 490, 496 (1st Cir. 1991) (quoting *Doucette v. Vose,* 842 F.2d 538, 540 (1st Cir. 1988)).   *See also Puleio v. Vose,* 830 F.2d 1197, 1200 (1st Cir. 1987).   Indeed, habeas review is allowed only if "the relevant state court decision . . . fairly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law."   *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991); *Coleman*, 501 U.S. at 734, 735.

First, the failure to preserve a federal claim for appeal is the type of adequate and independent ground that prevents review by this Court. *Osborne v. Ohio*, 495 U.S. 103, 123 (1990); *Parker v. North Carolina*, 397 U.S. 790, 798 (1970) (stating that failure to raise a timely objection "would constitute an adequate state ground precluding our reaching the [constitutional] issue" on direct review); *Edelman v. California*, 344 U.S. 357, 358 (1953) ("It is clear that this Court is without power to decide whether constitutional rights have been violated when the federal questions are not seasonably raised in accordance with the requirements of state law.").

Second, Massachusetts' contemporaneous-objection rule is "adequate and independent" because courts consistently apply the rule and it was not waived in this case.  *See, e.g.*, *Kemna*, 534 U.S. at 376.  *See also Commonwealth v. Curtis*, 417 Mass. 619, 626, 632 N.E.2d 821, 827 (1994) (rule that objections not raised at trial are forfeited is "a long-standing rule" in Massachusetts).   The First Circuit has "held, with a regularity bordering on the monotonous, that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in

its courts." *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010).[4]  The SJC's analysis under the

substantial likelihood standard did not waive this default.  *Lynch v. Ficco*, 438 F.3d 35, 45 (1st

Cir. 2006); *Horton v. Allen*, 370 F.3d 75, 81 (1st Cir. 2004).

At the trial in this case, Petitioner did not object to the admission of any of Dr. Cotton's

opinion testimony.  (Pet. App. at 46).  Consequently, when Petitioner argued to the SJC that Dr.

Cotton's opinion testimony violated the Confrontation Clause, the state court ruled that he had

forfeited the claim.  *Id.*  This ruling constitutes an adequate and independent state-law ground

that precludes granting the writ.

The SJC's decision on remand from the Supreme Court does not affect the default of this

claim.  The Supreme Court granted certiorari and remanded the case to reconsider its decision in

light of *Williams v. Illinois*, 132 S.Ct. 2221 (2012).  The SJC did as instructed and determined

that its jurisprudence was not affected by *Williams*.  Its determination of default was not affected

by this decision.  The SJC was simply responding to the question raised by the Supreme Court.

Petitioner can overcome this procedural default only if he can show cause for the default

and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure

to consider the claims will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at

750.  Petitioner has not attempted to show either of these nor can he.  Where he specifically

objected to Dr. Cotton's testimony about the DNA results of another analyst, the lack of

objection to her opinion testimony is telling.  In any event, the Supreme Court has made clear

---

[4] Moreover, Massachusetts' contemporaneous-objection rule serves a legitimate state purpose. As this Court has recognized, a "contemporaneous objection enables the record to be made with respect to the constitutional claim" and "may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation." *Wainwright v. Sykes*, 433 U.S. 72, 88 (1977).  *See also Commonwealth v. McDuffee,* 379 Mass. 353, 359, 398 N.E.2d 463, 467 (1979) (purpose behind Massachusetts' contemporaneous-objection doctrine is to give trial judge an opportunity to rectify errors during trial).

that an expert witness may testify to her opinion even if based on facts or data not in evidence or

prepared by a non-testifying analyst. *Williams*, *supra*, at 2270.   Dr. Cotton was the forensic

laboratory director of Cellmark at the time of trial and was therefore in a good position to speak

to the testing procedures at Cellmark. *Greineder*. 464 Mass. at 597 (Pet. Add. 65).   Moreover, as

the SJC found, "Dr. Cotton was also in a better position to testify meaningfully than the expert

witness in *Williams*, whose testimony, which implicated the underlying forensic report, satisfied

the mandates of the Sixth Amendment. *Id*. *See Williams, supra*, at 2228, 2240, 2244.   Trial

counsel vigorously cross-examined Dr. Cotton and "did not want for opportunity to test the

reliability of data underlying Dr. Cotton's expert opinion." *Id*. at 598 (Pet. Add. 65-66).

    **C.**    **The SJC's Reasonably Determined that Dr. Cotton's Testimony as to the Test Results of a Non-Testifying Analyst, Although Improperly Admitted, Was not Unduly Prejudicial.**

       *1.*    *The SJC's Decision was a Reasonable Determination of the Facts.*

Petitioner claims that the underlying data and the expert opinion in this case could not be

separated for purposes of analysis because they were so intertwined, but the SJC found

otherwise:

> The [Petitioner] challenges our bifurcation of admissible expert opinion from its inadmissible, hearsay basis. He argues that the two elements—the underlying facts that form the basis of an expert opinion and the expert opinion itself—are inextricably linked, at least in the context of DNA analysis. We disagree. There is a clear distinction between the allelic information that establishes genetic makeup and the statistical significance of the data that establishes how frequently a genetic combination appears in the population at large. See *Commonwealth v. Vao Sok,* 425 Mass. 787, 789, 790–791, 683 N.E.2d 671 (1997) (discussing alleles), 791 (statistical analysis). As we said in [*Commonwelath v.] Barbosa, [*457 Mass.773]*, 789, 933 N.E.2d 93 (2010), it is the statistical significance of a DNA match that is of greatest use to a jury; information about the prevalence of a particular gene combination gives meaning to the underlying fact of allelic presence. *See Commonwealth v. McCowen,* 458 Mass. 461, 484, 939 N.E.2d 735 (2010), citing *Barbosa, supra* ("the admission of the raw DNA testing results alone, even where the allele numbers match, is meaningless to a jury.")

*Commonwealth v. Greineder*, 464 Mass. at 599, 984 N.E.2d at 818-819 (Pet. Add. 66). This conclusion was a reasonable determination of the facts and is entitled to a presumption of correctness under § 2254(e)(1) unless rebutted by clear and convincing evidence.  See Argument IIB, *supra*.

