UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2015-CV-12978

DIRK GREINEDER,
Petitioner

v.

SEAN MEDEIROS,
Superintendent of MCI-Norfolk,
Respondent

**PETITIONER'S MEMORANDUM OF LAW
SUMMARIZING ISSUES IN DISPUTE**

Respectfully submitted,
**DIRK GREINEDER,**
By his attorney,

/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
Rankin & Sultan
151 Merrimac Street
Boston, MA  02114
(617) 720-0011
chinton@rankin-sultan.com

Dated: November 7, 2016

**INTRODUCTION**

This summary memorandum is filed in response to the order of the Court that the petitioner file a memorandum "summarizing the issues in dispute and his position as to those issues." As set forth in detail (with full record citations) in his previously filed memorandum-in-chief and reply memorandum, there are seven federal constitutional violations at issue in this habeas case. In this memorandum, Petitioner will address Ground Two, the Confrontation Clause claim, first.

**I.     CONFRONTATION CLAUSE CLAIM (HABEAS GROUND TWO).**

Greineder asserts (and the Commonwealth disputes) that: (1) admission of inculpatory DNA test results, over objection, through testimony of an expert witness who neither conducted the testing nor reviewed the raw data produced by a non-testifying analyst, violated his constitutional right to confrontation; (2) the constitutional error was preserved and was not harmless; (3) the SJC's decision was so unreasonable that he is entitled to habeas relief; and (4) there was no procedural default.

**A.     Greineder's Rights under the Confrontation Clause Were Violated.**

Based on the majority opinion in *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), and a combination of opinions reflecting a majority of the Court in *Williams v. Illinois*, 132 S.Ct. 2221 (2012), the testimony of Dr. Robin Cotton ("Cotton") recounting the substance of the report of a non-testifying lab analyst, Wendy Magee ("Magee") was admitted in violation of the Confrontation Clause. The introduction of Cotton's testimony violated *Bullcoming* as follows: (1) Magee prepared a report based on anticipated use against an identified defendant, so the substance of the report was "testimonial"; (2) information regarding alleles as well as statistics was contained in Magee's report; (3) Cotton repeated the information in the report in all its details, including both allele calls and statistics; (4) Cotton never reviewed the unfiltered electronic data; she only reviewed limited data as filtered by Magee. The Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial

statements provides a fair enough opportunity for cross-examination." *Bullcoming*, 131 S.Ct. at 2716. Under *Bullcoming*, Cotton's testimony parroting Magee's testimonial statements, introduced for their truth, and without an opportunity to cross-examine the person who made them (Magee), for the purpose of incriminating Greineder, was a clear violation of the Confrontation Clause.

*Williams* did not change this application of *Bullcoming*. Under *Williams*, a statement is "testimonial" when it passes the basic "evidentiary purpose" test of the *Williams* dissent (Kagan/Scalia/Ginsburg/Sotomayor) plus either the "targeted accusation" requirement of the *Williams* plurality (Alito/Roberts/Kennedy/Breyer) or the "formality" criterion of Justice Thomas's concurrence. *See Young v. U.S.*, 63 A.3d 1033, 1044 (D.C. 2013). Based upon a combination of the views in *Williams*, the substance of Magee's report, as recounted by Cotton, constituted a "targeted accusation" against Greineder under the *Williams* plurality test <u>and</u> had an "evidentiary purpose" under the *Williams* dissent test. Accordingly, Greineder had a constitutional right to confront Magee. Presenting a substitute expert was insufficient because she could not be asked about the analyst's proficiency, carefulness, veracity, or any testing errors, mix-ups, made up results, lapses, or the like.

