```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
 2


 3


 4                                )
        DIRK GREINEDER,           )
 5                                )
              Petitioner,         )
 6                                )    Civil Action
        v.                        )    No. 1:15-cv-12978-RGS
 7                                )
        SEAN MEDEIROS             )
 8      Superintendent MCI - Norfolk )
                                  )
 9              Respondent.       )
                                  )
10


11
                  BEFORE THE HONORABLE JUDITH G. DEIN
12                  UNITED STATES MAGISTRATE JUDGE


13


14                            HEARING


15


16                      November 21, 2016


17


18        John J. Moakley United States Courthouse
                        Courtroom No. 15
19                      One Courthouse Way
                  Boston, Massachusetts 02210
20


21


22                  Linda Walsh, RPR, CRR
23                  Official Court Reporter
          John J. Moakley United States Courthouse
24            One Courthouse Way, Room 5205
                  Boston, Massachusetts 02210
25                  lwalshsteno@gmail.com
```

```
 1    APPEARANCES:

 2    On Behalf of the Petitioner:

 3          RANKIN & SULTAN
            By: Catherine J. Hinton, Esq.
 4          151 Merrimac Street, Second Floor
            Boston, Massachusetts 02114-4717
 5          617-720-0011
            chinton@rankin-sultan.com

 6

 7    On Behalf of the Respondent:

 8          OFFICE OF THE ATTORNEY GENERAL
            By: Susanne G. Reardon, Esq.
 9          Trial Division
            One Ashburton Place, 18th Floor
10          Boston, Massachusetts 02108
            617-727-2200
11          susanne.reardon@state.ma.us

12

13

14

15
                   Proceedings recorded by sound recording and
16                    produced by computer-aided stenography

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (Recording begins at 2:33:31)
3              THE CLERK:  United States District Court for the
4    District of Massachusetts is now in session on November 21st,
5    the year 2016, in the matter of Greineder versus Medeiros,
6    Civil Action Number 2015-12978.  Could counsel please identify
7    themselves for the record.
8              MS. HINTON:  Catherine Hinton for the Petitioner, who
9    is present.
10             MS. REARDON:  Susanne Reardon, Assistant Attorney
11   General on behalf of the Respondent.
12             THE COURT:  So we're here on the habeas petition.
13   Ms. Hinton, I'll hear from you.
14             MS. HINTON:  There are seven Constitutional claims in
15   this rather complex lengthy habeas petition.  I'd like to
16   address the Confrontation Clause violation first, which is
17   actually ground two of the habeas petition.
18             The Petitioner asserts that, and the Commonwealth
19   disputes, obviously, that admission of the inculpatory DNA test
20   results in this case over objection through the testimony of an
21   expert witness who neither conducted the testing nor reviewed
22   the raw data nor served as a technical reviewer nor signed the
23   report, no direct connection to the testing at all, the
24   admission of DNA test results produced by a nontestifying
25   analyst violated his Constitutional right to confrontation;
```

1    that that violation was -- the error was preserved by objection

2    at trial.  The error was not harmless.  And the SJC's decision

3    to the contrary was so unreasonable that he's entitled to

4    habeas relief, and contrary to the Commonwealth claim, there

5    was no procedural default.

6          So this is a case in which the most inculpatory

7    evidence imaginable, the knife and the brown work gloves

8    presumably used by the killer, the Commonwealth presented

9    evidence that DNA results linked the Petitioner to the knife

10   and the brown work gloves through the testimony of the director

11   of the Cellmark lab, Dr. Robin Cotton.  And Dr. Cotton

12   testified for two full days with an incredible amount of

13   detail.  Specific test results were marked as chalks.  Each

14   locus was analyzed in-depth, allele by allele.  The

15   computer-generated electropherograms that were used in the case

16   to present these results were presented as chalks to the jury,

17   but it was impossible to know what was the underlying -- what

18   underlying decisions had been made by the analyst herself in

19   producing those electropherograms.

20         THE COURT:  So just go over with me the underlying

21   data that was done by the other expert.

22         MS. HINTON:  Okay.  So the analyst does a lot of

23   things in preparing a DNA lab report.  First, the sample has to

24   be cut, then it has to be -- the DNA has to be extracted, then

25   it has to be quantitated, then it has to be amplified, it has

1   to be run through a testing apparatus and -- to interpret which

2   peaks would show up.  After it's run through the testing

3   apparatus, there are peaks, and you have to determine whether

4   those peaks represent true alleles or whether they represent

5   what's called artifacts, which are to be ignored.  And the

6   analyst has a tremendous amount of discretion in choosing how

7   to filter those results.  The analyst has to use certain

8   protocols.  Some of those protocols involve the exercise of

9   discretion and judgment.

10        In this case there were some particularly acute issues

11   because these were low copy numbered mixtures, which are an

12   area of DNA that is very difficult to interpret, and they were

13   interpreted at unusually low RFUs, which are called relative

14   fluorescence units.  I'm not a scientist, but I am trying to

15   make it as simple as possible.  So this is an area which is

16   very easy for the analyst to misinterpret.  It's very -- it's a

17   case in which the Cellmark lab changed its thresholds mid test.

18        The lab had validated the test results at 100 RFUs,

19   and for some reason in this case shifted to first 40 and then

20   60 RFUs.  So they were bouncing around changing the threshold

21   of what they were looking at as the test was proceeding.

22   Significantly, the -- it was conceded that Cellmark knew who

23   the knowns were.  They knew that they were looking at Dirk

24   Greineder's DNA profile in comparison to the DNA profile found

25   on the knife and the work gloves.  So there is a clear

1    potential for bias, and in fact, an expert, Dr. Eisenberg, the

2    former chair of the US DNA Advisory Board to the director of

3    the FBI, in a post-conviction affidavit, which is before Your

4    Honor -- it's I think in Volume 1 of the record -- a lengthy

5    affidavit showing all of the many, many problems that there

6    were with this DNA test that was done by this analyst.

7         The validation studies were flawed.  There was a lack

8    of guidelines left to the undirected discretion of the analyst

9    to decide whether something was a peak or an artifact.  In

10   looking in detail at the raw data, Dr. Eisenberg found that

11   inconsistent calls were made by the analyst that were biased

12   against the accused, and it was conceded that the accused was

13   known, which is very important to the legal analysis of this

14   case.

15        THE COURT:  But could all of that have been explored

16   with Dr. Cotton?