The record supports the conclusion that Dr. Cotton offered her own independent opinion and was not merely a conduit.  She had extensive knowledge and expertise (Tr. XI/17-172), had qualified as an expert in numerous courts (Tr. XI/172), had supervisory authority at Cellmark (Tr. XI/164) and was ultimately responsible for its protocols, policies and analysts' work (Tr. XI/166-170).  She reviewed the complete case file in this case and her review of the testing process was exhaustive.  As explained in her affidavit submitted with the motion for new trial, Cellmark's practice is to print "blow-ups" or expanded regions of electropherograms so that opposing counsel or their experts would have a sound basis for understanding the analyst's conclusions (F.S.A. 1045).  Analysts also made notations on the electropherograms indicating their reason for a particular decision.  *Id*.

Dr. Cotton testified expansively and with precision about the DNA testing process, including data, readouts, labels and function of analyst versus software, gradations of sample sizes, interpretations, filters, stutter, etc.  (Tr. XI/176-197).  Moreover, as set forth above, "[o]nly an expert can testify to the likelihood that more than one person possesses a particular DNA profile, based on her knowledge of the alleles selected for the DNA profile and the mathematical probabilities that more than one person may possess the same characteristics of those alleles." *Commonwealth v. Barbosa*, 457 Mass. at 789, 933 N.E.2d 93.  Petitioner has failed to show clear and convincing evidence to rebut the presumption of correctness.

      2.    *Because Dr. Cotton Properly Testified to Her Independent Opinion, the SJC Properly Based its Decision on Williams.*

Petitioner claims because Dr. Cotton's testimony was merely a recitation of Magee's test results, the SJC should have analyzed the case under *Bullcoming, supra,* in which a "surrogate" witness testified in place of the actual author of a forensic report.  However, as argued above, Dr. Cotton testified as to her own independent opinion and was not merely a conduit to Magee's testing.

      3. *The SJC Reasonably Determined that the Improper Admission of the Underlying Test Results was not Prejudicial.*

The SJC upheld its finding that the underlying details and results of the non-testifying analyst's DNA test results was improperly admitted but that Petitioner was not prejudiced by its admission:

> Defense counsel made extensive use of the data prepared by [the nontestifying analyst] in his cross-examination of Dr. Cotton. This cross-examination buttressed two pillars of the defense, namely, the unreliability of Cellmark's testing procedures, which necessarily affected the credibility of Dr. Cotton's opinion as to the high probability of the defendant's being a contributor to the DNA on the knife and brown gloves, and the defense theory that a third party committed the murder.... Both strategies depended entirely on the use of [the nontestifying analyst's] data in cross-examination of Dr. Cotton.... The data were an integral part of the defense, and it was going to be the subject of inquiry by the defense whether [the nontestifying analyst] testified or not.

*Commonwealth v. Greineder*, 464 Mass. at 602-603, 984 N.E.2d 804 (quoting *Commonwealth v. Greineder*, 458 Mass. at 239, 936 N.E.2d 372) (Pet. Add. 67).

Even if there is constitutional error, a petitioner is entitled to habeas relief on the basis of a preserved trial error only if that error had a "substantial and injurious effect or influence in determining the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (harmlessness inquiry on habeas review asks whether an error had a "substantial and injurious

effect or influence in determining the jury's verdict"); *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (constitutional errors in state court proceedings are reviewed for harmlessness under the *Brecht* standard); *Farley v. Bissonnette*, 544 F.3d 344, 348 (1st Cir. 2008) (applying *Brecht* to evaluate harmlessness of claim involving limit on cross-examination). Petitioner is unable to show such an injurious effect.

The defense was able to question Dr. Cotton on the basis of her opinions, including the materials and information she reviewed, the assumptions that she made, and the procedures she used to reach her conclusions. In this vein, defense counsel elicited testimony from Dr. Cotton about gaps in her knowledge and faults in her assumptions. *See, e.g.,* Tr. XII at 173-74, 244-45, 248; Tr. XIII at 162-65. Counsel also used Cellmark's electronic data and a series of hypothetical questions to demonstrate that Dr. Cotton's opinion would change if Cellmark had employed more conservative RFU thresholds. *See generally* Tr. XIII at 1-198.

Defense counsel also elicited extensive testimony from Dr. Cotton about the tests that Magee performed, using both Magee's written test results and exhibits prepared by one of Petitioner's experts. Tr. XII/ 119-248; XIII/ 16-198. Therefore, Petitioner was able to question the reliability of the test results, which is what is required under the Confrontation Clause. *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (fundamental purpose of the Confrontation Clause is "generally satisfied when the defense is given a full and fair opportunity to probe and expose. . . infirmities [in an expert's testimony] through cross-examination").

In addition, because Dr. Cotton was the forensic laboratory director, the defense was able to question her about each step in the testing process, the lab's standard procedures and testing protocols, Cellmark's validation studies, its equipment purchases, shortcomings in the lab's reporting procedures, machine manufacturers' recommended RFU thresholds, and the lab's

decision to raise its RFU threshold while it was testing the evidence in this case.  *See, e.g.*, Tr. XII/132-88, 196-219, 226-31.

In light of the foregoing, the admission of the underlying test results did not have a substantial or injurious effect on the jury's verdict.  Habeas relief should be denied.

## IV.   THE SJC REASONABLY REJECTED PETITIONER'S INEFFECTIVE ASSISTANCE CLAIMS.

*Strickland v. Washington*, 466 U.S. 668 (1984) is the clearly established federal law that controls claims related to ineffective assistance of counsel.  Thus, a petitioner alleging ineffective assistance of counsel must establish the following: (1) deficient performance, in that "counsel's representation fell below an objective standard of reasonableness," and (2) prejudice, in that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington v. Richter*, 131 S. Ct. 770, 777 (2011) (quoting *Strickland*, 466 U.S. at 688, 694).  "'Surmounting *Strickland*'s high bar is never an easy task.'" *Richter*, 131 S. Ct. at 788 (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.*  "The standards created by *Strickland* and § 2254 (d) are both 'highly deferential,'" *id.* (citing *Strickland*, 466 U.S.at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997)), "and when the two apply in tandem, review is 'doubly' so," *id.* (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)).  "Federal courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  Where § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

Counsel's "strategic choices," made after sufficient investigation of law and fact, are "virtually unchallengeable." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690-91). "Only if, 'in light of all the circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance,' can a finding of deficient performance ensue." *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (quoting *Strickland*, 466 U.S. at 690). In fact, "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Lynch v. Ficco*, 438 F.3d at 49 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted)).