### B. The Constitutional Error was Preserved and Was Not Harmless.

Trial counsel's objection to Cotton's "testifying about the data in this case given the fact that she hasn't done any of the work on it" preserved the error. The "data" included both allele calls and statistics. The end product of forensic testing can be rendered utterly invalid by malfeasance or negligence occurring anywhere in the process. (*See*, *e.g.,* the Annie Dookhan and Sonia Farak sagas). Plugging the allele calls into a software program to spit out random match probability statistics is neither discretionary nor based on opinion, but numerous steps before that final mechanical step may involve critical mistakes in cutting the sample, extracting DNA, quantitating it, amplifying it, running it through the testing apparatus, and subjectively interpreting which peaks to treat as alleles

and which to ignore as artifacts. Many of these steps require proper application of protocols; some involve the exercise of discretion and judgment. The potential for error and unguided discretion was particularly acute in this case where Low Copy Number (LCN) mixtures were interpreted at unusually low Relative Fluorescence Unit (RFU) thresholds.[1] Magee had to make subjective calls on numerous peaks in the underlying electronic data; her interpretation of the data determined the random match probabilities reported by Cotton. Magee's absence at trial effectively insulated her critical allele calls from meaningful review, depriving Greineder of the opportunity to challenge her work. The inculpatory DNA results Cotton presented played a critical role in the outcome of the trial.

### C. Greineder is Entitled to Habeas Relief.

In *Greineder v. Massachusetts*, 134 S.Ct. 166 (2013) the Supreme Court vacated *Comm. v. Greineder*, 458 Mass. 207 (2010) for reconsideration in light of *Williams*. On remand, in *Comm. v. Greineder*, 464 Mass. 580 (2013), the SJC claimed: (1) Cotton's "opinion" testimony detailing statistical likelihood was admissible, and (2) admission of Cotton's testimony enumerating specific allele calls made by Magee was not admissible, but was not prejudicial. The SJC's bifurcated analysis separating test results from "opinion" based on those results was a creative, but invalid means of circumventing the Confrontation Clause, which should be given no habeas deference.

*The SJC's decision was based on an unreasonable determination of the facts.* The SJC's statements that Cotton conducted an independent evaluation of the data, expressed her own opinion,

---

[1] Dr. Arthur Eisenberg (former chair of U.S. DNA Advisory Board to the Director of the FBI) averred that minute quantities of DNA from more than one source, known as Low Copy Number (LCN) mixtures are "fraught with peril." Much of the DNA analyzed in this case was LCN. Dr. Esienberg averred that Cellmark's validation studies were seriously flawed; its lack of guidelines left to the undirected discretion of the analyst to decide whether to treat a peak as an allele or an artifact. Further, Magee knew the DNA profiles of Dirk and Mabel Greineder before making allele calls, and made inconsistent calls biased against the accused. Upon analyzing the underlying electronic data, Dr. Eisenberg found that the test results should have been reported as "inconclusive" and that no statistical likelihood of association should have been calculated.

was not a conduit, and reached similar views on statistical significance as Magee, are not supported by the trial record. Cotton did not even claim to have formed independent opinions. Rather, Cotton repeated, based on Magee's reports, the findings and conclusions made by Magee. She made clear that she was conveying results obtained by someone else, and never claimed to have been personally involved in obtaining the results, signing the report, or generating the statistics.[2] She was there to present Cellmark's results, consistently using the passive voice or "we" in describing what was done. She was a highly educated, knowledgeable conduit, but a conduit nonetheless. To conclude that she was testifying as an independent evaluator expressing her own opinions is to disregard the record.

*The SJC's decision was contrary to clearly established federal law.* This case is nearly identical to *Bullcoming*. The only difference is that Magee's written report was not introduced into evidence, but simply repeated (likely simply read) into evidence by Cotton. This makes no difference. *See U.S. v. Ramos-Gonzalez*, 664 F.3d 1 (1st Cir. 2011)(drug testimony of substitute analyst who "recit[ed]" testing analyst's report wrongly admitted per *Bullcoming*). *Williams* reinforced *Bullcoming*, and the logic of at least seven Justices in *Williams* supports finding a constitutional violation here, where both the evidentiary purpose and targeted accusation tests were met. The SJC's 2013 decision is directly contrary to clearly established Supreme Court precedent as set forth in *Bullcoming* and reinforced by the combination of opinions in *Williams*. *Cf. Barbosa v. Mitchell*, 812 F.3d 62, 67-68 (1st Cir. 2016) (Supreme Court had not clearly established by 2010, prior to *Bullcoming* (2011) and *Williams* (2012), that a substitute DNA expert who supervised and signed the DNA report should not offer an opinion relying on the report of a non-testifying analyst).