17        MS. HINTON:  No, it couldn't, because Dr. Cotton never

18   looked at the raw data.  So there's raw data and then there are

19   filters applied to the raw data and then there is a printout

20   called an electropherogram that is presented as the end result

21   after filtering out the alleles and the artifacts.  And

22   Dr. Cotton only looked at the filtered results.  It was

23   conceded by all sides and the SJC itself found that Dr. Cotton

24   never looked at the raw results.

25        THE COURT:  Right.  But she could be examined about

1  the potential problems.

2          MS. HINTON:  Potential problems, but she couldn't be

3  examined about what happened in this case.  And she

4  couldn't -- she was in no position to justify why Wendy Magee,

5  the analyst, called a particular peak an allele versus an

6  artifact.  She could not be questioned about why that was done

7  in an inconsistent manner in a way that was biased against the

8  accused.  She had no basis of answering questions like that

9  because she was neither there nor looked at the raw data;

10  underneath the filtered data was the only thing she had looked

11  at.

12          THE COURT:  Okay.

13          MS. HINTON:  So this is a case in which -- it's

14  really -- it's different from all the other cases that have

15  examined these types of issues in my exhaustive search of the

16  case law.  It's a case in which -- under *Bullcoming*, the answer

17  would simply be this is a violation of the Confrontation

18  Clause.  After *Bullcoming* we have *Williams*, and *Williams* is a

19  split decision.  It's a four-one-four decision in which none of

20  the -- there's no one thread that five justices agreed to, and

21  so the -- there are two approaches that have been taken.  One

22  approach is to say that *Williams* does not -- is not -- does not

23  have precedential value, and you just have to go back to

24  *Bullcoming*.  The other approach is to say, well, as does --

25  there's a decision called *Young versus United States* out of the

1    DC Circuit, which other courts have followed as well and I've

2    cited in my papers, that if you put together the two different

3    sides, the two -- if you put together what's labeled as the

4    dissent in the *Williams* case, which is four justices,

5    Sotomayer, Ginsburg, Scalia, and Kagan, if you put them

6    together, that that test plus one of the other tests will get

7    you to a Constitutional violation.

8           So in this case we've got a basic evidentiary purpose

9    test has been -- was met, and the plurality test was met, which

10   is Alito, Roberts, Kennedy, and Breyer came up with this

11   targeted accusation requirement.  So the testimony in *Williams*

12   was a cold hit DNA case where the accused was not known, and

13   the plurality decision said, well, the accused was not known so

14   it was not a targeted accusation against a known person, and

15   therefore, it's not testimonial.

16          And the dissent completely agreed with that --

17   completely disagreed with that, saying, well, there was an

18   evidentiary purpose and that should be enough.  You shouldn't

19   have to have this extra targeted accusation requirement.

20   Justice Thomas had his own requirement, a formality

21   requirement, and nobody else agreed to that.  So it was a

22   four-one-four decision, but the way I think it is best read is

23   by putting the different parts together.  And in this case

24   both -- under both the plurality test and the dissent test

25   there was a Constitutional violation here, a violation of the

1    Confrontation Clause, because Dirk Greineder, who was known to

2    the lab, was known to the analyst when testing the DNA.

3    There's definitely an evidentiary purpose.  The intent was to

4    put together a report and evidence for trial.  And so the

5    result that I think is mandated by *Bullcoming* is not changed.

6         What was presented here was surrogate testimony.  It

7    was testimony that the Constitution does not allow to present

8    someone who had nothing to do with the underlying testing to

9    basically recite these test results and leave the Defendant

10   with no recourse to actually confront the person that made

11   those test results.  And it's the same whether you're looking

12   at the allele calls or the statistics.

13        The SJC went to great pains, twisted itself up in

14   knots trying to distinguish the statistical analysis as an

15   opinion and the allele calls as the data.  And it just

16   doesn't -- it doesn't hold up.  When you examine it closely,

17   that distinction doesn't make any sense.

18        Dr. Cotton, she neither did the allele calls nor did

19   she do the statistics.  She didn't run the statistics.

20   Everything was in the report of the analyst that she

21   had -- that Dr. Cotton had in front of her when she was

22   testifying, both the allele calls and the statistics, and she

23   simply recited both parts.  And, you know, there are just some

24   logical leaps that one would have to take that don't hold up.

25   To claim that the statistics are somehow immune from the

1    Confrontation Clause because they're merely based on this

2    underlying data, it wasn't presented -- first of all, it wasn't

3    presented that way in court.  Dr. Cotton never -- she never

4    claimed to have been providing her own independent opinion.

5    She wasn't presented to the jury as someone who was providing

6    an independent opinion.  She -- all of her testimony was in the

7    form of we did this, we did that, Cellmark did this, Cellmark

8    did that.  She never even claimed to have run the statistics

9    herself, which is a difference between this case and some other

10   cases.

11          She -- when she presented the evidence, there was not

12   a distinction between here's the underlying data and here's my

13   opinion about the underlying data.  If anything is an opinion,

14   it's the discretionary calls that the analyst makes about what

15   to call an allele and what to call an artifact.  It's

16   discretionary calls in terms of filtering the DNA evidence and

17   coming up with the electropherogram, which is what got

18   Dr. Cotton eventually reviewed.

19          In *Williams*, if you look at *Williams* closely, you will

20   see that four justices that signed on to the dissent, plus

21   Justice Thomas, all five of them completely rejected the notion

22   that the analyst's testing results are simply the underlying

23   basis of the opinion.  The SJC decision keeps coming back to

24   that.

25          THE COURT:  I mean, isn't that fundamental, the SJC

1  says that *Williams* is not relevant here?

2         MS. HINTON:  And they have to say that; otherwise

3  their whole reasoning falls apart.  But it doesn't make any

4  sense, Your Honor.  Five justices in *Williams* all agree,

5  including Justice Thomas, who completely rejected the decision

6  of the plurality.  Five justices agreed that the underlying

7  data is presented for its truth.  There is no other -- you

8  can't say it's just presented as the basis of the opinion.

9  It's presented for the truth.  And since five justices agree to

10 that, I don't see how you can use *Williams* to justify the SJC's

11 take on this situation.

12        The SJC made several -- so first they made an

13 unreasonable factual ruling, which is that -- they made an

14 unreasonable determination of the facts, which is that -- that

15 Cotton was expressing her own opinion, an independent

16 evaluation, that she wasn't a conduit; and that does

17 not -- that is not borne out by the record.  The SJC makes a

18 big point that Cotton reached a similar view about the

19 statistics as did Magee, but there was no -- she never even

20 claimed to have run the statistics.