Second, "even if a lawyer's performance is constitutionally unacceptable, relief will be withheld unless [the petitioner] has demonstrate[d] that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ouber*, 293 F.3d at 25 (quoting *Strickland*, 466 U.S. at 694). "While this level of prejudice may be presumed in a few settings, that is the exception, not the rule." *Id*. (citation omitted). Indeed, the petitioner must "prove that he was prejudiced, *i.e.*, that his attorney's parlous conduct may have altered the outcome of the case." *Id.* (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)).

A.      **Failure to Exclude or Challenge Scientifically Unreliable DNA Results.**

Petitioner first claims that his counsel was ineffective for failing to file a pretrial motion to exclude the DNA evidence as scientifically unreliable and for failing to employ an expert to challenge the DNA evidence at trial. The SJC denied this claim, noting that the statutory test under § 33E is more favorable to a defendant than the constitutional standard for ineffective assistance of counsel. (Pet. Add. 52). *Mello v. DiPaulo*, 295 F.3d 137, 144 (1st Cir. 2002) (substantial likelihood standard is more favorable than the constitutional standard for ineffective

assistance of counsel); *Kirwan v. Spencer*, 631 F.3d 582, 590 n.3 (1st Cir. 2011) (same). Therefore, a finding that there is no substantial likelihood of a miscarriage of justice also fulfills the *Strickland* standard.

> 1.   *Failure to Move to Exclude DNA Evidence.*

Both the trial judge and the SJC recognized that trial counsel has a duty to conduct an independent investigation of the forensic, medical and scientific evidence on which the Commonwealth's case relies. (Pet. Add. 20, 52). Based on the evidentiary hearing testimony, the trial judge concluded that trial counsel's decision not to mount a challenge to the scientific reliability under *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342 (1994) was made after consultation with his team of DNA experts and a thorough investigation into the law and the facts. (Pet. Add. 20, 52) Counsel was aware of the potential weaknesses in the Commonwealth's DNA evidence and the criticisms that had been mounted on Cellmark's work. (Pet. Add. 20, 52). He also considered the risk that a *Lanigan* hearing would serve to educate the prosecution about the weaknesses in the DNA evidence and the fact that the presence of a stranger's alleles on the knife and the brown work gloves would work in his favor (Pet. Add. 20-21. 52). The SJC affirmed the trial judge's conclusion that counsel's decision was not manifestly unreasonable under these circumstances (Pet. Add. 21, 52-53).

The trial judge also concluded that he would most likely have rejected a *Lanigan* challenge to the reliability of Cellmark's test results and that issues raised by Petitioner's expert, including analyst bias, would go the weight of the evidence and not its admissibility (Pet. Add. 21). The SJC held that this was not an abuse of discretion (Pet. Add. 53).

The SJC's decision was a reasonable application of *Strickland*. Where it was clear that counsel made an informed decision and the trial judge indicated that a Lanigan motion would have been denied, counsel was not constitutionally ineffective. "Unlike a later reviewing court,

the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel and with the judge." *Harrington v. Richter*, 562 U.S. at 105.  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S. at 690.

### 2.     *Failure to Challenge DNA evidence at trial.*

Petitioner also faults his trial counsel for failing to adequately challenge the DNA evidence at trial, including his failure to replace Dr. Davis, an expert who he chose not to call because his credibility had been recently questioned in another case and his failure to retain a statistics expert to challenge Cellmark's calculations.  The SJC affirmed the trial court's rejection of this claim.  (Pet. Add. 53).  Counsel presented the testimony of another expert, Dr. Krane, to duplicate Dr. Davis's testimony about the shortcomings of Cellmark's test procedures and vigorously challenged Dr. Cotton about the test results during cross-examination. *Id*.[5]  He was able to get Dr. Cotton to admit that there was DNA from more than two people on the victim's glove and the glove found with the hammer and knife and Dr. Krane also testified that he detected DNA inconsistent with both the victim and Petitioner the two gloves.  *Id.* Thus, the third party culprit theory was presented to the jury and counsel's decision to proceed only with Dr. Krane was not manifestly unreasonable.  (Pet. Add. 54).

The SJC also found that counsel reasonably chose not to hire a statistics expert to challenge Cellmark's calculations.  (Pet. Add. 54).  This decision was made after consultation with his DNA expert team and after he determined that testimony from such an expert would not significantly reduce the probability that Petitioner was a source of DNA on various exhibits and

---

[5]  Dr. Davis also sat at counsel table with counsel during Dr. Cotton's entire testimony (Pet. Add. 53).

where there was other strong evidence of guilt.  *Id*.  The SJC found that counsel's decision was not manifestly unreasonable and that the trial judge's conclusion was not an abuse of discretion.

The SJC's decision on trial counsel's decisions regarding the DNA evidence fall comfortably within *Strickland's* standard.  As the trial judge found:

> An attorney representing a client in a murder case for 18 months preceding trial and six weeks of trial makes numerous decisions, which after an unfavorable verdict, may be the subject of 'Monday morning quarterbacking.' (citation omitted).  Strategies and choices which were well thought out may prove unsuccessful and, with the verdict in mind, [defense counsel] may well believe he should have done certain things differently.  Nonetheless, the actions which are the subject of [Petitioner's] ineffective assistance of counsel claims did not fall below the standard of competence expected from an ordinary fallible lawyer.

(Pet. Add. 23).  *See Collins v. Roden*, 749 F.3d 29, 32 (1st Cir. 2014) (Under AEDPA's "highly deferential" standard of review, to prevail on a claim that a state appeals court unreasonably applied *Strickland* in finding that petitioner's ineffective assistance of counsel claim lacked merit, petitioner would have to show that appeals court could not have reasonably concluded that he failed to prove he was entitled to relief under *Strickland's* own "highly deferential" standard).