---

[2] It makes no sense for the SJC to assert that Cotton reached "similar" views regarding the statistical significance of the allelic information, where it was clear that she had not herself done any statistical evaluations and was merely repeating computer generated statistics supplied in Magee's reports. There were not two sets of statistical analyses coming to the same result; there was only one, done by Magee, and read into evidence by Cotton.

*The SJC decision was an unreasonable application of clearly established federal law.* At the very least, the SJC unreasonably applied *Williams* by making a phony distinction between data and opinion. A valid distinction under *Williams* could be: "I have looked at DNA profile X and DNA profile Y. I do not know where these profiles derive or anything about the testing that produced them. Based on these profiles alone, they correspond to a degree that would occur in 1 in 10,000 random selected profiles." However, the SJC's approach is like this: "I have compared DNA profile X, an *accurate* profile generated from the defendant's blood, and DNA profile Y, an *accurate* profile generated from the glove found at the scene, and they correspond to a degree that would occur in 1 in 10,000 random selected profiles." As Justice Kagan explained in *Williams*, 132 S.Ct. at 2270 n.2: "But the statement 'if X is true, then Y follows' differs materially – and constitutionally – from the statement ' Y is true because X is true (according to Z).' The former is a logical proposition, whose validity defendant can question, the latter contains a factual allegation (that X is true) which the defendant can only challenge by confronting the person who made it (Z)." The *Williams* dissent, cited in *Greineder*, 464 Mass. at 593, approved only opinion testimony that did not implicitly convey as true a portion of the factual predicate (which is exactly what the "opinion" as defined by the SJC does). The SJC unreasonably interpreted *Williams* to mean the exact opposite of what it said!

*There was no procedural default.* The Commonwealth argues the claim is procedurally defaulted. However, the 2010 judgment in which SJC ruled that Greineder had forfeited the claim by purportedly not objecting to so-called "opinion" testimony was <u>vacated</u> by the U.S. Supreme Court in 2013 and no longer exists as valid precedent. After a new round of briefing and argument, the SJC issued a lengthy decision on the merits in 2013 affirming its bifurcation of expert "opinion" from the factual "basis" for such opinion, and specifically holding that admission of Cotton's so-called "opinion" testimony "did not violate Greineder's confrontation right," making no mention of

any forfeit, waiver, or procedural default. *Greineder*, 464 Mass. at 598. Procedural default is limited to cases in which a "default" actually occurred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Here, counsel's objection ("I would register my objection to Dr. Cotton's testifying about the data in this case given that she hasn't done any of the work on it") preserved the issue. The data consisted of both allele calls and statistics; the SJC's bifurcation of statistics as "opinion" and allele calls as "data" does not hold water. Even if a hypothetical default occurred, it would not apply if "the last state court rendering a judgment in the case reached the merits of the claim." *Harris v. Reed*, 489 U.S. 255, 262 (1989). "When a state court declines to find that a claim has been waived by a petitioner's alleged failure to comply with state procedural rules, our respect for the state-court judgment counsels us to do the same..." *Cone v. Bell*, 556 U.S. 449, 468 (2009).

## II.     PUBLIC TRIAL/FAIR TRIBUNAL VIOLATION (HABEAS GROUND ONE).

Greineder asserts (and the Commonwealth disputes) that: (1) closure of the individual jury voir dire violated his right to public trial; (2) the trial judge's refusal to recuse himself from ruling on that claim violated Greineder's right to a fair tribunal; and (3) an evidentiary hearing is required.