21        There was no separate -- there was not two separate

22 sets of statistics that happened to coincide.  There was only

23 one set.  It was in Magee's report.  She read them verbatim

24 into the trial record.

25        Secondly, this -- the SJC's decision was contrary to

1    clearly establish Federal law because it is almost exactly like

2    *Bullcoming* except for the fact that the evidence was recited

3    rather than a report physically being put into evidence, but

4    that shouldn't make a difference.  And there's case law, *Ramos*

5    *Gonzalez* from 2011, stating that a substitute analyst reciting

6    a testing analyst's report is wrongly admitted under

7    *Bullcoming*.  So under *Bullcoming*, this should be an

8    open-and-shut case.  And *Williams,* while it is a confusing

9    decision to read, if one reads it closely and really looks at

10   this four-one-four split, it is clear that the Confrontation

11   Clause was violated here because the evidence was both

12   presented as for an evidentiary purpose and against a targeted

13   individual.

14          And then, finally, at the very least, this SJC

15   decision was an unreasonable application of clearly established

16   Federal law because of this phony distinction that the SJC

17   keeps wanting to make, which is that they want to say this is

18   an independent opinion by Dr. Cotton.  Well, that would be okay

19   if Dr. Cotton was handed a DNA profile, and there was no

20   other -- no evidence presented as to where that DNA profile

21   came from, whose it was, how it got made.

22          If there was just a DNA profile in the abstract and

23   she was given that and she was given the Petitioner's DNA

24   profile and she was able to say "I don't know anything about

25   these two profiles, but when I run them through the computer, I

1    find that they match," that would be -- that's very different

2    from what happened in this trial, which is the underlying

3    analyst report was presented as part of the truth upon which

4    Dr. Cotton was relying.

5           So Justice Kagan said it well in *Williams,* "If the

6    statement of 'X is true, then Y follows' differs materially --

7    and constitutionally -- from the statement 'Y is true because X

8    is true (according to Z).'  The former is a logical

9    proposition, whose validity the defendant can question.  The

10   latter contains a factual allegation (that X is true), which

11   the defendant can only challenge by confronting the person who

12   made it (Z)."

13          So the SJC wants to say that, you know, all of the

14   justices in *Williams* agreed that this was fine, but that is a

15   misreading of the dissent.  The dissent clearly was approving

16   only opinion testimony by an expert that does not convey as

17   true an underlying predicate.  And that underlying predicate

18   was conveyed here in full force for two full days with charts

19   and graphs and allele by allele, we at Cellmark did this, we at

20   Cellmark did that and this is the result and this is the work

21   gloves and this is the knife and this is the Defendant's

22   profile, and here's the statistics.

23          And there was not a separate opinion that relied upon

24   something independent, like a hypothetical.  Like, if you took

25   two hypotheticals and asked the expert, you know, these two

1   hypothetical profiles, do they match, that would be okay even

2   under the dissent, but that's not what happened here.

3        The Commonwealth claims there was a procedural

4   default, but there wasn't a procedural default.  The 2010

5   judgment that ruled that Greineder had forfeited this claim by

6   not objecting to the so-called opinion testimony, let me make

7   clear, there was an objection.  The objection -- the objection

8   was "I would register my objection to Dr. Cotton testifying

9   about the data in this case given that she hasn't done any of

10  the work on it."  That was the objection that was overruled.

11       The SJC wants to say data.  Well, the data means only

12  the allele calls, and it doesn't mean the statistics.  The

13  statistics is the opinion and the allele calls are the data,

14  and so the -- so in its first decision, the SJC said that the

15  defense lawyer didn't object.  That decision, the 2010

16  decision, was vacated by the U.S. Supreme Court in 2013, and it

17  doesn't exist as a valid precedent anymore.

18       So there was a new round of briefing, there was a new

19  round of argument, and in 2013, the SJC issued another

20  decision, again upholding the conviction, again stating that

21  there was a bifurcation of the expert opinion from the basis of

22  the opinion, and again, saying the statistics are the opinion

23  and the allele calls are the data.  But there was no mention

24  this time about any procedural default.  And the SJC ruled on

25  the merits that admission of Cotton's testimony, quote, "did

1   not violate Greineder's confrontation right," unquote, with no
2   mention of forfeit, waiver, procedural default of any kind.

3          So procedural default is limited to cases where a
4   default actually occurred, and no default occurred here.  First
5   of all, the objection covered everything.  The data consisted
6   of both allele calls and statistics, and the SJC's bifurcation
7   does not hold water.

8          Secondly, even if there was a hypothetical default, it
9   wouldn't apply.  Under *Harris v. Reed*, if the last state court
10  rendering a judgment in the case reached the merits of the
11  claim, it doesn't apply.  And under *Cone v. Bell*, when a state
12  court declines to find that a claim has been waived by
13  Petitioner with respect to state procedural rules, the Federal
14  Court has to follow suit.  So there was no procedural default
15  here that the SJC found in its 2013 decision.

16         And, finally, I would say that even if one accepted
17  the SJC's reasoning, which Petitioner disputes vehemently, but
18  even if once accepted the SJC's reasoning that there's a
19  bifurcation between opinion -- the statistics as opinion and
20  the allele calls as data, the SJC said, well, the data, the
21  allele calls shouldn't have been presented to the jury, but the
22  opinion -- the statistics was fine.

23         And then they went on to say that that was -- it was
24  harmless error, and that decision was unreasonable.  I mean,
25  this is -- the Commonwealth presented these results over a

1    two-day period with such attention to detail, going to the

2    trouble of blowing up charts with each allele listed and

3    showing how it connected with the work gloves and the knife,

4    and then presented those charts to the jury in that kind of

5    excruciating detail, it's unreasonable to think that the jury

6    did not give that great weight and that the jury would not have

7    viewed Cellmark's analysis as rigorously scientific if that

8    underlying data hadn't been there.  And five justices in the

9    *Williams* court say that that -- those -- the analyst

10   information is presented for the truth, and it was presented

11   for the truth here.  So the entire trial would have proceeded

12   very differently if this DNA evidence hadn't been presented.

13        So that's it in a nutshell on the Confrontation

14   Clause.  If you have questions or do you want to do it back and

15   forth?