### B.  Failure to Move to Suppress Nails Receipt.

Petitioner next claims that his counsel's failure to move to suppress the receipt for the purchase of nails that was found during the search of his home constituted ineffective assistance. The SJC reasonably denied this claim.

Petitioner had initially moved to suppress the items seized pursuant to the search warrant because it was an impermissible general warrant.  The trial judge issued a ruling in which he partially allowed and partially denied the motion.  (F.S.A. 396-490).  The nails receipt was not considered in this decision.  During the middle of trial, the prosecutor moved to admit two receipts from Diehl's hardware store: one for nails and one for a hammer similar to one of the murder weapons that was purchased in a separate transaction two minutes later.  (Tr. X/5-7).

Defense counsel moved to exclude the nails receipt because of its late disclosure and ensuing prejudice to his defense.  (Tr. X/7-8).  He did not move to reconsider the earlier motion to suppress based on the theory of a general warrant.  It is this failure that Petitioner claims was ineffective.

> As the SJC found:

> The [trial] judge did not decide whether he would have allowed such a motion, but concluded that even if [Petitioner] would have prevailed in suppressing the receipt, his failure to file the motion would not have created a substantial likelihood of a miscarriage of justice. The judge found that, although the nails receipt created a strong inference that [Petitioner] purchased the Estwing hammer minutes after the nails purchase, [Petitioner's] son testified that he had purchased the nails. More important, the judge found that the receipt was not a key piece of evidence. There was evidence that [Petitioner] previously had purchased items at the hardware store, which sells the type of gloves involved here as well as Estwing hammers, and the judge noted the strength of the Commonwealth's case, including 'the DNA evidence linking him to the knife and [the brown gloves], the blood spatter and transfer evidence and absence of blood on the defendant's hands and the cuffs of his jacket, the blood pattern on his glasses, the fiber evidence, the consciousness of guilt evidence [the defendant's statements], and the myriad other pieces of circumstantial evidence in the case.'

> We need not decide the question of the motion to suppress because we agree that regardless of its resolution, there was no substantial likelihood of a miscarriage of justice.

(Pet. Add. 54).  Implicit in the SJC's finding that the substantial likelihood of a miscarriage of justice standard was not met is a determination that the *Strickland* ineffective assistance standard was not met as well.  See Argument IVA, *supra*.  *Mello v. DiPaulo*, 295 F.3d at 144 (substantial likelihood standard is more favorable than the constitutional standard for ineffective assistance of counsel).

This was a reasonable application of *Strickland*.  In ruling on Petitioner's pre-trial motion to suppress, the trial judge stated that he would have concluded that other items including

receipts from Diehl's Hardware would fall under the scope of the search warrant (F.S.A. 444 n.24).   Therefore, at the time that the Commonwealth moved to admit the nails receipt in the middle of trial, counsel believed that it had been ruled admissible.   His objection based on unfair surprise was appropriate and cannot be considered deficient performance under the first prong of *Strickland*.  *See Wright v. Marshall*, 656 F.3d 102, 108 (1st Cir. 2011) ("Counsel's performance is deficient only if no competent attorney would have acted as he did."); *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010) (same). *See also Epsom v. Hall*, 330 F.3d 49, 54 (1st Cir. 2003) ("Trial lawyers make countless tactical choices and unless the net reckoning is 'patently unreasonable,' counsel's judgment is not constitutionally defective.")

Petitioner has also failed to show that the SJC's finding that no prejudice ensued from counsel's failure to move to suppress the receipt was unreasonable.   Nails were not recovered from the murder scene or tied to the murder.   The receipt merely showed that Petitioner shopped at Diehl's, a store that also sold the type of hammer used in the murder.   Moreover, Petitioner's son in law testified that he bought nails shortly before the murder and left them on Petitioner's workbench (Tr. XXIV/ 78-84).   To establish prejudice, petitioner must show that "but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012); *Sleeper v. Spencer*, 510 F.3d 32, 39 (1st Cir. 2008) (same).

### C.    Failure to Move to Suppress Search of Petitioner's Car.

Lastly, Petitioner faults his trial counsel for failing to move to suppress the initial search of his car pursuant to the warrant for his house.   On the day of execution of the search warrant for his house, Petitioner's car was parked in the driveway.   Neither the search warrant return nor any police report indicated that the police had entered the car during the search.   (Pet. Add. 55). At a pretrial motion to suppress hearing, Trooper Foley testified that police had observed a

blood-stained towel in the car but it was not seized.  *Id.*  At trial, Detective McDermott testified

that she searched the car on the day the warrants for the house was executed and observed a

white towel inside; she described the towel as brown and dirty, not bloodstained.  *Id.*  Counsel

did not move to strike it as a fruit of an unlawful search believing that the inconsistencies could

be exploited on cross examination.  *Id.*

The trial judge found that the search of the car was unlawful because it was outside the

curtilage of the house.  (Pet. Add. 16).  However, he concluded that counsel had chosen not to

strike Detective McDermott's testimony for tactical reasons that were not manifestly

unreasonable.  (Pet. Add. 17).  Counsel chose instead to highlight the inconsistencies during

cross-examination of the two police witnesses and argued it in closing.  *Id.*  The SJC affirmed

this conclusion on appeal finding that counsel's decision to forego any challenge to the fruits of

the search of the car "was a reasonable tactical decision and was not manifestly unreasonable."

(Pet. Add. 55).

Petitioner argues that his trial counsel testified at the motion for new trial hearing that he

did not consider moving to suppress and strike the testimony about the search of the car (Pet.

Memo at 154).  Even so, counsel's motion to strike Detective McDermott's testimony based on

unfair surprise can still be considered a reasonable tactical decision.  In light of the

circumstances, counsel's action was reasonable under "prevailing professional norms."  *Lynch v.

Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

More importantly, counsel made full use of the inconsistencies in the testimony of the

two Commonwealth witnesses and argued them forcefully in closing argument.  Contrast *Tejeda

v. Dubois*, 142 F.3d 18, 25 (1st Cir. 1998) (finding prejudice where defense counsel's failure to

present a coherent argument deprived petitioner of his only viable defense).  The  SJC's decision

was a reasonable application of *Strickland*.  Habeas relief should be denied.