### A.     The Individual Voir Dire Was, In Fact, Closed to the Public.

An extraordinary amount of evidence was presented in state court that the individual voir dire was, in fact, closed to the public. Jury selection took place in the context of a longstanding practice of Norfolk Superior Court to close the courtroom during voir dire. *See Comm. v. Cohen*, 456 Mass. 94 (2010). In a simultaneous murder trial in the same courthouse, a sign on the door during individual voir dire stated that the courtroom was closed. Prior to Greineder's trial, the trial judge conferred with the media as to their interest "in being **present**" during the "**public part**" of the case, and stated that individual voir dire would be held in a "sideroom" for juror's "**private conversations with the court**." Individual voir dire was held in a small courtroom (Room 8) located up a "narrow

6

steep staircase" "so situated that it seldom attracts the general public." At the outset, the trial judge stated: "The record should reflect that we are in Room 8 for the purpose of conducting a **non-public** individual voir dire of the jurors." He repeatedly referred to the other courtroom as the "open courtroom," in contrast to Room 8. The transcript reveals no "bench conferences" in Room 8.

The media understood itself to be excluded, despite a "media frenzy" surrounding the trial. A newspaper reported that jury selection "has been closed to the public." The trial judge found that no member of the press was present during voir dire, and that members of the press believed themselves to be excluded and waited just outside the door. Two of Greineder's children were not present, despite their commitment to defense counsel to be present every day. The judge found "conflicting credible evidence" as to the presence of Greineder's daughter Britt, at best finding it "probable" that she spent some time in Room 8 during voir dire. No Commonwealth witness could name a single member of media or public other than Britt who supposedly attended. At best, the trial judge found "occasionally, a few unidentified persons who **may well have been** members of the public were present." Even if true, the "possible existence of one or two spectators brave enough or arrogant enough to seek admission does not convert the court room into an open one." *Peterson v. Williams*, 85 F.3d 39, 44 n.7 (2nd Cir. 1996); *Cohen*, 456 Mass. at 109 (closure found despite three spectators who "saw the sign but ignored it").

Eight years after the trial, the trial judge claimed the words "non-public" did not mean what they said, asserting that his "intent" was merely to bar "video and still photo media" and to "keep [his] option open to exclude people" if that became necessary. He blamed a reporter and trial counsel for telling people that the courtroom was closed. The SJC focused on the trial judge's subjective intent, insisting: "The trial judge has now explained his use of the word 'non-public' stating he never intended to exclude the public and he did not order room 8 closed." *Greineder*, 458 Mass. at 227.

7

The SJC's assertion that: "The ultimate question of fact before us is whether there was a court order or other official action that excluded the public (or media) from the room," *Greineder*, 458 Mass. at 226, was contrary to or an unreasonable application of clearly established federal law. To the contrary, "trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials" *Presley v. Georgia*, 558 U.S. 210, 215 (2010), thus a courtroom may be closed due to inadvertence or inaction. See *Owens v. U.S.*, 483 F.3d 48, 63 (1st Cir. 2007) (deputy closed door without judge's knowledge), *Cohen*, 456 Mass. 94 (closure found despite lack of judicial order and despite attendance of some members of public); *Walton v. Briley*, 361 F.3d 431, 433 (7th Cir. 2004)(trial inadvertently ran late; public unable to attend); *U.S. v. Negron Sostre*, 790 F.3d 295, 303 (1st Cir. 2015)(court may, in fact, be closed without "order" by inaction of judge). The SJC decision was also an unreasonable determination of the facts. The judge's subjective intent cannot outweigh the overwhelming evidence of closure. If a trial judge "intends" to provide correct jury instructions, but instead utters erroneous instructions, we do not look to his subjective intent! Based on the judge's comments, actions, inaction, and a commonsense understanding of the English language, any reasonable person would have believed that Room 8 was closed to the public. Accordingly, the courtroom was, in fact, closed.[3]