16        THE COURT:  No.  Actually, let's do it back and forth.

17        So, Ms. Reardon, I'll hear from you on this issue.

18        MS. REARDON:  Your Honor, the DNA evidence, we

19   contended there was a procedural default on the opinion

20   testimony.  To the extent that the Petitioner's arguing about

21   the underlying data, we would agree that that has not been

22   procedurally defaulted.  I think in some -- she's essentially

23   trying to put them together, but I will press --

24        THE COURT:  Well, because the objection was to the

25   testimony being based on the underlying data.  So how do you

1  distinguish those?

2        MS. REARDON:  The objection was to her testifying to

3  the underlying data.  I mean, it's not a strong procedural

4  default argument so I'm willing to go to the merits.

5        THE COURT:  Okay.

6        MS. REARDON:  I would suggest here that the

7  interpretation the Petitioner wants to put onto the *Williams*

8  decision is just this one interpretation from the DC Circuit.

9  What we have to remember in this case is we are on habeas

10  review now, so we're looking at whether this was contrary to an

11  unreasonable obligation of *Williams*.  And what happened in this

12  case is when it went on cert on direct appeal, the Supreme

13  Court actually remanded it to the SJC to reconsider it in light

14  of *Williams*.  It then went back up on a cert petition which was

15  denied by the Supreme Court.  I think that's pretty clear --

16  you can pretty clearly infer that the Supreme Court didn't

17  think, even on direct appeal, that they had interpreted

18  *Williams* wrongly.  And I would suggest that we --

19        THE COURT:  I don't have the grounds to take a denial

20  of cert as a ruling that way, do I?  I mean, they deny cert for

21  a million different reasons.

22        MS. REARDON:  Well, I think in this case where they

23  particularly sent it back for the SJC to reconsider in light of

24  *Williams*, I think you can infer that they looked at it pretty

25  closely again when it came back up to make sure that the SJC

1  did what they were told to do.

2       In any event, the way that I read *Williams* is I think

3  a little bit different than Petitioner does.  I read it as,

4  again, plurality -- again, it's a fractured decision, but I

5  read it as the plurality of the court held that witnesses can

6  testify to their opinions using test results from a

7  nontestifying analyst.

8       In this case Cotton did not do the underlying testing,

9  but what she did do -- and, again, she was the lab director at

10  Cellmark, so she had a pretty good knowledge of the procedures

11  and the policies used for the underlying testing.  She took the

12  underlying test, conducted her own review of them, and then

13  made her own opinion as to the statistical analysis.  I see the

14  testimony I guess a little bit differently than Petitioner.

15       THE COURT:  Do you agree, though, that she didn't

16  review the underlying data, that she assumed that the

17  underlying analysis was done correctly?

18       MS. REARDON:  She looked at the testing -- right.  She

19  didn't go back and retest, that's correct.

20       THE COURT:  Well, not only didn't retest, didn't

21  independently make the assumptions or the conclusions from the

22  raw data.

23       MS. REARDON:  Not independent --

24       THE COURT:  To the extent there was a discretionary

25  call, she relied on the underlying results?

1          MS. REARDON:  Yes.

2          THE COURT:  Okay.

3          MS. REARDON:  But, again, the way I read *Williams*, and

4    again, it's very fractured, *Williams*, if you read -- if you put

5    together the pieces, five justices actually found that even the

6    underlying test results don't violate the Confrontation Clause,

7    and the SJC in the second Greineder opinion noted that in

8    Massachusetts there's actually more protection because they

9    separated out -- they say the opinion can come in but not the

10   underlying testing and found in that decision that her

11   testimony as to the underlying testing was improperly admitted

12   but then went on to a harmless error analysis.

13         THE COURT:  I understand that the SJC thinks that

14   that's more protection, but why is it more protection if the

15   underlying data doesn't go in?  Then you just have the opinion

16   without having the underlying data.  Why is that better?

17         MS. REARDON:  I think they see it as more of the

18   underlying data can be seen as hearsay if that particular

19   analyst who is testifying didn't do those tests.  And to the

20   extent that they did come in in this case and that was harmful,

21   the cross-examination of Dr. Cotton was quite extensive and

22   included very favorable testimony in terms of the two, I would

23   say, theories of defense, one of which was the unreliability of

24   Cellmark's testing because they went through "so you didn't do

25   this testing," and the differences between where they switched

1   halfway through with the thresholds.  That all came out to the

2   jury and arguably made her testimony less reliable to them.

3   And that also came out on cross-examination, that there was

4   actually DNA evidence on the -- I believe it was the glove.  I

5   don't know if it was the glove and/or the knife -- that came

6   from a third party who was never identified, which also

7   considerably added to the defense theory that there was

8   possibly a third party involved.

9          So in terms of harmless error, really they did a very

10  good analysis of that and recognized that there was beyond the

11  DNA evidence -- now, granted that was strong evidence, but

12  there was much more evidence against the Petitioner than just

13  the DNA evidence.  So that's basically my argument on the DNA.

14          THE COURT:  All right.  We're all on the same page,

15  though, that if the DNA was a violation of the Confrontation

16  Clause, then that's a structural default, right, it's a

17  structural error?  So do I get to the harmless error?  I

18  mean --

19          MS. HINTON:  No.  Only if you agree with the SJC's

20  analysis.

21          THE COURT:  Right.  But, otherwise, I don't do an

22  independent harmless error analysis?

23          MS. HINTON:  Correct, correct.

24          THE COURT:  Okay.

25          MS. HINTON:  If I could just respond briefly.

1          THE COURT:  Briefly.  Go ahead.

2          MS. HINTON:  I don't think you can read anything into

3   denial of cert.  There were a number of cases that were -- that

4   went up.  *Williams* was decided and afterwards the SJC remanded

5   a handful of cases; Greineder happened to be one of them.  I

6   don't think you can read anything into that denial of cert as a

7   ruling of any kind.

8          The SJC itself stated very clearly that Dr. Cotton did

9   not review the raw data.  There's no question about that.  And

10  it would have been so much better for the Defendant if this DNA

11  testimony had not been admitted at all.  So we would not have

12  to be talking about, you know, parsing what the defense ended

13  up doing with it and how that may have been somehow helpful to

14  the defense.  Once it went in, of course trial counsel had to

15  deal with it, but it shouldn't have gone in to begin with, not

16  without the proper witness.

17         THE COURT:  Okay.

18         MS. HINTON:  So moving on to the public trial claim,

19  Greineder asserts that the closure of the individual jury voir

20  dire violated his right to a public trial.

21         Secondly, that the trial judge's refusal to recuse

22  himself from ruling on that claim violated his right to a fair

23  tribunal.