## V.     THE SJC'S DECISION ABOUT THE RECANTATION OF THE COMMONWEALTH'S FOOTPRINT EXPERT WAS A REASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW.

Petitioner claims that the recantation of State Police Sergeant Deborah Rebeiro regarding

her testimony that a footprint at the scene of the murder matched the shoes Petitioner was

wearing violated his right to exculpatory evidence and due process.  Sergeant Rebeiro testified

that the heel of the footprint was facing towards the back of the victim as she was found.  This

testimony supported the Commonwealth's theory that Petitioner dragged his wife off the path

after assaulting her and was emphasized in the Commonwealth's closing argument.  In support

of his motion for new trial, Petitioner filed an affidavit from William Bodziak, a forensic expert,

who averred that the footprint  actually matched the right toe of Petitioner's sneaker, not the heel.

In response, Sergeant Rebeiro filed an affidavit stating that she agreed with Bodziak and

admitting error in her trial testimony.

Petitioner raises two claims regarding this recantation evidence.  First, he claims that the

Commonwealth's failure to reveal that Sergeant Rebeiro's  testimony was false violated his right

to disclosure of exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

Second, he claims that the recantation violated his right to a fair trial based on reliable evidence

pursuant to *California v. Green*, 399 U.S. 149 (1970).  Habeas relief should be denied on both

claims.

### A.     Deferential Review under AEDPA is Appropriate.

The SJC analyzed this claim under the newly discovered evidence standard which

considers whether the evidence was newly discovered and whether it casts real doubt on the

justice of the conviction.  (Pet. Add. 51).  Petitioner argues that this court should resolve this

issue de novo because the state court ignored his constitutional claims. The First Circuit has

consistently held that a state court's decision on the merits can be considered an adjudication of

the federal constitutional claims raised by Petitioner even if the court does not cite to federal

caselaw. "A matter is 'adjudicated on the merits' if there is a decision finally resolving the

parties' claims, with res judicata effect, that is based on the substance of the claim advanced,

rather than on a procedural, or other, ground." *Teti v. Bender*, 507 F.3d 50, 56 (1st Cir.

2007). *See Clements v. Clarke*, 592 F.3d 45, 52 (1st Cir. 2010); *Junta v. Thompson*, 615 F.3d 67,

71 (1st Cir. 2010) (same). Section 2254(d) applies "regardless of the procedures employed or

the decision reached by the state court, as long as a substantive decision was reached; the

adequacy of the procedures and of the decision are addressed through the lens of § 2254(d), not

as a threshold matter." *Teti,* 507 F.3d at 56. *See Clements,* 595 F.3d at 55 (stating "AEDPA's

trigger for deferential review is adjudication, not explanation;" deference is owed to the "result,"

rather than "the opinion expounding it") (citing *Wright v. Sec'y for Dep't of Corrections*, 278

F.3d 1245, 1255 (11th Cir. 2002) (holding that even summary dispositions constitute merits

adjudications because "all that is required [by the statute] is a rejection of the claim on the

merits, not an explanation")).

Moreover, where the state law is explicitly more favorable than federal law, habeas

courts will presume that the adjudication of the federal claim is subsumed within the adjudication

of the more protective state-law claim, even if the federal claim is not explicitly discussed in the

state court decision. The SJC determined that there was no substantial likelihood that the jury

would have reached a different result if exposed to the evidence of recantation. (Pet. Add. 50).

Under *Brady*, evidence is considered material only when there is a reasonably probability that,

had the evidence been disclosed to the defense, the result of the proceeding would have been

different.  This is the same standard used for the prejudice prong in *Strickland*, which has been

deemed to be subsumed by the substantial risk standard.  *See Mello v. DiPaulo*, 295 F.3d 137,

144 (1st Cir. 2002) ("if the SJC found that the "substantial likelihood of a miscarriage of justice"

standard was not met, it must have concluded that the *Saferian / Strickland* standard for

ineffective assistance of counsel was not met as well").  Therefore, Petitioner's claim that the

SJC used the wrong standard of review must be rejected.  Where the SJC considered whether

there was a substantial likelihood that the jury would have reached a different result, the *Brady*

prejudice prong was implicitly considered and decided as well.

> **B.      The SJC's Decision was a Reasonable Application of *Brady* and *Green*.**
>
> > **1.      *The Brady Claim***

Petitioner's reliance on *Brady* to assert that the Commonwealth failed to disclose

exculpatory evidence is misplaced.  Under *Brady*, a defendant is denied due process if the

prosecution fails to disclose material exculpatory information **prior** to trial.  In this case, the

recantation by Sergeant Rebeiro was made **after** Petitioner's trial and conviction.  Sergeant

Rebeiro did not reconsider her testimony until she read the affidavit by William Bodziak filed

with Petitioner's motion for new trial.  Petitioner has not shown that the Commonwealth had any

knowledge that Sergeant Rebeiro's testimony was false at the time it was given.  Therefore,

Petitioner has failed to show that the Commonwealth violated its obligation to reveal exculpatory

evidence.  *See McLaughlin v. Corsini*, 577 F.3d 15, 21 (1st Cir. 2009) (Under *Brady,* the

allegedly exculpatory information must be possessed or controlled by the prosecution team or its

agents in order to give rise to a duty to disclose).

In any event, the SJC reasonably determined that the newly discovered recantation

evidence did not prejudice Petitioner's case.  Affirming the detailed findings of the trial judge,

the court found that

The judge concluded that the newly discovered evidence, if admitted at trial, would not have been a real factor in the jury's deliberation, and that there is not a substantial likelihood the jury would have reached a different result if exposed to the evidence.   He reasoned that although this footprint testimony was very important to the Commonwealth's theory that [Petitioner] held the victim from behind and dragged her from the path to a wooded area, other expert evidence supported the theory.   Most foot traffic left no identifiable prints, so the absence of the heel print would not rule out the possibility that [Petitioner] dragged the victim in the manner argued by the prosecutor.   Bloodstains on [Petitioner's] clothing supported the inference that [Petitioner] dragged the victim.