---

[3]   The procedure in Greineder's case was not the "functional equivalent of a sidebar" as in *Wilder v. United States*, 806 F.3d 653 (1st Cir. 2015). In *Wilder*, the entire jury venire was asked questions in open court; those who answered "yes" met with the judge one-by-one in an adjacent jury deliberation room, and spectators could see them going in and out of the open courtroom. Judge Casper upheld this procedure as "essentially the functional equivalent of a sidebar," and the majority of a First Circuit panel affirmed. Unlike *Wilder*, here jurors did not go from an open courtroom into an adjacent sideroom and back in view of spectators. Here, no questions were asked in open court. The jurors went from a non–public jury "stretching out area" into a non-public hallway in small groups lined up on benches, through a non-public back door into Room 8, which was, in fact, closed to the public, to attend a "non-public" individual voir dire outside of public view. In contrast to *Wilder*, here the entire individual voir dire was done in private and the courtroom closure was complete, not partial.

Under *Waller v. Georgia* 467 US 39, 46 (1984), a party seeking to close the courtroom must advance an overriding interest that is likely to be prejudiced. Moreover, closure must be no broader than necessary, and the court must consider reasonable alternatives and make findings adequate to support the closure. These factors were not addressed by the state court, so *de novo* review is warranted. Post-hoc justifications based on the trial judge's claimed reasons provided eight years later are insufficient, as such findings must be made <u>before</u> the closure. *Pressley*, 558 U.S. at 213 (*Waller* factors to be applied "*before* excluding the public"); *U.S. v. Gupta*, 699 F.3d 682, 687 (2nd Cir. 2012)(refusing to consider late-filed affidavit, findings must be made *before* closing courtroom). There can be no justification based on the judge's post-hoc excuse that "a sidebar voir dire would have required [participants] to stand for almost two days," and that it was "oppressively hot." *See Owens*, 483 F.3d 48, 62 (1st Cir. 2007)("To our knowledge, a trial closure has not yet been justified on the basis of convenience of the court"). There is no indication that any reasonable alternatives were considered. There was not a lack of space (the trial judge described room for 30 people). The closure was not trivial; it went on for a day and a half. *Cf. Owens*, 483 F.3d at 63 ("[T]his was not a mere fifteen or twenty-minute closure; rather Owens' trial was allegedly closed to the public for an entire day while jury selection proceeded."). Greineder is entitled to relief.[4]

### B. Greineder Was Deprived of a Fair and Impartial Tribunal.

Greineder was deprived of an impartial tribunal in litigating his public trial claim where the trial judge prejudged the issue in his first response to the SJC and then presided over an evidentiary

---

[4] Unlike *Wilder*, 806 F.3d at 656, there was no procedural default here. When the issue was raised on appeal, the SJC ordered a further hearing, and following the hearing considered the constitutional claim on its merits with no finding of any waiver, stating: "The posture of this issue before us is similar to the review of a decision on a motion for new trial." *Greineder*, 458 Mass. at 225. Since the SJC found no default, neither can this Court. *See Cone*, 556 US at 468-69 ("When a state court declines to find that a claim has been waived by a petitioner's alleged failure to comply with state procedural rules, our respect for the state-court judgment counsels us to do the same...").

9

hearing about a matter to which he was a percipient witness. This is unconstitutional. *See In re Murchison*, 349 U.S. 133, 136 (1955); *U.S. v. Ayala-Vazquez*, 751 F.3d 1, 24 (1st Cir. 2014); *Hurles v. Ryan*, 752 F.3d 768, 789 (9th Cir. 2014). Not only that, but the judge also contacted a potential witness (his former law clerk) with whom he had a supervisory relationship, interviewed her, shared memories with her, provided her with a detailed memorandum regarding his recollections, and advised her about responding to a defense request for information, thus assuming the role of an advocate. In *Wilder*, 806 F.3d at 656, the case was reassigned "so that Judge O'Toole could serve as a fact witness concerning the conduct of the voir dire." Here, where Judge Chernoff presided over a hearing in which he was a fact witness, a similar recusal should have occurred on Greineder's motion. The SJC stated that the judge "examined his own conscience (with penetrating self-awareness) and concluded that he could be fair and impartial" and that "there was no evidence of bias or prejudice from an extrajudicial source." *Greineder*, 458 Mass. at 394. That decision was contrary to clearly-established federal law, which asks not whether a judge harbors subjective bias, but instead whether "the average judge" in his position is objectively likely to be neutral or whether there is unconstitutional "potential for bias." *Williams v. Pennsylvania*, 136 S.Ct. 1899, 1905 (2016).