24         And, third, that an evidentiary hearing is required in

25  this court.  So --

1          THE COURT:  Can we start with the last one first?

2          MS. HINTON:  Okay.

3          THE COURT:  Of the evidentiary ruling, I mean, it

4     seems that I have all the witnesses who would be testifying.  I

5     mean, they gathered facts from a bunch of places.  What would

6     an evidentiary hearing accomplish?

7          MS. HINTON:  Well, the problem in this case is not

8     that insufficient facts were presented.  In fact, there was an

9     overwhelming amount of evidence presented.  The problem was

10    that the fact finder was not a fair tribunal because he was

11    making rulings about his own conduct from his own untested

12    memory and had direct contact including showing his preliminary

13    findings to a witness who was his former law clerk.  He

14    was -- and advising her about whether she should respond to the

15    defense's request for information.

16         He was right smack in the middle of the proceeding as

17    a witness himself, and he should not have been -- Judge

18    Chernoff should not have been the one to rule on the claim

19    about public trial.  And so since there never was a fair

20    tribunal, Petitioner argues that an evidentiary hearing has to

21    be held in this court to have that evidence presented before a

22    fair tribunal for the first time.  And it's not prohibited by

23    2254(e)(2) because it wasn't Petitioner's fault for failing to

24    develop the facts on the basis of the claim.  It was the

25    tribunal's fault for not being fair.  And it's not barred by

1   2254(d)(1) under *Cullen v. Pinholster* because there's

2   2452(d)(2) claims here, unreasonable determination of the facts

3   claims, that *Cullen v. Pinholster* doesn't bar an evidentiary

4   hearing about.

5          I mean, there's a very recent case from the Seventh

6   Circuit, 2014, *Avila v. Richardson*, remanding for a Federal

7   evidentiary hearing because, for reasons outside of

8   Petitioner's control, the State courts never gave a full and

9   fair hearing and that the pre-AEDPA standard has to apply under

10  those circumstances.

11         So, you know, whether you would need to hear all of

12  the testimony live is, you know, another question, but you

13  know, maybe some of it could be submitted in different forms,

14  but it can't be said to be a fair hearing when it was held

15  before a judge who was a witness.  I mean, the DA's office,

16  even in arguing at that -- you've got the transcript now of

17  both the pretrial and post-trial evidentiary hearings that were

18  held in this case, and there were a number of them.

19         So within that transcript, I mean, there's a part

20  where the DA is saying to the judge, you know, well, there's

21  eight witnesses, you know, in the Commonwealth's favor, and

22  you, Your Honor, make the ninth, you know, just completely

23  acknowledging that the judge was himself a witness, and under

24  those circumstances, he was deprived of a fair tribunal in

25  litigating the public trial claim.

1          In *Wilder*, the recent First Circuit case, Judge

2     O'Toole recused himself so that he -- because he could have

3     been a witness to a public trial claim that the Petitioner was

4     making in that case, and the same thing should have happened

5     here.  There's no need for an extrajudicial source of the bias.

6     The test is an objective test.  The SJC said, well, you know,

7     he subjectively looked at the inner workings of his mind and

8     decided that he could be fair and impartial.  That's not the

9     test.  I mean, *Williams v. Pennsylvania*, a recent Supreme Court

10    case for 2016, discusses the test is a purely objective test,

11    whether the average judge in his position is objectively likely

12    to be neutral or whether there's an unconstitutional potential

13    for bias.

14          So here we have a judge who rushed to judgment and

15    filed a first written response without any input from the

16    parties and then a reporter then contacted him and said, well,

17    wait a minute.  That's not my memory, and then he opened it up

18    to a further hearing and heard witnesses on all sides and then

19    he put together a decision that was very strange:  "Well,

20    here's what I think from my memory and here's what I think from

21    the witnesses."  He ended up being the only witness to the

22    events about the individual voir dire who was not subjected to

23    cross-examination, and there were some issues there in terms of

24    his changing explanations for why he had ordered the individual

25    voir dire to proceed as it did that, you know, could have been

1   ripe for cross-examination.  So a fair hearing was not had on

2   this claim.

3           In terms of the credible amounts of evidence

4   presented, you know, this jury selection took place in the

5   context -- there was an SJC decision in 2010, *Commonwealth v.*

6   *Cohen*, that found that Norfolk Superior Court, where this trial

7   took place, had a practice from 1982 to 2010 -- this was a 2001

8   trial, right smack in the middle of that time period -- a

9   longstanding practice of closing the courtroom for individual

10  jury voir dire.

11          And in a simultaneous murder trial going on in the

12  same courthouse at the same time, there was an affidavit from a

13  trial lawyer in that case that there was a sign on the door

14  stating that the courtroom was closed.  Then on the record we

15  have got the judge conferring with the media as to their

16  interest in being present during the, quote, public part of the

17  case, talking about how the individual voir dire would be held

18  privately -- for private conversations with the court in a side

19  room.

20          The voir dire was then held in a small courtroom

21  located up a narrow, steep staircase that doesn't generally

22  attract the public, and the jurors were brought not -- it

23  wasn't like *Wilder* where the jurors were addressed in an open

24  courtroom in view of spectators as a group and then brought one

25  by one into an adjoining jury deliberation room.  And, you

1    know, that case is kind of close, but this was not that case.

2          Here the -- I've, as I presented in the reply memo, at

3    great detail, because I went back to the trial transcript, the

4    jurors were sitting in a room that the judge had labeled that

5    room as the jurors' stretching out room.  You can stretch out

6    in here.  And there was evidence that no members of the public

7    were present in that jury stretching out room.  Jurors were

8    then called in groups of five into a closed back hallway where

9    they sat on a bench to be called one by one into the small

10   room, Courtroom 8, which -- and they were questioned in

11   Courtroom 8 and then brought back into the hallway and then

12   back to the jury stretching out room.

13         So if Courtroom 8 is nonpublic, which I insist it was,

14   there's no spectators viewing the jurors going in any

15   direction, not coming, not going, not going through the door,

16   or coming out the door, I mean, I dispute that's enough to make

17   a public trial anyway, but that's what *Wilder* found.  And I

18   understand that Your Honor is bound by *Wilder*, but this is not

19   like *Wilder*.  This is a complete closure.