. . .

The judge relied on his knowledge of the trial, he applied the correct standard, and he considered this newly discovered evidence in light of specific strengths of the Commonwealth's case, concluding that it 'does not case real doubt on the justice of the [Petitioner's] conviction.'   There was no abuse of discretion or other error of law.

(Pet. Add. 50-51).   This was a reasonable application of *Brady*. "Prejudice exists only if there is a 'reasonable probability of a different result' had the evidence been disclosed." *Healey v. Spencer*, 453 F.3d 21, 25 (1st Cir. 2006).   In other words, there must be a reasonable probability to undermine confidence in the outcome of the trial.   *See Norton v. Spencer*, 351 F.3d 1, 8 (1st Cir. 2003).   As set forth, *supra*, this prejudice test is subsumed by the SJC's more favorable substantial likelihood analysis and therefore this claim must be denied.

2.      *The Due Process Claim*

The SJC's decision was also a reasonable application of the due process right to reliable evidence under *California v. Green*, 399 U.S. at 188 n.20 (Harlan, J., concurring) (due process does not allow a conviction based on no evidence or evidence that is unreliable).   In light of the above discussion regarding the impact of the footprint testimony, the SJC implicitly determined that the erroneous testimony did not render Petitioner's trial fundamentally unfair.   Sergeant Rebeiro's testimony about the footprint at the scene, although important, was not central to the

41

prosecution's case and Petitioner has failed to show that the absence of the testimony would have been a real factor in the jury's deliberations.

## VI.   PETITIONER'S CLAIM REGARDING THE ADMISSION OF EVIDENCE OF EXTRAMARITAL ACTIVITY IS AN ISSUE OF STATE EVIDENTIARY LAW AND IS NOT COGNIZABLE ON HABEAS REVIEW.

### A.   Evidentiary issues are generally issues of state law and are not cognizable on habeas review.

The admissibility of evidence in state trials is governed by state law.  *See, e.g.*, *Evans v. Thompson*, 465 F. Supp. 2d 62, 79 (2006) (observing that admission of evidence in state-court criminal trial is determined by state evidentiary law).  It is a fundamental principle of the law of federal habeas corpus that no habeas claim exists as to state criminal convictions unless the alleged errors are violations of the Constitution, laws, or treaties of the United States.  *Kater v. Maloney*, 459 F.3d 56, 61 (1st Cir. 2006).  It is not the province of a federal habeas court to reexamine state court determinations of state law questions. *Lewis v. Jeffers*, 497 U.S.764, 780-81 (1990).

The SJC reviewed Petitioner's claim regarding the admission of extramarital sexual activity by determining whether the trial court committed an error by admitting unduly prejudicial evidence.  This review is consistent with Massachusetts state law, which considers whether the trial court abused its discretion in admitting evidence whose probative value does not outweigh its undue prejudice.  *See, e.g.*, *Commonwealth v. Booker*, 386 Mass. 466, 469, 436 N.E.2d 160, 163 (1992).  Applying Massachusetts evidentiary law, the SJC concluded that the trial court did not err in admitting evidence of Petitioner's extramarital sexual activity because it was highly relevant to a motive to kill and was connected in time and place with the fact of the case.  (Pet. Add. at 48-49).  Because these claims present issues of state evidentiary law, habeas relief is not available.

**B.      Alternatively, the SJC's decision is neither contrary to or an unreasonable application of clearly established Supreme Court law.**

If this Court were to review Petitioner's claim for habeas relief, it must deny the claim. This Court's review should be governed by the AEDPA standard because state court decisions denying relief on claims presented to them are presumed to be adjudicated on the merits, "in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99.

Petitioner acknowledges that habeas relief typically cannot be granted when a state court errs in its application of state law.  But in this case, Petitioner claims, the evidentiary rulings violated his right to due process because they rendered the trial fundamentally unfair.  (Pet. M. at 173). *See Lyons v. Brady*, 666 F.3d 51, 55 (1st Cir. 2012).  The SJC's decision is neither contrary to, nor an unreasonable application of Supreme Court law regarding general principles of due process and the right to a fair trial.  In determining whether the trial court's evidentiary rulings violated Petitioner's right to due process, this Court must consider whether any error rendered the trial so fundamentally unfair that it violated the Due Process Clause. *See Kater*, 459 F.3d at 64.  The SJC Court reasonably concluded that the evidence in question was relevant to Petitioner's motive and intent.

In responding to Petitioner's motion in limine to exclude this prior bad act evidence, the trial judge carefully considered whether the probative value of the evidence of Petitioner's extramarital sexual activity outweighed its prejudicial effect (F.S.A.  322-332).  The Commonwealth sought to present evidence of Petitioner's activities over a two year period prior to his wife's death to show the nature of his deteriorating marital relationship and the hostility he harbored towards his wife and his motive for her murder.  (F.S.A. 323).  The judge surveyed the relevant Massachusetts caselaw and determined that he would allow such evidence only during

the week preceding the murder.  (F.S.A.328).  He also denied admission of other evidence including Petitioner's use of telephone sex lines, internet pornography and the use of an alias, concluding that the marginal probative value was substantially outweighed by its prejudicial effect.  (F.S.A. 330).  The judge also instructed the jury twice that such evidence could be considered only on the issue of motive.  (Tr. XVI/85-86, XXIV/32).  The SJC affirmed this exercise of discretion, finding that inferences such as motive need not be "inescapable or necessary" but only "reasonable and possible," and that the evidence provided "a reasonable basis to infer a motive to kill, and it was connected in time and place with the facts of this case." Pet. Add. at 49, citing *Commonwealth v. Angelo, Todesca Corp*., 446 Mass. 128, 132-133, 842 N.E.2d 930 (2006).

Petitioner's further argument that the prosecutor improperly referenced the prior bad act evidence and abandoned his motive theory in closing argument was also properly denied.  As the SJC found, the prosecution was not obligated to prove a motive and the evidence it referenced in closing was properly based on the record.  (Pet. Add. 49).