    C.    **Greineder Is Entitled to (Not Barred From) an Evidentiary Hearing.**

Greineder has raised serious concerns regarding judicial bias and impartiality, showing that the state court fact-finding procedure was not adequate to afford him a full and fair hearing. Accordingly, the habeas court must conduct an evidentiary hearing and make independent findings of fact, as in *Hurles*, 752 F.3d at 791-792 (ordering federal evidentiary hearing due to flaws in state court factfinding process where "facts [the judge] 'found' involved her own conduct, and she based those 'findings' on her untested memory and understanding of events."). Contrary to the Commonwealth's argument, 28 U.S.C. §2254(e)(2) does not prohibit an evidentiary hearing because

10

petitioner here did not fail "to develop the factual basis of the claim"; rather, the trial judge was not impartial in deciding the claim. *See Avila v. Richardson*, 751 F.3d 534 (7th Cir. 2014) (remanding for federal evidentiary hearing because pre-AEDPA standard for granting hearing that applies when hearing is not barred by §2254(e) was satisfied, where for reasons outside petitioner's control, state courts never gave a full and fair hearing). Finally, *Cullen v. Pinholster*, 563 U.S. 170 (2011), holds only that review under §2254(d)(1) is limited to the state court record, and does not address §2254(d)(2) claims of unreasonable determination of the facts. A hearing is required.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL (HABEAS GROUND THREE).

Greineder asserts that trial counsel was constitutionally ineffective in failing to seek to exclude or challenge scientifically-unreliable, invalid DNA test results which formed the linchpin of the Commonwealth's circumstantial case.[5] Trial counsel's purported reasons for failing to move to exclude the DNA test results do not withstand scrutiny. Moreover, trial counsel did not bother to call an expert in DNA statistics to challenge the DNA evidence at trial.[6] As for counsel's failure to

---

[5] Post-trial defense expert Dr. Arthur Eisenberg concluded that Cellmark's reports on the knife and work gloves were unscientific, unreliable, and unfairly biased, and should have been reported as inconclusive. Low copy number (LCN) mixtures test results are fraught with peril. Many problems can occur (allelic drop-out, alllelic drop-in, increased prevalence of stutter), needing specific validation. Cellmark's validation studies and interpretation guidelines were seriously flawed. It is not possible to reliably determine whether a peak appearing on an electropheragram was a true allele or an artifact, and there were no validation studies at the interpretation thresholds Cellmark employed during Greineder's case. The only verifiable threshold to employ based on validation of its own equipment was 100 Relative Fluorescence Units (RFUs), but in the midst of analyzing the data, Cellmark lowered its threshold to 40 and later 60 RFUs, which was contrary to accepted practice and virtually unprecedented. Cellmark's interpretation guidelines gave unguided discretion to any analyst analyzing known samples from potential suspects. The analysis was unscientifically biased in favor of the prosecution's theory of the case. Cellmark arbitrarily treated peaks between 40 and 100 as alleles when they matched Greineder's DNA profile, but ignored them when they did not match. All of this rendered Cellmark's results invalid.