20         So in Courtroom 8 we've got the trial judge saying on

21   the record, "The record shall reflect we are here in Courtroom

22   8 for the purpose of conducting a nonpublic individual voir

23   dire of the jurors."  Now, the judge later, eight years later,

24   said, "Oh, I didn't really mean that.  When I said -- I said

25   we're here for conducting a nonpublic voir dire, I didn't

```
1   really mean nonpublic.  I meant something to the effect of like
2   if I had to make it nonpublic, then I would make it nonpublic
3   and that the media couldn't take pictures."  Well, that's not
4   what he said, and we don't look to what was in the judge's
5   subjective state of mind and what he meant.  We look -- you
6   know, in court cases, we look at -- if we're looking at jury
7   instructions and the judge said one thing to the jury but meant
8   another, we would focus on the words that came out of the
9   judge's mouth and how a reasonable jury would have understood
10  them, and here the words "nonpublic" were repeated over and
11  over again.
12          He told the media if you're interested in being
13  present during the public part of the case, he talked about --
14  in Courtroom 8 he talked over and over and over to the jury
15  that, you know, you met these lawyers back in the open
16  courtroom in contrast to the nonpublic courtroom they were now
17  in.  The media itself understood that it had been excluded.
18          There was a media -- what was characterized as a media
19  frenzy surrounding this trial, and the newspapers reported that
20  the jury selection had been closed to the public.  The trial
21  judge himself found that no members of the press were present
22  in Courtroom 8 during the jury voir dire.  Members of the press
23  sat and waited just outside the door.  I believe there was four
24  of them with testimony in the record that waited immediately
25  outside the door, waiting to see if -- when people came out if
```

1   something of interest might happen because they believed they

2   had been excluded.

3         So the trial judge upon deciding this motion basically

4   says, well, they believed they were excluded but, you know, I

5   didn't mean to tell them that and, you know, it must have been

6   the trial lawyer that told them that.  You know, he said he

7   blames it on the trial lawyer for having told them that, and he

8   said, well, nobody ever excluded them.  I don't think that this

9   passes muster.

10        It's -- we shouldn't be looking at his subjective

11  intent.  And the SJC's decision, which uses the judge's own

12  subjective explanation, is not -- is, first of all, contrary to

13  the already established Federal law in which that's not the

14  test, and that we're not supposed to look at his subjective

15  intent but further we're not supposed to look at whether there

16  was only an official action or a court order that excludes the

17  public.  So --

18        THE COURT:  Those are the cases that you've cited,

19  like even if it's by accident?

20        MS. HINTON:  Yeah, even if it's by accident.  Even if,

21  you know, somebody closed the door without the judge knowing or

22  the trial went late into the evening and the overall courthouse

23  doors were closed.  In *U.S. versus Negron-Sostre*, the court may

24  in fact be closed without an order by inaction of the judge in

25  the face of a longstanding practice, and there was a

1    longstanding practice in this case.  And so it's -- there was a

2    lot of evidence present and there was not a fair hearing of

3    that evidence, and I think that it would -- it is required for

4    this court to give that evidence a fair hearing for the first

5    time because it was not done.

6           Now, this is a case in which, you know, most -- this

7    case is really different from most of the other cases that have

8    raised public trial, and in public trial cases have been being

9    swatted down right and left, and I understand that.  But in

10   this case there was no procedural default because the court

11   ruled on this claim on its merits.  The issue was raised on

12   appeal.  The SJC ordered a further hearing.  Following that

13   further hearing, the SJC said "The posture of this issue before

14   us is similar to the review of a decision on a motion for a new

15   trial."  And then it went on to rule on the merits, finding no

16   procedural default.

17          So in most of the cases that have been ruled -- where

18   this issue has been ruled adversely to our position, there was

19   a default, but that's not the case here.  And just like in the

20   last issue, since the SJC didn't find a default, neither can

21   this court under *Cone v. Bell*.

22          THE COURT:  So with -- the Commonwealth says, though,

23   there was evidence from the members of the prosecution team and

24   a law clerk who stated that they saw public in the courtroom.

25          MS. HINTON:  Well, the -- at best, at best the trial

1    judge found that there was conflicting credible evidence that

2    the Defendant's youngest daughter was present in the room.  She

3    herself flatly denied being present.  A number of witnesses,

4    including trial counsel -- there was conflicting evidence, all

5    right.  The trial judge found that she may well have

6    been -- let me see.  It was probable.  So the trial judge found

7    at best it was probable that she spent some time in room 8, and

8    the trial judge found -- here's what he found:  "Occasionally a

9    few unidentified persons who may well have been members of the

10   public were present."  That's the best they could come up with.

11   The Commonwealth couldn't come up with any named person.  At

12   best they could come up with maybe the Defendant's daughter was

13   there and maybe a few unidentified people who might have been

14   members of the public were there.

15           But, first of all, there's case law that the courtroom

16   can still be considered closed even if a couple of people, a

17   couple of spectators basically sneak in.  That's not the test

18   as to whether one or two people who were brave enough to seek

19   admission anyway sat there.  In the case of *Peterson v.*

20   *Williams* in the Second Circuit and *Cohen* itself, the SJC case,

21   the previous SJC case, there were three spectators who saw a

22   sign but ignored it, but it still held that the courtroom was

23   closed.  So I don't think that's dispositive even if -- even

24   granting if there were a couple of people.

25           In light of the media believing itself to be excluded,

1  reasonably believing itself to be excluded in view of

2  everything that the judge had said, done, not said and not

3  done, the media camped itself right outside the door waiting

4  for the, you know, a shred of being able to participate.  And I

5  don't think that the trial judge's blaming the one reporter or

6  blaming the trial counsel for that holds water when you look at

7  what words actually came out of the trial judge's mouth.

8         And his explanation -- I mean, and I would also say

9  that the *Waller* case, U.S. Supreme Court case, *Waller v.*

10 *Georgia*, "A party seeking to close the courtroom must advance

11 an overriding interest that is likely to be prejudiced, and the

12 closure can be -- must be no broader than necessary and the

13 court must consider reasonable alternatives and make findings."

14 All that stuff is supposed to be done before the closure, not

15 afterwards.  That's -- *Presley* says that itself, before

16 excluding the public these *Waller* factors are supposed to be

17 applied.

18        Here we have eight years later the trial judge coming

19 up with -- trying to come up with reasons for why things were

20 done the way they were done.  He says, well, you know, if we

21 had it at sidebar, people would have had to stand around for

22 two days, and it was hot and so forth.  But these are -- I

23 mean, Owens said there's "Trial closure cannot be justified on

24 the basis of convenience of the Court."  And, you know, so

25 people didn't have to stand.  They could have come up with some

1    alternatives.  Maybe some people could sit down.