Therefore, where the SJC found that no error occurred at trial, there was no need for the court to consider whether the admission of the evidence created a fundamentally unfair trial which violated Petitioner's due process rights.  This analysis only comes into play when a trial court has made an evidentiary error. *See Lyons*, 666 F.3d at 56-57 (the SJC implicitly found that "the trial was not so infused with inflammatory prejudice as to render it constitutionally unfair"). *See also Coningford v. Rhode Island*, 640 F.3d 478, 484 (1st Cir. 2011).

**VII.   THE STATE COURTS REASONABLY DETERMINED THAT THE JURY'S EXPERIMENT WITH A BANANA DURING DELIBERATIONS DID NOT CONSTITUTE EXTRANEOUS EVIDENCE.**

**A.      Facts Regarding the Banana Incident During Deliberations.**

In response to a book written about this case in 2005, appellate counsel requested an evidentiary hearing to determine whether the jury had conducted an experiment with the gloves admitted in evidence and a banana that happened to be in the jury room during deliberations. The trial judge held a hearing in which six jurors testified and determined that one juror had picked up the banana while wearing the gloves and noticed dot impressions from the gloves on the banana peel (F.S.A. 1109).  He then rubbed a gloved finger across the banana peel, which produced a streak on the peel. *Id.*  The judge found that

> [t]here was a verbal reaction or communication between some jurors at the time and then the break was over and the deliberations resumed.  The banana was eaten by a female juror.  There is no evidence that the banana experiment subsequently became the subject of discussion among the deliberating jury and this Court specially finds that it did not. There were no further votes by the jury until the early afternoon of the fifth and final day of deliberations.  As a result of that vote, the jury reported that a verdict had been reached and the verdict was taken in open court after a few minutes.

(F.S.A. Vol. II/1109-1110).[6]

The judge concluded that the experiment did not constitute extraneous matter and it had no impact on the resumed deliberations on day four and day five to verdict.  (F.S.A. 1109-1110, 1115, 1119-11120).  The SJC affirmed this finding:

> The judge concluded that the experiment did not constitute extraneous matter. The judge found that the experiment was conducted to observe whether the glove was capable of making a pattern similar to the dots and swipe stain on the defendant's glasses and his jacket. He said it was 'loosely based on the testimony and arguments presented at trial and did not invade a new field of evidence.' The judge further found that the use of the banana, an outside object not part of the trial evidence, did not transform the experiment into extraneous matter. We agree.

---

[6]  The judge noted that this finding is consistent with the testimony of some jurors who had no memory of a banana incident at the evidentiary hearing.  (F.S.A. Vol. II/1109, n.4).

The experiment was within the scope of the evidence presented at trial, and cumulative of expert testimony. It was an evaluation of the testimony of experts who opined on the consistency between the dots on the gloves and dots and swipe stains on various pieces of evidence. See *Banghart v. Origoverken, A.B.,* 49 F.3d 1302, 1306–1307 (8th Cir.1995) (jury not exposed to extraneous evidence where they dropped toothpicks and matches not in evidence into wooden stove, a trial exhibit, in order to evaluate expert's testimony that experiments he conducted with stove showed it was defective). We discern no abuse of discretion or other error of law in the judge's determination that the jury experiment did not constitute extraneous matter. *Commonwealth v. Moore,* 408 Mass. 117, 125, 556 N.E.2d 392 (1990).

(Pet. Add. 82).

### B.    The State Courts' Findings of Fact Are Entitled to a Presumption of Correctness.

As set forth in Argument I, *supra*, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1) unless Petitioner rebuts the facts by clear and convincing evidence. The trial judge's factual findings made following the evidentiary hearing regarding the details of the incident and the jury's observations and reactions are entitled to such a presumption. Petitioner's attempt to recast the evidence in a different light and urge this Court to overturn the trial judge's and SJC's factual findings is not sufficient to constitute clear and convincing evidence. *See Teti v. Bender*, 507 F.3d at 58; *Gaskins v. Duval*, 640 F.3d at 453 (same).

### C.    The SJC's Decision Was not Contrary to or an Unreasonable Application of Clearly Established Supreme Court Law.

Clearly established Supreme Court caselaw requires that a criminal defendant be afforded the right to confront the witnesses against him and the right to a jury that consider only the evidence presented at trial under the Sixth Amendment. *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965). Jury exposure to extrinsic evidence may therefore violate this requirement. Jury experiments may constitute extrinsic evidence, especially when jurors gather evidence or test

theories outside the jury room and bring the results back to the jury room.  *U.S. v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (juror conducted his own experiment as to whether added weight in the trunk of a car had a noticeable effect and shared results with other jurors).

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner v. United States*, 483 U.S. 107, 120-121 (1987) (internal citations omitted).

In this case, the state courts reasonably found that the jury's use of the banana to compare the blood on the gloves with the Petitioner's glasses and jacket did not constitute extrinsic evidence and a valid part of their internal deliberations.  The Commonwealth's blood stain expert, Lieutenant Martin, testified that he made transfer exemplars of the glove's dot pattern with a damp paper towel, white paper and fingerprint powder, as well as exemplars and transparencies from a sample glove using a thin film of fingerprint ink and noted the similarity of the patterns (Tr. XVII/135-148).  Another Commonwealth expert, Rod Engler, testified that the stain on Petitioner's jacket showed a unique bar pattern which was consistent with the pattern of dots on the glove (Tr. XVIII/143-156, 180-185).  The jury's use of the banana assisted the jury in assessing the experts' testimony and was not outside the scope of the evidence presented at trial.  *See Kurina v. Thieret*, 853 F.2d 1409, 1413-1414 (7th Cir. 1988) (habeas relief denied where juror's construction of cardboard knife to determine whether killer was right handed was simple experiment based solely on evidence presented and did not constitute extrinsic evidence); *Fletcher v. McKee*, 355 Fed. Appx. 935 (6th Cir. 2009) (habeas relief denied where jurors'

reenactment of shooting during deliberations did not constitute improper extraneous influence and was part of the private internal deliberations of the jury).  *See also State v. Pease*, 163 F.3d 985, 988-993 (Alaska App. 2007) (citing cases upholding jury's efforts to test credibility or plausibility of trial testimony by experimenting with physical evidence or reenacting events or conditions witnesses described).  Habeas relief should be denied on this claim.