[6] Post-trial defense expert Dr. Brenner averred that the statistical conclusions presented "violated basis scientific principles and unfairly biased the statistical results against the defendant."

move to suppress the nails receipt, the prosecutor argued in closing that the nails receipt arguably linked Greineder to the purchase of a hammer which may have been the murder weapon. As for the fruits of the unlawful car search, Detective McDermott's testimony about the towel she saw there weakened Greineder's trial defense of DNA transfer and significantly undermined his credibility. In this circumstantial case, the improper admission of this evidence had a substantial and injurious effect on Greineder's trial defense, and the state courts' finding of lack of prejudice was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Relief is warranted.

## IV.   DUE PROCESS CLAIM (FOOTWEAR EVIDENCE)(GROUND FOUR).

Greineder asserts that his constitutional rights to disclosure of exculpatory information and to a fair trial based on reliable evidence were denied based on the post-trial recantation of the prosecution's footwear expert. The trial judge overtly refused to adjudicate the federal constitutional claim,[7] instead considering the post-trial recantation under the less rigorous state newly-discovered evidence rubric, which did not subsume the federal standard. The presumption that the state court adjudicated the federal constitutional claim is thus effectively rebutted. *See Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013); *Dennis v. Secretary, PA Dept. Of Corrections*, 2016WL4440925, *13 (3rd Cir. 2016)("when the state court pens a clear, reasoned opinion, federal habeas courts may not speculate as to theories that 'could have supported' the state court's decision"). *De novo* review is warranted. Even if not reviewed *de novo*, Greineder is still entitled to habeas relief. Based upon the central importance of the footprint testimony to the prosecution's case at trial, there is at least a reasonable probability that the verdict would have been different had this false evidence been

---

[7] Ignoring the legal irrelevance of "bad faith" (*U.S. v. Agurs*, 427 U.S. 97, 110 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)), the trial judge stated: "[b]ecause there is neither a hint of wrongdoing nor of bad faith, the Court does not feel compelled to impose a strict due process standard of review," which he candidly recognized "might well result in an order for a new trial."

withdrawn or corrected in a timely manner. Petitioner was convicted at least in part because of this false inculpatory evidence presented at trial, while the true facts were not presented to the defense until after the trial.[8] To the extent that the SJC's failure to find prejudice (under a different legal standard) can be deemed to constitute a rejection of Greineder's constitutional claims, that failure constituted an unreasonable application of clearly-established federal law. The constitutional error was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18 (1967).

## V.  DUE PROCESS CLAIM (EXTRAMARITAL SEXUAL ACTIVITY) (GROUND FIVE).

Greineder asserts that the Commonwealth's deliberation elicitation and exploitation of irrelevant, unfairly prejudicial evidence regarding his extramarital sexual activities rendered the trial fundamentally unfair, in violation of his constitutional right to due process. *See Dowling v. United States*, 493 U.S. 342, 352 (1990). Moreover, the over-the-top, pervasive repetition of lurid details (including extensive evidence about prostitutes, group sex, and sadomasochism presented through numerous witnesses) and the abandonment of the claimed nexus of this evidence to any theory of motive in the prosecutor's closing argument was indicative of the prosecution's intentional misconduct in seeking to destroy petitioner's character. *See Gumm v. Mitchell*, 775 F.3d 345, 379-385 (6th Cir. 2014)(evidence of defendant's alleged bizarre sexual activities improperly injected to inflame jury; *habeas* relief granted). In light of the total absence of any evidence of hostility between Greineder and his wife prior to her death, any evidence that he had threatened her or that she was planning (or threatening) to leave him, lurid details of Greineder's marital infidelity were not at all relevant to the issue of motive, served no purpose other than to besmirch his character and poison

---

[8] Had Rebeiro authored her affidavit correcting her mistaken identification prior to trial, and had that affidavit not been turned over to the defense, this would have constituted a grave constitutional violation under *Brady v. Maryland*, 373 U.S. 83 (1963). It would be truly anomalous if the petitioner in that scenario were entitled to a new trial, while Greineder can be denied relief because the same affidavit was not produced until after trial.

the jury against him, and likely contributed significantly to the jury's verdict. The SJC's finding to the contrary constituted an unreasonable determination of the facts, warranting habeas relief.