2         This wasn't done the way it was done in *Wilder*, which

3    maybe could have been another alternative that maybe could be

4    justified under the *Wilder* decision.  This was done in a

5    completely different way, nonpublic room to a nonpublic hallway

6    to another nonpublic room.  There were 30 -- the trial judge

7    found that there were 30 seats available in Courtroom 8, he

8    found eight years later after the fact.  There's -- it can't be

9    justified, and it certainly can't be -- you can't rely on a

10   decision by a judge who was himself a witness and who was

11   himself embroiled in the fact-finding procedure.

12        There's this interesting exchange where the trial

13   clerk -- the court clerk who was also a witness called the

14   judge and said, well, should I answer this defense request for

15   information, and the judge talked to her about that and, you

16   know, gave her his initial preliminary findings and discussed

17   her memories with her.  I mean, you can't have witnesses doing

18   that with each other and then not be subject to

19   cross-examination either.  So it was not a fair tribunal, and

20   the SJC ruling can't be upheld.

21        MS. REARDON:  Your Honor, I guess I'll start with the

22   evidentiary hearing.  Clearly a federal habeas court is not or

23   should not be in the position of re-examining the evidence that

24   was already presented to the state court.  This was a three-day

25   evidentiary hearing with 21 witnesses that were received by the

1    judge, and the common practice in Massachusetts on motions for

2    a new trial in -- and I've handled a lot of cases where the

3    public trial was claimed -- the motion judge really -- the

4    trial judge is in the best position to, again, recall what

5    happened during the trial, and that's exactly what happened

6    here.  Judge Chernoff was very careful in his second set of

7    findings to parse out what he remembers and what the witnesses

8    said.  And, again, Petitioner says there was conflicting

9    evidence.  Well, it was up to the judge to decide which

10   evidence he believes, and that's what happened.

11          THE COURT:  It's just so hard, if you have a case with

12   so much press, to not have the press cover the jury selection,

13   if the courtroom was open, is just hard to fathom.

14          MS. REARDON:  I mean, there were comments, I

15   believe -- I don't know if it was during the hearing -- that

16   the press aren't necessarily interested in individual voir dire

17   because nothing is really happening then and a lot of it

18   happens at sidebar or out of the hearing of anyone in the

19   courtroom.  Again, a habeas court is in the position --

20   Petitioner is really just rehashing what the testimony was and

21   saying it should have come out differently.  That's the job of

22   the state court, to make findings like this, and I think

23   they're entitled to a presumption of correctness.

24          If you look at -- I don't think it's in my memo, but

25   *Pike versus Guarino*, a federal court decided to have another

1    evidentiary hearing very similar to the motion for new trial

2    hearing.  In fact, all the same witnesses, much of the same

3    testimony, and the First Circuit said that really -- he

4    shouldn't have.  That had already happened in the state court,

5    and habeas courts are limited to what was before the state

6    court.  So to have another evidentiary hearing in federal

7    court, you're not really analyzing what happened and what the

8    state court had in front of it.

9         THE COURT:  So you do agree, though, even if I take

10   the record as it stands, I do have to make an assessment --

11   there's a presumption but it's a rebuttable presumption.  So

12   whether it's an unreasonable finding based on the evidence

13   presented, right, that's the standard that I need to apply,

14   right?

15        MS. REARDON:  The standard, but generally it's not

16   rebutted by just arguing that it should have been decided a

17   different way based on the same evidence.  Usually it's

18   rebutted by showing something different that perhaps hadn't

19   been in front of the State.

20        THE COURT:  Well, except that the habeas court doesn't

21   have additional evidence.  So it's based on the record.  There

22   are situations where you end up with a determination that

23   was -- it was an unreasonable finding of fact.

24        MS. REARDON:  Yes.

25        THE COURT:  I mean, that's the standard, right?

1          MS. REARDON:  Yes.

2          And in terms of the --

3          THE COURT:  I have not been through the record so I

4     don't want anybody to read this as I have made that decision.

5          MS. REARDON:  In terms of the public trial claim

6     itself, again we should look at the findings as made by the

7     state court.  In the *Waller* case, really what's important to

8     remember about *Waller* is those factors only come into play once

9     defendant has made an objection to the closure.  Here, first of

10    all, we've had a finding that there was no closure, and there

11    was no objection to the closure.  So I think *Waller* doesn't

12    really apply in this case.

13         And in terms of the other cases, there's one case

14    cited by Petitioner on the recusal issue, that the judge should

15    have recused himself, the *Williams* case.  In that case, the

16    judge had previously been involved in the case as a prosecutor.

17    I mean, that's clearly much more involvement than here.  Like I

18    said, it's -- state courts actually give more deference to

19    decisions on a motion for a new trial where the trial judge

20    decides it.  I think they're in the best position really to

21    remember and to have the best perspective on motions for a new

22    trial.

23         THE COURT:  I guess the problem, though, is that it's

24    sort of no clear memory.  I mean, it's kind of like I remember

25    but maybe I said this and maybe I said that.  It's not a

1   definitive I was there, and this is my standing order to keep

2   the courtroom open and I have a clear memory of what went on.

3        MS. REARDON:  He did have a memory that he -- there

4   was no sign on the door.  He never told anyone that the

5   courtroom would be closed.  His -- you know, his phrase that

6   the courtroom was closed -- or the public part of the trial was

7   his way of saying that he wasn't going to allow media during

8   certain parts of the trial.

9        THE COURT:  That he wasn't going to allow the media?

10  I'm sorry.  I didn't hear you.

11       MS. REARDON:  I believe that was right.  The media,

12  like the cameras couldn't be in certain parts of the trial.  So

13  there's differences from *Cohen* where, I think everyone was

14  clear in *Cohen,* there was a sign on the door that said no one

15  can come in.  It wasn't as clear-cut in this case.

16       MS. HINTON:  May I respond briefly?

17       THE COURT:  Yes.

18       MS. HINTON:  So -- I mean, I heard that, well, judges

19  view these kinds of motions all the time based on their own

20  memory, but then why did Judge O'Toole recuse himself in the

21  *Wilder* case so that Judge Casper could rule on the public trial

22  claim?  I mean, that's the proper way to do it, as if the judge

23  that presided over the jury voir dire who is himself a fact

24  witness and the claim is made, that judge should recuse himself

25  so that he can be presented as a fact witness.  So if you look

1    at the *Wilder* case, that's what happened.