## VIII.   PETITIONER'S CLAIM REGARDING THE JURY'S EXPOSURE TO STAINS ON THE BACK OF PETITIONER'S JACKET IS PROCEDURALLY DEFAULTED.

### A.   The Gatekeeper's Decision Constituted a Procedural Default.

Petitioner's last claim must also be denied because it is procedurally defaulted.  *See* Argument  III, *supra*.  This claim regarding the jury's exposure to stains on the back of Petitioner's jacket was raised in a second motion for new trial, filed in March, 2014.  Since the motion was filed after Petitioner's direct appeal, he was required to seek leave to appeal from a single justice of the SJC, pursuant to M.G.L. c. 278, § 33E.  The single justice "gatekeeper" denied leave to appeal, finding the claim to be neither new nor substantial, pursuant to the standard of § 33E.   The First Circuit has held that § 33E's "new and substantial" rule has been applied with sufficient consistency by the SJC to generally qualify as an "independent and adequate state ground" barring federal habeas review.  *See Mendes v. Brady*, 656 F.3d 126, 128 (1st Cir. 2011); *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 75 (1st Cir. 2009).

Moreover, the First Circuit has held that "[t]he 'particular waiver rule' expressed in Massachusetts's § 33E procedure for gatekeeper review merits 'separate, categorical treatment' as an independent and adequate state ground."  *Costa v. Hall*, 673 F.3d 16, 23 (1st Cir. 2012) (citing *Mendes,* 656 F.3d at 129).  "A Single Justice's finding that a petitioner has not raised a 'new-and-substantial' question for further review constitutes a finding of procedural default under state law."  *Id.* at 23 (quoting *Mendes,* 656 F.3d at 131).

**B.     Petitioner Failed to Demonstrate "Cause and Prejudice" to Excuse the Procedural Default.**

In light of the procedural default, this court may consider the extraneous evidence claim only if the petitioner establishes "cause and prejudice" to excuse the procedural default or demonstrates to this Court his actual innocence.  *See Lynch v. Ficco*, 438 F.3d at 45.  Petitioner did not attempt to show either "cause" or "prejudice" to excuse the default.   For these reasons, petitioner's claim regarding the jury's consideration of the stains on the back of Petitioner's jacket should be denied.

**C.     In the Alternative, the State Court's Decision was not Contrary to or an Unreasonable Application of Clearly Established Supreme Court caselaw.**

If this court chooses to consider this claim despite the procedural default, it should deny relief where the motion judge's conclusions were not contrary to or unreasonable application of clearly established Supreme Court law.  *See Gunter v. Maloney*, 291 F.3d 74, 80 (1st Cir. 2002) (where last court decision was unexplained order, habeas court should look through to last reasoned state court decision); *Mendes v. Brady*, 656 F.3d 126, 131 (1st Cir. 2011) ("The gatekeeper was not ruling on the merits, for he had no authority under state law to do so; instead, he was simply addressing the second prong of the new-and-substantial rule, the substantiality of the claim as measured by Mendes's chances of success with it.")

Petitioner cites to *Turner v. State of Louisiana*., 379 U.S. 466, 472-473 (19865) for the principle that a jury's verdict must be based solely on evidence presented in the courtroom where the full judicial protection of the rights of confrontation, cross-examination and of counsel are guaranteed by the Sixth and Fourteenth Amendments.  The motion judge concluded that Petitioner failed to demonstrate by a preponderance of the evidence that the jury was exposed to extraneous evidence. (Pet. Add. 81).  The jacket was submitted to the jury as a properly admitted trial exhibit without any limiting instruction regarding the back of the jacket.  Other experts at

trial informed the jury about the fact that amido black enhances protein stains and that cast-off

stains form distinctive patterns. (Pet. Add. 80). Therefore, the jury could draw its own inference

that the stains on the back of the jacket were cast-off blood.

The motion judge also properly concluded that even if the evidence was extraneous, the

jury's consideration of the stains on the back of the jacket was not unduly prejudicial to

Petitioner's defense. Considering the "probable effect of the extraneous facts on a hypothetical

average jury," and rejecting Petitioner's argument that the court should presume prejudice, the

judge found that the remaining evidence against Petitioner was so compelling that the jury's

consideration of this additional evidence did not impact their verdict (Pet. Add. 81-82).[7]

The motion judge also found that the cast-off stains on the back of the jacket were not of a

nature which produced a high probability of prejudice. (Pet. Add. 82). "The inference that those

stains were consistent with blood from an upraised weapon was cumulative of other bloodstain

evidence on the [Petitioner's] clothing that identified him as the assailant." *Id.*

Finally, the motion judge rejected Petitioner's alternative theory of ineffective assistance of

counsel where Petitioner was unable to show that the jury's consideration of the evidence created

a substantial likelihood of a miscarriage of justice. (Pet. Add. 83). "Where the SJC applies its

more favorable 'substantial likelihood of a miscarriage of justice' standard, its decision will not

be deemed to be 'contrary to' the *Strickland* criterion." *Gomes v. Brady*, 564 F.3d 532, 541 n.6

---

[7]   Among the "compelling evidence that [Petitioner] killed his wife," the SJC referenced the blood spatter on his shoes, shirt, pants, and jacket, scratches on his neck, blood transfer stains on his jacket, his spotless hands, which he denied washing, a witness's observation of [Petitioner] hurrying to and quickly reemerging from the path leading to the storm drains where the murder weapons were found, DNA evidence on the murder weapon and murder gloves linking him to those items and other incriminating evidence (Pet. Add. 82).

(1st Cir. 2009) (quoting *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006)).   Habeas relief should

be denied on this claim.

## CONCLUSION

For the foregoing reasons, this Court should deny the habeas petition.

Respectfully submitted,
MAURA HEALEY
Attorney General

/s/ Susanne G. Reardon
Susanne G. Reardon
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2832

Dated: March 8, 2016                    BBO # 561669


## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing,
including Catherine Hinton, counsel for the petitioner in this matter.  There are no non-registered
participants involved in this case.

/s/ Susanne G. Reardon
Susanne G. Reardon