### VI. RIGHT TO TRIAL BY JURY (BANANA EXPERIMENT) (GROUND SIX).

Greineder asserts that his constitutional right to trial by jury was denied based on the deliberating jury's exposure to extraneous evidence through its unauthorized banana experiment. The Commonwealth argues that the experiment did not constitute extraneous information. Yet the "transfer exemplar" created by the jury during its unauthorized banana experiment was new, extraneous "evidence," unfiltered by either expert opinion or cross-examination, and was not at all like the re-enactments employed by deliberating jurors in the two federal cases the Commonwealth cites, *Kurina v. Thieret*, 853 F.2d 1409,1413-1414 (7th Cir. 1988) and *Fletcher v. McKee*, 355 Fed. Appx. 935 (6th Cir. 2009). Rather, this was new, extrinsic information which filled in a gap in the Commonwealth's proof by linking Greineder's jacket to the work glove, far more akin to the unauthorized jury experiments warranting habeas relief in cases such as *Marino v. Vazquez*, 812 F.2d 499 (9th Cir. 1987) and *Jennings v. Oku*, 677 F.Supp. 1061, 1062 (D. Haw. 1988). The SJC's refusal to characterize this as extraneous information raising a presumption of prejudice constituted an unreasonable application of settled Supreme Court precedent. *See, e.g., Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *Parker v. Gladden*, 385 U.S. 363, 364 (1966). Relief is warranted.

### VII. RIGHT TO TRIAL BY JURY (STAINS ON JACKET) (GROUND SEVEN).

Greineder asserts that his constitutional right to trial by jury was denied based on the deliberating jury's exposure to extraneous evidence. At trial, the trial judge specifically excluded the *stains* on the back of Greineder's jacket, not just the expert testimony regarding them. The stains were not rendered admissible simply by being attached to an admitted piece of evidence. Despite the trial judge's ruling, the jury discovered those stains and formed their own unscientific conclusions

about what caused them. Greineder was denied any opportunity to present an alternative explanation for the protein detected on the back of the jacket or to contest the conclusion that the stains were consistent with cast-off from an upraised weapon. The jury's evaluation of this evidence was not only beyond the scope of the trial evidence, but also likely based on a fundamentally-flawed and untested assumption that the stains were bloodstains. The Commonwealth bore the burden of proving that there was no prejudice. The extraneous information fit precisely into the Commonwealth's theory of the case, thus the prejudice was extreme. *U.S. v. Santana*, 175 F.3d 57, 67 (1st. Cir. 1999). The information was not cumulative, as there was no discussion whatsoever before the jury regarding any cast off stains on the jacket. Trial counsel was ineffective because once the stains were excluded, he should have ensured that the back of the jacket was either covered or removed. Finally, the issue was not procedurally defaulted. A single justice gatekeeper's finding of a lack of "substantiality" does not preclude habeas relief, *Lee v. Corsini*, 777 F.3d 46, 56 (1st Cir. 2015), and the finding of lack of "newness" was based on an unreasonable determination of the facts under §2254(d)(2). The information about the jacket was "new" because it was based on a book published after the first motion for new trial was litigated and denied. It was not possible to raise the issue earlier, as the predicate facts were not yet known or knowable. There was no default.

## CONCLUSION

For the reasons set forth herein, and for the reasons set forth more fully in his memorandum-in-chief and reply memorandum, Greineder is entitled to federal habeas relief.

Respectfully submitted,
**DIRK GREINEDER**
By his attorney,
/s/ Catherine J. Hinton
Catherine J. Hinton, BBO #630179
151 Merrimac Street
Boston, MA 02114
(617) 720-0011

15

**CERTIFICATE OF SERVICE**

      I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, including Susanne G. Reardon, Assistant Attorney General, counsel for the respondent in this matter, on November 7, 2016. There are no non-registered participants involved in this case.

      /s/ Catherine J. Hinton
      Catherine J. Hinton, BBO #630179