2         And the idea that the press wasn't interested is just

3    ludicrous.  The media -- I mean, there were several reporters

4    who testified at this hearing that they were waiting right

5    outside the door only because they didn't think they were

6    allowed in, and the judge himself found that they believed they

7    had been excluded.  I mean, they were very interested.  They

8    wanted to be there.

9         The *Pike* decision, there was no issue of a lack of an

10   impartial tribunal in the *Pike* First Circuit decision, which

11   there is here.

12        And I would ask Your Honor to look at the *Hurles v.*

13   *Ryan* case, which is a case that's very close on the facts.

14   It's cited in my materials.  It's a case in which the

15   judge -- it's -- a habeas petition was allowed because a judge

16   had made facts -- made factual findings in a case in which she

17   herself was a witness and should not have done so.

18        And on the issue of the lack of objection, you know,

19   that shouldn't matter where the SJC revived the issue and

20   stated, you know, in its decision that this issue is now in the

21   posture of a motion for a new trial.  There was no -- there was

22   no default.

23        And, finally, the judge didn't say anything about

24   cameras.  So the idea that that's what he meant, it doesn't

25   hold up because that's not what he said.

1          THE COURT:  All right.  Can we kind of group some of

2     the others, some of the other issues?

3          MS. HINTON:  Well, the others, you know, as you can

4     see in my summary memo, I spent a little less time on them.  I

5     think ineffective assistance of counsel as to DNA is a very

6     weighty issue, and I urge Your Honor to read that affidavit

7     from Dr. Eisenberg, which is, I think, in Volume 1 of the

8     appendix.  He's one of the more foremost scientists in this

9     area in the country, and he went through in great detail

10    everything that was wrong with this Cellmark analysis in this

11    case, the low copy number, you know, the problems with

12    determining what's an allele and what's an artifact and what's

13    just stutter and how you need to have specific validation and

14    how Cellmark had not validated -- did not -- its validation

15    studies and its interpretation guidelines were flawed and it

16    was not possible to determine whether something was an allele

17    or an artifact based on the validation studies and

18    interpretation guidelines that Cellmark had, the problems with

19    lowering the threshold below 100, which was contrary to

20    accepted practice.  Among all of the DNA labs, it was virtually

21    unprecedented to lower it to 40 and then back up to 60 in the

22    middle of the testing process, the unguided discretion given to

23    the analyst and how arbitrarily these peaks were viewed by this

24    analyst in terms of treating it as a true -- as a peak --

25    treating a peak as a true allele when it matched Dirk Greineder

1  and ignoring it as an artifact when it didn't, basically.  So

2  all of that rendered the DNA invalid.

3       And trial counsel should have retained a serious DNA

4  expert in a serious case to go through the DNA testing and

5  should have moved to exclude it prior to trial.  If the DNA had

6  not been part of this trial, the trial counsel would not have

7  had to try to work with it to come up with, you know,

8  alternative arguments.

9       So the trial counsel gave a number of reasons why he

10 believed -- you know, why he didn't move to exclude it, but

11 none of those reasons hold water.  So he claimed that moving to

12 exclude the DNA would give the Commonwealth a preview of his

13 defense, but at trial he didn't ask a single question about

14 some of the things that were reasons why it should have been

15 excluded.  Like lack of validation at less than 100 RFUs, he

16 didn't ask a single question about that, so he wouldn't have

17 been giving away his defense if he had made the motion to

18 exclude.  He didn't retain a statistical expert.  I mean, I

19 could go on and on.

20      And the papers go on and on and describe in great

21 detail -- you know, I apologize for the length of my filings in

22 this case, but I hope Your Honor will understand that this case

23 has -- it's because there are so many weighty issues and

24 because it's been before the SJC twice and before the U.S.

25 Supreme Court, and there have been motion hearings about public

1    trial, motion hearings about the banana experiment, motion

2    hearings about ineffective assistance, so that there are a lot

3    of facts here to digest.  And, you know, it takes a person a

4    long time to digest all of those facts and put it all together.

5    It was daunting to come down to a 15-page summary, but I hope

6    it was helpful.

7            THE COURT:  It was helpful, however, given the length

8    of the brief.

9            MS. HINTON:  So I think the ineffective assistance of

10   trial counsel in failing to move to exclude the DNA evidence is

11   a very important issue and in failing to challenge the DNA

12   evidence at trial.  He, you know, made some efforts at

13   cross-examination, but when you look at Dr. Eisenberg's

14   affidavit, you see what really was there to work with and how

15   little was actually done.  It's rather astonishing.

16           You know, then there's the nails receipt and the towel

17   that was in the unlawful car search.  I'll rest on my papers on

18   that one.

19           Would you like me to continue on with the other issues

20   or?

21           THE COURT:  I thought they were very well briefed,

22   though.  So unless there's something that you really want to

23   call to my attention, let me know if we can rest on the papers

24   on them.

25           MS. HINTON:  I think on the remainder, I can rest on

1  my papers.

2          THE COURT:  Ms. Reardon?

3          MS. REARDON:  Your Honor, just on the ineffective

4  claims, again on habeas review, it's a doubly deferential

5  standard.  On the failure to move to exclude the DNA evidence,

6  there was, again, an evidentiary hearing where trial counsel

7  testified that -- on why he made these decisions.  He had a

8  team of DNA experts that he consulted with.  He was aware of

9  potential weaknesses in the Commonwealth's DNA evidence and he

10  chose to highlight those.  There was testimony as to why he

11  made these decisions and why the motion judge, who was also the

12  trial judge, decided to deny the motion on those grounds.  I

13  would suggest that this Court has to grant that decision

14  substantial deference under the habeas standard, and I would be

15  willing to rest on my brief on the remaining claims as well,

16  Your Honor.

17          THE COURT:  All right.  I thank you all.  I have a lot

18  of reading to do, so I take the matter under advisement.  It is

19  going to take a while.  Thank you very much.

20          Court is in recess.

21          (Recording ended at 3:41:57)

22

23

24

25

1                      CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4  and Certified Realtime Reporter, in and for the United States

5  District Court for the District of Massachusetts, do hereby

6  certify that the foregoing transcript is a true and correct

7  transcript of the stenographically reported proceedings held in

8  the above-entitled matter to the best of my skill and ability.

9          Dated this 21st day of July, 2019.

10

11

12          /s/ Linda Walsh_____

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25